UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,          :
                                   :
                Plaintiff          :   Criminal Case
                                   :   No. 20-CR-00239-TSE
        v.                         :
                                   :
                                   :   November 17, 2021
EL SHAFEE ELSHEIKH,                :   9:06 a.m.
                                   :
                Defendant          :   DAY 2
.............................   :   ........................

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE T.S. ELLIS, III
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:          RAJ PAREKH
                            JOHN T. GIBBS
                            DENNIS FITZPATRICK
                            ALICIA H. COOK
                            U.S. ATTORNEY'S OFFICE
                            2100 Jamieson Avenue
                            Alexandria, VA  22314
                            703-299-3700

FOR THE DEFENDANT:          NINA J. GINSBERG
                            ZACHARY ANDREW DEUBLER
                            DiMURO GINSBERG PC
                            1101 King Street
                            Suite 610
                            Alexandria, VA  22314
                            703-684-4333

                            EDWARD B. MacMAHON
                            LAW OFFICES OF
                            EDWARD B. MacMAHON, JR.
                            PO Box 25
                            107 East Washington Street
                            Middleburg, VA  20118
                            540-687-6366

                            (APPEARANCES CONTINUED ON
                            FOLLOWING PAGE.)

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**FOR THE DEFENDANT:**              JOHN EDWARD YANCEY ELLIS
                                   CARMICHAEL ELLIS & BROCK
                                   108 N. Alfred Street
                                   1st Floor
                                   Alexandria, VA  22314
                                   703-684-7908


**OFFICIAL COURT REPORTER:**       REBECCA STONESTREET, RPR, CRR
                                   U.S. District Court, 9th Floor
                                   401 Courthouse Square
                                   Alexandria, Virginia  22314
                                   (240) 426-7767


( Pages 1 - 207)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

3

# C O N T E N T S

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SDF WITNESS NUMBER 1 | | | | |
| By Mr. Parekh | 23 | -- | 104 | -- |
| By Ms. Ginsberg | -- | 56 | -- | 110 |
| | | | | |
| SDF WITNESS NUMBER 2 | | | | |
| By Mr. Parekh | 117 | -- | 196 | -- |
| By Ms. Ginsberg | -- | 171 | -- | 199 |

# E X H I B I T S

| GOVERNMENT EXHIBITS | PAGE |
|---|---|
| Number 6-1 | 19 |
| Number 6-2 | 19 |
| Number 6-3 | 21 |
| Number 7-4 | 123 |
| Number 7-5 | 153 |
| Number 7-6 | 155 |
| Number 7-7A - 7-7C | 166 |
| Number 7-8 | 168 |
| Number 7-11 | 170 |
| Number 8-3A | 21 |

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

4

**P R O C E E D I N G S**

THE COURT:  This is criminal number 20-CR-239, continuing the motion to suppress hearing, and the record will reflect that counsel and the parties are present.

Mr. Fitzpatrick, you have something you want to take up, and I think Ms. Ginsberg has something.

MS. GINSBERG:  Yes, sir.

MR. FITZPATRICK:  No, Your Honor.  I was just going to introduce the parties, but you already did that.  I'll step back.

THE COURT:  All right.  Ms. Ginsberg, you wanted to be heard outside of the public setting?

MS. GINSBERG:  Your Honor, I don't know if that's necessary, but I wanted -- since we were not permitted to be present during the closed hearing with the Government yesterday where the Rule 15 depositions were discussed, there are some issues about those -- the conduct of the depositions --

THE COURT:  The only thing you were not permitted to be present for was a Section 4 CIPA hearing.

MS. GINSBERG:  Judge, when we came back from that, Your Honor announced his decision about the Rule 15 motions.

THE COURT:  Because you had objected to the Rule 15.  I knew what your objections were, and I issued an order dealing with the objection.

MS. GINSBERG:  Yes, Your Honor.  But we would have

requested to make additional argument and requested that the Government put on the record certain information about how these witnesses were -- it was decided that these witnesses were the witnesses who would be brought here from Syria, what efforts the Government made to obtain all *Brady* and *Giglio* information; in other words, what efforts the Government made to provide the information required to be produced to the defense in order to cross-examine fully at a trial.

THE COURT:  Did you discuss that with Mr. Fitzpatrick or Mr. Parekh?

MS. GINSBERG:  Your Honor, I have discussed it with them.  I've been told that there were no -- well, I was originally told that they didn't even know which witnesses were going to appear; that there was a request made for SDF witnesses.  And before the witnesses arrived, none of the Government lawyers seemed to know even who would be coming or what roles they had played.

I think it's also legitimate for the defendant to ask what efforts the Government made to assure that it had -- that information had been turned over.

THE COURT:  What information?

MS. GINSBERG:  Any exculpatory information.  The same efforts they would make if there was an agent in another government agency who was testifying at trial.

THE COURT:  Well, as a practical matter, the defendant

does not get to probe what the Government does with respect to its *Brady* and *Giglio* and other -- it's assumed that the Government will make an appropriate investigation into that, and that it will abide by and comply with its *Brady* and *Giglio* obligations.  But I'm not aware of any authority that says the Government is then going to be subjected to questions by the defendant as to whether it did its duty.  I don't know of any reason to doubt that.

Well, let me hear from Mr. Parekh --

MS. GINSBERG:  If I could say one other thing.

THE COURT:  Yes.

MS. GINSBERG:  Judge, this is not the kind of situation where you have another government entity who is being requested. The SDF is not even a recognized governmental entity.  The United States has no ability to assure that the SDF has provided this information.  When a federal prosecutor asks someone in another governmental agency to provide *Brady* material, they know that that agency understands that obligation.

We have no reason to believe that any of that occurred with respect to the SDF.

THE COURT:  You have the witnesses who will appear today and you can ask them about that.

All right.  Mr. Parekh, do you have anything else you want to say about that?

MR. PAREKH:  No, Your Honor.  Just briefly, as

Your Honor stated, there was no additional argument on the Rule 15 depositions without the presence of defense counsel, for number one.

Number two, as Your Honor noted --

THE COURT:  Yes, let me confirm that and make it clear. Because Ms. Ginsberg suggested that the defense was precluded from being present during some argument on Rule 15.  They were not.

MR. PAREKH:  That is absolutely correct.

THE COURT:  What they were precluded from being present for is a CIPA Section 4 consideration, and that was entirely appropriate --

MR. PAREKH:  Yes.

THE COURT:  -- because that's an *ex parte* proceeding.

MR. PAREKH:  Called for by statute, Your Honor, that's correct.

THE COURT:  Now, Ms. Ginsberg is concerned that since this is a nongovernmental or a non -- it is a governmental; it's just not the same as a country.  And she says, how do we know that they have produced all the *Brady* and *Giglio*?  And I've told her that that isn't what the defense gets to do.  The defense doesn't get to examine the U.S. Government as to whether it has made any effort to comply with *Brady* and *Giglio*.  That's assumed.  And that's true, isn't it, Mr. Parekh?  You understand your *Brady* and *Giglio* obligations?

MR. PAREKH:  Your Honor, that's absolutely true.  We're a team of seasoned prosecutors here.  I served as acting United States Attorney of this district.  I'm the first assistant attorney currently right now.  We will always discharge our discovery obligations without any doubt whatsoever.  That continues in this case, that continues in every case.

And if I could just briefly put on the record the efforts that we have made.  We've turned over any interviews that were done with at least one of the SDF witnesses prior to them traveling here.  That was turned over in discovery.  After they arrived in the United States, I communicated that to counsel for the defendant.  Mr. Deubler and I were in touch almost on a daily basis, if not on a daily basis.

When we interviewed the witnesses at the U.S. Attorney's Office, I had an agent there, and the agent prepared lengthy 302s, reports of the interviews.  I turned those over within approximately 24 to 48 hours.  I was keeping the defense counsel updated on information we were learning.  For example, the SDF witnesses brought over official records from Syria regarding this particular matter, as well as their investigation on Alexanda Kotey, so El Shafee Elsheikh, Alexanda Kotey.  They brought over SDF records.  Those records were promptly provided to counsel for the defendant, they were uploaded to their website.

I described the records for counsel to the defendant.

We also hired interpreters. The interpreters are present in the courtroom today. They translated the material relevant to today's hearing. Those translations were promptly turned over to counsel for the defendant.

I then asked counsel for the defendant, do you have any questions about the materials? Mr. Deubler had questions, Ms. Ginsberg had questions. They called me. Sometimes they called me late at night after 9 p.m. I always answered their calls. I returned their calls if I didn't answer them. Every single question they had, I made sure that I gave them answers to.

And we know our discovery obligations. I asked each of these witnesses, is this the SDF's material, official records on these two individuals, El Shafee Elsheikh and Alexanda Kotey? They represented yes. At one point they indicated that there might be some ICRC letters, International Red Cross letters that they didn't bring with them. But they received them from Syria, they sent them over. Those were emailed almost immediately to counsel for the defendant.

They also indicated that there was a transfer document or documents indicating El Shafee Elsheikh's transfer between facilities of the SDF and his ultimate handover to the U.S. Government. At least one of those documents is going to be introduced today. Those were provided to counsel for the defendant. We also provided translations of those as they were

translated by one of the interpreters who I'm going to be seeking to qualify.

So I think we've undertaken extensive efforts. If we learn anything additional, of course we always have a duty, an ongoing duty to discharge our discovery obligations, but to this point, Your Honor, I'm not aware of anything further that we can provide.

THE COURT: All right. Thank you.

MR. PAREKH: Thank you.

THE COURT: Ms. Ginsberg, I understand your concern, but I am satisfied that the Government, the United States Government, has done all it is required to do under *Brady*, *Giglio*, and their discovery obligations in this connection, and I see no reason for concern about that.

MS. GINSBERG: Your Honor, I agree entirely with what Mr. Parekh said about what the U.S. Attorney's Office has done with the material they've received. And I actually am very grateful for the way they have provided this information to us in a forthcoming way.

My concern is not what they have done; my concern is what they may not know and what may exist that is beyond their reach that, essentially, they have no way of knowing whether these individuals are telling the truth or not, either, and no way of confirming --

THE COURT: That's my job. And I will hear. You may

ask these people in cross-examination what you will, and I will make determinations about that.  That's my task.  But I don't see anything further that the United States Government can do in connection with its discovery obligations or its *Brady* and *Giglio* obligations.  I think that's clear.  Now, that does not preclude you from asking these individuals questions in cross-examination.

Anything further, Ms. Ginsberg?

MS. GINSBERG:  Just one thing.  Your Honor, Mr. Parekh has told me that he has inquired and that to the best of his knowledge, there were no either promises or inducements made by any agency of the United States government to the SDF to assist in bringing these witnesses here for trial.  I am relying on that representation, and I have no reason to --

THE COURT:  What difference would it make?  Let's suppose that the U.S. Government did offer the officials of the SDF some inducement.  It wouldn't have anything to do with the credibility of these particular persons.

MS. GINSBERG:  Well, it certainly could.  The same way any inducement to a witness can affect their --

THE COURT:  All right.  We can hear this endlessly, Ms. Ginsberg, but the fact of the matter is, Mr. Parekh has represented to the Court that he has disclosed to you, as the counsel for defendant, everything he knows about what -- about these witnesses being brought here.

Is that right, Mr. Parekh?

MR. PAREKH:  Yes, Your Honor.  And we've also told Ms. Ginsberg that the United States Government did transport these defendants from Syria to the Eastern District of Virginia. That was also disclosed yesterday, it was disclosed prior to yesterday.  And as far as Ms. Ginsberg's initial point about not being certain whether we've turned over everything, we turned over everything in our possession, custody, and control regarding these witnesses.  And as I noted, we also asked these witnesses, do you have any other records relating to this case. And the answer to that question was no.

And so --

THE COURT:  All right.

MR. PAREKH:  -- that's correct, Your Honor.

THE COURT:  I am satisfied that the Government has met its obligations under *Brady*, *Giglio*, and anything else.  I'm also satisfied that the defendant may ask questions of these witnesses as to whether they have been given any inducement or any encouragement -- not encouragement.  Inducement to be here and to say things in a certain way, as they would for any witness who testifies.  And I think that is adequate.

I don't see anything, Ms. Ginsberg, in what you've raised that gives the Court any concern.  It's true that these witnesses may or may not be truthful, as true of any witness who testifies in a trial or a motion to suppress hearing.  And you

may ask questions about it, Mr. Parekh may ask questions.  I will determine whether I find them to be truthful or not truthful.

Now, Mr. Parekh, let me ask you a few questions about the presentation.  I take it there are three of these witnesses?

MR. PAREKH:  That's correct, Your Honor.

THE COURT:  And what language will they be testifying in?

MR. PAREKH:  I believe primarily Arabic.  They also know Kurdish equally.  They're fluent in both Kurdish and Arabic, and both of our interpreters are fluent in Kurdish and Arabic.

THE COURT:  And where are your interpreters?

MR. PAREKH:  They're sitting in the second row of the courtroom, Your Honor.

THE COURT:  All right.  And they've been qualified in a federal court before?

MR. PAREKH:  They have, Your Honor, by Judge O'Grady in the Mohamad Khweis case, 1:16-CR-143.

THE COURT:  All right.

MR. PAREKH:  It's an ISIS case that I was involved in, I helped prosecute in 2017.  But if Your Honor will permit --

THE COURT:  Yes, you all come forward, please.  I will ask you your names and your qualifications.

What are your names?  Don't stand behind.  I have to

14

see you.  What are your names?

INTERPRETER SAYID:  Good morning, Your Honor.  Mustafa Sayid.

THE COURT:  Would you spell your last name, please.

INTERPRETER SAYID:  S-A-Y-I-D.

THE COURT:  And how do you pronounce it?

INTERPRETER SAYID:  Sayid.

THE COURT:  All right.  And what is the name of your colleague there?

INTERPRETER FAIZULLA:  I'm Peshwaz Faizulla.

THE COURT:  All right.  Now, one at a time, tell me what languages you are able to interpret simultaneously; that is, as it is spoken; that is, from English to another language and from another language to English.  And identify yourself before you speak so that the court reporter can attribute what you say to you.

It's not working.  That's all right.  Speak up, please.

INTERPRETER SAYID:  I'm Mustafa Sayid.  I'm certified by the State Department as a simultaneous and consecutive language interpreter since 2003, both in Arabic and in Kurdish.

THE COURT:  How about Kurdish?

INTERPRETER SAYID:  Both languages, Your Honor.

THE COURT:  All right.  And let me hear from you as well, sir.

INTERPRETER FAIZULLA:  I'm Peshwaz Faizulla.  I've been

a translator and interpreter for the past 23-plus years, both in Arabic and in Kurdish.  And I'm also certified with the State Department Language Services since 2012.

THE COURT:  All right.  Mr. Parekh tells me that you-all were ruled to be qualified as interpreters in a previous proceeding in this courthouse.  Is that correct, by Judge O'Grady?

INTERPRETER FAIZULLA:  That's correct.

THE COURT:  All right.  On the basis of that, the Court finds that you're fully competent and capable of serving as interpreters in this case.  You'll be interpreting the testimony of the SDF witnesses.  You understand that?

INTERPRETER FAIZULLA:  Yes.

INTERPRETER SAYID:  Yes.

THE COURT:  All right.  You may administer the oath to the interpreters.

(Oath administered by courtroom deputy clerk.)

THE COURT:  You may return to your seats.  Mr. Parekh, let's go back for just a minute.  The first three witnesses will be persons who were SDF soldiers or combatants?

MR. PAREKH:  SDF officials, Your Honor.  So the first witness is SDF Witness 1.  He is a coordinator, serves in a fairly high-level position with the SDF, and can testify about relevant policies and procedures that will --

THE COURT:  Policies and procedures relating to what?

MR. PAREKH:  So relating to the issues that the defense has raised in their motions, such as their policy on treatment of detainees in their custody, conditions of confinement at three facilities in which El Shafee Elsheikh and Alexanda Kotey were held while they were in SDF custody, the SDF's policy on media interviews.  Because of course as Your Honor knows, the Government is seeking to admit a number of media interviews that the defendant gave when he was in SDF custody.  So things of that nature.

The second witness, SDF Witness Number 2, is currently the head of the Derik prison.  The Derik prison is the facility in which the defendant spent the most amount of time while he was in SDF custody.  And so he can talk about conditions of confinement at Derik prison when the defendant was there, as well as Derik prison's policies, procedures regarding treatment of detainees, and his own eyewitness observations as it relates to some of the media interviews and other things that took place when the defendant was at Derik prison.

And the third witness, SDF Witness 3, is an investigating officer at Derik prison.  He frequently interacted with the defendant, including during questioning sessions, seeing him around the prison, and he can testify as to his observations of the defendant's treatment, whether the defendant was -- appeared to have ever been injured or abused or had any signs whatsoever of being coerced to do anything, including in

interviews, media interviews.

THE COURT:  All right.  So your first witness is the SDF Witness 1.  Will he be -- how long do you anticipate this witness will take?

MR. PAREKH:  Your Honor, because he will not be testifying in English, I expect it to take a little bit longer than it normally would, of course.  But I expect direct examination to take approximately one hour, I hope, not too much beyond that.  A lot of it sort of depends on the translation back and forth.

THE COURT:  All right.  We are in a courtroom that's unfamiliar because of the flooding that occurred last week, and my courtroom remains unusable.  But we will have the witness testify from -- all of the witnesses from the witness stand over here to your left and my right.  The interpreters I think will be best positioned by standing next to the witness box.

Now, if it becomes a long questioning period and you need to sit down, raise your hand and I'll find a way to make it more comfortable for you.  Is there a microphone there for the interpreters?

COURT SECURITY OFFICER:  Sir, we're unable to get it to connect.  I don't know if you want someone from IT to call on, but it's not --

THE COURT:  All right.  The court security officer has just --

18

COURT SECURITY OFFICER:  We got it to work.

THE COURT:  Got it?

COURT SECURITY OFFICER:  Yes, sir.

THE COURT:  Good.

COURT SECURITY OFFICER:  Somehow.

THE COURT:  Okay.  All right.  Let's begin.  Mr.  Parekh --

Yes, Ms. Ginsberg?

MS. GINSBERG:  I'm going to object to this witness testifying at all.  Your Honor has previously ruled that the treatment of other detainees in SDF custody was not relevant to Mr. Elsheikh's motion and his allegations of abuse.  So we object to testimony -- this witness had no personal contact with Mr. Elsheikh.

THE COURT:  All right.  Then your cross-examination ought to be quite brief.  Your objection is overruled.  Let's proceed.

MR. PAREKH:  Your Honor, just a few final housekeeping matters.  I know Your Honor has deemed both interpreters qualified.  Can I move in their CVs?

THE COURT:  Yes, you may.

MR. PAREKH:  Move to admit Government Exhibit 6-1 and 6-2.  Those are the CVs of Mustafa Sayid and Peshwaz Faizulla.

THE COURT:  Yes, I have those.

(GOVERNMENT Exhibit Numbers 6-1, 6-2 were admitted into evidence.)

MR. PAREKH:  Your Honor, the Government and the defense has also agreed to a stipulation.  That is Government Exhibit 6-3, and that's a stipulation of certain Arabic to English translations, namely Government Exhibits 7-4, 8-3A, and 8-3B.  We would move to admit the Arabic to English translations of those exhibits.

So the Arabic versions are in 7-4, page 1 of 7-4, and Government Exhibit 8-3A is a video clip, and the translations of those are on the second page of 7-4.

THE COURT:  Why is there a video clip in there?

MR. PAREKH:  The video clip is relevant to one of the arguments that the defense has made; namely they are claiming that Elsheikh, the defendant, was coerced into performing media interviews while he was in SDF custody.  And so this particular video clip, 8-3A, is a video clip of Alexanda Kotey, the co-defendant.

And what I anticipate the testimony to be from SDF Witness Number 3 is that the SDF asked Alexanda Kotey and the defendant whether they wished to participate in a videotaped interview; Kotey agreed, the defendant said no.  And so that's why they have a clip of Kotey, but they have no corresponding clip to Elsheikh.

And so it's directly relevant to show that if the SDF

was coercing the defendant into performing interviews, then they would have their own interview interrogation session of the defendant, as they do of Kotey.

THE COURT:  Well, I take it, as you've represented, Mr. Elsheikh did not agree to media interviews?

MR. PAREKH:  No, he agreed to media interviews.  This particular clip is of the SDF's interview, their video-recorded interview of Alexanda Kotey on August 6th, 2019.  I think it's also instructive because it will show --

THE COURT:  What did you say Mr. Elsheikh refused to do?

MR. PAREKH:  He refused to -- so the August 6th, 2019, interview that the SDF conducted of the co-defendant in this case, Alexanda Kotey, they also requested Elsheikh to participate in a video-recorded interview.  Mr. Elsheikh declined to do so, and the witness will testify, we would have loved to have a video-recorded session with Mr. Elsheikh; we asked him.  He declined to participate.

That's one reason why it's relevant.  The other reason, Your Honor, is that to the extent the defense will continue to argue, that is have, that the SDF, it's a coercive environment, that this is an organization that allegedly abuses people.  I think it will be good for the record, we believe, for Your Honor to see that Kotey, when he's giving this interview with the SDF, he's relaxed, doesn't appear under any duress, doesn't appear to

have any injuries.

And to the extent that the defense may argue in their case that Kotey was similarly subjected to alleged abuse, this particular clip we believe will show otherwise.

THE COURT:  All right.  I take it, Ms. Ginsberg, you object to the admissibility of that?

MS. GINSBERG:  Yes, I do, Your Honor.  I think it -- taken out of context, the Government knows that Mr. Kotey has made representations that some of his other interviews were not voluntary.  This was an interview of Mr. Kotey.

I think it's certainly sufficient, if the witness says that Mr. Kotey agreed to an interview, that Mr. Elsheikh declined, but there's no reason for the Court to hear this interview.

THE COURT:  All right.  I'll overrule that objection and I'll admit it.

(GOVERNMENT Exhibit Number 8-3A was admitted into evidence.)

MR. PAREKH:  Thank you, Your Honor.  Move to admit the stipulation that is Government Exhibit 6-3, signed by myself and Ms. Ginsberg.

THE COURT:  All right.  I'll admit that as well.

(GOVERNMENT EXHIBIT Number 6-3 was admitted into evidence.)

THE COURT:  Are we ready now to hear the first witness?

22

MR. PAREKH:  We are, Your Honor.

(OFF THE RECORD.)

THE COURT:  Call your first witness, Mr. Parekh.

MR. PAREKH:  Yes, Your Honor.  If the interpreters feel comfortable, may they lower their mask so that --

THE COURT:  Yes.

MR. PAREKH:  -- the Court may hear them?

THE COURT:  Yes.

MR. PAREKH:  And I ask that because, of course, we're recording these next several --

THE COURT:  Yes, that's appropriate.  And I'm not wearing a mask because I'm sitting behind several feet of Plexiglass, and I'm at least 20 feet away from any other person. That's the only reason I'm not wearing anything.

All right.  Do we have the witness here?

MR. PAREKH:  We do, Your Honor.

THE COURT:  All right.  Come forward.

MR. PAREKH:  The United States calls SDF Witness 1 to the stand.

(Oath administered by courtroom deputy clerk.)

MR. PAREKH:  Your Honor, may the witness similarly remove his mask if he feels comfortable for purposes of his testimony?

THE COURT:  Yes, he may do so.  What is his name?

MR. PAREKH:  SDF Witness 1.

23

THE COURT:  SDF Witness 1.  All right.  You may proceed now, Mr. Parekh.

MR. PAREKH:  Thank you, Your Honor.

**(SDF WITNESS NUMBER 1, having been duly sworn,**

**testified as follows:)**

**EXAMINATION BY COUNSEL FOR THE UNITED STATES**

**BY MR. PAREKH:**

Q.  Sir, we are keeping your name out of the public record.  We will be addressing you as SDF Witness 1.  Do you understand that?

A.  Yes.

Q.  Where are you from?

A.  I'm from Syria.

Q.  Do you currently reside in Syria?

A.  Yes.

Q.  In what area of Syria?

A.  In the area of Hasakah.

Q.  Do you speak English?

A.  A little bit of English, yes.

Q.  What languages are you fluent in?

A.  My mother tongue is Kurdish and also Arabic and a little bit of English.

Q.  But you are not fluent in English.  Is that correct?

A.  That is correct.

Q.  Are you currently employed?

A.   Yes.

Q.   By whom?

A.   I work for the Syrian Democratic Forces.

Q.   Are they also known as the SDF?

A.   Yes.

Q.   What is the SDF?

A.   It is the Syrian Democratic Forces that is present in the northeast part of Syria.  It was established in 2015, and it's comprised of the local population of the Syriac, Arabic, and Kurdish population.  Their goal was to combat the ISIS presence.

Q.   And in what ways was the SDF combatting the ISIS presence?

A.   Could you repeat the question, please?

Q.   How was the SDF combatting ISIS?

A.   With whatever capability they had, they were battling them and combatting them in warfare.  And at the end of around 2014, we were able to, through coalition and partnership with the coalition forces, to combat ISIS.

Q.   And by ISIS, you're referring to the Islamic State, a terrorist organization?

A.   Yes.

Q.   Was ISIS a threat to north and east Syria in the years 2018 and 2019?

A.   Yes.

Q.   Is ISIS still a threat to the region in which you work and reside?

25

A.   Yes.

Q.   Where in Syria do you serve with the SDF?

A.   In the areas of Al-Jazira and Hasakah.

Q.   I want to show you Government Exhibit 1-1.

MR. PAREKH:   Your Honor, that's been admitted.   May I have permission to publish?

THE COURT:   You may.

Q.   Sir, is this a map of Syria?

A.   Yes.

Q.   Can you describe the area in which you work for the SDF?

A.   In this area.

Q.   And you've drawn on the map?

A.   Yes.   Approximately in that area.

Q.   And by that area, you're referring to an area east of the location of Ayn Issa.   Is that correct?

A.   Yes.

Q.   What is your title with the SDF?

A.   I am a general coordinator between the SDF and the international coalition and also responsible for the portfolio of transferring detainees of ISIS.

Q.   What are your duties in that role, if you can explain?

A.   It entitles knowing the presence of individuals who are detained in our detention centers, our prisons, who they are. And we also coordinate, because of that, to have the people who are from different nationalities to be transferred back to their

countries.

And of the different groups of the coalition forces in our area, they comprise of different nations.  Whenever they need to meet with any of our people, I coordinate and schedule meetings with our people.

Q.  How long have you served with the SDF?

A.  From the founding of it, since 2015.

Q.  How long have you served in your current role?

A.  Since four years.

Q.  What did you do prior to your current role with the SDF?

A.  I was a company commander.

Q.  What does that mean?

A.  It entitles training my company and making sure that they're always equipped and always on the ready whenever having the need to engage with ISIS units.

Q.  When you say company, are you referring to a platoon, as in the military sense?

A.  Yes.

Q.  Who do you currently report to in the SDF?

A.  I report to General Mazloum.

Q.  Who is General Mazloum?

A.  He is the general commander of the SDF, and it is from his office where instructions and orders come from.

Q.  Please summarize the training you've received while you've been with the SDF.

A.   Training on small arms, like the AK-47 rifle, medium heavy rifle, the BKC, antiaircraft machine guns, and medium size of those, and hand grenades.

Q.   As part of your current duties, are you responsible for assessing the overall conditions of the SDF-controlled prisons in Syria?

A.   Yes.

Q.   Through your job with the SDF, are you familiar with two individuals named El Shafee Elsheikh and Alexanda Kotey?

A.   Yes.

Q.   Were both of those individuals apprehended by the SDF in Syria in January 2018?

A.   Yes.

Q.   Were Elsheikh and Kotey prisoners in SDF-controlled prisons in 2018 and 2019?

A.   Yes.

Q.   In what SDF prisons were Elsheikh and Kotey held?

A.   Yes, in the three detention centers.

Q.   Please name them.

A.   The first one is Ayn Issa, then Kobani, and then Derik.

        MR. PAREKH:  If we can bring up Exhibit 1-1, please.

Q.   Looking at this map, are the three prisons that you just named marked on the map, and if so, could you indicate where?

A.   Yes.  This is Ayn Issa, a prison.

        MR. PAREKH:  Your Honor, let the record reflect the

witness is pointing to the marker that indicates Ayn Issa below Kobani.

THE COURT:  So ordered.  Next question.

Q.  Next.

A.  (Witness complies.)

MR. PAREKH:  The witness has identified Kobani.

Q.  And is that where Kobani prison is located?

A.  Yes.

Q.  And where is the last location?

A.  Derik, right there.

Q.  The Derik prison is located in the area on the map which indicates Derik?

A.  Yes.

Q.  Are you familiar with the living conditions and other conditions of confinement in each of those SDF prisons; namely Ayn Issa, Kobani, and Derik prisons?

A.  Yes.

Q.  How?

A.  All the detention centers that are under the SDF have similar conditions and have similar regulations that they go by in form of administration.  Their daily procedures that they go by in these prisons are according to international standards.  As an example, they have three square meals every day --

Q.  Well, before we get to that --

MS. GINSBERG:  Your Honor, I'm going to object that

there's an improper foundation as to --

THE COURT:  Overruled.

MS. GINSBERG:  -- at what point in time --

THE COURT:  Overruled.  He's not done.  I understand you don't think he has -- he hasn't finished yet.

MS. GINSBERG:  Well, the question didn't specify any particular period of time.  It could be any time between 2015 and 2021.

THE COURT:  All right.  Mr. Parekh, you may clarify that.

MR. PAREKH:  Yes, Your Honor, I'm getting to that.

BY MR. PAREKH:

Q.  Please explain how you're familiar with Ayn Issa, Kobani, and Derik.  Have you visited those prisons?

THE COURT:  Your question is compound, but you can ask him.  SDF Witness 1, he wants to know how it is that you are familiar with those conditions --

For what period of time, Mr. Parekh?

MR. PAREKH:  2018 and 2019.

THE COURT:  In other words, he wants to know whether for that period - 2018, 2019 - how are you familiar with it, were you there, did you visit it, and so forth.

A.  Yes.  Being that I'm a general coordinator, I do visits and inspection visits all over the northeast provinces of Syria where I go visit these detention centers.  I have visits where I

30

have gone inside Ayn Issa prison, also in Kobani prison and also in Derik prison.

Did you want me to continue in giving details about the inside -- the daily life of the prisons?

Q.  My next question is, are the conditions of confinement as it relates to the years 2018 and 2019 similar across the three prisons that you've indicated you visited; Ayn Issa, Kobani, and Derik?

A.  Yes.

Q.  And are these amenities and privileges provided to each prisoner generally the same --

MS. GINSBERG:  Objection.  Your Honor, he's leading.

THE COURT:  Wait until -- oh, you say leading?

MS. GINSBERG:  Leading.

THE COURT:  I'll overrule that.  I don't believe it is impermissibly leading, and I think in the circumstances it's an appropriate question.  In some technical sense, Ms. Ginsberg, it may be leading, but I don't think it's putting words in this witness' mouth.

Proceed, Mr. Parekh.

MR. PAREKH:  Thank you, Your Honor.

Q.  Are the amenities and privileges provided to each prisoner generally the same in each of those three prisons - Ayn Issa, Kobani, and Dêrik - in 2018 and 2019?

A.  Yes.

31

Q.   In light of your testimony, I'm going to first ask you general questions, and then I will ask you questions about each individual prison facility.  Do you understand that?

MS. GINSBERG:  Judge, before we go on, Mr. Elsheikh has sent me a note indicating that the translator is not including in his translation the timeframe that Mr. Parekh is specifying.

THE COURT:  All right.  I think otherwise.  So I think he's been quite clear about the timeframe --

MS. GINSBERG:  No, no, not that Mr. Parekh is not being clear, but Mr. Elsheikh has sent me a note saying that, from what he can hear, the translator is not including the timeframe in his translations to the witness.

THE COURT:  All right.  Let's make sure that he does that.  I can't tell whether he's done that.  Let me ask the interpreter.  Have you made clear, 2018, 2019?

THE INTERPRETER:  Word for word, Your Honor.  I actually have the two years written down in front of me.  Every time it's repeated, I go back to the top of the page to make sure.

THE COURT:  All right.

MS. GINSBERG:  Thank you, Your Honor.

THE COURT:  In the future, Ms. Ginsberg, I'm only going to entertain legal objections, not some quibble that the defendant may have about the interpretation.  But in any event, I think I've clarified that.

Mr. Parekh, continue.

MR. PAREKH:  Yes, Your Honor.  For the sake of clarity, I'll repeat.

BY MR. PAREKH:

Q.  My questions right now will focus on general conditions of confinement as it relates to the three prisons that you've identified have generally the same living conditions, amenities, and privileges provided to each prisoner in 2018 and 2019.  I will then ask you questions specific to each of the prison facilities.  Do you understand that?

A.  Yes.

Q.  Please describe the living conditions in the prisons in which you've indicated you've personally toured and have visited.

THE COURT:  For 2018 and 2019?

MR. PAREKH:  That's correct, Your Honor.

A.  Yes.  Let me give you a general idea of the conditions of these prisons to begin with.  To clarify, first of all, that these prisons, these detention centers are not prisons.  They are actually schools transformed into prisons.  As you understand and are well aware that Syria has been going through war, and all these areas have been living in a war condition-like life.

When it comes to the conditions for the detainees in the prisons that we have, the conditions of living are all

similar among them.  We would provide all the necessities and provide everything daily and weekly.

          Do you want me to continue?

Q.  I'll ask some targeted questions.  Are the prisons regularly cleaned?

A.  Yes.

Q.  Are prisoners provided sleeping mats, blankets, and pillows?

A.  Yes, a complete set of a mattress, blanket, and pillow.

Q.  Is that true for each prisoner?

A.  Yes.

Q.  Were the prisons equipped with television sets that the prisoners could watch?

A.  Yes.

Q.  How was the lighting in the prison -- prisons?

A.  Good lighting, like any other building.

Q.  Are prisoners given outdoor or recreational time?

A.  Yes.

Q.  Is that true on a daily basis?

A.  Yes.

Q.  When it is cold, is there heating in the prisons?

A.  Yes.  We have AC units that provide heating and cooling. But one clarification is that Syria has very bad electric continuous grid, so that's why we had to buy electric generators for the prisons to provide electricity, in spite the fact that the general population, our own families and our own communities

34

lack electricity.  We did that to provide the comfortable living conditions inside the prisons.

And for their meals they have three meals every day; breakfast, lunch, and dinner.  And every week twice in the meals we had meat.

Q.  Please describe each of the three meals in those prisons 2018 and 2019 time period; breakfast, lunch, and dinner.

A.  Like I said, because we have central administration for all of these prisons, for all those three we have the -- a uniform type of administration for that period of time, and we are still going on with that same system up till now.

Q.  And for all those three, you're referring specifically to Ayn Issa, Kobani, and Derik in 2018 and 2019?

A.  Yes.

Q.  Please give us a general sense of what prisoners would eat in each of those three prisons for breakfast, then for lunch, and then for dinner.

A.  What they eat is quite similar to what even the prison guards eat for breakfast.  It's tea, bread, zaatar and oil bread, cheese, and olives.

Q.  And how about for lunch?

A.  It changes from day to day, depending what we're preparing for them.  Basically comprises a lot of rice, beans, and meat also.

Q.  And how about for dinner?

A.   It depends.  Sometimes it could be a pasta dish, macaroni and pasta dish, or lentil soup.

Q.   And if a prisoner or detainee was hungry and wanted more food, did they have the ability to get more food during breakfast, lunch, and dinner?

A.   Yes.

Q.   I believe you mentioned this earlier, but just to clarify, do the SDF prison guards eat the same food that is served to the prisoners at each of those three facilities in 2018 and 2019?

A.   Yes.

Q.   Could prisoners take restroom breaks whenever they wished?

A.   Yes.

Q.   Please describe the clothing that prisoners could wear.

A.   It was not a uniform type of clothing.  They were free to wear whatever they wanted.

Q.   Whatever they're comfortable in?

A.   Yes.

        THE COURT:  Let me ask a question.  Is he answering in Arabic or Kurdish?

        THE INTERPRETER:  Arabic, Your Honor.

        THE COURT:  All right.  Proceed, Mr. Parekh.

Q.   Please describe whether prisoners had access to any medical care or treatment.

A.   Yes, we have mobile medical units that would do rounds and visit the prisons twice a week.  And also, unless it was an

emergency at any off time, a doctor would be brought on site.

Q.   So are you saying that beyond the twice a week, if a detainee needed immediate medical treatment, there would be medical personnel who would arrive at the prison facility to treat the detainee?

A.   Yes.

Q.   What if a prisoner needed to go to the hospital?  Was that available?

A.   Yes.  In multiple cases I witnessed where detainees needed even to have surgery where the SDF would take them to the hospitals and surgical procedures were performed on them according to need.

Q.   How about access to medications?  At each of the three prison facilities in 2018 and 2019, if a prisoner needed medicine, was that available?

A.   Yes.  In generally, yes.  But to clarify, we are a borza (ph), so generally it's safe to say that we, ourselves, the general population, were not able to access or to obtain medications.  So it was difficult just because of the general conditions.

Q.   I want to go back to what you said earlier about the mobile medical teams that would visit each prison twice a week.  Would those mobile medical teams observe whether any detainees needed any treatment whatsoever in the prisons?

        MS. GINSBERG:  I'm going to object again to the general

nature of these questions.  They have nothing to do with Mr. Elsheikh or his individual treatment.

THE COURT:  Well, they don't have anything to do with him directly, but they do deal with general conditions, to the extent that we don't know, other than your motion to suppress, what -- if you put him on, what he's going to say.  I don't know whether you intend to offer him as a witness.

So I understand your concern, Ms. Ginsberg, but I'm going to overrule it and we'll hear it.  It may turn out, Ms. Ginsberg, that you're correct, that this won't be pertinent or relevant to the Court's decision.  But I'll hear it.

MS. GINSBERG:  Thank you, Your Honor.

Q.  Do you need me to repeat the question?

THE INTERPRETER:  Please.  For me.

Q.  The mobile medical teams that you previously testified about, when they would go to each of the prisons twice a week, would they observe whether any detainees needed medical treatment?

MS. GINSBERG:  Judge, objection to foundation.  If he knows.  If he was not present, he would not be able to answer this question.

THE COURT:  Well, that's a cross-examination matter.  He says what his job was, and his job was plenary; that is, it covered those three prisons, and he was overall responsible for that.

38

So I'll overrule your objection, but that doesn't preclude you in cross-examination from pointing out --  you need to be translating all of this.

But that doesn't preclude you, Ms. Ginsberg, from cross-examining him to point out that he really doesn't know on a day-to-day basis, if that's your position.  He may say otherwise.  He may say he does.

MS. GINSBERG:  Thank you.

THE COURT:  Proceed.

BY MR. PAREKH:

Q.  You may answer the question.

A.  Could you please repeat the question?

Q.  Yes.  The mobile medical teams that you previously testified about, please describe what they would do when they would go to each of the three prisons, based on your personal knowledge.

A.  Yes, during these visits, the doctors on the team would conduct routine tests for overall health of the detainees.  And other than those times when they were visiting, if there was a case that would come up that a detainee would need medical attention or was complaining of something, they would knock the door and bring it to the attention of the guard, which would then the administration would be informed about.

Q.  Could a detainee request medical treatment whenever he or she wishes?

A.  Yes.

Q.   Please describe what activities, if any, were available to prisoners at each of the three prison facilities that you've been testifying about in 2018 and 2019.

A.   Like I said, the permission for that kind of activities every day is uniform between the prisons.  And they have collective activities that they can do on their own.  In addition to their group outdoor fresh air period, they do their own daily activities.  They're free to read, read the Koran, pray, to exercise and to spend their time with games to help the time go by.

Q.   Were prisoners allowed to make phone calls to family members in Syria?

A.   Yes.

Q.   Were prisoners allowed to have visits from family members who were located in Syria?

A.   Yes.

Q.   Were there any restrictions?

A.   Only security restrictions, no more.

Q.   And were they restricted to camps that were within SDF control, for the calls and the visits to be restricted to camps within SDF control?

A.   Yes.  Yes, these are from camps that were under the control of our forces.

Q.   Did humanitarian groups such as the Red Cross visit the prison facilities that you've been testifying about in 2018 and

2019?

A.   Yes.

Q.   And why would you allow those visits?

A.   We -- according to the regulations of our local administrative area, territory, we do allow --

THE COURT:  Louder, please.

A.   We do allow, according to the regulations of our local authority, administration government, to permit these organizations to visit regularly, and we have nothing to hide from them.

Q.   And are those humanitarian organizations such as the Red Cross permitted to meet privately with detainees?

A.   Yes, they have that freedom.

Q.   Without any SDF officials present?

A.   Yes, it happens.

Q.   Are prisons --

THE COURT:  What was that answer?  Repeat the answer, please.

THE INTERPRETER:  Yes, it happens.

THE COURT:  Next question.

Q.   Are prisoners permitted to send letters to their family and loved ones through the Red Cross?

A.   Yes.

Q.   The three prison facilities that you've been testifying extensively about, did you notice that any of them in that time

41

period, 2018 and 2019, were infested with bugs?

A.  I never heard of it.

Q.  And did you ever observe that?

A.  No.

Q.  All of the privileges and amenities that you've testified about, would all of those have been able to El Shafee Elsheikh, based on your personal knowledge?

A.  Yes.

Q.  I want to now ask you specific questions about each of the three prison facilities, starting with Ayn Issa.

SDF Witness 1, when did you visit the Ayn Issa, approximately, in the 2018 time period?

A.  I visited in January.

Q.  Of 2018?

A.  Yes.

Q.  And describe for the Court what you observed during your visit in January of 2018 about the living conditions and how prisoners were being treated in Ayn Issa.

A.  Yes, I saw with my own eyes and I entered some of the rooms, and they were living a normal living condition.  I could not see or there was no fear or worry on their faces.  I even had some discussions with the inmates and ask them questions about their condition.

Q.  And what did you learn during those discussions?

MS. GINSBERG:  Objection.  Hearsay.

42

MR. PAREKH:  Your Honor, this is a motions hearing.

MS. GINSBERG:  No, this is a Rule 15 deposition, Your Honor.

THE COURT:  Yes, and what's your objection?

MS. GINSBERG:  Hearsay.

THE COURT:  Yes, it is hearsay, but I'll hear it.  And at the time that this is offered in evidence, I'll consider whether it should be admitted.

So I'm going to hear it for now because it's a motions hearing, and I would typically hear and evaluate hearsay.  Whether or not I will admit it at the time of a trial will be an issue I'll address at that time, at which time you may renew your motion or your objection, Ms. Ginsberg.

MS. GINSBERG:  Thank you.  And, Your Honor, I intend to continue to make these trial objections.  I understand it will prolong these proceedings a little, but the objections need to be preserved for trial.

THE COURT:  Yes, I told you that.  Typically, objections such as leading, in the first place, this is the questioning of a person who doesn't speak English and so we're going through some languages.  So I think some latitude is appropriate there.

In addition, if there 's something that you consider seriously leading and you object, I'll give Mr. Parekh the opportunity to change the question in a way that's non-leading.

43

So you may continue to make your objections, I'll continue to rule on them.  In general, I'm going to hear what he has to say.

Now, at the time of the trial, all of this may be admissible, all of it may not be.  We'll see at that time.

Proceed, Mr. Parekh.

MS. GINSBERG:  Thank you, Your Honor.

MR. PAREKH:  Thank you, Your Honor.

THE INTERPRETER:  Could you repeat the question, please?

MR. PAREKH:  Yes.

BY MR. PAREKH:

Q.  You indicated during your testimony that during your visit to Ayn Issa prison in January of 2018, you had the opportunity to observe prisoners and speak to some of them.  Is that correct?

A.  Yes.

Q.  Please describe for the Court what you learned during those conversations.

A.  Yes, as I am aware of most of the prisons --

THE COURT:  Speak up, please.

THE INTERPRETER:  I'm sorry.  Apologies.

A.  As I -- my general awareness of the prisons, and in particular talking to the inmates in this particular prison, I asked them, the inmates, about their foods, their drinks, their treatment, and their answer was always, we live here a good way,

44

we ha no deficiencies.  That's what they said.

Q.  Did you observe whether any prisoners had been injured or -- did you observe whether any prisoners had been injured?

A.  They had wounds during the time when they were combatants with ISIS.

Q.  Did the prisoners appear to be in any distress that you observed when you visited Ayn Issa?

A.  No.

Q.  Did they make any complaints during your conversations about the living conditions there?

A.  No.

Q.  I'm now going to ask you some questions about your visit to Kobani prison.  When was that, approximately?

A.  It was in August 2018.

THE INTERPRETER:  I'll ask to repeat.

My apologies.

A.  August of 2019.

Q.  And based on your personal knowledge, were the living conditions in Kobani in 2019 the same as the living conditions in 2018, based on what you know through your job?

MS. GINSBERG:  Objection again, leading.

THE COURT:  Overruled.

A.  Yes.

Q.  You previously testified that the defendant, El Shafee Elsheikh and Alexanda Kotey, were detained at

Ayn Issa, Kobani, and Derik prisons.  Correct?

A.  Yes.

Q.  Do you know why the defendant, El Shafee Elsheikh and Alexanda Kotey would have been transferred from Ayn Issa to Kobani prison?

A.  The Ayn Issa holding facility is considered temporary. That's why they were transferred to the main Kobani prison.

Q.  And which facility is closer to the war zone, or where ISIS was waging battles in the 2018 timeframe?

A.  Ayn Issa and Kobani were closest to the battlefields.

Q.  And what do you mean by Ayn Issa is a temporary holding facility?  Why are detainees transferred from Ayn Issa to Kobani?  Explain that.

A.  Yes, whenever someone is arrested or a new inmate will be put in Ayn Issa until their files are prepared, and then they're transferred to another prison.

Q.  Based on your personal observations at Kobani prison, what did you observe about how prisoners are living and how they're treated?

A.  I didn't notice anything.  The living conditions were similar to that of Ayn Issa.

Q.  Did you have the opportunity to talk to prisoners at Kobani, as you testified you did for Ayn Issa?

A.  No, I didn't.  I didn't have time.  Or the opportunity didn't arise.

46

Q.  Did you hear of any complaints from the prison staff regarding the conditions of confinement at Kobani?

MS. GINSBERG:  Objection.  Hearsay.

THE COURT:  All right.  I'll overrule that.

You may answer.  I'll overrule it for this hearing. I'll review it, Ms. Ginsberg, at the time of the trial if it's offered by the Government.  They may not offer it.

MS. GINSBERG:  Yes, sir.

THE COURT:  Go ahead.  He may answer.

THE INTERPRETER:  Can you repeat the question, please?

Q.  Did you hear of any complaints from the prison staff at Kobani about the facility?

A.  No.

Q.  Based on your personal observations during your visit, were the prisoners able to receive all of the amenities that they needed?

THE COURT:  You're talking now about Kobani in 2019?

MR. PAREKH:  Yes, Your Honor.

THE COURT:  All right.  Make that clear.

A.  Yes.

Q.  At some point were the defendant and Alexanda Kotey transferred from Kobani to Derik prison?

A.  Yes.

Q.  What was the reason for that?

A.  The reason is that the Derik prison is the safest in our

areas of control.  And it is considered to be a central prison for the SDF.  For that reason, they were transferred to that prison.

Q.  I want to now ask you some questions about the SDF's policies as it relates to the treatment of detainees.

A.  Okay.

Q.  Please describe, based on your personal knowledge, what the policies are as it relates to how detainees are treated.

A.  Yes, we do have our own policies.  We abide by our laws and obligations.  Whenever we are on the front line, we fight the enemy, we do our best to defeat them.  But whenever someone surrenders, we treat them humanely and morally, provided that they don't have a weapon.

Q.  What happens if someone violates that code?

MS. GINSBERG:  I'm going to ask him to clarify whether he's just talking strictly about policy or what actually happens in fact.

THE COURT:  Well, that's a matter for cross-examination.  But Mr. Parekh, you may accept her request for clarification and decide you want to restate your question.

How much more do you have by the way?

MR. PAREKH:  Not too much more, Your Honor.  Maybe another 20 to 25 minutes.

THE COURT:  All right.  Proceed.

Q.  I'll clarify my question.  What is the process if a prisoner

alleges any mistreatment or abuse within the prison facilities, and specifically as it relates to Ayn Issa, Kobani, and Derik in the years 2018 and 2019?

A.   Yes, when a prisoner files a complaint about the guards in the prison, an investigation will begin.  And based on the findings of that investigation, if the guard has violated the right of the prisoner or mistreated the prisoner, based on that, the misconduct they conducted, they either will be removed or even be imprisoned themselves.

Q.   How can a prisoner report any alleged mistreatment?

A.   He or she will ask for the head of the prison, the warden, and then will submit their complaint to that person.

Q.   Are there other avenues to report mistreatment?

A.   We -- at the SDF, we have -- the guards are meeting.  They have weekly meetings where all the guards get together.  And if it so happened that one of the guards has mistreated an inmate, his colleague would report on him, and based on that report, they will be also disciplined.  Because no one single guard is allowed to enter the prisons where inmates are.  There have to be two or three.

Q.   And is that required for guards to report any mistreatment that they observe of other guards?

        MS. GINSBERG:  Objection.  Leading.

        THE COURT:  Overruled.

A.   Yes, they do.

Q.   If a prisoner did not feel comfortable reporting any alleged mistreatment to SDF officials, were they restricted in any way from reporting mistreatment in their meetings with the ICRC?

A.   Yes, they can.  They write letters that they submit to the ICRC to send it to their families.  And whenever they meet with them, they had the opportunity to complain about any mistreatment that they have received.

Q.   And by ICRC, do you understand that I'm referring to the International Committee of the Red Cross?

A.   Yes.

Q.   And those meetings that you've just testified about are private, without any SDF officials present?

A.   Yes.

Q.   Are prisoners also permitted to report whatever they wish, including alleged mistreatment, to the media without restriction?

A.   Yes.

Q.   Through your position with the SDF, would you know whether El Shafee Elsheikh ever made any complaints that he was abused, mistreated, or harmed in any way when he was in the custody of the SDF.

A.   I haven't heard.

Q.   And would you know if El Shafee Elsheikh --

        THE COURT:  That wasn't the question.  Repeat your question.

MR. PAREKH:  Yes, Your Honor.

Q.  Through your position, would someone tell you if El Shafee Elsheikh had ever been mistreated, abused, harmed in any way, or made any complaints of similar nature?

MS. GINSBERG:  Objection.  Hearsay.

THE COURT:  Yes.  But there's probably an exception to that.  I'm not going to take the time.  So I'll overrule it for purposes of this.  I think you could make it clearer.

As a result of your position, would it come to your attention if Mr. Elsheikh had made a complaint about being abused or mistreated while in SDF custody during 2018 or 2019?

THE WITNESS:  No, I have not heard any complaint about the inmates.

THE COURT:  Yes, I understand that.  Repeat everything to him.

THE INTERPRETER:  I will.

THE COURT:  Yes, I understand that.  But what I'm asking you is, as a result of the position you held with the SDF during 2018 and 2019, would it come to your attention if Mr. Elsheikh had made any complaints about being abused or mistreated while in SDF custody?

THE WITNESS:  Yes.  If there were any mistreatment, I will have known.

THE COURT:  And were you advised of any complaints of mistreatment or abuse by Mr. Elsheikh?

THE WITNESS:  I haven't heard.

BY MR. PAREKH:

Q.  I have the same question for Alexanda Kotey.

THE COURT:  But you're going to have to repeat the question.

MR. PAREKH:  I'm just waiting for the translation.

THE COURT:  All right.

Q.  Through your position, would you have known if Alexanda Kotey had been mistreated, abused, or harmed in any way while he was in SDF custody in the years 2018 and 2019?

A.  No, I have not heard.

Q.  Would you have heard if such complaints had been lodged by Alexanda Kotey?

A.  Yes, I would have.

Q.  The last topic I want to ask questions about is the media interview policy for the SDF.  Are you familiar with that policy?

A.  Yes.

Q.  Please explain what the media interview policy is with respect to interviewing prisoners while in SDF custody, specifically in the years 2018 and 2019.

A.  Yes, some media outlets or some journalists will come knocking on our doors.  They want to interview particular inmates.  They have their names.  And then based on our policy and respecting the inmates' rights, we will ask the said inmates

whether they agree to such interview.  If they said yes, we will arrange the media interview.  If they said no, we'll respect that.

Q.  Does the SDF ever put pressure on a prisoner to participate in a media interview?

A.  No.  Something like this never happened.

Q.  And are all prisoners treated the same and subject to the same policies regarding media interviews, and specifically in the years 2018 and 2019?

A.  Yes.

Q.  And is the policy that you just described applicable also to the present day?

A.  Yes.

Q.  Are prisoners free to speak to the media about any topics as they wish?

A.  Yes.  The inmates have total freedom to say whatever they wish to the media, and a proof of that is whenever such interview happens, our guards that are present in the room do not understand English.

Q.  So you mean the guards that are attending the media interviews don't understand English?

A.  Yes.

Q.  Please explain why SDF guards would attend a media interview that a prisoner was participating in.

A.  Not for any particular goal except for security precautions.

53

Q.   Specifically in the years 2018 and 2019, did the U.S. Government ever ask the SDF, based on your personal knowledge, to have a prisoner be subjected to a media interview?

A.   No, it didn't happen.

Q.   Do you even check with anyone in the U.S. Government before one of your prisoners goes on television to speak to the media?

THE INTERPRETER:   I'll ask for clarification.  Can you rephrase the word "check"?

MR. PAREKH:   Yes.

Q.   Do you seek permission at all from the U.S. Government?

THE COURT:   Restate your whole question, Mr. Parekh.

Q.   Do you ever seek permission from the U.S. Government to have one of your prisoners in SDF custody participate in a media interview?

A.   No, we don't.

Q.   And when journalists reach out with a request to speak to a prisoner, do you coordinate those requests with anyone from the U.S. Government?

A.   No, didn't happen.

Q.   The SDF guards that attend the media interviews, are they involved in any way in the investigation that may be ongoing with respect to a particular prisoner participating in the media interview?

A.   No, they're just normal prison guards.

THE COURT:   And what's the purpose of their being there

again?  That is, what is the purpose of SDF guards being present for media interviews?

THE WITNESS:  First of all, none of our guards are armed.  There are one or two of them who are in charge of transporting the inmates to that interview room.  And then the reason they stay there is just for security precautions, just in case something happens during that interview.

THE COURT:  All right.  Anything further, Mr. Parekh?

MR. PAREKH:  Just a follow-up question on the armed part of his testimony.

BY MR. PAREKH:

Q.  Are SDF guards allowed to bring in weapons into any of the prison facilities - Ayn Issa, Kobani, or Derik - in 2018 and 2019?

A.  Our regulations are across the board.  We do not allow carrying weapons inside the prisons.

THE COURT:  All right.  I have one question, then I'm going to recess, Ms. Ginsberg, so you'll have an opportunity to prepare, streamline, and focus and shorten, thereby, your cross-examination.

Let me ask SDF Witness Number 1, at the present time, are combat operations still under way in Syria between the SDF and ISIS or Syrian government forces?

THE WITNESS:  Let me explain a small idea about that. Yes, it's true that geographically we -- we eliminated ISIS.

But most of the emirs in ISIS, they have turned into sleeper cells.  Up to now, the danger is continuing.  They carry out assassinations of our civilian administrators, and they also carry out -- they also booby trap or explode vehicles of the SDF.

But they also have the freedom of movement in the deserts bordering Syria and Iraq; in particular, the deserts of Mosul to Deir ez-Zur, so they have the freedom to move in those desert areas.

THE COURT:  All right, thank you.  The reason I ask those questions is to confirm in part what I relied on, Ms. Ginsberg and Mr. Parekh, in my Rule 15 decision.  It's still a war zone, and I think it is difficult to predict whether people can move freely around there and whether they'll be allowed to.

I suspect that even in his position, if it were necessary, he might have to return to front-line combat rather than to pay attention to the security of detainees.

All right.  We'll recess now.  We've been at this for just at two hours.  And we'll begin at 11:20 with cross-examination.  And Mr. SDF Number 1, you may not discuss your testimony with any attorneys during this recess.  You'll have to say nothing about your testimony to anyone during this recess.

THE WITNESS:  Yes.

56

THE COURT:  All right.  Who is standing?

MR. MACMAHON:  I was just anticipating the break in court, Your Honor.

THE COURT:  All right.  You're more eager than I am, which at your age is surprising.  At my age it's shocking that I'm still here.

MR. MACMAHON:  It's just a habit, Your Honor.

THE COURT:  The Court stands in recess until 11:20.

(Recess taken at 10:57 a.m.)

THE COURT:  The record will reflect that SDF Number 1 is in the witness box.

Ms. Ginsberg, you may proceed with your cross-examination.

**CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

**BY MS. GINSBERG:**

Q.  Good morning, sir.

A.  Good morning.

Q.  We've never met.  Is that correct?

A.  That's correct.

Q.  You have met a number of times with the prosecutors sitting on this side of the courtroom.  Correct?

A.  Yes.

Q.  Approximately how many times did you meet with them?

A.  A couple of times.

Q.  And who asked you to come to the United States to testify in

this case?

A.   People from the U.S. Government.

Q.   And was the request made directly to you or someone above your level?

A.   Above me.

Q.   Okay.  And do you have any personal knowledge of the conversations between the U.S. Government and the person above you?

A.   Yes.

Q.   And what were you told?

A.   Do you mean the reason for me to come here?

Q.   Yes.

A.   As -- to stand witness because I was involved in the process of the transfer that happened.  That's why I was asked to testify as a witness.

Q.   All right.  And were you asked to come here or did the general tell you that you were required to come here?

A.   I came personally.

        THE INTERPRETER:  Could you repeat that question, please?

        MS. GINSBERG:  Yes.  I asked if he was asked by -- whether he was told by anyone that he was required to attend these proceedings.

A.   I personally came.

Q.   Did anyone tell you that you -- that they wanted you to

come?

A.  Could you clarify the question a bit more?

Q.  Yes.  Did anyone above you tell you that they wanted you to come to attend these proceedings?

A.  No.

Q.  And do you know whether the United States Government made any offers of additional assistance to the SDF if they could arrange for witnesses to come to testify at this hearing?

A.  No.

Q.  And are you still seeking assistance -- is the SDF still seeking assistance from the United States Government in maintaining its prisons?

A.  Yes.

Q.  And what kind of assistance are you requesting?

A.  Logistic things.

Q.  And that's the only -- what do you mean by logistic things?

A.  Material and equipment for furnishing and renovating the buildings that I use for prisons.  Because of the wars, a lot of these buildings need renovations.

Q.  So are the conditions in the prisons today similar to the conditions that they were in 2018 and 2019?

A.  Yes.  Although there are some renovations that have been done to some of these prisons.

Q.  Right.  Isn't it true that the prisons are extremely overcrowded?

A.   No.

Q.   No?  Isn't it true that after the fall of Baghuz -- I guess it says Baghuz --

A.   Except the period of time where we liberated the Baghuz area, territory, that's when we were facing a lot of difficulties.

Q.   All right.  And that was in March of 2019?

A.   Yes.

Q.   Is it your testimony that there were -- the number of prisoners increased after March of 2019?

MR. PAREKH:  Objection, Your Honor.  Where is Ms. Ginsberg talking about, which facility?

MS. GINSBERG:  At all of the facilities.

THE COURT:  I'll overrule it.  He can answer if he's able to.  He may not know.  I don't know.

A.   Yes.

Q.   Yes.

THE COURT:  What did you -- what was your answer "yes" to, SDF Number 1?

THE WITNESS:  The answer was that, yes, after the Baghuz fall, there was a high influx of detainees.

THE COURT:  Next question.

Q.   So it's not true that the conditions were the same in the prisons in 2018 and before March of 2019 as they are today?

A.   Could you repeat the question, please?

Q.   It's not true -- your prior testimony is not true when you said that the conditions in the prisons, the SDF prisons, are the same today as they were in 2018 and 2019?

MR. PAREKH:  Your Honor, I'm going to renew my objection.  I think the confusion is Ms. Ginsberg is not being specific as to is she talking about the prison related to the battle of Baghuz that was stood up or is she talking about the facilities in which her client was held?

MS. GINSBERG:  Judge, I'm asking the exact same kind of questions Mr. Parekh asked about the general conditions, overall, at these prisons.  I will get to the specific prisons, as he did.

THE COURT:  Well, I think that's -- since conditions, you contend, changed, I think you better be specific about the prisons that you're asking about.  Because you're implying that his previous testimony was incorrect, and it's unfair to the witness to be vague about that.

MS. GINSBERG:  Judge, he testified in general about the conditions --

THE COURT:  All of this should be translated.

All right.  Go ahead, Ms. Ginsberg.

MS. GINSBERG:  Your Honor, he was permitted to testify about the general conditions at all of the prisons and testified that they were all essentially the same.

THE COURT:  All right.  And what's your current

question?

MS. GINSBERG:  My current question is, he further testified that the conditions today were relatively the same as they were in 2018 and 2019.  I'm trying to inquire whether he was being truthful when he said that the conditions after this large influx of prisoners is the same today as it was earlier.

THE COURT:  I don't recall any testimony in his direct testimony about a large influx of prisoners at any particular time.

MS. GINSBERG:  No, I'm asking him that.

THE COURT:  Well, no, you implied that he was dishonest in a previous answer.  So I think you need to be quite specific and not characterize his previous testimony as you did in your answer.  Your question was, weren't you dishonest in your previous answer --

MS. GINSBERG:  In his previous answer to me, not to Mr. Parekh.

THE COURT:  No, I don't understand that either.

MS. GINSBERG:  Well, why don't I just start over.

THE COURT:  All right.

MS. GINSBERG:  I think that would be helpful.

THE COURT:  I think that's a good suggestion, Ms. Ginsberg.

BY MS. GINSBERG:

Q.  Sir, is it still your testimony that the conditions in the

prisons, the SDF prisons, in 2018 and '19, are generally the same as they are today?

A. I'm referring to all of the prisons in general. And to let you know, we have actually in total eight detention centers, eight prisons. The conditions in those prisons, all of them in those dates mentioned, were all very similar, except for that period of time when we had the Baghuz military operation, which brought in a high influx of detainees at that time.

The circumstances and the atmosphere of these detention centers that we have differ from where they are geographically from each other.

Q. So the conditions are not the same in all the prisons?

THE COURT: At what period of time, Ms. Ginsberg?

Q. In 2019, the conditions in all the prisons were not the same.

A. Similar.

Q. So are you aware -- you have said that humanitarian groups were permitted to freely tour these prisons. Is that correct?

A. Yes.

Q. And were they given access to all of the areas of the prison?

A. Yes.

Q. And if these same humanitarian groups wrote about complaints of contaminated water, food shortages, unsanitary conditions, and insufficient medical care, those reports would be false?

MR. PAREKH:  Objection, Your Honor.  Which prison is Ms. Ginsberg referring to?

THE COURT:  I think that's a fair request, to be more precise, Ms. Ginsberg.

MS. GINSBERG:  Judge, I understand the Court's ruling.  But for the record, I'm objecting.  The Court gave Mr. Parekh huge latitude in asking general questions about the conditions of these prisons.

MR. PAREKH:  Your Honor, my questions repeatedly focused on Ayn Issa, Kobani, and Derik.  I did not ask about the battle at Baghuz or any popup prisons that may have presented itself after the battle of Baghuz.  I focused on the facilities in which Mr. Elsheikh was detained.  I did not ask any questions whatsoever about any facilities in which he was not detained.

MS. GINSBERG:  Judge, this witness testified that in the entire period of time about which he testified he visited each of those three prisons one time.  So his testimony, which was quite extensive, was based upon singular visits to each of these prisons.  I don't think that he's in a position to give the kind of testimony he did based on individual visits --

THE COURT:  All right.  You've made your argument, and to the extent that that has any relevance to the motion to suppress in the end, I certainly will hear that argument and take it into account.

MS. GINSBERG:  Thank you.

BY MS. GINSBERG:

Q.  All right.  Sir, at any of your prisons beginning in 2019 --

THE COURT:  You're back now talking to all prisons.  Is that right?

MS. GINSBERG:  Yes.

THE COURT:  Not the three?

MS. GINSBERG:  Including the three prisons.

THE COURT:  Well, of course if it's all, it would be including.  But this is going to suffer from the same infirmity, isn't it, Ms. Ginsberg?

MS. GINSBERG:  Your Honor, I think I'm -- the Government spent half of it -- before it got to these three individual prisons, spent half of its questioning asking general questions.  I think I'm entitled to attack his credibility as far as his answers to those questions.

THE COURT:  Mr. Parekh?

MR. PAREKH:  Your Honor, the general questions that I asked was preceded by referring to Ayn Issa, Kobani, and Derik, and I said, as I'm sure the court reporter can read back, are the privileges and amenities offered to each prisoner in 2018 and 2019 generally the same at Ayn Issa, Kobani, and Derik.  I then asked general questions based on his answer, which was yes, and then I focused specifically on each of those three prisons.

THE COURT:  Ms. Ginsberg?

MS. GINSBERG:  Your Honor, I think the record

ultimately will be clear that there were a considerable number of questions in general.  But I will attempt at this point to limit the questions to those three prisons.

THE COURT:  All right.  Proceed.

BY MS. GINSBERG:

Q.  Sir, are you aware of reports that were made by civil society and humanitarian groups about complaints of contaminated water, overflowing latrines, food shortages, unsanitary conditions, and insufficient medical care at Ayn Issa, Kobani, or Derik prisons?

MR. PAREKH:  Your Honor, when?

THE COURT:  Yes.  What period of time, Ms. Ginsberg?

MS. GINSBERG:  During the period of 2018 and 2019.

THE COURT:  All right.  He may answer.

A.  I have not heard of those reports.

Q.  And are you familiar with reports during those same periods of time by humanitarian groups about the loss of life and torture in those prisons?

A.  No, that did not happen.

Q.  Is it true that the SDF does not have the ability to continue to hold the number of prisoners it has in its custody?

THE COURT:  You mean at this time?

MS. GINSBERG:  At this time.

MR. PAREKH:  Objection.  Beyond the scope of direct, Your Honor.

THE COURT:  It is beyond the scope of direct.  Why should we do this, Ms. Ginsberg?

MS. GINSBERG:  I'll rephrase the question.

THE COURT:  All right.

Q.  After March of 2019, when the large number of prisoners increased, isn't it true that the autonomous administration pleaded with the international community to take back its foreign prisoners?

A.  Yes, we sent out a request to all the countries to take back their nationals.  Because, according to our laws, we are not able to try them.  That's why we asked these governments to take them back.  These are non-Syrian individuals.

Q.  And you also don't have enough money to feed them.  Correct?

A.  Not true.  We just asked the international community, those countries, to take back their detainees because they're a large number.

Q.  And because they pose a security risk to the SDF?

A.  The prisons are under the control of the SDF.

Q.  The SDF does not have sufficient financial resources to adequately sustain these prisons?

A.  And during the Baghuz period, yes, we were overwhelmed.  But after that we were able to manage and provide what was needed.

Q.  And is it true that you're still holding about 10,000 men in prisons in SDF?

MR. PAREKH:  Objection, Your Honor.  What is the

relevance of still holding in almost 2022 have anything to do with the case?

THE COURT:  Sustained.

Q.  Isn't it true that the prisons that Mr. Elsheikh was held in were also overcrowded in as early as 2018?

A.  It was not crowded to that degree.

Q.  Was it overcrowded generally?

A.  No, not overcrowded for these prisons.

Q.  No, and the prisoners were not sleeping on top of each other?

A.  No.

Q.  So can you explain why -- or are you aware that Department of Defense officials, in January of 2018, discussed the fact that there were no less than 50 prisoners sleeping on top of each other?

MR. PAREKH:  Objection, Your Honor.  Object to the form of the question.  Ms. Ginsberg is asking this witness to talk about another individual's testimony that he didn't hear.

THE COURT:  All right.  You can ask him whether he's aware, and that's it.

MR. PAREKH:  And I would also add to my objection that she's mischaracterizing the testimony as well.

THE COURT:  All right.  You may proceed, Ms. Ginsberg, but you're going to have to ask him if he's aware of that.

MS. GINSBERG:  Yes.

68

THE COURT:  You can't pose it as a fact because we don't know if it's a fact.

BY MS. GINSBERG:

Q.  Are you aware that two of the DoD interrogators who were interrogating Mr. Elsheikh at Ayn Issa prison had conversations about the overcrowding at Ayn Issa prison?

A.  I did not hear of it.

Q.  And if in those conversations one of those two DoD officials who was interrogating Mr. Elsheikh told the other that no less than 50 guys were sleeping on top of each other, would that be a lie?

MR. PAREKH:  Objection, Your Honor.  The witness --

THE COURT:  Sustained.

MR. PAREKH:  -- has already said he's not aware of the conversation.

THE COURT:  That's right.

MS. GINSBERG:  I can ask him if it would have been true, if it were said, would it have been true.

THE COURT:  You may ask him if he knows about it, and that's it.  All he can testify is to his knowledge.

MS. GINSBERG:  Right.  But he can testify -- I think he can testify that if --

THE COURT:  I think I've said what you may do, Ms. Ginsberg.  Do it and let's move on.

BY MS. GINSBERG:

Q.   Is it true that 50 prisoners were lying and sleeping on top of each other in Ayn Issa prison in 2018?

A.   I did not see nor hear.

Q.   All right.  And your testimony -- your earlier testimony today was that you visited Ayn Issa prison in the two years that Mr. Elsheikh was detained in SDF custody.  You visited Ayn Issa prison one time.  Is that correct?  One time?

A.   Yes, it was one time, and I'm always generally aware of the conditions in the prisons.

Q.   So you visited the prison, you testified, in January of 2018?

A.   Yes.

Q.   And that's the only time that you visited Ayn Issa prison in 2018 or 2019?

A.   Yes.

Q.   And yet you believe that you had knowledge of what was going on in that prison on a day-to-day basis?

A.   Yes.

Q.   That knowledge is not based on anything that you saw or personally heard.  Correct?

          THE COURT:  What do you mean by "personally heard"?

          MS. GINSBERG:  Overheard in person.

          THE COURT:  He has reports made to him.  Is that "overheard"?

          MS. GINSBERG:  No.  Overheard at the prison.

THE COURT:  At the prison?

MS. GINSBERG:  At the prison.

THE COURT:  Well, he's already said he visited it once, so your question was vague.  You may repeat it, and if you mean during the one time that you visited did you overhear anything, you can ask that.

But the question that you asked originally would have encompassed people who report to him.

MS. GINSBERG:  Thank you.

THE COURT:  Over a longer period of time.

BY MS. GINSBERG:

Q.  The only personal knowledge you have from your own observations is based on the one day that you visited Ayn Issa prison.  Correct?

A.  Also, we receive reports about the conditions of the prisons on a weekly basis.  These reports having to do with two individuals, but it's the conditions for everyone detained in all of these prisons.

Q.  And if you don't go and see the prisons themselves, you have no way of knowing if the reports are true or accurate?

MS. GINSBERG:  Judge, I asked a yes or no question.

THE COURT:  No, you didn't.  Absolutely not.  There are many ways he could know, quite apart from being there.  So let him answer the question.  And you interrupted before any of it was even translated, which is inappropriate, unless you speak

Arabic.

MS. GINSBERG:  You know I don't.

THE COURT:  All right.  So go ahead and translate what answer he was giving.

A.   Like I said, I was -- when I visited, I asked and I inspected the prison, and if there were things that contradicted any of the reports that I would usually receive, the detainees would have told me.

THE COURT:  Next question.

Q.   If you received reports from -- who would you receive these reports from about the conditions in the prison?

A.   From the prison wardens.

Q.   And if they reported -- if they were aware of abuse by the guards in the prisons, those guards would have been disciplined.  Correct?

A.   Yes.

Q.   And is it your testimony that you were relying on reports from other guards to tell the head of the prison or tell you whether there was abuse going on in the prison?

A.   Yes.

Q.   Were you concerned, if the guards started reporting on each other, what would happen between the guards in the prison?

MR. PAREKH:  Objection.  I don't understand that question.

THE COURT:  Nor do I, Ms. Ginsberg.  Re-ask it.

Q.   Were you concerned that the guards would retaliate against each other if they reported abuse in the prison?

A.   We have observation cameras inside the facilities, inside the prisons.

Q.   Where are these cameras?

A.   Inside rooms.

Q.   Inside what rooms?

A.   Inside the rooms of the detainees.

Q.   Do you know what room Mr. Elsheikh was in?

A.   I do not know, but he's within the confines of the prison.

Q.   And is it your testimony today that --

A.   All of our prisons have cameras in them.

Q.   In every room.  Is that your testimony?

A.   Yes.

Q.   And are the recordings preserved?

A.   Only for a period of time.

Q.   So when you were asked to come testify, were you asked to bring with you all of the records that existed regarding Mr. Elsheikh and Mr. Kotey?

A.   Yes.

Q.   And the records that you brought, how many pieces of paper did you bring with you?

A.   Some of the papers I brought with me.

Q.   No.  How many papers -- how many pages of papers did you bring?

73

A.    I don't remember the number.

Q.    20?

A.    I don't remember.

Q.    Did you give them all to the prosecutors when you met with them?

A.    Yes.

Q.    And Mr. Elsheikh and Mr. Kotey were considered to you -- by you to be high-value detainees.  Correct?

A.    There's many detainees in our prisons.

Q.    Was Mr. Elsheikh considered by you to be a high-value detainee?

A.    All of them have high value.

Q.    Well, after Baghuz -- the fall of Baghuz, the SDF released hundreds of other prisoners who were considered to be low-value detainees because of overcrowding.  Correct?

A.    From what nationalities do you mean?

Q.    From any nationality.

A.    I would like to understand your question.  So I'm asking, from which nationality?

Q.    From all nationalities.

A.    No.  Except for the only case of Syrian detainees who are determined that are -- don't have blood on their hands and who have been guaranteed by the leaders of their tribes, that they will safely hold them, only those.  And that they will be under surveillance.

74

Q.  So it's not true that all of the detainees were treated the same?

THE COURT:  In that respect, Ms. Ginsberg?

MS. GINSBERG:  In that respect or any respect.

THE COURT:  Well, no, that's not the question.  So you need to be precise.  If you're seeking to impeach this witness, you're going to have to be more precise.

What's your question, Ms. Ginsberg?

Q.  How was Mr. Elsheikh treated differently while he was an SDF prisoner from the other SDF prisoners who were held in the same prison?

A.  They all received equal treatment, but being that they are high-profile, they were usually observed more than the others while detained.

Q.  And how do you know that?

A.  I don't understand the question.

Q.  How do you know that Mr. Elsheikh was observed more than the other prisoners?

A.  Through the reports that come from the different prisons.

Q.  And isn't it also true that the SDF was telling the United States Government as early as 2017 that they would soon have to start releasing known foreign fighters?

MR. PAREKH:  Your Honor, I let a number of questions go about this without objecting, but at this point I don't see what relevance this has to any motions filed by either the defense or

the Government.

THE COURT:  Ms. Ginsberg?

MS. GINSBERG:  Judge, it's our contention that there was abuse going on in these prisons from the time -- at least from the time that Mr. Elsheikh was being held.  This witness has basically said that the prisoners were -- they were not overcrowded and the prisoners had essentially a cushy life living in these prisons.  I think we're entitled to --

THE COURT:  I don't think anyone has testified they had a cushy life.  But in any event, you're a lawyer and you argue, so I understand why you would say cushy life.  But that isn't what the testimony was.

Tell me this, why is any of this of significance to the motion to compel?  You're not contending, are you, that the statements he ultimately gave to the FBI were the product of treatment he received by the SDF?

MS. GINSBERG:  Judge, we are contending --

THE COURT:  I'm sorry, yes or no?

MS. GINSBERG:  Yes.

THE COURT:  You are?  Tell me how.

MS. GINSBERG:  We are also contending --

THE COURT:  No, tell me how.

MS. GINSBERG:  Mr. Elsheikh has submitted a 10-page declaration explaining how; that he was tortured by members of the SDF during the time that he was being questioned; that his

torture accelerated after he was taken to Derik prison for the second time and subjected and required to participate in the media interviews.  We are also claiming that the media interviews that he gave were the product of torture by the SDF.

MR. PAREKH:  Your Honor, I would note that the two individuals who are from Derik prison are SDF Witness 2 and SDF Witness 3.  Perhaps it would be more appropriate for Ms. Ginsberg to pose those questions to those individuals, as in my direct I focused on Ayn Issa and Kobani and put very little focus on Derik prison, knowing that we have two witnesses in the witness room outside the courtroom who can speak to those facts.

THE COURT:  Well, she'll get to those and you'll get to those in due course.

But I point out to you, Ms. Ginsberg, that it's not at all clear, nor is any case you've cited make it clear, that mistreatment or abuse or even torture by some other body would render any statements or confessions he might have made well after that inadmissible.  I don't mean to suggest that he can't contend that he was coerced or that his will was overborne, but I'm not sure he can make that claim about abuse or mistreatment that he received weeks or months before he gave statements.

But we're spending a lot of time on that anyway.  In his statement, Ms. Ginsberg, when did he say he was abused or tortured?

MS. GINSBERG:  He says he was beaten from the time he

was captured at each of these prisons.

THE COURT:  All right.  I understand he was beaten.  I don't know that that amounts to torture.  But I'm sure it's mistreatment.  When was he tortured?

MS. GINSBERG:  Judge, I guess it depends on what you define as torture.

THE COURT:  It does.

MS. GINSBERG:  He was threatened -- it's our position that he was threatened with being sent to Iraq to summary trials and executions from the very beginning of the time he was held --

THE COURT:  All right.  And --

MS. GINSBERG:  -- including -- and that -- including by the FBI, Agent Kath, who told him that that was a possibility of what could happen to him.

THE COURT:  Well, he didn't tell him that he would be executed in Iraq.  He said he could be sent to Iraq.  And so your addition of being executed is not what the agent testified to.  But I understand your argument.

MS. GINSBERG:  I think I'll ask this witness if he has personal knowledge of complaints that Mr. Elsheikh has -- complaints of abuse --

THE COURT:  All right.  You may do that.  You don't have any objection to that, Mr. Parekh?

MR. PAREKH:  No.  In fact, I asked it on direct

examination.

THE COURT:  Yes.  Proceed.

BY MS. GINSBERG:

Q.  Sir, you were not present when Mr. Elsheikh was captured by the SDF fighters.  Correct?

A.  Yes.

Q.  And these fighters, you said they are the local people in the communities in which they were serving?

THE COURT:  What do you mean "these fighters"?  What are you talking about?

MS. GINSBERG:  The SDF.

Q.  When Mr. Parekh asked you who was the SDF, you said they were people from the local communities.

A.  Yes.

Q.  And many of the people who were fighting in the name of the SDF and people who were guards in your prisons had been -- had lost family members' lives to ISIS.  Correct?

A.  Yes, many of the SDF members lost family members in the war against ISIS.

Q.  And many of the guards and interrogators in the SDF prisons had also lost family members' lives in the fight against ISIS?

A.  Not all of the investigators.

Q.  Not all but some?

A.  Yes.

Q.  And some of the guards?

79

A.   It's not a condition that they must have lost someone to ISIS to become a prison guard.

Q.   Okay.  But some of them had?

THE COURT:  Asked and answered.  Let's move on.

Q.   Sir, you have no personal knowledge -- Mr. Elsheikh claims that he was -- when he was first detained and brought to a facility before Ayn Issa, that he was beaten and struck --

MR. PAREKH:  Objection, Your Honor.  She's narrating what Mr. Elsheikh claims instead of just asking the witness a question.

MS. GINSBERG:  I'm going to ask him if he has --

THE COURT:  I'll overrule that objection, but it does seem to me that as I've sat here listening to you, I don't understand your question.  You started, you stopped, you started.

So repeat it, Ms. Ginsberg.

Q.   Do you know whether Mr. Elsheikh was beaten with the butt of a gun by the guards at the first facility where he was detained?

A.   Like I mentioned earlier, we do not allow firearms in any of our detention centers.  In addition to that, why did not he in any of the media interviews not mention this -- did not mention this, knowing that the security guards of the SDF prison don't even speak English.  If they have the free will during the interview to end an interview, what is holding them back from talking about their suffering in captivity?

Q.   Well, sir, you know that it was a requirement that the guards who accompanied Mr. Elsheikh to the interview recorded those interviews?

A.   Repeat the question.

Q.   You know that the media interviews were recorded by the SDF guards?

A.   By the journalists it was recorded --

Q.   No, by the SDF guards.

A.   I did not hear of that.

Q.   No, and you don't know that copies of the recorded -- the SDF recordings of those interviews was provided by someone in the SDF to the United States Government?

A.   I did not hear of that.

Q.   So there are many things about what happened to prisoners in SDF custody that you didn't hear about.  Correct?

        MR. PAREKH:  I don't understand that question.  Objection.

        THE COURT:  I'll sustain the objection.  It's argumentative.  You may make the argument.  He said he's only visited the place once.  His personal knowledge is limited as to that particular time.  He said he didn't receive any reports.  You can ask him that directly.

        But if you want to argue that he doesn't have personal knowledge, you may argue that.  You may also ask him, and you might tell him what you mean by personal knowledge.  I'll give

you an example.

Mr. SDF Number 1, did you ever see anybody strike, abuse, or torture Mr. Elsheikh?

THE WITNESS:  No, I did not see.

THE COURT:  Do you understand that's what I mean by personal knowledge, that you have actual knowledge that something occurred?

THE WITNESS:  No, I did not see.

THE COURT:  All right.  Now, you only visited the -- what are the three prisons, Mr. Parekh?

MS. GINSBERG:  Your Honor, it's Ayn Issa --

THE COURT:  I asked the prosecutor, but Ms. Ginsberg you can tell me if you want to.  But go ahead.

MS. GINSBERG:  Ayn Issa --

THE COURT:  Yes.

MS. GINSBERG:  -- Kobani, and Derik.

THE COURT:  All right.  Have you already asked him whether he's aware of any reports of mistreatment or abuse or torture of Mr. Elsheikh at any of those places?

MS. GINSBERG:  He's testified that he hasn't, he is not aware.

THE COURT:  All right.  What else can he tell you about that other than your argument that he can't know what happens on a day-to-day basis unless he's here?  And you can make that argument.  He then responds that he gets reports and the reports

didn't report that.  But then you can argue that there's reasons why I shouldn't rely on the fact that the reports might not be entirely accurate.

BY MS. GINSBERG:

Q.  Let me ask you another question.  You said that the weapons, firearms, were not allowed in any of the SDF prisons?

A.  Yes.

Q.  And that includes the U.S. Government?

A.  Yes.

Q.  And if several -- at least two witnesses from the U.S. Government testified that they brought firearms into the prison when they interviewed Mr. Elsheikh, would they be violating your rules?

A.  Yes.

Q.  And how would you know if any of your rules were being violated?

A.  I did not see any of these things that you speak of. Because all of these visits, when it's the U.S. individuals or anyone else who visits these facilities, I am the coordinator for these.

Q.  Yes.  But your guards are responsible -- your guards at Ayn Issa and Kobani are responsible for making sure that the United States interrogators were following SDF rules.  Correct?

A.  I have within my staff individuals with the coordination office who accompanied these individuals who make onsite visits,

and they give me reports later.

Q.   And, in fact, it was a requirement that someone from the SDF accompany the U.S. interrogators in each of the -- each time they interrogated Mr. Elsheikh.  Correct?

MR. PAREKH:  Objection, Your Honor.  This witness didn't speak of any interrogations with Mr. Elsheikh on direct examination.

THE COURT:  I'll overrule it.  The question is understandable, and he may answer if he knows.

A.   The coordinator that accompanies them accompanies them for the sake of facilitating their entry into the location into these prisons.

Q.   And didn't you tell the prosecutors in your meetings with them before this hearing that the SDF had someone accompany the U.S. interrogators and participate in the interviews?

A.   Could you clarify the question, please?

Q.   Did you tell the prosecutors when you were preparing for this hearing that it was a requirement for an SDF official, either a guard or some SDF personnel, to accompany the U.S. interrogators and remain with them during the interrogation sessions?

A.   I mentioned that he accompanies them during the visit and the tour, but not while -- interrogation in the room.

Q.   Wasn't it also a requirement that there be a linguist who could translate from English to Arabic during these

interrogations?

A.   They know English much better.

Q.   And wasn't it a requirement that the interrogations occur in Arabic so that the SDF official could understand what was being said during the questioning?

A.   I do not know of this.

Q.   Would this have been a requirement that you would have been responsible for as coordinator of the coalition -- the relationship with the coalition parties?

A.   Yes.

Q.   And you know of no such requirement?

THE COURT:   What requirement are you referring to?

MS. GINSBERG:   That an SDF -- that the interviews be conducted in Arabic and that a linguist be present to translate.

A.   This is something I have not heard of.

Q.   Did you know that the SDF personnel who accompanied the U.S. interrogators made notes during the interrogations?

MR. PAREKH:   Your Honor, I'm going to renew my objection because I believe this is going way beyond the scope of direct examination.

THE COURT:   It has, but I'll permit this question.  I may, Ms. Ginsberg, limit it; however, it is beyond the scope. But I'll permit you to ask it.

Go ahead, you may ask the question about notes.

THE INTERPRETER:   I'm sorry, Your Honor.

A.   Not during the interrogation but during the tour or the visits.

Q.   Do you know that SDF officials provided the Department of Defense interrogators with copies of the notes that they made and reports that they created about Mr. Elsheikh?

THE INTERPRETER:  I'm sorry.  I'm asking, can you repeat the question?  I didn't get it.

Q.   Do you know that the SDF officials provided the Department of Defense interrogators with copies of their reports?

MR. PAREKH:  Your Honor, is the question do you know whether they provided?  Because it sounds like an argument.

THE COURT:  I'll overrule it.  If your objection is that it's not understandable, it is.  He can answer.

THE INTERPRETER:  He's asking me to repeat the question.  I'll just repeat it.

THE COURT:  Yes, repeat the question, Ms. Ginsberg.

THE INTERPRETER:  I got the question.  I'll just repeat it for him.

THE COURT:  All right.

A.   No.

Q.   And do you know whether it was a requirement, in order for the U.S. interrogators to have access to Mr. Elsheikh, that the interrogators provide SDF officials with copies of their reports?

A.   No.  No, but sometimes the interrogations were joint, so we

did not have to copy each other.

Q.   Do you know whether any of the Department of Defense officials was ever told that their access would be limited -- the access to Mr. Elsheikh or other detainees would be limited if they didn't provide copies of their reports --

THE COURT:  Told by whom?

MS. GINSBERG:  Does he have knowledge -- does he know from any source.

THE COURT:  Yeah, but told by whom?  By the SDF?

MS. GINSBERG:  By the SDF.

THE COURT:  Re-ask your question and make that clear.

BY MS. GINSBERG:

Q.   Do you know whether any of the Department of Defense interrogators were ever told by someone under your command at the SDF that their access to Mr. Elsheikh or the other detainees would be limited if the Department of Defense did not share their intelligence interviews with the SDF?

A.   There are times, there are occasions where the requests by the American teams for interrogations were rejected because it conflicted with our regular schedules for our teams' works.  But there's no such thing that we would tell them, we'll let you have access if you give us that.

Q.   Didn't you tell the prosecutors in this case that there were times when access to the -- the Department of Defense access to Mr. Elsheikh was denied because you didn't have an SDF official

or a guard available to sit in during the interview, during the intelligence interviews?

MR. PAREKH:  Objection, Your Honor.  I'm looking at the report.  I see no -- I don't know what Ms. Ginsberg is talking about.  And I understand she can ask questions, but she's now bringing in claims about what he told the prosecutors.  I have the report with me.  That's not mentioned anywhere in the report.  So I think this is an improper argument rather than asking a question that the witness would know the answer to.

THE COURT:  Ms. Ginsberg?

MS. GINSBERG:  If I could have a moment, Your Honor.

THE COURT:  This ought not to take this time.  Let me see.  Mr. SDF Number 1, did there ever come a time when Department of Defense interrogators, American interrogators, were told by the SDF that they could not interview Mr. Elsheikh unless the Department of Defense interrogators agreed to give the SDF copies of Department of Defense reports on the interview?

THE WITNESS:  Your Honor, I've never heard that thing before.

THE COURT:  Next question, Ms. Ginsberg.

BY MS. GINSBERG:

Q.  Did the SDF have discussions with the U.S. Government about sending its ISIS prisoners to Iraq if they were not returned to their native countries?

MR. PAREKH:  Objection, Your Honor.  When is Ms. Ginsberg talking about, and what's the relevance to this witness' testimony?

THE COURT:  Well, I think what she means is she wants to add this to her list of coercive acts by the SDF and the United States in order to bolster the motion to compel -- not motion to compel.  The motion to suppress.

That's right, isn't it, Ms. Ginsberg?

MS. GINSBERG:  Yes, sir.  That's correct.

THE COURT:  So what's the objection?

MR. PAREKH:  Well, it's an imprecise question.  As she's saying related to Mr. Elsheikh because she -- I believe her question was broader than that.  So if she would like to ask whether there was any discussions about sending Mr. Elsheikh to Iraq or threatening or using any force or tactics, that seems, at least to me, to be a more precise and appropriate question than saying, did there ever come a time that the SDF did this.

THE COURT:  Well, I agree that we ought to be precise.

Ms. Ginsberg, do you want to rephrase your question in any way?  I know you want to understand whether Mr. Elsheikh was ever told that he would be sent to Iraq if he didn't cooperate.  That's what you want to show.  Right?

MS. GINSBERG:  That's correct.

THE COURT:  Why don't you ask it directly:  Do you know whether Mr. Elsheikh was ever told by an American interrogatory

that if he didn't cooperate, he would be sent to Iraq; do you know one way or the other?

THE WITNESS:  All the reports are submitted to me. I've never seen anything related to this thing in any of those reports.

BY MS. GINSBERG:

Q.  Did you have discussions, in general, with the U.S. Government authorities about sending foreign fighters to Iraq?

A.  Yes.  I am in charge of the profile of the prisoners, and I do carry on transfers of inmates into Iraq with the coalition forces.  But only the Iraqi nationals.

Q.  Do you know whether other non-Iraq nationals were transferred from SDF custody to Iraq?

MR. PAREKH:  Your Honor, she's asking about any --

THE COURT:  I understand.  It's too broad and vague, but I'm going to permit it in the hope that a concession to the shortness of life that you're making progress and we'll get there.

MS. GINSBERG:  Yes, sir.

THE COURT:  How much longer do you anticipate, Ms. Ginsberg?

MS. GINSBERG:  Maybe 20 minutes.

THE COURT:  All right.  Let's move it along.  Did he give an answer yet?

THE INTERPRETER:  No, he hasn't.

THE COURT:  All right.

THE INTERPRETER:  Could you repeat the question, please, so I can ask it again?

MS. GINSBERG:  Yes.

BY MS. GINSBERG:

Q.  Are you aware of whether the SDF transferred any non-Iraqi prisoners that it was holding to Iraq?

A.  All the -- the list of all the prisoners that we handed to Iraq were in front of me and I did not see anyone that was not Iraqi.

Q.  Are you aware of any visits or inspections by the U.S. Government officials where they found that conditions in the cells in either Ayn Issa, Kobani, or Derik were unacceptable because they were too hot?

MR. PAREKH:  Your Honor, when?

MS. GINSBERG:  At any time.  Or in August -- in either 2018 or 2019.

THE COURT:  Does he understand the question?

THE INTERPRETER:  I'm trying to interpret it now.

A.  I'm in continuous meetings with the Americans.  If there were such a thing, they would have told me.

Q.  And did they ever tell you that?

A.  No, I haven't heard.

Q.  Were there ever reports of abuse of the SDF prisoners?  Did

91

you ever receive reports of abuse by SDF guards of the SDF prisoners?

MR. PAREKH:  Your Honor, I'm going to object because, again, these are very broad questions, and my objections are to relevance.  Are we talking about related to Mr. Elsheikh or Mr. Kotey, or is she talking about in the history of the SDF being founded were there any reports of abuse?  So the questions are, quite frankly, hard for me to follow along because they're extremely broad.

MS. GINSBERG:  I'll rephrase the question.

THE COURT:  All right.  You may do so.

Q.  While you were occupying your current position, did you receive reports of any detainee abuse?

A.  Do you mean with the two defendants or in general?

Q.  In general.

A.  Yes.

Q.  How many times?

A.  I don't recall exactly, but I would guess twice.

Q.  In four years you received two complaints of --

THE COURT:  All right.  That does go well beyond.  I know you're trying to undermine his credibility, and I've given you some latitude in the last several questions.  And I think your point is that it isn't credible that in a war situation there would not be any reports to him.  Is that what your argument is?

MS. GINSBERG:  Yes, sir.  I think you've understood me.

THE COURT:  Yes, I have understood it.

MS. GINSBERG:  Thank you.  I'll move on.

THE COURT:  Whether or not it serves to undermine what he has said as far as I'm concerned is another matter.

Proceed.  I'm only, in the end, going to be interested in whether your client persuades me that his will was overborne and that he was tortured.  That's what's going to persuade me or not persuade me.  I don't sit in judgment of everything the SDF does.  I certainly understand the questions you've asked.

I don't think anyone who's ever been close to combat -- I've been close but I've never been in it.  I've certainly never been captured.  I was captured by friendly forces in a war game, but of course I knew that at the end of two or three days I'd be at the officer's club having a steak.  I didn't know that I would be -- it would be very different psychologically to me if I knew that I did not know if I would ever get out.  So I can't say from personal experience.

But we know these were wartime situations, and I'm really interested in whether your client was tortured or abused in such a way that when he was finally asked questions by the FBI after he was Mirandized in what I understand was a modified Miranda fashion, whether his will was overborne.  I've heard testimony about whether he was abused or not, I have his declaration.  I don't know whether he'll testify.  But I do know

that people who saw him during a period of time have testified that he did not have any marks on his face or body that they could see, and I don't know about any other signs of physical abuse or torture.

And I don't remember, Ms. Ginsberg, whether he described in his affidavit what he contends was his torture.

MS. GINSBERG:  He does, Your Honor.

THE COURT:  Does he say waterboarding?

MS. GINSBERG:  Not waterboarding.  We use the term "torture."  Being coerced does not require that you meet the certain definition of torture.

THE COURT:  Well, there's a big difference between coercive stuff and torture.

MS. GINSBERG:  Well, repeated beatings, Your Honor, and starvation and threats of being sent to Iraq and threats to family members who are being held in Syrian detention camps.

THE COURT:  Yes.

MS. GINSBERG:  But if I could just respond to your comments.

THE COURT:  Yes, you may.

MS. GINSBERG:  Your first comment, I actually totally agree with you, and that's why I objected to Mr. Parekh putting this witness on in the first place.  But just so the Court is clear, the statements that Mr. Elsheikh made to the FBI did not include -- let me rephrase that.

94

Mr. Elsheikh made no admissions whatsoever to the FBI about any involvement with the hostages. And his statements to the FBI I don't believe will have any evidentiary value as to whether or not he is guilty of the crimes that are charged in the indictment.

THE COURT: So why are we here?

MS. GINSBERG: Perhaps -- I'll tell you. Perhaps with the one exception of providing material support.

The reason we're here is because Mr. Elsheikh was taken to these media interviews and in our version of what occurred was forced to participate in these media interviews after undergoing a regular -- regular sessions of torture at the Derik prison in 2019 --

THE COURT: You mean regular sessions of beatings.

MS. GINSBERG: Beatings.

THE COURT: All right. That's not torture.

MS. GINSBERG: Beatings, abuse.

THE COURT: Abuse.

MS. GINSBERG: Mistreatment and abuse.

THE COURT: That's a better term to use.

MS. GINSBERG: Mistreatment and abuse.

THE COURT: You know, if your fingernails are pulled out, if you're waterboarded, if you're hung by your toes and dropped in a pool and held there, that's torture.

MS. GINSBERG: Mistreatment or abuse, severe enough

that if it occurred in the United States would be considered coercive and would be a basis to argue involuntariness with respect to the statements.

But it is during these media interviews that Mr. Elsheikh made statements which the Government intends to offer in evidence as proof that he engaged in the conduct, with respect to the hostages, that is the basis of this indictment.

THE COURT:  All right.  Now, those statements, of course, may well come in because the Government didn't coerce him to give those statements.

MS. GINSBERG:  We have not alleged that the Government coerced him to make those statements.  But if he had been coerced, if he was in fear of additional beatings, threats of being sent to Iraq, threats to his family who were being held in Syrian displaced persons camps, and the threat of ongoing and potential future beatings, I think that that is a basis upon which to argue that his statements to the media were not voluntary.

THE COURT:  All right.  That's a basis -- you can argue that.  I don't think it ultimately is going to amount to a basis to exclude presentation of the evidence.  But under 3500, you may argue to the jury that they were involuntary, and it's a jury issue.  Do you agree with that, Mr. Parekh?

MR. PAREKH:  That's correct, Your Honor.  Voluntariness is a jury question.

THE COURT:  That's right.

MR. PAREKH:  And if I could just say a couple of things that Ms. Ginsberg said.

THE COURT:  Well, let her finish first.

MR. PAREKH:  Sure.

MS. GINSBERG:  But I also think involuntariness is also, the Court has a gatekeeping function.

THE COURT:  I do, but so far I'm not moved.  I'll wait and see at the end.  You have that burden.

MS. GINSBERG:  Yes, we haven't gotten that far yet.  But if the Court were to believe that the media statements were involuntary, I think the Court would be required to exclude those statements --

THE COURT:  Well, we'll see.

MS. GINSBERG:  -- as involuntary.

THE COURT:  We will see.  I will look carefully at the law on that and we will see.

But I think we have clarified by this exchange what your position is, Ms. Ginsberg, and Mr. Parekh, I think what your position is.  But you wanted to say something, Mr. Parekh.  Let's do so, and let's, as a concession to the shortness of life, which I have more basis to rely on than either of you, I want to get this done.  I have a docket on Friday as well.

MR. PAREKH:  Yes, Your Honor.  We have mutual interests in that.  Just a few things that Ms. Ginsberg --

THE COURT:  But I can tell you this:  If we go on to Friday, it's your docket and Ms. Ginsberg's docket that's going to have to move, not mine.

MR. PAREKH:  I understand, Your Honor.  We would like to move this on as well.

A few things that Ms. Ginsberg said.  In their motions they've directly indicated certain things that we wish to rebut, and that's why we put this witness on the stand.  They've indicated that the prison facilities were filthy, Mr. Elsheikh indicated that they were infested with bugs.  He indicated he was subject to --

THE COURT:  I'm aware of all of that.

MR. PAREKH:  So that's why this witness is relevant. And he would be in a position to know whether there were any claims of abuse, mistreatment, or some other type of physical or psychological misconduct as it relates to Mr. Elsheikh or Mr. Kotey.

Secondly, I don't agree at all with what Ms. Ginsberg said about the FBI interviews having no relevance other than material support.  They may not solve the ultimate question. Because she's right, Ms. Ginsberg is right; he didn't speak about hostages.  But that goes to voluntariness.  That's what we've been arguing.  He chose what to speak to the FBI about and what to not speak to them about.  Whereas in the DoD interviews, he freely spoke about the hostage-taking scheme, which goes to

show that he knew this was a totally separate process and he could choose to answer questions about what he wanted, when he wanted, and how he wanted.

Lastly, I do think -- you know, Ms. Ginsberg is talking about beatings and torture and things that Mr. Elsheikh went through.  With all due respect, Your Honor, the victims in this case, those are the individuals that were tortured, that were beaten, that were given threats, as we've alleged by Mr. Elsheikh.

And so that's why that evidence is relevant because it goes to whether an individual like him, whether his will would be overborne when we've alleged - and we have extensive evidence of - the fact that he was subjecting all of the victims in this case and the deceased hostages to that kind of treatment.

And so that's why we're putting in that type of evidence.

THE COURT:  All right.

MR. PAREKH:  Thank you, Your Honor.

THE COURT:  Enough, Mr. Parekh.  Enough.  Let's finish the examination of this witness, Ms. Ginsberg.

Cross-examination.

BY MS. GINSBERG:

Q.  How large were the rooms that Mr. Elsheikh was held in at Ayn Issa, Kobani --

THE INTERPRETER:  I think my microphone is dying.

(OFF THE RECORD.)

BY MS. GINSBERG:

Q.  What were the size of the rooms that Mr. Elsheikh was held in at Ayn Issa, Kobani, and Derik prisons?

A.  As I said earlier, these are not prisons, these were schools converted into prisons.  When it comes to size, I don't recall. I haven't measured them.

Q.  Were they different or the same?

THE COURT:  Different?  What do you --

MS. GINSBERG:  Or the same.

THE COURT:  What was different or the same?

MS. GINSBERG:  The rooms, the sizes of the rooms in these prisons.

THE COURT:  Well, that wasn't clear.  Was the size of the rooms that they were interviewed in --

MS. GINSBERG:  No, that they were held in.

THE COURT:  All right.  Was the size of the rooms that they were held in in the various prisons all the same size?

THE WITNESS:  Yes.

THE COURT:  I assume you meant approximately the same size, since you didn't measure them?

THE WITNESS:  Because I haven't measured them, so I don't give an answer on my own.

THE COURT:  Next question.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

BY MS. GINSBERG:

Q.   Now, you testified that the prisons were visited by medical doctors twice a week?

A.   Yes.

Q.   And that the prisoners were given medical care by these doctors?

A.   Yes.

Q.   Were records of this medical care maintained by the SDF?

A.   These are things special to the doctors and the medical teams.  But what I recall is that some of the medications or treatments we could not get because they were not available in our territories.

Q.   Did you keep records of the medications that you purchased for the prisons?

A.   Maybe with the medical teams.

Q.   And were you asked by the Government to bring any of those records with you here?

A.   No.

Q.   And do you have personal knowledge of whether the guards actually provided medicine to any of the prisoners?

A.   I didn't understand the question.

Q.   Do you know from something you observed yourself that any of the guards actually provided medicine to the prisoners?

        THE INTERPRETER:  For clarification, when you say "provided," as in to give them to eat [sic] as treatment?

MS. GINSBERG:  Yes.  Thank you.

A.  Besides the medical teams, you're asking?

BY MS. GINSBERG:

Q.  I'm asking if you know from something you saw yourself about medicine being given by the guards to the prisoners.

A.  No, I have not seen.

Q.  You testified about the ICRC having access to the prisoners. Do you recall that?

A.  Yes.

Q.  Wasn't it a condition of allowing the ICRC into the SDF prisons that the ICRC keep confidential everything that the prisoners told them?

A.  I don't understand the content on the question.  So the ICRC keeps the contents confidential?

Q.  That the ICRC was required to keep the information that the prisoners gave them secret.

A.  No, it didn't happen.

Q.  So if I asked the ICRC about its meetings with Mr. Elsheikh and I was told that they were not permitted to share that information, would that be a lie?

MR. PAREKH:  Object to the form of the question, Your Honor.

THE COURT:  I'll sustain the objection.  All he can do is testify as to what he knew.  What the ICRC says is quite another matter.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

Q.  But you know of --

THE COURT:  And I don't have any idea, Ms. Ginsberg, how that's relevant to anything here other than an attack on his credibility.

MS. GINSBERG:  Yes, that's the purpose, Your Honor.

THE COURT:  And I think I understand your attack on his credibility, but I still don't see a lot of this testimony having much to do with whether this defendant's will was overborne with respect to the statements the Government wishes or intends to introduce at trial and that you wish to block or to prevent the Government from offering at trial.

The fact that the ICRC or some other humanitarian was told they had to keep the information that they learned from detainees confidential or secret is immaterial to that determination; in addition to which, if he says he doesn't know it and you then say, well, then it's a lie if the ICRC, that doesn't move me a bit and it wastes my time.

MS. GINSBERG:  Your Honor, the point I'm trying to make is that if there was in fact abuse that was either reported or concealed that was occurring, it tends to bolster the credibility of Mr. Elsheikh's allegations.  The Government went to great lengths to try and establish that there was no abuse going on in these prisons to undermine Mr. Elsheikh's credibility.

It's our position that the existence of abuse and the

103

concealment of abuse at these facilities tends to corroborate Mr. Elsheikh's allegations.

THE COURT:  Bring it to a close, Ms. Ginsberg.  There's no objection pending, but I think I have made clear that you --

MS. GINSBERG:  Yes, you have.

THE COURT:  -- need to be sharply focused.

BY MS. GINSBERG:

Q.  To the point about -- going back to the ICRC, the SDF read the letters that the detainees wrote to their family members before the ICRC was permitted to take those letters.  Correct?

A.  Yes.

Q.  Yes.  And, in fact, you brought several and gave them to the prosecutors here in this case?

A.  Yes.

Q.  And if there were letters that alleged abuse, you would not have given them to the ICRC?

A.  No.

MS. GINSBERG:  Your Honor, I have no --

THE COURT:  Were there any letters alleging abuse?

THE INTERPRETER:  Your Honor, I have a clarification. I think that question needs to be clarified, because the way I said it and the way he said no was answering to the question, not -- I'm trying to avoid if there was a confusion that was caused by me.  Can you please repeat the question in a manner that's --

THE COURT:  I will strike the previous question and answer, Ms. Ginsberg, and give you an opportunity to re-ask it and the witness an opportunity to re-answer it.

THE INTERPRETER:  Please, thank you.

BY MS. GINSBERG:

Q.  Do you know whether any of the letters that the detainees wrote complained of abuse?

A.  I haven't heard.

Q.  And did you instruct the SDF people who reviewed these letters not to send any letter if it did contain an allegation of abuse?

A.  No, that didn't happen.

MS. GINSBERG:  I have nothing further.

THE COURT:  Any redirect?

MR. PAREKH:  Briefly, Your Honor.

**REDIRECT EXAMINATION BY COUNSEL FOR THE UNITED STATES**

**BY MR. PAREKH:**

Q.  Mr. SDF Witness 1, Ms. Ginsberg asked you questions about why you came here to testify.  Do you remember that?

A.  Yes.

Q.  Were you promised anything whatsoever from the United States Government or anyone in exchange for your testimony today?

A.  No.

Q.  If the United States Government declined to assist in helping maintain the SDF prisons before you traveled here to

testify, would you have still come to testify voluntarily?

A.   No.

Q.   Do you understand my question?  If the United States Government had said that they're not going to help you, would you have still come here to testify voluntarily?

A.   Yes, I will have come.

Q.   You were asked questions about the battle of Baghuz in March 2019.  Do you remember that?

THE INTERPRETER:  I'm sorry, can you repeat?

Q.   You were asked questions by Ms. Ginsberg about the battle of Baghuz in March 2019.  Do you remember that?

A.   Yes.

Q.   Did the prison or prisons that were created after the battle of Baghuz have anything to do with Ayn Issa, Kobani, or Derik, the three prisons in which Mr. Elsheikh was held in SDF custody?

A.   Those prisons were established after the town of Baghuz was liberated.

THE COURT:  What prisons were established after Baghuz?

THE WITNESS:  We called it the Hasakah Wahiran (ph) prison.

Q.   And are those prisons different than Ayn Issa, Kobani, and Derik?

THE INTERPRETER:  He's answering "yes" without me interpreting.

MR. PAREKH:  Can you interpret it to make sure he

understands?

THE INTERPRETER:  (Interpreting question.)

A.  Yes.

Q.  You were asked questions by Ms. Ginsberg about SDF officials and prison guards losing family members to ISIS.  Do you recall that?

A.  Yes.

Q.  Have you ever heard of any SDF official retaliating or seeking revenge against Mr. Elsheikh because he was a member of ISIS in the way they treated him?

A.  No, that didn't happen.

Q.  You were asked questions about sending detainees to Iraq by Ms. Ginsberg.  Do you remember that?

A.  Yes.

Q.  Based on your personal knowledge or anything you heard from the reports that you testified about, did any SDF official ever threaten to send Mr. Elsheikh to Iraq if he did not cooperate with interrogations or media interviews?

MS. GINSBERG:  I just want to make sure I heard this correctly.  He asked based on reports he received.  Is that correct?

MR. PAREKH:  Reports he heard or received.

THE COURT:  Read back the question, please.  Let me ask the court reporter so that the interpreter has the full question in front of him.

(The reporter read the record as follows:

"Based on your personal knowledge or anything you heard from the reports that you testified about, did any SDF official ever threaten to send Mr. Elsheikh to Iraq if he did not cooperate with interrogations or media interviews.")

A.  No, I have never heard that before.

BY MR. PAREKH:

Q.  You were asked questions regarding medical records as it relates to Mr. Elsheikh.  Do you remember that?

A.  Yes.

Q.  If Mr. Elsheikh had received any serious medical treatment or hospitalization -- let me rephrase the question.

Are you aware of whether or not Mr. Elsheikh was ever treated for any serious medical conditions, or was he hospitalized for any reason?

A.  No, I have not heard that, but I know that the medical teams visit on weekly basis.

Q.  And if Mr. Elsheikh had received serious medical attention --

THE COURT:  Or been hospitalized.

Q.  -- or been hospitalized, is that something that you would have heard about in connection with your position with the SDF?

A.  Yes, I would.

Q.  And finally, you were asked questions about the fact that the SDF makes copies of letters that detainees send through the

ICRC.  Do you remember that?

A.  Yes.

Q.  Please explain to the Court why that occurs.

A.  Do you mean copying or just opening them?

Q.  Both.

A.  As a security precaution, or measure.  We worry that someone will send some information, leak some information through these letters.  We have 10,000 inmates, and if each one sends a bit of information out, security information, we will have a problem on our hands.

Q.  And the private meetings with the ICRC, are those recorded in any way by the SDF?

THE INTERPRETER:  Recorded on the video?

MR. PAREKH:  Any recording, audio or video.

A.  No.

Q.  So if a detainee wanted to complain to the ICRC privately without the SDF knowing about it regarding his or her alleged mistreatment, could that be done?

A.  Yes, they could.

Q.  And if Mr. Elsheikh had made any claims of mistreatment or abuse to the ICRC, would the ICRC have told the SDF?

MS. GINSBERG:  Objection.  Speculation.

THE COURT:  Well, I agree he may not know.  What's your question again, Mr. Parekh?

MR. PAREKH:  If Mr. Elsheikh had made any claims of

mistreatment or abuse to the ICRC, is that information that the ICRC would pass on to the SDF.

THE COURT:  All right.  I'll let him answer that.

A.  No.  They speak English with them, so our guards don't speak English.

BY MR. PAREKH:

Q.  I think it's a translation...

What I'm asking is, if the ICRC received a complaint from Mr. Elsheikh regarding mistreatment or abuse, would that be information that the ICRC would share with you in order to address any such complaints?

MS. GINSBERG:  The question assumes that the detainee would have given consent for the information to be shared.

THE COURT:  If that's an objection, it's overruled. I'll give you an opportunity, Ms. Ginsberg, depending on his answer, you can examine further.

What's the answer?

A.  Yes, if there were any complaints that were made to the ICRC, they will have let us know.

Q.  And for a high-value prisoner like Mr. Elsheikh, if there were such complaints made, is that information that would have made its way to you given your position within the SDF?

A.  Yes.

Q.  And did you receive any such complaints from the ICRC regarding Mr. Elsheikh?

A.   No.

Q.   Thank you.

MR. PAREKH:  No further questions, Your Honor.

THE COURT:  All right, Ms. Ginsberg, I said I would give you one more chance on that subject if you wanted to ask him a further question.

**RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

**BY MS. GINSBERG:**

Q.   You don't know for a fact that Mr. Elsheikh did not make complaints to the ICRC, do you?

A.   I didn't understand the question.

Q.   You have no proof based on anything -- you have no way to know if the ICRC relayed complaints by Mr. Elsheikh to any personnel at the SDF prisons?

A.   No.  If it were submitted, I would have known.

THE COURT:  Let me ask you, are you aware of any complaints of mistreatment or abuse or torture by Mr. Elsheikh?

THE WITNESS:  No, sir, I have never heard that before.

THE COURT:  And are you aware of any complaints of abuse, mistreatment, or torture that Mr. Elsheikh made to the ICRC, if indeed he made any to the ICRC?

THE WITNESS:  I haven't heard.

MS. GINSBERG:  Judge, may I ask one last question?

THE COURT:  On what?

MS. GINSBERG:  On whether he heard of any complaints of

abuse that Mr. Kotey made while he was -- of his treatment in SDF.

THE COURT:  Why should I care about that?

MS. GINSBERG:  Well, because his testimony suggests that there were no complaints -- there was no abuse occurring at these facilities.  Mr. Kotey has made allegations that he was abused at these facilities.

THE COURT:  I asked him already whether he was aware of any allegations of abuse, mistreatment, or torture, and he said he wasn't.

You want to ask him whether Mr. Kotey made any?

MS. GINSBERG:  Whether he was aware of any allegations of abuse that --

THE COURT:  Any objection to that, Mr. Parekh?

MR. PAREKH:  No objection, Your Honor.

THE COURT:  All right.  Ask that one question.

BY MS. GINSBERG:

Q.  Are you aware of any complaints of abuse or mistreatment that Mr. Kotey made while he was in SDF prison?

A.  No.  As I said before, no, I haven't heard.

MS. GINSBERG:  Thank you.

THE COURT:  All right.  It is now a little bit after 1 o'clock.  We're going to recess for lunch.  You have, as I understand it, three more witnesses?

MR. PAREKH:  Well, three more who will be recorded by

Rule 15 -- through the Rule 15 deposition process.  But two more SDF witnesses.  The third is the UK --

THE COURT:  Yes.  And then after that, what do we have?

MR. PAREKH:  So Mr. Fitzpatrick may have two Department of Defense witnesses after that.  I believe they'll be brief.  Following that, we have the two FBI agents who conducted Mirandized interviews with Mr. Elsheikh at the end of March 2018.  And then following that, we have two other witnesses.  One is the UK film -- documentary filmmaker Sean Langan, and then a wrap-up summary agent, FBI Agent Daniel O'Toole.

THE COURT:  The UK journalist, did he record or obtain statements that the Government intends to offer at trial?

MR. PAREKH:  Yes, Your Honor.

THE COURT:  And does the Government contend they're incriminating?

MR. PAREKH:  Yes, Your Honor.

THE COURT:  All right.

MR. PAREKH:  In July of 2019.

THE COURT:  Where was the defendant located at that time?

MR. PAREKH:  He was located at Derik prison.  And, in fact, the next witness that I'll be putting on the stand has an anecdote about what had occurred with respect to one of the interviews that Mr. Langan conducted.  And so that was the

facility in which Mr. Elsheikh and Mr. Kotey were detained the longest. And we do believe that there are incriminating statements that were made during that interview, and we will be seeking to admit those statements at trial.

THE COURT: All right. We will recess until 2 o'clock. At that time we will go on. Court stands in recess until 2:00.

This witness may be excused.

MR. PAREKH: Yes, Your Honor, we'd like to excuse him on behalf of the Government.

THE COURT: All right.

MS. GINSBERG: Judge, I would ask that you admonish the witness that he's not to speak with any of the other witnesses, especially the SDF witnesses he may not be familiar with.

THE COURT: All right. All of this should be translated. The witness should understand all of this. So Mr. SDF Number 1 -- is that right?

MR. PAREKH: Yes, Your Honor.

THE COURT: You are not to discuss your testimony with anyone, not with any of the lawyers or any of the other SDF witnesses until this matter is over. Do you understand that?

THE WITNESS: I understand. Thank you.

(Recess taken at 1:14 p.m.)

THE COURT: To clarify what I said, it's very clear under Fourth Circuit and other circuit authority that a preliminary determination of voluntariness of a defendant's

statement by the judge is a precondition, a prerequisite to the submission of the statement for the jury's consideration. And I could also exclude it if I find that it was coerced and involuntary.

The purpose of the evidentiary hearing that we're having is to develop a record for making this preliminary determination of voluntariness of a defendant's statement. And even after I make a preliminary determination, defendant is nonetheless free to present evidence during the trial that any statements were not made voluntarily. That's under 3501 of Title 18. And the trial judge, according to that statute, shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession, if that's what it is, as the jury feels it deserves under the circumstances.

But I don't need to reach that issue right now. All I need to determine here is to see if the record warrants suppression of it, and if not, then it will get presented at trial and the defendant will have an opportunity to argue to the jury voluntariness if the facts warrant that.

All right. Who is the next witness, Mr. Fitzpatrick?

MR. FITZPATRICK: Your Honor, Mr. Parekh has the next witness. If the Court pleases, I would like to update the Court on the schedule. We've made some movement over the lunch hour and I would like to advise the Court.

115

THE COURT:  All right.

MR. FITZPATRICK:  We've reached a stipulation with respect to the testimony of DoD Individual 1 and DoD Individual 2.  This stipulation will result in the admission of Government Exhibit 9-1 and 9-1A.  9-1 is a classified document; 9-1A corresponds with the defense's Exhibit 14 filed with their October 1st, 2021, motion to suppress.

So all of those documents should be admitted, Your Honor, without objection.

THE COURT:  Does that obviate the necessity to hear DoD 1 and DoD 2?

MR. FITZPATRICK:  It does, Your Honor.  And in that regard we have a written stipulation that I'm asking the Court to accept as Government Exhibit 9-2.

THE COURT:  Do you have it there?

MR. FITZPATRICK:  I do, Your Honor.

THE COURT:  Hand it to the court security officer, please.

All right.  So 9-1A is an unclassified first page of this chat.  Is that correct?

MR. FITZPATRICK:  Yes, sir.

THE COURT:  All right.  I will have this stipulation filed and I will admit 9-1A.  Is that correct?

MR. FITZPATRICK:  Yes, Your Honor, as an unclassified document.  And also 9-1 as a classified document.

THE COURT:  All right.  But that won't be, of course, in the public record.

(GOVERNMENT Exhibit Number 9-1A was admitted into evidence.)

MR. FITZPATRICK:  Correct.

THE COURT:  So that means you have SDF Witness 2, an SDF Witness 3 by Mr. Parekh, and then you have the FBI witnesses.

MR. FITZPATRICK:  Yes, Your Honor.  And we have released FBI Special Agent William Heaney as the defense no longer requires him.  So from the Government's witness list, Witnesses 9, 10, and 11 are now released.

THE COURT:  All right.  So we have two SDF witnesses and three FBI witnesses and one journalist.

MR. FITZPATRICK:  Correct.

THE COURT:  All right.  We should finish, let us hope, by tomorrow.

MR. FITZPATRICK:  I think so, Your Honor.

THE COURT:  All right.  Call your next SDF witness, Mr. Parekh.

MR. PAREKH:  Thank you, Your Honor.  The United States calls SDF Witness 2.

THE COURT:  Tell me again, Mr. Parekh, who he is, as a preface, while he's marching up here.

MR. PAREKH:  Yes, Your Honor.  I believe he'll say that

117

he's currently the head of Derik prison, where the defendant spent the majority of his time in custody in Syria.

THE COURT:  All right.  That explains enough.  Thank you.

All right.  You may administer the oath to the witness.  He may affirm.

(Oath administered by courtroom deputy clerk.)

THE COURT:  The witness may remove his face mask if he feels comfortable doing so.  All right.  He has removed it.  Proceed, Mr. Parekh.

**(SDF WITNESS 2, having been duly sworn, testified as follows:)**

**EXAMINATION BY COUNSEL FOR THE UNITED STATES**

**BY MR. PAREKH:**

Q.  Good afternoon, sir.

A.  Good afternoon.

Q.  Sir, we are keeping your name out of the public record.  We will be addressing you as SDF Witness 2.  Do you understand that?

A.  Yes.

Q.  Where are you from?

A.  From Syria.

Q.  Do you currently reside in Syria?

A.  Yes.

Q.  In what area of Syria generally?

A.  The city of Derik.

Q.   What languages are you fluent in?

A.   Arabic and Kurdish.

Q.   By whom are you employed?

A.   For the SDF.

Q.   Also known as the Syrian Democratic Forces?

A.   Yes.

Q.   Do you also serve the SDF in Derik, Syria?

A.   Yes.

Q.   What is your title --

          THE COURT:  Spell that for the court reporter, please.

          MR. PAREKH:  Yes, Your Honor.  There are different spellings, but I believe the Arabic spelling is D-E-R-I-K.  So that's what I've been using.  It's also indicated on the map 1-1.

          THE COURT:  All right.  Did you say D-E-R?

          MR. PAREKH:  D-E-R-I-K, that's correct, Your Honor.

          THE COURT:  All right.  Go on.

          MR. PAREKH:  Thank you.

Q.   Do you also serve the SDF in Derik, Syria?

A.   Yes.

Q.   What is your title with the SDF?

A.   I am the director of the office of investigating antiterrorism in northeast Syria.

Q.   Where is your office located?

A.   In the prison of Derik.

Q.   Are you considered to be the head of Derik prison?

A.   Yes.

Q.   How long have you been serving in that role?

A.   The beginning of my job --

THE COURT:  Louder, please.

A.   The beginning of my job at that position --

THE INTERPRETER:  Forgive me.

A.   I started in June 2018 as the deputy for that position.

Q.   Okay.  So you were the deputy head of Derik prison in June of 2018?

A.   Yes.

Q.   And when did your service as the deputy head of Derik prison end?

A.   In February 2021, this year.

Q.   Okay.  Does that mean that in February of 2021 you became the head of Derik prison to the present day?

A.   Yes.

Q.   What are your current duties with the SDF?

A.   At present time I am the head of the division.

Q.   I mean, if you can explain what your roles and responsibilities are in your current position.

A.   I supervise and oversee all of the investigation offices in the entire area of the northeast part of Syria, and also to follow up constantly with all of the investigations going on in all of the centers.  And also to observe and be aware of the

conditions of all of the detainees in all of the centers.

Q.  And that includes --

A.  But mostly specifically it's the prison of Derik.

Q.  Okay.  You predicted my next question.

And what were your roles and responsibilities when you were the deputy head of Derik prison in June of 2018 to February of 2021?

A.  Parts of my responsibilities were that, for example, if the director was not there, I would be in his stead and I would take care of the responsibilities.  And if he was there, I was in charge of the portfolio of investigations regarding terrorism.

Q.  I'm going to focus my questions on the years 2018 to 2019 when you were serving as the deputy head of Derik prison.  Do you understand that?

A.  Okay.

Q.  When you were the deputy head, did your duties also include the oversight of the detainees' living conditions at Derik prison?

A.  Yes.

Q.  And did your duties also include investigations pertaining to antiterrorism subjects of the SDF; specifically ISIS members that were detained at Derik prison in 2018 and 2019?

A.  Yes.

Q.  In connection with those roles and responsibilities, did you have the occasion to meet two individuals, one by the name of

El Shafee Elsheikh and the second by the name of Alexanda Kotey?

A.    Yes.

Q.    And is it true that you met both of them face to face in connection with your duties at Derik prison in 2018 and 2019?

A.    Yes.

Q.    Do you recognize whether anyone in the courtroom resembles the appearance -- or is, rather, El Shafee Elsheikh?

THE COURT:    Well, everyone is wearing a mask.    I don't know how you expect him to identify anybody.    But if he can, so be it.

MR. PAREKH:    Your Honor, he appears to be nodding his head yes.

THE COURT:    All right.    Go on.

Q.    Can you identify him by location of where El Shafee Elsheikh is sitting and describe an article of clothing that he's wearing.

A.    I believe he's sitting at this table.    He's wearing I believe a green shirt and trousers.    He's wearing blue and white shoes, and I believe he's reading a few sheets of paper.

MR. PAREKH:    Your Honor, may the record reflect an in-court identification of the defendant?

THE COURT:    All right.    Any objection to that?    I can't see whether that's the case.

MS. GINSBERG:    No objection.

THE COURT:    All right.    So ordered.    Next question.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

Q.  When did you first meet El Shafee Elsheikh?

A.  When I received my position as deputy director to the Derik prison, El Shafee Elsheikh and Alexanda Kotey were both present at the time in Derik prison.  The first time that I first met them was during the period just before they were transferred to Kobani prison.

Q.  And how long did they spend in Derik prison?  And specifically until what month and year did they no longer -- were they no longer in custody at Derik prison?

A.  I believe they were transferred from Derik to Kobani on June 24th, 2018.  At that time I supervised the transfer.  Up until the date of November 11th, 2018, is when we received them back in from Kobani --

THE COURT:  Louder, please.

A.  It was November 11, 2018, when we received them back from Kobani prison.  And they remained in Derik prison up until October 9th, 2019, was the last date.

Q.  Where did they go in October of 2019?

A.  They were handed over to the U.S. Government.

Q.  I want you to take a look at the binder that's next to you, and if you can turn to Exhibit 7-4, please.

(OFF THE RECORD.)

THE COURT:  The binder that you're referring to that I was using yesterday has found its way into the SCIF.  But you go ahead and we'll get it back as quickly as we can.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

MR. PAREKH:  Your Honor, we can provide you with a spare copy of our binder.

THE COURT:  All right.  That would be helpful so we don't have to go to the SCIF.

Thank you.  Now what exhibit?

MR. PAREKH:  7-4, Your Honor.  And for the record, the defense team has the identical binder that you're looking at.

THE COURT:  All right.

BY MR. PAREKH:

Q.  Sir, do you recognize Government Exhibit 7-4 that's in front of you?  And I'm referring to the first page.

A.  Yes.

Q.  What is it?

A.  This document was produced by myself and it's a document showing the handover of the accused El Shafee Elsheikh and Alexandria Kotey to the U.S. Government.

MR. PAREKH:  Your Honor, move to admit 7-4.

MS. GINSBERG:  No objection.

THE COURT:  Without objection it's admitted.

(GOVERNMENT EXHIBIT Number 7-4 was admitted into evidence.)

THE COURT:  Next question.

MR. PAREKH:  Can you please publish the exhibit.

Q.  Is your signature on this document?

A.  Yes.

Q.   Is that on the right-hand side?

A.   Yes.

Q.   And just please summarize for the Court why this document was created by you.  What was the purpose?

THE COURT:  The question is compound, but I'll let it go.

MR. PAREKH:  Thank you, Your Honor.

A.   This document is one of the standard conditionary [sic] documents in our offices.  When handing over any detainee to any party, a document like this has to be signed, which is one of the core conditions in any kind of handover.

Q.   And up until October 2019, were El Shafee Elsheikh and Alexanda Kotey in SDF custody?

A.   Yes.

Q.   Were they ever in U.S. Government custody prior to the execution of this document?

A.   Not at all.

MR. PAREKH:  Your Honor, for the record, the translation of the document is on page 2.  The whole document has been admitted, and we have a stipulation to the English translation as well.

THE COURT:  All right.  Have I admitted that stipulation?

MR. PAREKH:  You have, Your Honor.  It's Government Exhibit 6-3 signed by myself and Ms. Ginsberg.

125

THE COURT:  Next question.

MR. PAREKH:  Thank you, Your Honor.

BY MR. PAREKH:

Q.  Now, in connection with your roles and responsibilities, you testified earlier that you helped oversee the living conditions at Derik prison.  Do I have that right?

A.  Yes.

Q.  Can you describe for us those living conditions and conditions of confinement at Derik prison specifically as it relates to the time that the defendant, El Shafee Elsheikh and Alexanda Kotey, were physically in the custody of you at the Derik prison.

A.  The period of time that El Shafee Elsheikh and Alexanda Kotey spent in Derik is divided into two different periods.  The split here is only things that are pertaining to the style and the comfort of living.

Q.  Okay.  Let me break it down, then.  When you say two different periods, let's start with the first period.  What are you referring to?

A.  The first period is the period of time that I was at Derik prison, which was in June 2018.  Going up until April, April 5th, 2019, is when a riot broke out in Derik prison.  During that period of time I can speak about in detail.

All of the detainees in Derik and all of our other prisons, they have three square meals a day.  They have the

right to receive a packet of cigarettes, they have the right to -- for 45 to one hour -- 45 minutes to one hour of outdoor time.  They have, in all of their cells, capabilities for heating the room or cooling down the room.  And also in their rooms they are provided with entertainment tools like playing cards, sets of chess, and books.

In addition to that, in Derik prison we were able to provide frequent visits for their families to see them, those family members who are held in Roj camp; in addition to the ability to make phone calls to their children or children of their families who are held in Hori Center.

Q.  Describe first Roj camp.  What are you referring to when you say Roj camp?

A.  Camp Roj is a camp which is about 10 kilometers away from Derik prison and which is almost under complete control of the SDF.  A lot of the individuals who are at this camp are the family members of the people who are detained in Derik, be it their wives or their children.  So as to decrease the tension of the families and the detainees, we would allow visitations and we would arrange visitations for them to see each other.

This was a very large undertaking to conduct, but after the riots that happened later on, that operation was stopped.

Q.  That's the riots in April of 2019.  Correct?

A.  Yes.

Q.  Let's go back to the living conditions.  I'll ask some

targeted questions.  You generally described that detainees received three males a day.  Can you go into some detail about what those three meals would consist of as it relates to the defendant and any other detainees that were in your prison from 2018 to 2019?

A.   The breakfast starting is usually a light meal, usually comprises of two or three items.  But lunch and dinner, they are more of a complete or heavy meal which requires cooking.

Q.   And what are some examples of what might have been served -- or what would be served to El Shafee Elsheikh when he was at Derik prison in 2018 and 2019 for lunch and dinner?

A.   Breakfast or lunch?

Q.   Let's start with breakfast, then lunch, then dinner.

A.   We have a constant schedule when it comes to meals.  We have yogurt and olives and cheese, zaatar oil, eggs.  These are items that are presented during breakfast but not all together at the same time.

Q.   And how about for lunch?

A.   We have pergo, rice, a cooked complex dish of rice and vegetables and meat, pasta dishes, fried food, in addition to meat.  Also, these items have their own schedule and timing in addition to the secondary vegetables and fruit and such.

Q.   And dinner?

A.   Dinner, usually it would be a soup, and fried food and pasta dishes would be scheduled according to when it was on the

schedule.

Q.  When El Shafee Elsheikh was in your custody at Derik prison, was he ever intentionally starved?  And I can provide clarification for that.  Let me ask the question again.

When El Shafee Elsheikh was in your custody at Derik prison, did you or any SDF officials intentionally keep food away from him so as to starve him?

A.  Not at all.

Q.  All of the questions that I'm going to be asking you, I want you to answer keeping in mind that we're focusing on the defendant, El Shafee Elsheikh, and Alexanda Kotey, in the 2018 to 2019 timeframe when they were at Derik prison.  Do you understand that?

A.  Clear.

Q.  When you testified about providing heating and air conditioning, was that available to the defendant, El Shafee Elsheikh?

A.  When I say the AC which is a unit that can do the cooling and the heating, it's a device.  It's a climate control device, and it's present in all the rooms.

Q.  Can you talk about the types of medicinal care that was available at the prison during that time period?

A.  When it comes to medical care, we pay extra attention to it because we have, among the population of the detainees, the widespread of skin conditions sometimes or lice.  That is why we

take extra care that the detainees have ability to have access to the medical professionals and that the doctors are able to access them to have a one-on-one to inspect them.

But if it is something which exceeds the ability of the doctor on site to treat, it is quite normal that the individual or individuals would be transferred to Derik hospital and the hospital in Qamashli, and the private clinics also.

Q.   Would doctors visit the prison frequently to check up on the prisoners?

A.   Every Sunday and Wednesday.

Q.   Twice a week?

A.   Yes.

Q.   And if El Shafee Elsheikh or any detainee needed medical attention beyond the set schedule, would a doctor be made available to tend to any medical circumstances beyond those two days?

A.   If it was an emergency, yes.  Not something like as if a detainee would say I have a headache.  That's not an emergency.

Q.   If a detainee needed medicine, would medicine be made available?

A.   Yes.

Q.   And that would be made available also beyond the two days a week that a doctor would come to visit?

A.   We do not give out medication on our side without the presence of a doctor.  A doctor has to be there to administer or

to be able to permit for medication to be given.  Being that some of the detainees have had previous experiences from their own past, sometimes some of the medications that were given to them or that they had, they would sprinkle on their food as in the form of a spice.

Q.  During the time that El Shafee Elsheikh was in your custody at Derik prison, did he have any serious medical ailments that required treatment?

MS. GINSBERG:  Objection.  That he knows of.

MR. PAREKH:  Your Honor, he's testified that he's overseeing the living conditions of the prison.

THE COURT:  Yes, I'll overrule the objection.  But, Ms. Ginsberg, of course when you cross-examine, you can attack whether he has the basis to have expressed that answer.

Next question.

Q.  You may answer.

THE INTERPRETER:  Could you please repeat the question?

MR. PAREKH:  Sure.

Q.  During the time that El Shafee Elsheikh was in your custody at Derik prison, did he have any serious medical issues or ailments that required treatment?

A.  No.  When it comes to any kind of special case, we can't handle it.  They would usually be transferred for special cases, any kind of special need medication, to a hospital where they could treat it or handle it.

If it's something common, something easy that a doctor can handle, they would usually just prescribe something for them like a medication to treat.

Q.   And if El Shafee Elsheikh had been hospitalized or had required serious medical treatment, would you have known that in connection with your position as the deputy head of the Derik prison at that time?

A.   Yes.

Q.   Do you know whether the defendant required treatment for lice during the time that he was at Derik prison?

A.   No.

Q.   No, that he did not have lice?

A.   The lice and the skin condition is not targeted at one person as a treatment.  Wherever it may be found, the entire area has to be completely sanitized.  Being that he existed among other groups around him, that would not be a single task to treat.  It would be something done in a group form.

Q.   And my question is, was the defendant ever subjected to that type of treatment?

A.   I don't know specifically about that case.

Q.   Going to the size of the rooms, what was the typical capacity per prison room at Derik prison during the 2018-2019 period?

A.   The cell rooms that we have right now in Derik prison, at the current time they are 15 in number.  Before the riots that

broke out in there, we used to have bunk beds in these cells. The sizes of these rooms are not equal or uniform.  Each detainee has their own bed, so the number from room to room differs.  So some room might be 15, another one might be 25.

Q.  And did each room afford each prisoner their own personal space?

A.  Each individual has a bed.  Of course I'm talking about all the period of time before the riots.  This is up until April 2019.

Q.  Yes.  And during that period, were prisoners on top of each other such that they couldn't move inside their prison cells?

A.  No.  These bunk beds were aligned up against the walls around the room.  The middle portion of the room was an empty area, empty space.

Q.  Did each room have a television set?

A.  Yes, every room had a television and a climate control AC unit.

Q.  What about a satellite dish?

A.  All the rooms had satellite service.  We had designated the numbers of channels that they could watch, but they on their own reprogrammed it.  So I could say they had unlimited channels they could watch.

Q.  Did each prisoner have a pillow?

A.  Yes, each one had a pillow.

Q.  Did each prisoner have blankets?

A.   Yes.

Q.   Did each prisoner have personal hygiene items such as toothbrush, shampoo, soap, things of that nature?

A.   Yes.

Q.   Did each prisoner have a towel for bathing?

A.   Yes.

Q.   Were prisoners allowed to use razors if they wished to shave?

A.   When it comes to razors, for us, we approach this in the angle of a security matter.  So we would give them disposable razors once every 40 days, because it would be used every now and then to shave certain parts, which is something that is related to purity and cleanliness connected to the core teachings of Islam.

        But the hair and beard, facial, it was always trimmed by the administration of the prison.

Q.   Were prisoners allowed access to sports-related items such as soccer balls, volleyballs, and basketballs?

A.   When it comes to the administration of the prison, we had provided to them tools for playing these games.

Q.   And that was --

A.   And within the rooms themselves, the inmates would practice playing sometimes.

Q.   And that was available to the defendant, El Shafee Elsheikh?

A.   Yes.

Q.   Did you allow international organizations to tour the prison frequently and conduct inspections?

A.   The international organizations that would do visits like that and do tours was the Red Cross, in addition to committees, inspector committees that would come and visit that were part of our civilian regional government.

Q.   And let's now talk about prison conditions post riot, as you've described, April 2019.  But before we do, please explain to the Court what happened in April 2019 in terms of a riot. What are you talking about?

A.   The riot that broke out happened on the 5th of April, 2019. This was instigated after the announcement that the news came that the Islamic State had been toppled.  It was a Friday, and on that day the prison guards, a team of them, were actually doing the periodic shaving for the inmates.  One of the inmates, who is of Iraqi nationality, had made a makeshift weapon, a piece of metal in the form of a knife and attacked the individuals, the prison guards who were doing the task of the shaving.  They were holding him and trying to drag him into a room.

     The prison guards were alerted and they were ready to respond quickly, and they were able to pull him back again.  And all the rooms were -- began to yell out "Allahu Akbar," God is great, and they went ahead and broke and smashed the observation cameras that were present in all of the rooms.  And they used

the metal doors of the bathrooms of the cells as a ram to smash the interior walls between the cells.  So that caused the result in all of the different rooms turning into one connected room.

Of course, they were trying to dig a tunnel to tunnel out of the prison, but that was also controlled and stopped.

Q.  How did you stop the riots?

A.  We attempted to speak with them and to negotiate with them, and that took until the evening, later in the evening, with no results.  From then on we used tear gas.

Q.  And when you say "them," you're referring to the prisoners?

A.  Yes.

Q.  Were any prisoners harmed during this riot?

A.  They had difficulty in breathing because of the gas that was used, because of the smoke.  But generally no one came to harm.

Q.  Was the confident harmed, El Shafee Elsheikh?

A.  At that time when that happened, El Shafee Elsheikh was in solitary confinement.  He was not a part of this group, riot that happened.

Q.  And is the same true for Alexanda Kotey?

A.  Yes.

Q.  Describe for us what it means to be in solitary confinement at Derik prison at that time.

A.  Being that we have a lot -- the characteristic of the solitary confinement is that being that we have quite a few cells for solitary, around 20 to 21, is that they do also

receive about an hour or so of outdoor fresh air.  The thing is that they might not have their turn to go out.  Sometimes it can take a couple of days or several days for them to take their -- to get their turn to go outside for some fresh air.

When it comes to food, it's the same.  When it comes to medical care, it's the same.  In that portion of the prison we do not have AC and climate control.

Q.  And how are prisoners kept in humane conditions in solitary confinement?

A.  They have their clothes, they have their bed with mattress and blanket and pillow.  And this is not a confinement which is for a long period of time or forever.  We use that portion of our prison according to need.

Q.  And why were Elsheikh and Kotey placed in solitary confinement?

A.  It could be different reasons why an individual would be placed there.  For example, if it would be for the reason of investigation.  As an example, when an individual is just newly transferred to Derik, they are put in solitary confinement until we get a clear picture about that person.  Or if they have problems coexisting with the other detainees in the larger rooms, the group rooms, we then move them over to solitary confinement.

Q.  Were Elsheikh and Kotey having such problems?

A.  Yes.

Q.   Please explain.

THE INTERPRETER:  Can I ask for clarification from a phrase that he used.  He said "them."  Can I ask who "them" is?

THE COURT:  Yes, you may.

Mr. Parekh, clarify your question, please.

MR. PAREKH:  Your Honor, I believe he's referring to the answer, not the question.

A.   The issue was with them was that the rest of the inmates who were sharing the cell with them were uneasy around them and with them.  So that is one of the reasons, when it was brought to our attention, that we decided to move them to solitary.

And another reason that they were put in solitary confinement was also for the purpose of investigation, which they were under investigation, of course.

Q.   Under investigation by whom?

A.   By the SDF.

Q.   And were they given -- they being Elsheikh and Kotey, were they starved in solitary confinement?

THE COURT:  You mean deprived of food?

MR. PAREKH:  Correct, Your Honor.

A.   No, not at all.

Q.   Are prisoners given less food when they're in solitary confinement?

A.   Never.

Q.   The period June 2019 to October 2019, were Elsheikh and

Kotey in general population?

A.   I believe so, yes.

Q.   Did the Red Cross visit your prison when Elsheikh was in your custody?

A.   Yes.

Q.   Approximately what month and year?

A.   It was at the end of August in 2019.

Q.   Going back to the prison riot that you've testified about in April of 2019, what living conditions, if any, changed after that prison riot?

MS. GINSBERG:  Judge, I'm going to object to many more of these questions.  They really have no bearing on whether or not on a particular day or on a particular instance Mr. Elsheikh was abused.

THE COURT:  Mr. Parekh?

MR. PAREKH:  Your Honor, I believe the defense is claiming that at various points during his time in Derik prison he was subjected to harsh conditions.  Prior to the lunch break, Ms. Ginsberg said that his treatment grew harsher, excessively harsher when the defendant went to Derik prison.

So I'm establishing a record that that simply was not the case.

THE COURT:  I'll overrule the objection, Ms. Ginsberg.

BY MR. PAREKH:

Q.   Did you hear the question?  Okay.  The question is, after

the riots in April of 2019, what living conditions, if any, changed?

A.   The change was we removed all the beds in the cells, we removed all the TV sets, we stopped all the visits from Roj camp.  The rest was normal.

Q.   And where did prisoners sleep?

THE COURT:   During what period?

MR. PAREKH:   We're specifically focusing now on the post April 2019 riot period.

THE COURT:   Well, make that clear in your question.

MR. PAREKH:   Apologies, Your Honor.  I said that initially.  I had said --

THE COURT:   I know, but then there were questions.

MR. PAREKH:   Yes, Your Honor.

BY MR. PAREKH:

Q.   These questions focus specifically on the living conditions as it relates to the April 2019 time period, after the Derik prison riot.  Do you understand that?

A.   On the ground, on the floor, but mattresses.  They had mattresses.  There were no beds.

Q.   And was that because of the damage that had occurred at the prison?

A.   Yes, they used most of the metal framing of the beds as daggers and swords.

Q.   By "they," are you referring to the prisoners who rioted?

A.   The inmates, yes.

Q.   Were prisoners given any less food after the April 2019 riots?

A.   No.

Q.   Were prisoners given any less medical care after the riots?

A.   Never.

Q.   I want to focus now on the topic of allegations regarding abuse or mistreatment at Derik prison.  And specifically I want to focus on, as we have, the 2018 to 2019 period when El Shafee Elsheikh and Alexanda Kotey were in your custody.  Do you understand that?

A.   Yes.

Q.   What was the prison process at that time regarding allegations of abuse or mistreatment that were made by detainees?

A.   When I went there until at the end of 2019, there were no such cases that needed our attention.  I remember before I went there, there there was a complaint that was submitted by one of the inmates, and that complaint was actually given first to the American government during one of the interrogation sessions.  I wasn't there.

     And an investigation ensued based on that allegation. The results of that investigation was provided to the coalition forces, and the person who was found at fault was dismissed or removed.

Q.   Okay, let's back up for a moment.

MR. PAREKH:  Question for the interpreter.  Did you say 2019 or '18?

THE INTERPRETER:  Me?  Or do you want me to ask him?

MR. PAREKH:  Well, I'll ask him.

Q.   Were you referring to the period 2018 prior to when you became the deputy head of Derik prison?

A.   Before I went to the prison, they told me that it had happened few months earlier.

Q.   Prior to June of 2018, then?

A.   Yes.

Q.   And did this allegation involve El Shafee Elsheikh?

A.   No.

Q.   Did this allegation involve Alexanda Kotey?

A.   Never.

Q.   And you testified that there was some action taken.  Just describe what happened.

A.   We launched an investigation into this matter.  I think the inmate, the prisoner, was from Oman, or Omani.  We interrogated the inmate and also our member who has insulted him.  There were multiple complaints that the inmate alleged.  When we investigated, we found out that there was only one of them was founded.  So based on that, we punished our member.

Q.   And what was found?

A.   That this action took place, and that has resulted in his

cap falling -- the inmate's cap falling on the ground, which he considered to have insulted him, that had caused an insult.

Q. For the record, when you say "this action," are you referring to --

THE INTERPRETER: A hand on the head, like a push on the head.

A. At the time the American government stopped their interrogations until that issue was resolved.

Q. And is this -- why is this type of conduct not allowed under SDF policies?

A. The purpose of our teams, our work, is to get information, important information that we can use on the battleground. To use force or pressure will not get you any results that you need. And we have agreements with the International Coalition and also with the humanitarian organizations that we don't follow such things.

Q. During El Shafee Elsheikh's entire time in custody at Derik prison in 2018 and 2019, did he make any complaints regarding abuse or mistreatment?

A. No.

Q. Based on your position as the deputy head of the prison, if El Shafee Elsheikh had alleged that he was subjected to any form of abuse or mistreatment, would you have known that information?

A. If he had made a complaint of such thing.

Q. Then you would have known?

A.   Yes.

Q.   And is that virtue of your position as the deputy head of the prison at that time?

A.   Yes.

Q.   The same question for Alexanda Kotey.  During the 2018 to 2019 time period when Alexanda Kotey was in your custody at the Derik prison, did he make any complaints that he had been abused or mistreated in any way?

A.   Never.

Q.   And would you have known if he had by virtue of your position as the deputy head of the prison?

A.   Of course.

Q.   What types of mechanisms are available to a detainee at Derik prison, focusing on the time period that we have, 2018 to 2019, to report any allegations of abuse or mistreatment?

A.   The mechanism that exists in the Derik prison is that every inmate has the right to reach the administration of the prison and make a complaint, or file a complaint.  Despite that, all the inmates meet with the International Red Cross, they meet with coalition forces, and they also go on media interviews.  So they have the right to make complaints or submit a request in any of these venues.

Q.   Can they also make complaints privately through the Red Cross without the SDF being present in those meetings?

A.   All the SDF sessions are private sessions.  When the

Red Cross enters the Derik prison, they become the ones in control of the Derik prison -- the monitor.

Q.  Did you mean the Red Cross sessions, not the SDF sessions?

A.  I'm talking about the Red Cross.

Q.  Okay.

A.  When the Red Cross enters the Derik prison, they have the right to meet -- to visit any inmate and go anywhere in the prison.

Q.  And does that include meeting privately with detainees without the SDF present?

A.  Yes.

Q.  If -- during that time period in 2018 and 2019, if El Shafee Elsheikh had privately told the Red Cross that he had been subjected to any abuse or mistreatment by the SDF during one of those private meetings, would you have known about it through the Red Cross?

A.  Yes.

Q.  And did you receive any information whatsoever about any such complaints of abuse or mistreatment?

A.  Never.

Q.  And that's regarding El Shafee Elsheikh.  Correct?

A.  Yes.  I'll explain a little bit of this subject.  Any inmate or any prisoner that submits any kind of complaint to the Red Cross, the Red Cross will share that with us as part of recommendations, and we have to follow its resolution.

145

Q.   Same question for Alexanda Kotey.  Did you receive any information from the Red Cross that Mr. Kotey had been subjected to abuse or mistreatment in any way?

A.   No.

Q.   The final topic I want to ask you questions about has to do with the media interview policies at Derik prison during the period that you've been testifying about, which is when El Shafee Elsheikh and Alexanda Kotey were in your custody at Derik prison in 2018 and 2019.  Do you understand that?

A.   Yes.

Q.   Please explain to us what the media policies were, focusing on that time period.

A.   All the media interviews are done through the public relations office in the autonomous administration.  Those requests will be spread around the detention centers and then the media interview will be conducted.

        Our connection was directly to the Rmelan public relations office, and the visits of the Derik prison will happen in the Roj office.

Q.   Just so we're all clear on what you're explaining, can we put up Exhibit 1-1, please.

        Sir, do you see a map of Syria in front of you?

A.   Yes.

Q.   Do you see on the map where Derik is identified?

A.   Yes.

146

Q.   You just mentioned a particular location that you called Rmelan.  Do you see that on this map?

A.   Yes.

Q.   And is that located close to where Derik is shown on the map?

A.   It's about 20 kilometers.

Q.   Can you just circle the general area where Rmelan is located.

A.   (Witness complies.)

Q.   And now that we can all see the location that you've described on the map, can you just explain, what is located at Rmelan with respect to the media interviews?

A.   In the town of Rmelan, there is an office called (Arabic word) office that is -- that belongs to us.  The journalists whose requests were approved will come to that office and then we will transfer the said inmates to that office.  And then after the filming is over, we'll bring them back.

Q.   Why aren't the media interviews held at the Derik prison?

A.   The reason has to do with security.  There are multiple journalists; we don't know their security backgrounds, so we'll avoid all together.

Q.   Is that to avoid filming certain secure areas in the prison?

A.   The issue is it has to do with security as a general rule, be it filming certain locations or allowing certain people to enter the prison.

147

Q.   Going back to the media policies, and again focusing on when the defendant, El Shafee Elsheikh, was in Derik prison, are prisoners ever forced to speak with the media?

A.   Never.

Q.   Describe the process whereby a media interview is actually taken of a detainee from the detainee's perspective.

A.   From the inmate's perspective?

Q.   Meaning how does the inmate find out about the media interview?

A.   He will be informed at the time he's taken that he has a media interview.  If they, the inmates, did not say they don't want, they will be taken.  But there are multiple inmates who didn't want to be interviewed so they stopped that process, they didn't take them.

Q.   Okay.  Let's just break that down for a moment to avoid the double negative.  So if an inmate is asked whether or not they wish to participate in a media interview and the inmate says no, do you ever apply any pressure whatsoever to have that inmate participate over their objection?

A.   I don't have any interest in them making any interviews or agreeing to any interviews.  I don't even know what the questions will be asked, and I don't know the journalists.  I will not undertake the task.  That's a huge security burden of transporting an inmate from the prison to the Rmelan office to find out that they don't want to make that -- or participate in

that interview.

Q.  If a prisoner answers yes, that they wish to participate in the media interview, are they restricted in what they're permitted to say to the media?

A.  To the journalists or to the inmates?

Q.  No.  When the inmate speaks to the journalists, are they free to speak on any topic they wish?

A.  They are free.  As I said initially, we don't know what the questions will be.  And we don't know what they will be talking about.

Q.  So the inmate is free to answer any and all questions posed by the journalists?

MS. GINSBERG:  Judge, I'm going to object.  This witness can't know what is in the mind of the inmate when he's answering questions.

THE COURT:  All right.

MR. PAREKH:  Your Honor, I'm asking about the policy.

THE COURT:  He's asking about whether they restrict him from saying anything or whether they pressure him to say something.  That's what he's asking.  He's not asking about what's in the mind of a prisoner or a detainee, are you?

MR. PAREKH:  No, Your Honor.  I'm simply asking --

THE COURT:  All right.  Clarify your question.  How much more do you have, by the way?

MR. PAREKH:  I just have some exhibits to go through,

Your Honor, but this is the last topic that I'm going through.

THE COURT:  All right.  Because we've been here now more than an hour and a half, so finish up and I'll take a recess and then Ms. Ginsberg you can cross-examine.

There's one more SDF witness, isn't there?

MR. PAREKH:  That's correct, Your Honor.

THE COURT:  Is it a short one?

MR. PAREKH:  It's a shorter one than the first two.

THE COURT:  All right.  I want you to make it even shorter than you planned.

MR. PAREKH:  Understood, Your Honor.

Mr. Interpreter, did you understand the question?

THE INTERPRETER:  Can you repeat it, please?

MR. PAREKH:  Sure.

BY MR. PAREKH:

Q.  My question is, can the prisoner answer any and all questions posed by the journalists during media interviews?

A.  Yes.

Q.  If a prisoner wanted to speak about any abuse or mistreatment that they've suffered while in SDF custody, are they permitted to do so with the media?

A.  Most of those interviews are conducted in English, and our members who are present during those sessions do not speak English.  So we have no idea what is going on.

THE COURT:  Does the SDF place any limitations on what

detainees can say to journalists or outside agencies?

THE WITNESS:  No.

THE COURT:  Doesn't that cover it, Mr. Parekh?

MR. PAREKH:  Yes, it does, Your Honor.

THE COURT:  Let's go on.

Q.  Did the U.S. Government ever request that you conduct any media interviews of El Shafee Elsheikh?

A.  As I said, the media interviews are done by the civil administration, or the autonomous administration, and I as the head of the prison, I have the right to refuse such request or such interviews.

Q.  Is the U.S. Government involved in any way with respect to whether a detainee participates in a media interview or not?

A.  Never.

Q.  Okay.  Are you aware of whether or not El Shafee Elsheikh and Alexanda Kotey participated in media interviews when they were in the custody of the Derik prison in 2019, let's focus on?

A.  Yes.

Q.  Is that true for both of them, Elsheikh and Kotey?

A.  Yes.

Q.  Have you heard of a United Kingdom-based documentary filmmaker named Sean Langan?

A.  Yes.

Q.  Did Sean Langan, to your knowledge, interview El Shafee Elsheikh and Alexanda Kotey separately while they were

151

both in Derik prison?

A.   Yes.

Q.   And were those interviews held at the Rmelan public affairs building that you previously testified about?

A.   Yes.

Q.   What month in 2019, approximately, were those interviews held?

A.   The interview with the -- or the video with Sean Langan, I think it was in July because there was a problem that occurred.

MR. PAREKH:   Can you show the witness the CD marked Government Exhibit 7-5.

THE INTERPRETER:   On the CD there's no marking of 7-5.

MR. PAREKH:   There should be on the sleeve.

THE INTERPRETER:   No, it's not here.   So the blank pages before it is a sleeve?

MR. PAREKH:   There should be a tab that says 7-5.   Do you see that?

(OFF THE RECORD.)

Q.   Do you see a CD behind the Tab 7-5, sir?

A.   Yes.

Q.   And is your signature on that CD?

A.   Yes.

Q.   Did I play for you, prior to your testimony today, a clip of Sean Langan interviewing Alexanda Kotey?

A.   Yes.

Q.  Are you familiar --

MS. GINSBERG:  Your Honor, I'm going to object to any of these interviews with Mr. Kotey.  The question is whether there were coercive circumstances that surrounded Mr. Elsheikh's interview, not Mr. Kotey's.

MR. PAREKH:  Your Honor, these are highly relevant. The witness, as the witness alluded to, I believe will testify about an incident that occurred.  It's a short clip.  It's a few minutes, and the witness I believe will testify that he showed up at that interview, and it is relevant to Elsheikh.  But I would like the witness to describe it rather than me testifying.

THE COURT:  All right.  I'll permit that.  Proceed.

BY MR. PAREKH:

Q.  Are you familiar with that video clip?

A.  Yes.

Q.  Did that take place at the Rmelan office?

A.  Yes.

Q.  You recognize it by watching the video?

A.  Yes.

MR. PAREKH:  Move to admit 7-5.

THE COURT:  All right.  It's admitted.  How long is the clip?

MR. PAREKH:  I believe it's less than four minutes.

THE COURT:  All right.  You may play it.

MR. PAREKH:  Thank you, Your Honor.

(GOVERNMENT EXHIBIT Number 7-5 was admitted into evidence.)

(Video played in open court.)

THE COURT:  Mr. Parekh, is that the end?

MR. PAREKH:  Almost, Your Honor.

MS. GINSBERG:  Judge, if we're going to see anything more, if nothing else, this video shows that he was provoking Mr. Kotey.

THE COURT:  At the end I will let you say something after I hear from Mr. Parekh.

(Video played in open court.)

THE COURT:  I take it that's Mr. Langan?

MR. PAREKH:  It is, Your Honor.

THE COURT:  How much more of this do I have to see?

MR. PAREKH:  We can cut it now, Your Honor.

THE COURT:  Now, what was the purpose of showing that, Mr. Parekh?

MR. PAREKH:  Can I just ask a few questions of the witness and it will be explained through his testimony?

THE COURT:  All right.  You may do so.  Make it quick.

BY MR. PAREKH:

Q.  Mr. SDF Witness 2, did you show up on site after this incident had occurred?

A.  Yes.

Q.  Did you hear what had happened?

A.   I'll talk about this in the sequence of how it happened. During that day I was in Rmelan.  I was with -- it was myself and my head of the office, my boss at the time.  While we were busy doing our duties, we received a call that said that something, a problem happened in the Rmelan office.  We went directly to the office.

When we arrived there, there was Sean and then there was the head of the public relations office in Rmelan.  When we asked what had happened, Mr. Sean had multiple reasons.  We listened to all of them and we stopped filming.

We blamed Mr. Sean for what had happened, and he was asked to write a formal apology to the administration.  Because prior to agreeing to any interviews, the journalists have to abide by or agree to not pressure any inmate or play any games.

Q.   And did this have any consequences for Sean Langan with respect to requesting another interview with El Shafee Elsheikh?

A.   He did not ask for another interview because the interview was arranged for two interviews in the same day.

Q.   And what occurred with respect to the confrontation between Sean Langan and Kotey having any consequences with respect to whether or not Mr. Langan could conduct his second interview with El Shafee Elsheikh?

A.   Our policies were very clear.  When I was there, I was of the opinion that even this video should have been deleted, but I wasn't present during the time that the filming took place.

155

Q.  Was Sean Langan able to conduct his second interview with El Shafee Elsheikh that day?

A.  Do you mean if he wanted to interview him again?

Q.  Okay.  Let me break it down.

MR. PAREKH:  Your Honor, may I have some latitude to lead the witness?  I think there's a --

THE COURT:  Yes.  But do it quickly.

MR. PAREKH:  Okay.

Q.  El Shafee Elsheikh also sat for an interview with Sean Langan.  Correct?

A.  Yes.

Q.  Okay.  And is that shown in Government Exhibit 7-6?

A.  Yes.

MR. PAREKH:  Move to admit 7-6.

THE COURT:  All right.  It's admitted.

(GOVERNMENT EXHIBIT Number 7-6 was admitted into evidence.)

THE COURT:  Next question.

MR. PAREKH:  Okay.

MS. GINSBERG:  Judge, I'm going to object.  These videos are clips that are selected by the Government presumably just to prove a particular point.  They are taken out of context and --

THE COURT:  All right.  Let me hear from Mr. Parekh what this is all about.

MR. PAREKH:  Yes, Your Honor.

Q.  After this person --

THE COURT:  No, to me.  Explain to me what it's all about.

MR. PAREKH:  Yes, Your Honor.  Sean Langan conducted an interview with El Shafee Elsheikh, separate interview with Alexanda Kotey.  As Your Honor will hear, I believe during this witness' testimony and Mr. Langan's testimony, Mr. Langan wanted to do a second interview with El Shafee Elsheikh.  After the blowup with Alexanda Kotey, the SDF, including this witness, said:  You're done.  I know you want to conduct a second interview with El Shafee Elsheikh, but because of the way the interview with Alexanda Kotey ended, you're not permitted to do that second interview and it's time for you to leave.

This goes to multiple issues raised by the defense in seeking to suppress this video and other media interviews.

THE COURT:  Why do I care about this video?

MR. PAREKH:  This shows the voluntariness of how these media interviews are conducted.  The defense is claiming that the only reason that El Shafee Elsheikh sat for this interview and other media interviews was because the SDF was coercing him and telling him you better do these interviews; otherwise, we're going to beat you, we're going to torture you, we're going to mistreat you.

This video shows quite the opposite.  If the SDF was

doing that, there's no way they would have allowed this whole scene to play out the way they did, and they would have said to El Shafee Elsheikh tough, you're going to sit for that second interview because we're forcing you to.

What this shows is that it corroborates the witness' testimony that the SDF doesn't treat detainees inhumanely, they're not forcing them to conduct to these media interviews, and when someone gets out of line, according to their code of conduct and policies, they terminate the interviews and they don't allow the detainee to sit for the interview.

My next question was going to be did El Shafee Elsheikh want to do another interview with Sean Langan.  I believe the witness will say yes, but the SDF said not after the way Sean Langan behaved, that interview is done, it's not happening.

So it is integral to rebutting their claims that these interviews were not voluntary.

THE COURT:  Did Mr. Langan ever indicate on this clip why he went off the handle, as it were?

MR. PAREKH:  Yes.  Well, I believe he'll testify to it. You can kind of hear it underneath his breath during the clip. We can play the whole clip.  But he was a little bit upset because he didn't feel that Alexanda Kotey was answering his questions, and so he --

THE COURT:  I take it this journalist Langan probably knew one or more of the individuals who lost his life in all of

this?

MR. PAREKH:  You're exactly right, Your Honor.

THE COURT:  That's what I was asking, to explain his conduct.

MS. GINSBERG:  Judge, if I may.

THE COURT:  Just a moment.  Ms. Ginsberg, it seems to me that if you're going to contend that Mr. Elsheikh wanted to speak to this journalist and he was denied the opportunity to do so, it should be open to the Government to explain why, shouldn't it?

MS. GINSBERG:  Yes, Judge.  But we've never made that allegation.  Mr. Elsheikh has said he was forced to participate in all of these media interviews.

And, in fact, I believe it's disingenuous for the Government to ask -- to put on this evidence and ask this witness these questions when it knows that Mr. Kotey told them during debriefings that after much earlier than this date, that none of his interviews with the media were voluntary.

THE COURT:  Well, he could have changed.

MR. PAREKH:  Well, Your Honor, Ms. Ginsberg is not telling you the full story.  Because in the very letter that Ms. Ginsberg is claiming we stated, the prosecution team explicitly said these are the statements that Mr. Kotey made.  They have not been evaluated by the Government.

So we discharged our discovery obligations by turning

over Mr. Kotey's statements with respect to this interview and other claims of alleged mistreatment, but that doesn't mean we believe them or we've evaluated them to date.

THE COURT:  All right.  I'm going to permit it, so you may go ahead and finish your direct examination.  I'll take a recess and then Ms. Ginsberg, you can conduct your cross-examination.

Let's finish up.

MR. PAREKH:  Thank you, Your Honor.

Can you put up 7-6, please.

BY MR. PAREKH:

Q.  You've already testified that this is a screenshot of Mr. Elsheikh's interview with Sean Langan on the same day in July 2019.  Is that correct?

A.  Yes.

Q.  After Sean Langan raised his voice at Mr. Kotey, as we saw in the clip that I played for you in Government Exhibit 7-5, was Mr. Langan permitted to go back and interview Mr. Elsheikh?

THE COURT:  By the SDF.

MR. PAREKH:  Right.

Q.  By the SDF.

A.  I don't understand what do you mean by the second interview. He only conducted one interview.

Q.  Okay.  What I'm asking is, in light of what had occurred between Mr. Kotey and Mr. Langan, the argument that we saw in

Government Exhibit 7-5, did you -- did the SDF tell Mr. Langan that he's done, he's not permitted to conduct any more interviews with SDF detainees, including Elsheikh?

A.  Yes.

Q.  Did you terminate your relationship with Sean Langan at that point?

MS. GINSBERG:  Judge, for purposes of the trial, these questions are all leading and I have to object.

MR. PAREKH:  Your Honor, I'm trying to move it along.

THE COURT:  Overruled.  I don't think it's impermissibly leading.

Go ahead.

A.  Yes.

Q.  And based on your personal knowledge, did Mr. Elsheikh want to voluntarily interview with Sean Langan?

MS. GINSBERG:  Objection.  Unless he spoke with Mr. Elsheikh and Mr. Elsheikh told him that he wanted to have another interview with Mr. Langan, this is hearsay.

THE COURT:  Overruled.  I'm going to permit it.  Now, whether I admit it at the trial is another matter.

MS. GINSBERG:  I understand.  But I have to make these objections, and Mr. Elsheikh did not ever ask to have these interviews.  That's our position.

THE COURT:  Next question.

MR. PAREKH:  Thank you.  Did you translate the question

for the witness?

THE COURT:  No, do it again.

BY MR. PAREKH:

Q.  Based on your personal knowledge, did Mr. Elsheikh wish to voluntarily sit for an interview with Sean Langan?

THE INTERPRETER:  And for clarification, after this?

MR. PAREKH:  Yes, after this.

A.  I don't have any knowledge of that.

Q.  Okay.  Did Mr. Elsheikh interview with the *Washington Post* while he was in your custody in August 2019?

A.  Yes.

Q.  Did he agree to sit for that interview?

MS. GINSBERG:  Objection.  Unless he has personal knowledge.

THE COURT:  Overruled.

A.  Yes.

Q.  Do you recall what date in August 2019 that was?

A.  *Washington Post*, I think it was August 4th.

Q.  Have I played clips from that interview for you prior to your testimony today?

A.  Yes.

MR. PAREKH:  Can you show the witness the CDs behind Tab 7A, 7B, and 7C.

THE COURT:  Do you plan on playing these?

MR. PAREKH:  I'll move it along.  I was but --

THE COURT:  I'm thinking I'll take a recess first. Now, do you plan to offer these at trial?

MR. PAREKH:  We do, Your Honor.

THE COURT:  All right.  Well, now, Ms. Ginsberg said he never agreed to this and he always resisted this.  At least that's what I understand her objection to be.  And she says this witness doesn't have any firsthand knowledge of whether he agreed to do this.  What's your position there?

MR. PAREKH:  I believe the witness previously testified that because he serves in a position of authority at Derik prison, he would know whether a detainee would agree or not agree to do an interview, and if they didn't agree, they wouldn't participate in the interview.  There would be no --

THE COURT:  Yes, but ask him specifically -- I'm going to recess.  I'm tired of the squabbles here.  I'm going to ask him myself, if you don't, directly, whether Mr. Elsheikh agreed to be interviewed by the *Washington Post* or anybody else - you can take each one of them that you intend to offer - and I want to know why, if he says he did agree to it, how does he know that.

MR. PAREKH:  Understood.

THE COURT:  And you can elicit all of that.  And if he claims that he was forced to do this, I'll hear what he says if he testifies.

His declaration is not going to cut it because it has

not been subject to cross-examination.  You understand that, Ms. Ginsberg?

MS. GINSBERG:  Your Honor, if he does not testify, the declaration is admitted for whatever purpose --

THE COURT:  Exactly.

MS. GINSBERG:  -- whatever weight it has.

THE COURT:  Whatever weight it may have because it was not cross-examined.

MS. GINSBERG:  I understand.

THE COURT:  All right.  Court stands in recess now. We've been here more than two hours.  We will reconvene at 4:25, and then I intend to go until we finish, I hope, the SDF witnesses.

And as a matter of courtesy, everything I say should be interpreted for these witnesses.  They're entitled to know what's happening in the courtroom, and I don't think this gentleman speaks English.

THE INTERPRETER:  That's true.  And we're doing our best, Your Honor.

THE COURT:  Well, I don't see you doing it as I'm speaking.  Court stands in recess until 4:25.

(Recess taken at 4:07 p.m.)

THE COURT:  Can you shorten this?  Let me see if I can help you.

Mr. SDF Number 2, to your knowledge, given the jobs

that you held in 2018 and 2019, was Mr. Elsheikh ever prevented from speaking to a journalist by the SDF?

THE WITNESS:  No.

THE COURT:  Just ask pointed specific questions and let's finish it.

BY MR. PAREKH:

Q.  Mr. SDF 2, did Elsheikh participate in a *Washington Post* interview on August 4th, 2019?

A.  Yes.

Q.  Did I --

THE COURT:  Was he forced to do so?

THE WITNESS:  Not at all.

THE COURT:  Next.

MR. PAREKH:  Move to admit 7-7A through 7-7C, the *Washington Post* interview.

THE COURT:  What are they?  They're the *Washington Post* interview?  Is it a video?

MR. PAREKH:  Yes, they're three video clips.  We obtained them because the defense subpoenaed the *Washington Post*, and the *Washington Post* complied with the subpoena by posting their full interview with Mr. Elsheikh on their website, including multiple camera angles.

THE COURT:  All right.  Now, Ms. Ginsberg has referred previously to the fact that you cherry-picked and are only showing parts of the interview.  But of course that's not

inappropriate.  She can then show parts that she wants to show at the time of the trial, or here, if she wishes.

How long are these?

MR. PAREKH:  I'm not going to play them, Your Honor. This isn't cherry-picking at all because the entire *Washington Post* interview is contained within these three clips; the full interview, plus we have two additional clips from a different camera angle.

THE COURT:  Now, are you intending to offer these at the trial?

MR. PAREKH:  Yes, Your Honor.

THE COURT:  So don't I have to make a threshold determination as to whether his appearance and statement in these interviews were voluntary?

MR. PAREKH:  That's correct, Your Honor.  That's why we would like it to be part of the motion to suppress motions hearing record.

THE COURT:  All right.  Proceed.

BY MR. PAREKH:

Q.  Is your signature on 7-7A, 7-7B, and 7-7C?

A.  Yes.

Q.  Did I play these clips for you prior to your testimony today?

MS. GINSBERG:  Judge, I'm going to object.  If this witness was not present for these interviews, I don't see what

166

special knowledge he has with respect to these clips or any portion of the interview.

THE COURT:  All right.  Thank you for informing me of that.

Go ahead, Mr. Parekh.

MR. PAREKH:  Your Honor, I'm trying to speed it along.

THE COURT:  You played these clips for him.  Go on.

Q.  Do you recognize the room in which the *Washington Post* interview depicted in those three CDs took place?

A.  Yes, in the Rmelan office.

MR. PAREKH:  Move to admit 7-7A, 7-7B, and 7-7C.

MS. GINSBERG:  No objection.

THE COURT:  All right.  It's admitted.

(GOVERNMENT EXHIBIT Numbers 7-7A, 7-7B, and 7-7C were admitted into evidence.)

THE COURT:  Next question.

Q.  Can you take a look at 7-8.

THE COURT:  While he's looking at 7-8, I thought you told me that you intend to offer these first three that you mentioned at the time of the trial.

MR. PAREKH:  We do, Your Honor.

THE COURT:  And don't I have to see them?

MR. PAREKH:  Well, Your Honor, I believe the total clips are over roughly two hours long of total video.  So in an effort to speed things along, we thought we would admit them.

Mr. Gibbs may go through one or two of them when he puts Special Agent O'Toole on the stand, but for the sake of brevity, we thought we'd just make them part of the record.

THE COURT: All right. But Ms. Ginsberg, of course, it's open to you to play a part of it if you want to. I, however, before I rule, will watch all of it.

MR. PAREKH: That's why we'd like it to be part of the record, Your Honor.

THE COURT: All right. Proceed.

MR. PAREKH: And so those have been admitted, right, for clarification, Your Honor?

THE COURT: That's correct.

MR. PAREKH: Okay. Move to admit --

BY MR. PAREKH:

Q. Do you see 7-8 in front of you?

A. Yes.

Q. Is that a screenshot from the *Washington Post* interview that you've testified about?

A. Yes.

Q. Do you recognize the background in the photograph?

A. The curtain in the background and the chair are the ones that are in Rmelan office.

MR. PAREKH: Move to admit 7-8.

THE COURT: Admitted.

168

(GOVERNMENT EXHIBIT Number 7-8 was admitted into

evidence.)

THE COURT:  And I take it the individual there is

Mr. Elsheikh?

THE WITNESS:  Yes.

THE COURT:  Next question.

MR. PAREKH:  It's now been published, Your Honor, so

you can see it on the screen.

THE COURT:  Yes.

BY MR. PAREKH:

Q.  To your knowledge, did Mr. Elsheikh sit for an interview in

approximately October 2019 with ITV News?

A.  Yes.

Q.  Can you take a look at Government Exhibit 7-11.

A.  (Witness complies.)

Q.  Is the photograph depicted in Government Exhibit 7-11 a

screenshot from the ITV News interview?

A.  Yes.

MS. GINSBERG:  Objection.  Unless he was present and

knows who this reporter is, he has no basis for reaching that

conclusion.

THE COURT:  All right.  If you want to establish some

basis, you may do so.  I'll rule on it once you do.

MR. PAREKH:  I was going to, Your Honor.

THE COURT:  All right.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

Q.   Do you recognize the room in that photograph?

A.   The room and everything in it is a room in the Rmelan office.  The one in the picture is Mr. El Shafee, and regarding this interview, I was the one who was managing it.

MR. PAREKH:  Your Honor, I think that's good foundation to admit 7-11.

THE COURT:  Well, were you there?

THE WITNESS:  I was the one who actually dispatched and sent the detainee to conduct this interview.  This was the last interview for El Shafee Elsheikh in our custody.

THE COURT:  And do you know who the person depicted other than Mr. Elsheikh is in this picture of 7-11?

THE WITNESS:  He's a journalist that I did not meet.  I was not present during the interview.

THE COURT:  All right.  And how do you know that this is the journalist who did it?

THE WITNESS:  It's because I know the journalist who was a coordinator -- who coordinated this with him, local journalist, by the name Zana Omar.  He's a local journalist and he was the one who was the coordinator, the middle person, for this interview to happen.

In addition to that, the office is the Rmelan office.  In that I have no doubt.

THE COURT:  All right.  So respond to the objection, Mr. Parekh.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

MR. PAREKH:  Your Honor, this is just a screenshot, and I was laying the foundation for authenticity because Mr. Gibbs plans to play a clip from this particular interview during his direct examination of Special Agent O'Toole.

THE COURT:  So what further information do you expect to be elicited either by you or by Mr. -- who is it who's going to do it?

MR. PAREKH:  Mr. Gibbs.

THE COURT:  -- Mr. Gibbs?

MR. PAREKH:  I expect Mr. Gibbs to play the clip, to show a portion of the video in which Mr. Elsheikh makes a statement that's contrary to a prior statement he made, or at a minimum minimizing his statement.  And that goes directly to rebutting claims that are made by the defendant in his motion to suppress.

THE COURT:  All right.  Proceed.  I'll admit 7-11.

MR. PAREKH:  Thank you, Your Honor.

(GOVERNMENT EXHIBIT Number 7-11 was admitted into evidence.)

BY MR. PAREKH:

Q.  Just wrapping up, what were your working hours at the Derik prison in the 2018 and 2019 time period during which El Shafee Elsheikh and Alexanda Kotey were in the custody of the SDF at Derik?

A.  Of course, I was always present there 24 hours a day during

my line of work.  That continued up until the year 2021.  When I got married, then my life schedule changed.  I mean, my life prior to that was in a prison.

THE COURT:  Join the troops.

MR. PAREKH:  That's right, Your Honor.

Q.  So do I have it correct that when El Shafee Elsheikh and Alexanda Kotey were at the Derik prison, you were essentially living at the Derik prison?

A.  Yes.

MR. PAREKH:  No further questions, Your Honor.

THE COURT:  All right.  Cross-examination.

**CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

**BY MS. GINSBERG:**

Q.  Congratulations on your marriage.

A.  Thank you so much.

Q.  Sir, were you responsible for making all the decisions about what happened on a daily basis at the prison?

A.  Yes.

Q.  And the way you kept track of what was happening was to obtain information from the guards who were in direct contact with the prisoners.  Correct?

A.  That is correct.

Q.  And, in fact, I believe if I understood you correctly, you said that one of the ways you would learn if there had been abuse was by one guard essentially reporting abuse by another

172

guard.  Is that correct?

A.  Yes.

Q.  And I believe that -- well, is it correct that if you found that abuse had occurred, you would take serious measures against the guard who had abused the detainee?

A.  That's correct.

Q.  And was that well known throughout the prison?

A.  Yes.

Q.  And were you concerned that because of the serious consequences to a guard if he had committed some form of abuse, were you concerned that the other guards would be reluctant to report on their fellow guards?

A.  Those who do not report and found out, they will be punished.  It is quite clear among us, within us, that no one takes responsibility of hiding such actions.

And in addition to that, all of the facility, the prison facility, is watched by cameras, so no one can hide anything.

Q.  You described, I believe, one instance of abuse that was reported to you by the U.S. Government interrogators.  Correct?

A.  It was not me, no.  I was not there at that time.

Q.  Okay.  That was before you came to the prison?

A.  Yes, by a few months.

Q.  Okay.  And the cameras were still at the prison, in all the rooms at the prison before you arrived?

A.  Yes.

Q.  And the same rules applied with respect to the obligation of the guards to report instances of abuse.  Correct?

A.  Yes.

Q.  And, in fact, the report that you heard about involved more than just slapping someone in the head, but the prisoner claimed that he had been choked by the guard?

A.  I did say that.  But the thing is, when we looked into it to see what actually did happen, the detainee did claim that, but when we investigated, it was proven false.

Q.  And how was it proven false?

A.  Of course we opened an investigation, we opened an investigation, and we spoke with the detainee.  What he claimed was that he hit him and tried to choke him, strangle him.  But that was not proven.  The investigation that was conducted at the time did not prove that from the detainee against the prison guard.

Q.  If you know, the conclusion that it wasn't proven was based on what the inmate said and what the prison guard said and nothing else?

A.  Yes.  Yes, what the detainee said and what the assaulter said.

Q.  So you chose to believe the assaulter about what happened?

A.  Why?

Q.  You believed his version instead of the inmate's version

about whether or not he had been choked?

A.   When I tried -- when we try to solve an issue, we go to the roots.  When we saw and we found that an assault of some kind did happen, that individual was punished and was removed.

Q.   He was removed from the -- he lost his job?

A.   From his job.

Q.   Yes.  For hitting someone in the head like this?

A.   Yes.  The issue here, that scenario is a question of one's dignity.  It's not amount of force or muscle gauge.  It is the action, it's an insult to one's dignity.

Q.   And as far as you know, none of the other guards reported this incident to whoever was in charge of the prison at the time?

A.   No.

Q.   And the incident was not captured on any of the cameras?

A.   This room -- these rooms are interview rooms, interrogation rooms.  They are not the prison cells of the detainees.

Q.   Now, is it -- do you -- I believe you testified that you didn't receive complaints of abuse from either Mr. Kotey or Mr. Elsheikh.  Is that correct?

A.   Yes.

Q.   Did you have an agreement with your -- the United States government and your coalition partners that they would inform you or someone in the autonomous authority if they were made aware of complaints of abuse?

A.   I didn't understand the question.  To which government would it be presented to?

Q.   Did you expect -- if the United States government learned of some abuse, some claim of abuse, did you expect them to report that to you?

A.   For sure.

Q.   And that was true for all of the prisons during the period of time, as far as you know, from 2018 through 2019?

A.   Up until today.

Q.   Up until today.

     So did anyone from the U.S. Government -- well, do you recall when Mr. Kotey and when Mr. Elsheikh were transferred to the custody of the U.S. Government?

A.   Yes.

Q.   And when was that?

A.   October 9th, 2019.

Q.   So after Mr. Kotey and Mr. Elsheikh were transferred, did the U.S. Government, anyone from the U.S. Government, ever tell you that Mr. Kotey had made allegations that he was abused while he was at the Derik prison?

A.   No.  In regards to myself and my office, I did not receive any notification about that.

Q.   Am I understanding you to testify that if abuse occurred, it would not be possible to have it hidden from you at the prison?

A.   At all.  These are responsibilities that people will not

allow to fall upon them.  The staff that we have, our job is so important, it's really important that they know what they're doing.  These detainees are regularly meeting and conducting media interviews, they are meeting with the Red Cross, they are meeting with the local counsels who are doing different kinds of tours and inspections.  There's not something that can be hidden in any shape or form.

Q.  Now, the meetings with the media, any time that a prisoner met with someone from the media, they were accompanied by a prison guard.  Correct?

A.  Yes.

Q.  And the prison guards recorded the interviews that the detainees had with the media.  Correct?

A.  Yes.

Q.  And, in fact, those -- at least some of those recordings were turned over by the SDF to the U.S. Government.  Correct?

A.  No, that's not correct.

Q.  So if someone at Kobani turned over copies of these recordings to someone in the U.S. Government, that might be something you didn't know?

THE COURT:  Copies of what?

MS. GINSBERG:  Of the media interviews.

THE COURT:  Of whom?

MS. GINSBERG:  Of inmates.

THE COURT:  Any inmates?

MS. GINSBERG:  Any inmate.  I'll move on.

BY MS. GINSBERG:

Q.  But the media interviews were recorded by the guards?

A.  Yes.  To clarify, they're not guards.  They are elements of the investigative department.  They're not common prison guards.

Q.  Are they interrogators?

A.  No.

Q.  They investigate the backgrounds and the actions of the detainees?

A.  No.

Q.  Did you receive the copies of these media recordings?

A.  Yes.

Q.  So it is possible for you to know -- to have those recordings translated and for you to be aware of the information that the detainee provides during these interviews?

A.  Madam, these recordings are not the entire interviews.  It is a segment of it.  It is a portion of it.  We do not have that kind of technical capability to hold and archive this number of footage.

THE COURT:  Let me ask the interpreter, I notice that his answers are sometimes longer than your interpretations, and you don't have a pad of paper there.  Oh, you do.

THE INTERPRETER:  Yes, sir.

THE COURT:  Well, I want you to be sure that you understand that I want you to interpret everything he says.

THE INTERPRETER: Absolutely, Your Honor.

THE COURT: All right. Proceed.

MS. GINSBERG: I believe he was answering.

A. We don't have the technology to archive and to save all this information. Some days we have tens of different kinds of interviews that are conducted that we have to record segments of it and archive it. So it is quite difficult.

BY MS. GINSBERG:

Q. But the prisoners know that the interviews are being recorded by the SDF interviewer, the SDF official who is with them at the interview?

A. They think that we are recording but we are not.

Q. And it's the same -- when a U.S. Government investigator wanted to interview -- wants to interview one of the prisoners at Derik, the interview will only be allowed if you can also arrange to have an SDF officer present at that interview. Correct?

A. Yes.

Q. And there's a linguist who can translate -- the interviews occur in Arabic or Kurdish. Correct?

A. No, not true. Most of the interviews are conducted in the English language. Because all of the international broadcasting stations, the media stations, speak English.

Q. I understand. My mistake.

MR. PAREKH: Your Honor, he had answered, so can the

interpreter finish interpreting his answer?

THE COURT:  No, I don't think he had.  Had you finished interpreting?

THE INTERPRETER:  Not the last sentence, correct.

THE COURT:  All right.  Go ahead.

A.  The other kind of interviews that you would see with Arabic or English in it, that's local journalists who are conducting interviews.  In Kurdish.

BY MS. GINSBERG:

Q.  Now a different subject.  The interviews, the intelligence interviews that the U.S. Government investigators conducted at Derik, I'm going to ask you some questions about that.

MR. PAREKH:  I object, Your Honor.  There's no evidence whatsoever that there were U.S. interviewers present at Derik prison during this time period in this case.  Zero evidence of that.

MS. GINSBERG:  I'm going to ask him.

THE COURT:  All right.  Go ahead.

Q.  Did the United States government conduct intelligence interviews at Derik prison of the SDF prisoners?

MR. PAREKH:  Hold on, Your Honor.  The SDF prisoners or of Elsheikh and Kotey?  Because I think that would go way beyond, and we certainly don't want to get into sensitive areas like that unless it has to do with the defendant or the co-defendant.

THE COURT: Well, why don't you start, Ms. Ginsberg, with, did they conduct intelligence interviews of Kotey and Elsheikh. And if they say no, then you'll have to tell me why you think it's important for you to go on beyond that.

BY MS. GINSBERG:

Q. Do you know whether there were intelligence interviews conducted of either Mr. Elsheikh or Mr. Kotey while they were prisoners at Derik prison?

MR. PAREKH: Can Ms. Ginsberg clarify, in person at Derik prison?

THE COURT: She said at Derik prison.

MR. PAREKH: She didn't say that just now, so I just want to make sure that that's part of the question.

THE COURT: She did. I thought I heard her say that.

THE INTERPRETER: Can I reinterpret once again?

THE COURT: Yes. But why don't you --

MR. PAREKH: Your Honor, there's a reason that -- I know it may not be apparent but --

THE COURT: Oh, I understand. I think what you're suggesting is the possibility of intelligence matters.

MR. PAREKH: Correct. And I think the question that Ms. Ginsberg is trying to ask - and I just want to make sure the interpreter is properly interpreting it - is did the U.S. Government interrogate either Elsheikh or Kotey in person at Derik prison while they were in custody at Derik prison.

THE COURT:  All right.  I'll let him answer that question, and then, Ms. Ginsberg, you can tell me if you want to go on and why.

MS. GINSBERG:  Thank you.

THE COURT:  So you did it, Mr. Parekh.  So state your question again.

MR. PAREKH:  Yes, Your Honor.

Did the U.S. Government come in person to Derik prison at any point to question Mr. Elsheikh or Mr. Kotey while they were in Derik prison.

THE WITNESS:  No.

MR. PAREKH:  Then I think the rest is irrelevant, Your Honor.

MS. GINSBERG:  No.  I'd like to ask a follow-up question.

THE COURT:  Yes, what is it, Ms. Ginsberg?

MS. GINSBERG:  Whether the U.S. Government interviewed either Mr. Elsheikh or Mr. Kotey not in person while they were in the custody of Derik prison.

THE COURT:  How would they do it not in person?

MS. GINSBERG:  I don't know.  But Mr. Parekh seems to be making a distinction.  I think we're entitled to know if they were interviewed --

THE COURT:  By whom?

MS. GINSBERG:  By a U.S. Department of Defense

interrogator or an FBI interrogator.

THE COURT:  Yes, but I think he's answered that.  But I don't understand why you think in person limits it in a way that you find problematical.

MS. GINSBERG:  I'll tell you.  The fact that Mr. Parekh is making such an issue of including in person in the question makes me suspect that there may --

THE COURT:  All right.

MS. GINSBERG:  -- have been some other contact that we're entitled to know about.

THE COURT:  All right.  Do it this way.  You may ask whether the U.S. Government, in person or through an agent, questioned Mr. Elsheikh or Mr. Kotey while they were at the Derik prison.

MR. PAREKH:  Your Honor, I think what Ms. Ginsberg is trying to get at is, did the U.S. Government pass questions in writing to the SDF that were then posed to either Mr. Elsheikh or Mr. Kotey.  And I just want to make sure that distinction is there, versus in person or passing questions.

THE COURT:  All right.  Why shouldn't she ask did they pass questions to the SDF to put to Elsheikh and Mr. Kotey?

MR. PAREKH:  No objection to that, Your Honor.

THE COURT:  All right.  Go ahead, Ms. Ginsberg.

BY MS. GINSBERG:

Q.  So if you know, did the United States government give you

questions or someone at Derik prison questions to ask either Mr. Kotey or Mr. Elsheikh?

A.   Hand it to someone?

Q.   Did they convey in some way questions that they were asking someone at Derik prison to ask Mr. Kotey or Mr. Elsheikh?

A.   Those questions were handed to me directly.

Q.   And did you ask -- were you the person who asked those questions?

A.   No.

Q.   Thank you.  Now, during the time that Mr. Elsheikh was at Derik prison, is it correct he was -- like the other prisoners, he was sleeping on the floor on a mat or some form of bedding?

A.   It was on a mattress that was on the ground, on the floor.

Q.   And he arrived there shortly before the prison riot.  Is that correct?  The second time he came to Derik it was --

          THE COURT:  The question is now compound.  What's your question, Ms. Ginsberg?  He's already told you when Mr. Elsheikh arrived there.

          MS. GINSBERG:  He arrived on two different occasions.

          THE COURT:  All right.  Well, then ask your question and be specific about time.

BY MS. GINSBERG:

Q.   The second time Mr. Elsheikh was brought to Derik prison, that was very shortly before the riot?

A.   No, by a long period before.  He arrived on November 11th,

2018; the riots happened on April 5th, 2019.  That's a gap of probably five or six months.

Q.  Yes, my mistake.  And during that period of time, he was held for the most part in the general population?

A.  Which period?

Q.  The second time he was at Derik.

A.  Yes.

Q.  Is that correct?

A.  Yes.

Q.  And he was treated the same as the other prisoners who were held in the prison?

A.  Yes.

Q.  And he was given the same access to food and health --
medical treatment?

A.  You mean rights to?

Q.  Yes.  He was given the same food as the other prisoners?

A.  Yes.

Q.  And the same access to medical care as the other prisoners?

A.  Yes.

Q.  And the food was described as the three meals a day that you described earlier?

A.  Yes.

Q.  Do you know that -- did you see Mr. Elsheikh before he was -- immediately before he was transferred to the U.S. custody?

A.   I'm the one who handed him over.

Q.   Okay.  So then you know that at that time he weighed less than 130 pounds?

A.   Since we ever saw him, he had been at that weight.  Not something new.  Why would he be overweight or fat to begin with? We have photos and videos of him from the beginning of the time that he was apprehended until the day that he was handed over. He had not shifted in weight.

Q.   Okay.  And would you be surprised to know that he weighs 163 pounds now?

A.   I'm not sure about pound numbers, poundage.  Kilograms, pounds.

        THE INTERPRETER:  Kilograms, pounds, forgive me.

A.   I think he is the same, not much changed.

Q.   Not much changed now?

A.   Not much changed.  I did not put him on a scale to weigh him, but I think he has not changed.  And he was not doing any kind of intense labor to lose weight.  All he was doing was eating and sleeping for the most part.

Q.   And to your personal observation, he was not considerably thinner than he is now?

A.   No.

Q.   So did you ever personally ask Mr. Elsheikh whether he wanted to participate in any of the media interviews?

A.   No.

Q.   So your opinion that he chose to participate in these interviews is based on what you believe the policy was at the prison and not anything specifically that you know about Mr. Elsheikh?

A.   Well, I deal with -- on a daily basically with tens of cases.  To me, El Shafee Elsheikh is not a very unique special case.  We have regulations and rules that we implement and go by.  I would not put myself in the situation, with all the dangers that surround us, to put a detainee -- to send them 20 kilometers away to conduct an interview by us, when he gets there to say, oh, I'm not doing this interview, unless we were sure.  I wouldn't do that to begin with.

        THE COURT:  Are you aware of any facts or reports to the effect that Mr. Elsheikh was compelled or required or coerced by SDF to participate in media interviews?

        THE WITNESS:  No.

Q.   But --

        THE COURT:  Just a moment.  So am I correct that it has never come to your attention that he was required or compelled by the SDF to participate in media interviews?

        THE WITNESS:  Why would that be?  Why would we pressure him to conduct an interview with a video recording?

        THE COURT:  Next question.

BY MS. GINSBERG:

Q.   Were you shown a copy of Mr. Elsheikh's CNN interview?

MR. PAREKH:  Your Honor, I would just note for the record, Mr. Elsheikh participated in multiple CNN interviews, so if we could clarify for the record which CNN interview we're talking about here.

MS. GINSBERG:  I'm asking about the CNN interview in 2019.

THE COURT:  All right.  Re-ask your question and add the CNN interview of 2019.

BY MS. GINSBERG:

Q.  Did you ever see a copy of Mr. Elsheikh's interview with CNN that happened in 2019?

A.  No.

Q.  So you have no personal knowledge of what his physical condition was at the time he participated in that interview?

A.  No.

Q.  And --

THE COURT:  Well, just a moment.  Just because he didn't see or know about that interview doesn't mean he doesn't know about his physical condition.

MS. GINSBERG:  Well, I'm going to ask him if he saw Mr. Elsheikh --

THE COURT:  Did you see Mr. Elsheikh in 2019?

THE WITNESS:  Yes.

THE COURT:  All right.  Did he look sick or emaciated or beaten or abused?

THE WITNESS:  No.

THE COURT:  Next question.

BY MS. GINSBERG:

Q.  Do you have a specific recollection of seeing Mr. Elsheikh in the months of May and June 2019, specific recollection?

A.  Yes.

Q.  And where would that have been?

A.  In April and May, the detention center was out of commission.  In June we had a very large, very heavy interest of media pouring on us, and I do recall Mr. Elsheikh conducting five interviews during that time.

Q.  Five interviews in May and June of 2019?

A.  June.

Q.  June.

A.  In April and May, we were out of commission because we were doing renovations and fixing the detention center back up again.

Q.  And do you know how many times Mr. Elsheikh met with the ICRC?

A.  I believe one time it was at our facility.  Because the Red Cross made two visits during the renovations of the prison.  The second visit was done in the end of August in 2019.

Q.  And do you keep records of which inmates meet with the ICRC?

A.  Yes.

Q.  And did you bring those here with you to court, or to give to the Government?

189

A.   What are these?

Q.   These records of the times that Mr. Elsheikh met with the ICRC.

A.   These are registries of visitations -- of visits that are conducted by them.  It's not like something that is a scheduled timetable.  It is not a document.

Q.   So there are no records of when and how many times a particular inmate meets with the ICRC?

A.   No.

Q.   And if the ICRC receives a letter from an inmate to give to a family member, does someone at the prison read the letter first?

A.   No, it's not read, but we get a copy of it.  If you like, I can give you the reason.

Q.   Yes.

A.   In northeast Syria we have thousands of detainees.  Hundreds of them are using fake names, fake backstories, background stories, fake nationalities that they claim.  We just use that information just to cross-match the information to see if we can get to the truth about them.

Q.   And by the time that prisoners get to Derik, have they been biometrically enrolled by the United States Department of Defense?

          THE COURT:  If you know.

Q.   If you know.

A.   Not all of them.

Q.   Who was the head of the Derik prison when you were the deputy?

MR. PAREKH:  Objection, Your Honor.  We're referring to these SDF witnesses as SDF Witness 1, 2, 3.  It would seem to go against our agreement to not talk about names of other individuals who are not even testifying today.

MS. GINSBERG:  Your Honor, I understood that the reason for that was the safety of these witnesses.  I'm sure that it's public record who the head of Derik prison was.

THE COURT:  Really?  You think there's a public record of that?  I would be shocked and surprised, Ms. Ginsberg.  It paints a picture of war-torn Syria different from the one I envision.

MS. GINSBERG:  Well, Your Honor, I have an article from the *New York Times* --

THE COURT:  Ah, well, that you can forget about.

MS. GINSBERG:  But that --

THE COURT:  I wouldn't trust that as far as I could throw it.  And I quit trusting CNN when they gave in to Saddam Hussein's requirement that they keep certain things quiet as a condition of their being able to get into Iraq.  I lost complete faith in that news organization.  I don't find any news organization to be reliable today.

MS. GINSBERG:  Well, judge, the article identifies a

congressional delegation that went to visit certain prisons, names the officials who headed those prisons.  But I'll move on.

THE COURT:  Well, then you know who the person is, and you don't need to elicit it from this witness.  And if you want to ask him questions about some individual you know the name of, I don't think Mr. Parekh has any objection to that.

MR. PAREKH:  No, you're correct, Your Honor.

MS. GINSBERG:  All right.

BY MS. GINSBERG:

Q.  Was a person named Abu Ali in charge of the Derik prison at any time?

MR. PAREKH:  Your Honor, Ms. Ginsberg explicitly ignored what you had just --

THE COURT:  No.  I invited her to do it.

MR. PAREKH:  Well, did she have to use names during her questioning?

THE COURT:  I see.

MR. PAREKH:  Does it matter who the person --

THE COURT:  No, it doesn't matter to me, Ms. Ginsberg. Can you explain why it should matter to me?

MS. GINSBERG:  Well, I want to ask this witness if he knows about interactions between Abu Ali and Mr. Elsheikh.

THE COURT:  Ask him that question.

BY MS. GINSBERG:

Q.  Do you know about any interactions that an SDF individual

named Abu Ali had with Mr. Elsheikh?

MR. PAREKH:  Your Honor, can I just point out one thing?  If Ms. Ginsberg thinks she knows the name, then she's asking the witness to confirm or deny whether that is the true name of the head of the prison.  Wouldn't it be just as fine to say, the individual who occupied your current position, do you know whether that individual had interactions with Mr. Elsheikh?  What does it matter?

THE COURT:  Try it that way, Ms. Ginsberg.  That might soothe Mr. Parekh.

MS. GINSBERG:  I will.  But the Court might -- I will tell Your Honor that I believe I know who the head of the prison was but I'm not certain.

THE COURT:  Oh, I don't doubt that.

MS. GINSBERG:  I'm not certain that that person -- that I'm correct.

THE COURT:  Well, do you know whether that person had any conversations with Elsheikh?

MS. GINSBERG:  I do.  The person who was the head of the prison.

THE COURT:  You have documents to that effect?

MS. GINSBERG:  No, but there don't appear to be documents to the effect of any communications between guards and Mr. Elsheikh.

THE COURT:  Just ask him whether he knows whether

Elsheikh had discussions with the head of the -- what is it?

MS. GINSBERG:  Derik.

THE COURT:  Derik prison in 2019, I guess it is.

BY MS. GINSBERG:

Q.  Do you know whether Mr. Elsheikh had either conversations or meetings of any kind with the head of Derik prison in 2018 or 2019?

A.  The head of the prison is allowed to meet with every inmate, so there's nothing significant about anything like that.  This is normal duties if you wanted to pursue it.

Q.  All right.  And how would an inmate like Mr. Elsheikh make a complaint that the head of the Derik prison had mistreated or abused him?

MR. PAREKH:  Your Honor, just to save time, he's already testified to this.  He's named all the different avenues.  I actually went through that in explicit detail on direct.

MS. GINSBERG:  Your Honor --

MR. PAREKH:  It's in the record.

THE COURT:  Mr. Number 2, SDF Witness 2, do you know whether the head -- your predecessor of the prison, do you have any information that that person abused or mistreated Mr. Elsheikh in any way?

THE WITNESS:  No.

THE COURT:  Go ahead, Ms. Ginsberg.

BY MS. GINSBERG:

Q.   If Mr. Elsheikh wanted to make an allegation that he had been abused by the head of the prison, who would he make that allegation to?

A.   He will have tens of parties to submit that complaint to.

Q.   For example?

A.   The easiest example is he could have given it to the Red Cross, the most impartial agency in this whole thing.  He could have met with any detective and could have told them -- any detective he wanted and could have told them about it.  In our system, there is no room for any information, no matter how small they are, to be hidden.  And for what reason?  Why would he mistreat him?

Q.   Well, that's not a question I can answer.

What mechanisms were in place that would have protected Mr. Elsheikh from retaliation for making a claim that he had been abused by the head of El Derik prison?

A.   Why would there be precautions or revenge against him?

Q.   Can you tell me that you -- sitting here today, you don't believe that there would be ramifications against an inmate who claimed that he had been badly abused by the head of Derik prison?

MR. PAREKH:   Your Honor, she's assuming facts not in evidence.

THE COURT:   That's right, Ms. Ginsberg.  Let me ask

again, SDF Number 2, are you aware of any information, any reports or any charges by Mr. Elsheikh that he was abused, mistreated, in any way, by the head of the prison; that is, your former -- or your predecessor?

THE WITNESS:  No.

THE INTERPRETER:  The answer was no.

BY MS. GINSBERG:

Q.  And would there be ramifications against you if you said that you did have knowledge, that type of knowledge?

A.  Why would that be?  We're not angels.  I'm not saying we're perfect.  But why would I not say -- if I have received anything like this or came to the knowledge of anything like this, why would I not mention it or why would I not say it?

THE COURT:  She says you would be afraid to do it. Would you be afraid?

THE WITNESS:  Of what?  From what?

Q.  Of losing your job.

A.  My job?  My job is all hardship.  On daily basis I meet with hundreds of inmates of high danger, and there's nothing more dangerous than that.

Q.  I just want to correct one thing I asked you before.  I think I said that Mr. Elsheikh weighed 129 pounds when he left Derik.  Would you have knowledge that he weighed not 129 pounds but 133 pounds?

THE INTERPRETER:  I'm sorry, I'll ask for repetition.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

You lost me with the numbers.

THE COURT:  Do you have a question, Ms. Ginsberg?

BY MS. GINSBERG:

Q.  Am I correct -- you said you don't know how much Mr. Elsheikh weighed when he left Derik prison.  Is that right?

A.  That's correct.

Q.  Okay.

MS. GINSBERG:  Nothing further, Your Honor.

THE COURT:  Any redirect?  Sharply focused.

MR. PAREKH:  Sharply, Your Honor.

Can we please pull up Exhibit 7-11, please, which has already been admitted in evidence.

THE COURT:  I have it.  Go ahead.

MR. PAREKH:  Thank you, Your Honor.  I'm just waiting for the witness to have it in front of him.

THE COURT:  He does now too.

**REDIRECT EXAMINATION BY COUNSEL FOR THE UNITED STATES**

**BY MR. PAREKH:**

Q.  You testified earlier that this is the last media interview that Elsheikh participated in before he was transferred to U.S. custody.  Is that correct?

A.  Yes.

Q.  You were asked a number of questions by Ms. Ginsberg about the defendant's weight.  Do you remember that?

A.  Yes.

Q.   And about his physical appearance.  Do you remember that?

A.   Yes.

Q.   Take a look at that picture in 7-11 and then take a look at the person you previously identified as Elsheikh.  Does he look pretty similar?

A.   In this picture I see some muscles.  I don't know.

Q.   In the picture you see muscles?

A.   Yes.

Q.   And otherwise, does he appear to you to be the same weight, approximately, in both photos?  In the photo and how he looks in the courtroom today?

           MS. GINSBERG:  Your Honor, I think the photograph speaks for itself.

           THE COURT:  Well, I'll overrule that objection.

A.   I think he looks healthy here in the picture.

Q.   Thank you.  You were asked some questions about the SDF recording certain portions of media interviews.  Do you remember that?

           THE COURT:  Let me shorten it.  Those are usually jury redirect techniques to call the jury's attention.  You don't need to do that here.  Go right to what you want to clarify or clear up.

Q.   In all the interviews that Mr. Elsheikh participated in when he was in your custody at Derik, have you bothered to translate any of those?

A.   Our problem is we don't have anybody in the office who speaks the English language.

THE COURT:  So is your answer yes or no?  Re-ask the question.

Q.   Have you translated any of the media interviews that Mr. Elsheikh has participated in?

A.   No.

Q.   When Mr. Elsheikh was in your custody in Derik, what language did you and other SDF officials use to communicate with him?

A.   Arabic.

Q.   Did you speak to him in English?

A.   Never.

MR. PAREKH:  No further questions.

THE COURT:  Tell me, I'm curious, is there a big difference between Arabic and Kurdish?

THE WITNESS:  Yes.

THE COURT:  And it happens, I suppose, that people of Kurdish ethnicity who live in Syria speak both Kurdish and Arabic?

THE WITNESS:  Yes.

THE COURT:  Tell me -- what did he say?

THE WITNESS:  The Kurdish language is the mother tongue, and we learn Arabic in school.

THE COURT:  I'm curious, can you tell me, what defines

a Kurd?  What makes one a Kurd?

THE WITNESS:  This subject is a little bit complicated.

THE COURT:  I thought so.  Never mind.

MS. GINSBERG:  Judge, since we're not going to -- may not have him back for trial, I neglected to ask one question.

THE COURT:  All right.  You may do so.

**RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

BY MS. GINSBERG:

Q.  Sir, I believe you testified that there were no cameras in the interrogation rooms.

A.  There are cameras in the interrogation rooms.

Q.  Okay.  So I thought before you described -- you said that the prior incident that you learned about of abuse occurred in the interrogation room and there was no camera.  So that is not correct?

THE COURT:  I thought he said interview room.  I don't think there are cameras in the interview room in a different location.  The interrogation room is at the prison.  Is that right, Mr. SDF Number 2?

THE INTERPRETER:  Your Honor, I might as a linguist, there is no distinction between interview and interrogation in their lingo.  So they're both used as interrogation in the Arabic words.

THE COURT:  I see.  Well, go ahead, Ms. Ginsberg.  But, you know, the interviews took place away from the prison.

MS. GINSBERG:  I'm not speaking of the media interviews.  I'm speaking of the instance of abuse that he heard about and I thought described as having happened in an interview or in an interrogation.

THE COURT:  All right.  Go ahead.  You said one more question, but I'm going to give you some leeway.  Go ahead.

BY MS. GINSBERG:

Q.  The episode of abuse that was reported to you, that occurred in an interview room?

A.  Yes.

Q.  And there are cameras in those rooms.  Correct?

A.  Yes, there are cameras.

Q.  And the incident was not discovered because it was seen on a camera?

A.  These cameras are for closed-circuit monitoring.  You will be in one room and the cameras are in the other room, and you will be monitoring those rooms through those cameras.  If you're not there, you won't see everything.  Because you are viewing the room and listening to it directly, and there's no recording.

Q.  So it's possible for abuse to occur even though there are cameras and for you not to know that the abuse occurs?

A.  No, it's impossible.  The thing is that there's nothing that could remain or stay hidden or unknown.  Everybody knows what the precautions -- or the punishments are, and nobody wants to, for the sake of saying or having said a couple of words to an

inmate, to go to a military tribunal or lose their job.

Q. But no --

THE COURT: Anything else?

Q. This --

THE COURT: Anything else?

MS. GINSBERG: Yes.

THE COURT: Well, respond to me, please.

MS. GINSBERG: I'm sorry, Your Honor.

THE COURT: Anything else?

MS. GINSBERG: Yes, sir.

THE COURT: All right. You said one question and I've given you a lot of leeway. Finish it up, please.

Q. The way that the SDF learned about this instance of abuse was because it was reported to them by a U.S. Government official. Correct?

A. Yes.

Q. Thank you.

MS. GINSBERG: Thank you, Your Honor.

THE COURT: Any redirect based on any of that?

MR. PAREKH: No, Your Honor.

THE COURT: All right. Now, he may step down.

MR. PAREKH: Your Honor, may he be excused?

THE COURT: Yes. Now, you have a third SDF witness?

MR. PAREKH: Yes, Your Honor.

THE COURT: How long will he take?

MR. PAREKH:  I'm going to do my best to keep the questions focused, and if I can have some latitude to lead.  Not lead because I'm trying to put words in the witness' mouth, but I can see through the interpretation it's taking a lot longer.

THE COURT:  How long do you think it will take you to do your direct?

MR. PAREKH:  If I could lead, Your Honor, I would hope to get it done within 30 to 45 minutes.

THE COURT:  And what were you going to say, Ms. Ginsberg?

MS. GINSBERG:  I was going to say I understand the need for brevity here, but I think the Government does this at its peril because if the questions are leading, they will be objectionable at trial.

THE COURT:  Well, they may be.  You know, not every leading question results in a decision that the answer is excluded.  Many leading questions are not impermissibly leading.  They don't put words in the mouth.  In other words, instead of asking what if anything did you do after that, they ask, did you punch him in the nose after that?  That is technically perhaps leading but it's not a problem.  Do you see what I'm saying?

And so I am telling Mr. Parekh that he needs to focus his questions, to the extent that he makes them leading, in a way that I don't find them impermissibly leading.  You may object if you think otherwise, and I will rule.

MS. GINSBERG:  I think I probably would object if he asked the question, did you punch someone in the face, if that was the point of the -- if that was a critical point.

THE COURT:  Well, that wouldn't move me.  That wouldn't move me.

MS. GINSBERG:  I understand.

THE COURT:  Now, if you asked him -- if he were to say that something happened, and then you think the best way to ask it is, "What if anything did you do after that," I don't mind that.  That's, of course, a non-leading way to do it.  But I also don't mind, "Did you punch him in the nose."  Because that doesn't put words in his mouth.  He can say, no, I didn't do that, or yes, I did.  And it saves time, and it doesn't really put words in his mouth.

But in any event, Mr. Parekh, avoid them when you can. I don't think you need to lead very much.

MR. PAREKH:  No, Your Honor.

THE COURT:  You know, the questions, "Did you ever receive any information from any source as to whether Mr. Elsheikh had been abused or tortured or mistreated in any way," and he says no, that gets to it.  She can then cross-examine him.

MR. PAREKH:  That's right, Your Honor.

THE COURT:  All right.  Where is this witness?

MR. PAREKH:  I believe --

204

THE COURT:  He's right there.

MR. PAREKH:  -- SDF Number 3 is in the witness room.

COURT SECURITY OFFICER:  Number 3?

THE COURT:  Yes.  He's right here.  They're going to get him.  Okay.

MR. PAREKH:  And, Your Honor, we're excusing SDF Witness 1 and 2 for the remainder of the hearing.

THE COURT:  Yes.

MS. GINSBERG:  Judge, Mr. Elsheikh needs to pray.

THE COURT:  Well, I'm sorry about that.  I accommodate Christmas for Christians.  I'm not Christian.  I accommodate Jewish holidays for Jews.  I'm not a Jew.  Well, ethnically I might have been.  I accommodate all kinds of religions.  But I don't have to stop a legal proceeding just so someone can pray.

Does it matter, Ms. Ginsberg, if he prays an hour from now?

MS. GINSBERG:  Your Honor, apparently it does.  I'm not a scholar in this area, but Muslims are required to pray a certain number of times at certain hours of the day.

THE COURT:  Double up after we finish.

Well, I'm not moved to do this, but the fact that we won't finish this fellow today seems to me, Mr. Parekh, to counsel in favor of recessing for the day.  Not because he needs to pray, because that isn't, for me, sufficient.

Now, I will accommodate any religion.  I don't know all

the holidays and religious services for Muslims or Christians or Jews or Buddhists or atheists or anybody else.  I don't know all of that.  I'm not a believer, but I'm not a skeptic either.  My mother said -- before she died, she said there's no empirical evidence of an afterlife, she said; but I'm prepared to be pleasantly surprised.  I doubt she was.  Even if there is an afterlife, I'm not sure it would have been pleasant for my mother.

MS. GINSBERG:  Judge, I think that might be too much information.

THE COURT:  Yes, it might be.  But my point is, I try to accommodate various religions.  I do my best.  But when we have hearings and we're trying to get things done, I'm not going to stop in the middle of the day so someone can pray or do something else.  I don't care whether they're Rosicrucians or something else.

But I will try to accommodate them if it isn't a problem for the Court.  And it isn't a problem for the Court tonight because it's already late.  So I am going to recess. We'll commence at 9 o'clock tomorrow.  Tomorrow is Thursday.  I really want to finish this matter as soon as we can.  I have a Friday docket.  You all have engagements Friday.  Am I correct?

MR. PAREKH:  The Government is available, Your Honor.

MS. GINSBERG:  Your Honor, I have a plea in front of Judge Hilton at 10 o'clock.  I think that can be accommodated.

THE COURT: Well, that can easily be moved.

MS. GINSBERG: I know other counsel --

MR. MACMAHON: I have a 2 o'clock sentencing in District Court in D.C.

THE COURT: Well, if you're in this proceeding and you need to be here, the District of Columbia Federal Court will have to accommodate that. Who's the judge?

MR. MACMAHON: Judge Mehta.

THE COURT: Must be a young person.

All right. Anything further?

MS. GINSBERG: And I believe Mr. Ellis has two court appearances tomorrow.

THE COURT: Well, you'll have to do something other. You'll either have to miss those while we finish this --

MS. GINSBERG: May he be excused if we can't --

THE COURT: Oh, absolutely he may.

MS. GINSBERG: -- accommodate.

THE COURT: Absolutely he may be. And we'll be in my courtroom tomorrow, 900, at 9 o'clock.

MS. GINSBERG: Your Honor, may I notify Judge Hilton's chambers that I may need to be here.

THE COURT: Yes. Well, I'll ask the deputy clerk to notify his chambers that we are still in this hearing and will be at 10 o'clock tomorrow.

MS. GINSBERG: Friday.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

THE COURT:  Friday.  Well, you better wait until tomorrow.  Maybe Mr. Parekh has a nifty way of expediting this.

MS. GINSBERG:  Maybe.  That would be nice.

THE COURT:  Or you may have a nifty way of expediting your cross-examination.

MR. PAREKH:  Took the words out of my mouth, Your Honor.

THE COURT:  All right.  Court stands in recess until 9 o'clock tomorrow.

(Off the record at 5:56 p.m.)

**CERTIFICATE OF OFFICIAL COURT REPORTER**

**I, Rebecca Stonestreet, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.**

**\_\_\_//Rebecca Stonestreet//\_\_\_                    \_\_12/6/21\_\_\_**

**SIGNATURE OF COURT REPORTER                          DATE**

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*