UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,          :
                                   :
                Plaintiff          :     Criminal Case
                                   :     No. 20-CR-00239-TSE
        v.                         :
                                   :
                                   :     November 18, 2021
EL SHAFEE ELSHEIKH,                :     9:15 a.m.
                                   :
                Defendant          :     DAY 3
............................       :     ........................

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE T.S. ELLIS, III
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES:</u>

FOR THE PLAINTIFF:          RAJ PAREKH
                           JOHN T. GIBBS
                           DENNIS FITZPATRICK
                           ALICIA H. COOK
                           U.S. ATTORNEY'S OFFICE
                           2100 Jamieson Avenue
                           Alexandria, VA  22314
                           703-299-3700

FOR THE DEFENDANT:         NINA J. GINSBERG
                           ZACHARY ANDREW DEUBLER
                           DiMURO GINSBERG PC
                           1101 King Street
                           Suite 610
                           Alexandria, VA  22314
                           703-684-4333

                           EDWARD B. MacMAHON
                           LAW OFFICES OF
                           EDWARD B. MacMAHON, JR.
                           PO Box 25
                           107 East Washington Street
                           Middleburg, VA  20118
                           540-687-6366

                           (APPEARANCES CONTINUED ON
                           FOLLOWING PAGE.)

FOR THE DEFENDANT:          JOHN EDWARD YANCEY ELLIS
                           CARMICHAEL ELLIS & BROCK
                           108 N. Alfred Street
                           1st Floor
                           Alexandria, VA  22314
                           703-684-7908


OFFICIAL COURT REPORTER:    REBECCA STONESTREET, RPR, CRR
                           U.S. District Court, 9th Floor
                           401 Courthouse Square
                           Alexandria, Virginia  22314
                           (240) 426-7767


( Pages 1 - 320)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

# C O N T E N T S

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **SDF WITNESS NUMBER 3** | | | | |
| By Mr. Parekh | 7 | -- | 52 | -- |
| By Ms. Ginsberg | -- | 18 | -- | -- |
| | | | | |
| **SPECIAL AGENT JOHN M. CHIAPPONE** | | | | |
| By Mr. Parekh | 53 | -- | 121 | -- |
| By Mr. Deubler | -- | 99 | -- | -- |
| | | | | |
| **SPECIAL AGENT JULIUS NUTTER** | | | | |
| By Mr. Parekh | 131 | -- | 181 | -- |
| By Mr. Deubler | -- | 170 | -- | 184 |
| | | | | |
| **SEAN LANGAN** | | | | |
| By Mr. Gibbs | 192 | -- | -- | -- |
| By Mr. MacMahon | -- | 248 | -- | -- |
| | | | | |
| **SPECIAL AGENT DANIEL O'TOOLE** | | | | |
| By Mr. Gibbs | 272 | -- | -- | -- |
| By Mr. MacMahon | -- | 300 | -- | -- |

# E X H I B I T S

| GOVERNMENT EXHIBITS | PAGE |
|---|---|
| Number 8-3A | 13 |
| Number 8-3B | 14 |
| Number 12-1 | 57 |
| Number 12-2 | 65 |
| Number 12-4 | 66 |
| Number 12-5 | 67 |
| Number 12-6A | 73 |
| Number 12-6B | 83 |
| Number 12-7 | 84 |
| Number 12-8 | 91 |
| Number 12-11 | 123 |
| Number 13-2 | 139 |
| Number 13-3 | 140 |
| Number 13-4 | 145 |
| Number 14A | 225 |
| Number 14-2A | 228 |
| Number 14-3A | 229 |
| Number 14-5A | 234 |
| Number 14-6A | 235 |
| Number 14-8 | 240 |
| Number 15-1 | 274 |

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**E X H I B I T S   C O N T I N U E D**

**GOVERNMENT EXHIBITS**      **PAGE**

Number 15-4      282
Number 15-7      293
Number 15-9      287
Number 15-11      289


**DEFENDANT EXHIBITS**      **PAGE**

Number 1      102
Number 6      171
Number 7      108
Number 10      119
Number 121      308
Number 400 - 410      303

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

**P R O C E E D I N G S**

THE COURT:  Good morning.  This is 20-CR-239, and the record should reflect that counsel and the defendant are present and prepared to proceed.

Yesterday I didn't want to stop this proceeding merely for the purpose of a particular prayer session, but I want to be sure, Ms. Ginsberg, that your client is being given the opportunity to do his praying at the prison and has the Koran and all the rest that he needs.

MS. GINSBERG:  I believe he is, Your Honor.  I haven't heard otherwise.

THE COURT:  All right.  If he isn't, that should be brought to my attention.  I have seen that defendants are provided with Korans, rosary beads, and other things if they need it.

Now, Mr. Parekh, I take it that you have one more SDF, SDF 3, to present.

MR. PAREKH:  Correct, Your Honor.

THE COURT:  How long do you think this will take?

MR. PAREKH:  Your Honor, my outline is less than two pages, so I hope it will be short.  I can't predict what cross-examination will be like, but I think direct examination hopefully should be relatively short, somewhere under an hour.

THE COURT:  All right.  The last witness who testified was the assistant director and ultimately the director at the

Derik prison.  Who is this person?

MR. PAREKH:  This person is an investigating officer at the Derik prison.  I expect that he will testify that he had numerous interactions with Mr. Elsheikh and Mr. Kotey in connection with his investigating officer duties and responsibilities at Derik.

THE COURT:  All right.  I think that basically what I have heard is -- with respect to the Derik prison, is there were no reports received by the assistant director when he was assistant director, and when he was director, as to any mistreatment or abuse of Mr. Elsheikh.

And by cross-examination, Ms. Ginsberg has sought to demonstrate that there might be reasons why that occurred but wasn't reported to these people.  That's essentially what has been presented.  Am I correct, Mr. Parekh?

MR. PAREKH:  Just one correction, Your Honor.  The last witness, SDF Witness 2, wasn't the director at the time that Mr. Elsheikh was in their prison.  He became the director in February 2021, and of course by then the defendant was in the United States.

THE COURT:  Yes, I recall that.  I recall that.

Is that a fairly accurate summary, Ms. Ginsberg.

MS. GINSBERG:  Yes, sir.

THE COURT:  All right.  Now, we'll begin with SDF Number 3.

7

MR. PAREKH:  Thank you, Your Honor.  The United States calls SDF witness 3.

(Oath administered by courtroom deputy clerk.)

MR. PAREKH:  Your Honor, with the Court's permission, may the interpreters and the witness remove their masks so they may be heard more audibly?

THE COURT:  They may if they're comfortable.

MR. PAREKH:  May I proceed, Your Honor?

THE COURT:  Yes, you may.

**(SDF WITNESS NUMBER 3, having been duly sworn,**

**testified as follows:)**

**EXAMINATION BY COUNSEL FOR THE UNITED STATES**

**BY MR. PAREKH:**

Q.  Sir, we are keeping your name out of the public record.  We will be addressing you as SDF Witness 3.  Do you understand that?

A.  Yes.

Q.  Where are you from?

A.  From Derik, Syria.

Q.  Do you currently reside in Syria?

A.  Yes.

Q.  Do you also reside in the Derik area?

A.  Yes.

Q.  What languages are you fluent in?

A.  My mother tongue is Kurdish, and Arabic as well.

Q. Do you speak English?

A. No.

Q. Where do you work?

A. In the Derik prison.

Q. Who do you work for?

A. The SDF.

Q. Also known as the Syrian Democratic Forces?

A. Yes.

Q. What is your title with the SDF?

A. You mean my job?

Q. Yes.

A. Investigating officer in the office of counterterrorism in the north and east part of Syria. And I'm in charge of the ISIS portfolio.

Q. And is your office located inside of the Derik prison?

A. Yes.

Q. Please summarize your roles and responsibilities as an investigative officer for the SDF?

A. To interrogate the ISIS inmates, to prepare their files. I also go to do field interviews on the battlefield. I also go to media interviews with the inmates, and also touring the prisons where terrorist suspects are held.

Q. And by "battlefield," are you referring to locations in Syria where ISIS is located?

A. Of course.

Q.   As an investigative officer with the SDF, have you received training in interrogation techniques and body language?

A.   Yes.

Q.   Through your job with the SDF, do you know two individuals named El Shafee Elsheikh and Alexanda Kotey?

A.   Yes.

Q.   How do you know them?

A.   They were two high-profile members of ISIS.  When they were apprehended, the media close to SDF has announced their capture, and I have met them in person.

Q.   Have you met them on numerous occasions in person?

A.   Of course.  Yes.

Q.   Do you see El Shafee Elsheikh in the courtroom today?

A.   Yes.

Q.   Can you identify where he is sitting and describe an article of clothing that he is wearing?

A.   He is sitting right in front of me wearing a green top and wearing a black mask.

          MR. PAREKH:  Your Honor, may the record reflect an in-court identification of the defendant?

          THE COURT:  So ordered.

Q.   How much time did you spend at Derik prison in 2018 and 2019 working every week?

A.   All my work is in Derik prison.

Q.   What were your working hours?

A.   From around 9 o'clock in the morning until 11 p.m.

Q.   Was El Shafee Elsheikh a prisoner at Derik prison in 2018 and 2019?

A.   Yes.

Q.   Same for Alexanda Kotey?

A.   Yes.

Q.   How often did you see Elsheikh when he was at Derik in 2018 and 2019?

A.   I would say once a week, either seeing them while they summoned them for interrogations or I saw them in the recreation court.

Q.   Were there times that you would see them up to five times a week?

A.   Yes.

Q.   And by "them," we're referring to El Shafee Elsheikh and Alexanda Kotey?

A.   Yes.

Q.   Did you frequently talk to Elsheikh when he was in custody at Derik prison?

A.   Yes.

Q.   Did Elsheikh ever tell you that he had been tortured, abused, or mistreated in any way?

A.   No.

Q.   Did you ever see any signs of abuse or injury on Elsheikh when you saw him at Derik?

A.   No.

Q.   Same questions for Kotey.  Did you frequently talk to Kotey when he was at Derik prison?

A.   Yes.

Q.   Did Kotey ever tell you that he had been tortured, abused, or mistreated in any way?

A.   No.

Q.   Did you ever see any signs of abuse or injury on Kotey in all of the times that you saw him at Derik prison?

A.   No.

Q.   You indicated that you had interviewed Elsheikh when he was at Derik prison.  Is that correct?

A.   Yes.

Q.   Did Elsheikh refuse to answer some of your questions during those interviews?

A.   Many times.

Q.   Please explain.

A.   I will ask him -- ask him to be brought to the interview room, he will come there, will sit down, and I will talk to him, chat him up, ask him about how he was doing, how was his health.

When I come to asking him about the things the he -- the works that he had done while he was in ISIS territory, he will refuse to answer.  And as a result, he would be brought back to his cell.

Q.   Did you ever force him to answer your questions?

A.   No.

Q.   When you would ask him about his health and how he was doing, what would he say?

A.   Good.

Q.   Were there times when Elsheikh would refuse to participate at all in your interviews?

A.   Yes.

Q.   Did you ever force Elsheikh to participate in any interviews whatsoever at Derik prison?

A.   No.

Q.   Mr. SDF Witness 3, did your team video record a statement of Alexanda Kotey at Derik prison?

A.   Yes.

Q.   When was that, approximately?

A.   It was in August 2019.

Q.   Why was that done?

A.   So whenever they have -- they make confessions, we will record a video of that.

Q.   I want you to turn to the binder that should be in front of you, and turn to Exhibit 8-3A.  There should be a sleeve following that tab labeled 8-3A with a CD inside of the sleeve. Do you see that?

A.   Yes.

Q.   Does that CD have your signature on it?

A.   Of course.

Q.   Did I play that CD for you prior to your testimony today?

A.   Yes.

Q.   What's contained on that CD?

A.   Admissions by Alexanda Kotey.

Q.   Is it a video recorded interview of Alexanda Kotey?

A.   Yes, a piece of video.

Q.   And is that the same one that you described as taking place in August of 2019 at Derik?

A.   Yes, on 6 August 2019.

Q.   And is it a true and correct copy in full of that video?

A.   Yes.

MR. PAREKH:  Your Honor, move to admit Exhibit 8-3A.

THE COURT:  All right.  It's admitted without objection.  Proceed.

(GOVERNMENT EXHIBIT Number 8-3A was admitted into evidence.)

MR. PAREKH:  Thank you, Your Honor.  Since the CD has now been admitted, I also move to admit Exhibit 8-3B.  That particular exhibit is a translation from Arabic to English of 8-3A, and it is also contained in the stipulation that is Exhibit 6-3 that was signed by both myself and Ms. Ginsberg.

THE COURT:  And I take it the translation, both the original and the English translation, have been made available to counsel for the defendant?

MR. PAREKH:  Yes, Your Honor.  Immediately upon

14

translating it, Mr. Faizulla translated it, I emailed it to counsel for the defendant.

THE COURT:  All right.  It's admitted.  Next question.

(GOVERNMENT Exhibit 8-3B was moved into evidence.)

MR. PAREKH:  Your Honor, may we just play the first 15 or 20 seconds of 8-3A?

THE COURT:  All right.  You may do so.  And of course if the defense wants to play any additional portions in the course of cross-examination, they may do so.  Proceed.

(Video played in open court.)

MR. PAREKH:  I believe that's the first approximately 10 to 15 seconds that have been played.  We cans stop there.

THE COURT:  Yes.  That was all a narrative, wasn't it?

MR. PAREKH:  It was, Your Honor.  8-3B contains the English translation that's now in evidence.

BY MR. PAREKH:

Q.  But my next question for Mr. SDF Witness 3:  Just summarize, approximately, what we just heard Mr. Kotey state.

A.  He's introducing himself and mentions what his nickname was in ISIS.  In the video he talks about how he got to Syria.

Q.  Does he mention the date of the interview at the beginning of the interview?

A.  Yes.

Q.  What does he say?

A.  He said:  Today is 6th of August, 2019.

Q.   Did you force Alexanda Kotey to participate in this video interview?

A.   No.

Q.   Describe how it came to be that he participated in this interview.

A.   We summoned him to the office, we told him that we were going to make a video recording of his confessions and how he got to Syria, and the video is the result of that.

     We did the same thing Elsheikh, but he refused to do the video recording.  Therefore, we don't have a video of him doing the same thing.

Q.   And by "him," you mean Elsheikh?

A.   Yes.

Q.   Could Kotey refuse to participate in the video that we just watched?

A.   Of course.

Q.   And if Kotey would have declined to participate, would you have forced him to participate?

A.   No.

Q.   Why didn't you force Mr. Elsheikh to participate in this interview, given that Mr. Kotey participated?

     THE INTERPRETER:  I'm sorry, Mr. Parekh, can you repeat the question?

Q.   Why didn't you force Mr. Elsheikh to participate in the interview, given that Mr. Kotey had participated?

A.   We don't have anything compulsory.  The inmates have their freedom to refuse.

MR. PAREKH:  Mr. Interpreter, can you say it again with the microphone closer to your mouth.

A.   We don't have any obligatory practice.  We don't force anything.  The inmate has the freedom to say no.

Q.   In August 2019, did you know that Kotey and Elsheikh would be transferred to U.S. Government custody?

A.   No, I didn't know.

Q.   Were you still investigating Elsheikh at that time?

A.   Yes.

Q.   Were you still investigating Kotey at that time?

A.   Yes.

Q.   And were those investigations being conducted solely by the SDF in your capacity?

A.   Yes, of course.

Q.   Did the U.S. Government ask you to video record Mr. Kotey's statement that we just watched?

A.   No.

Q.   Did the U.S. Government in any way ask you the video record a statement of Mr. Elsheikh when he was at Derik prison?

A.   No.

MR. PAREKH:  Your Honor, I'm wrapping up.  I just have a few more questions turning to another topic now.

THE COURT:  All right.  Proceed.

Q.   As part of your job, did you visit Ayn Issa prison in early 2918?

A.   Yes.

Q.   Why?

A.   We conduct tours of the prisons to find out the needs of the prisons, the inmates.

Q.   Did you talk to prisoners when you were at Ayn Issa in early 2018?

A.   Yes.

         (Reporter clarification.)

Q.   Did any of those prisoners tell you that they had been abused or mistreated?

A.   No.

Q.   Did you see any signs of detainee abuse or mistreatment while you were there in Ayn Issa prison in early 2018?

A.   No.

Q.   As part of your job, did you also visit the Kobani prison in or around April 2018?

A.   Yes.

Q.   Did you talk to prisoners when you went there?

A.   Of course.  This is part of my job.

Q.   Did any of those prisoners tell you that they had been abused or mistreated in any way?

A.   No.

Q.   Did you see any signs of abuse or mistreatment while you

were there?

A.   No.

Q.   Are SDF guards permitted to bring in guns in Ayn Issa, Kobani, or Derik prison?

A.   No.

Q.   Do the SDF guards have items such as pepper spray, rubber batons, and shields for their protection?

A.   Yes.  These will be used during riots.

Q.   And is that all, when they would be used?

THE INTERPRETER:  Is that all when they would be used?

Q.   Are those the only occasions on which they will be used, during riots?

A.   Yes, but except for the spray, they will be carrying that all the time.

MR. PAREKH:  Court's indulgence.

As promised, Your Honor, no further questions.

THE COURT:  All right.  Ms. Ginsberg, you may cross-examine.

MS. GINSBERG:  Thank you, Your Honor.

**CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

**BY MS. GINSBERG:**

Q.   Good morning.

A.   Good morning.

Q.   Sir, your job is as an investigator or what we might call interrogator at Derik prison.  Correct?

A.   Yes.  And I'm also in charge of the investigating team.

Q.   How many people do you -- how many investigators do you supervise?

A.   Four investigators.

Q.   And you have -- at Derik prison you have four interrogation rooms?

A.   More.

Q.   More.  How many?

A.   Near 12 -- nearly 12 rooms are there.

Q.   12 rooms that are used specifically for interrogation of ISIS prisoners?

A.   Yes.

Q.   And how often would you be interrogating these prisoners?

A.   On a daily basis.

Q.   And how many times did you personally interrogate Mr. Elsheikh?

A.   Many.

Q.   Approximately, can you -- 20?

A.   I can't say how many sessions.  We have thousands of prisoners.

Q.   Do you keep records of each time that you do -- perform an interrogation of an ISIS prisoner?

A.   No.

Q.   So you have -- in your memory?  You keep the information that the prisoners provide to you only in your memory?

20

A.   When there is a confession, we will record that, put it down in the laptop.

Q.   But if a prisoner decides not to talk to you, you don't even write down, Prisoner refused to speak?

A.   No, I just tell my superiors that they refuse to talk.

Q.   Do you bring a computer with you every time into your interrogations?

A.   Yes.

Q.   And do you have a witness with you when you perform interrogation?

A.   This is part of our procedures, we'll have sometimes two or three interrogators, sometimes one interrogator.

Q.   So it's very important for you to be successful in obtaining confessions from the prisoners.  Correct?

A.   If he wanted to speak, yes.  If not...

THE COURT:  Let me ask you, SDF Witness 3, the questions that Ms. Ginsberg is asking has talked about confessions, I take it you were interested also in obtaining battlefield and other ISIS organizational information from these individuals.  Is that correct?

THE WITNESS:  Yes, of course that's part of our priorities.

THE COURT:  So when she asked you about confessions, you also had in mind that you were interested in obtaining this other information from these ISIS inmates.  Is that correct?

THE WITNESS:  Yes.

THE COURT:  Next question.

BY MS. GINSBERG:

Q.  Sir, just so we're not confused about words, the type of information the judge just asked you about, you consider that to be a confession.  Correct?

A.  Of course.

THE COURT:  But let's be clear, Ms. Ginsberg.  I don't consider them the same.

MS. GINSBERG:  I'm just trying to differentiate what he is actually talking about.

THE COURT:  All right.  Well, he is talking about both, in answer to your question, but there is a difference as to what kind of information they're seeking.  But you go ahead and phrase your questions in the way you think appropriate, and if I feel there's a clarification required, I will so note.

MS. GINSBERG:  Okay.

BY MS. GINSBERG:

Q.  Sir, so it was important to you to get tactical information.  Correct?

A.  Yes.

Q.  Admissions from the prisoners about what they had done as members of ISIS?

A.  Yes.

Q.  Yes.  And any knowledge they had of future actions that ISIS

may have planned?

A.   Yes.

Q.   And were your most high-value ISIS prisoners kept at Derik prison?

A.   We have other inmates that are not important, but they're all foreign prisoners.

Q.   All of the foreign -- the foreign prisoners were detained at ISIS -- at Derik?  I'm sorry.

A.   Arabs, foreigners, and a small number of Syrians.

THE COURT:  Is there a difference between Arabs and Syrians?

THE WITNESS:  The Syrians are nationals of Syria.  When we say "Arabs," they are nationals of other Arab countries.

THE COURT:  Next question.

Q.   And the SDF had complete control of the decisions that were made about the treatment of your detainees.  Correct?

A.   Yes.

Q.   And at any time that you were -- well, in 2018 and 2019, are you aware of any time that a U.S. Government interrogator came to Derik prison?

MR. PAREKH:  Your Honor, I'm going to object to beyond the scope, and it doesn't seem particularly relevant about at any time in 2018 or 2019, versus regarding this defendant or Alexanda Kotey.

THE COURT:  All right.  I think there's some force to

your objection, but I'm going to permit the answer.  But where it goes from here, you may renew the objection.

MR. PAREKH:  Thank you, Your Honor.

THE COURT:  You may answer.

A.   I spend most of my time in interrogation rooms interviewing the detainees, beginning from 9 o'clock in the morning.  It's difficult for me to determine or to testify that anyone was coming and going of any identity in and out of the prison at any time.

BY MS. GINSBERG:

Q.   And is it your testimony that you spent all these hours in these interrogation rooms asking prisoners if they would voluntarily give you information?

A.   Of course.

Q.   Of course.  And you brought prisoners day in and day out, and every day asked them:  Today are you willing to tell us what you did with ISIS?

A.   Of course.

Q.   Yes.  And then they said, no; and you said, thank you, you may leave now?

A.   Yes, at the beginning we would start a normal conversation with them, in the beginning of each interview.  We asked them how they're doing, how their health is, how is their sleep, when did they go to bed, how are they waking up.  Just normal dialogue.

24

I talk a little bit about their personal lives, where they're from, what did they used to do as a profession back then in their old country, if he's married, do they have kids, how did he come to be introduced to the Islamic state, how did he come into Syria.

Then we get into the kind of conduct and work that they did while they were with the Islamic State.  When they would refuse, there would be allowed to go back to their cell.

Q.   And every day, did many of them refuse?

A.   No.

Q.   No.  And you continued to interview these same people over and over and over again, every day, even after they did not refuse to provide you information?

A.   No.

Q.   How many prisoners were there at Derik in 2018?

A.   The number is a fluctuating number.  It depends on the number of people being transferred, also transferred from us. It's a number I wouldn't be aware of.  It is something that is under the supervision of the management of the prison.

Q.   Well, you were in the prison every day?

A.   Yes.

Q.   And you can't estimate the number of prisoners who were present?

A.   Maybe approximately 100 to 150.  What I'm saying is I can't give you a real figure for what the real number was.

Q.   What did you intend to do with the foreign fighters?

THE COURT:   By "you," whom do you mean, Ms. Ginsberg?

MS. GINSBERG:   I mean the SDF.

Q.   In your command, what you understood was going to happen to the foreign fighters?

A.   We were anticipating holding an international tribunal for them, and this is something that we repeatedly asked for.

Q.   Isn't it true that you -- that the SDF put out a call to all the -- to the international community to come and repatriate their foreign fighters?

A.   We did request that.

Q.   And isn't it true that the prisons were overcrowded and that you were not -- the SDF was not capable of continuing to hold as many prisoners as had been detained?

A.   Yes, the number rose very high, the number of detainees, after the Islamic State lost and was beaten geographically.

Q.   And wasn't it -- as early as early in 2018, weren't the prisons in Ayn Issa and Kobani already overcrowded?

THE COURT:   If you know.

MS. GINSBERG:   Well, he said he toured them.

THE COURT:   Well, I'm not sure about the time period. In any event, this is the third witness you've had on this.  I don't recall these questions, but you may have asked.

Go ahead, ask that question, Ms. Ginsberg, and we'll hear the answer.

A.   It was not too crowded.

BY MS. GINSBERG:

Q.   So when you visited Ayn Issa, how long did you stay at the prison?

A.   About two or three days.

Q.   And how much time did you spend with the prisoners?

A.   Most of the time that I spent there was with the detainees, where I was asking about their needs.  And I toured the detention centers and I conducted a few interviews with them.

Q.   And the prisoners were not crowded on the floors, sleeping on floors on mats very close to each other at the time that you were there?

A.   No.

Q.   You also testified that you interrogated ISIS prisoners on the battlefield.  Is that correct?

A.   Yes.

Q.   And that would be immediately after some battle had occurred?

A.   In most cases these were detainees who were people who walked towards our lines to surrender themselves.  So we would ask them:  How are things on the other side, on the ISIS side?

        And they would be very cooperative and they would be telling us about how things are and what is being done on the ground on the other side.

Q.   And these are the kinds of situations you describe as a

battlefield?

A.    This is the front line.  This would be conducted in a rear line, right behind that, where we would be protecting their lives from the fighting that would be happening ahead of us.

Q.    So you were in situations where people were dying in the area around where you were interrogating people?

A.    Yes.

Q.    And it's your testimony that your conversations with the ISIS captives were just -- were not coercive?

A.    No.

Q.    No.  And you weren't furious that ISIS was killing members of the SDF?

A.    My job and my role and my duties is not a front fighter combatant.  I'm an investigator.  My job and task is to come and interview detainees.

       We would take care of these individuals when they would come and surrender themselves with their families.  The families are innocents.  They have no guilt in any of these things.  To the contrary, we would protect them and take them away from the danger zone in the rear lines.

Q.    And these are the same families that the SDF is holding prisoner in the displaced persons camps?

A.    In the camps, yes.

Q.    And these people are prisoners in the displaced persons camps.  Correct?

A.   They're not prisoners, they are in a camp.

Q.   They're not free to leave the camp?

A.   No, they are from different nationalities.  If their husbands are in detention with us, where are they going to go?  If their governments of their nations are not taking them back, where are they going to go?

Q.   Sir, does the SDF allow the families of detained ISIS prisoners to leave the camps if they want to leave the camps?

A.   The Syrians.

THE COURT:  The Syrians are free to leave?

THE WITNESS:  For the Syrians, with those who are from our region, our country, after they are interviewed, if there is a group, a party, like, for example, if they are from an area where their tribes would guarantee them being repatriated to their towns and villages, we allow that.

If they are foreigners, if the governments of those countries come to receive them, we will also do the same thing with them.

Q.   Sir, you are aware that there is an international outcry about the conditions in these displaced persons camps, and the fact that prisoners are being held there, and that the SDF will not release or try any of these individuals?

MR. PAREKH:  Objection, Your Honor.  I think now we're going well beyond the scope of direct examination.

THE COURT:  Sustained.  It is beyond the scope.

MS. GINSBERG:  Your Honor, it relates to his credibility.  He's saying that --

THE COURT:  It's beyond the scope.

BY MS. GINSBERG:

Q.  Sir, how many family members do you have who have fought against ISIS in the battlefield?

MR. PAREKH:  Objection.  What relevance does this have to any of the issues?

THE COURT:  Again, it's her argument on credibility. I'll permit it, but I'd be surprised if the answer is any different from anything that you or I would expect.  Unlike most people who have never been in a war, they don't understand that. But I'll permit this question to be asked and answered.

THE INTERPRETER:  Can you please repeat the question.

BY MS. GINSBERG:

Q.  Yes.  How many family members do you have who have fought against ISIS in the battlefield?

A.  Ma'am, I didn't do a numbers check on this.

Q.  You don't know how many members of your family have fought on the battlefield?

THE INTERPRETER:  I'm sorry, could you repeat the question?

Q.  Do you know how many members of your family have fought on the battlefield?

THE INTERPRETER:  His family?

MS. GINSBERG:  His family.

A.   There's no one from my family who is engaged in warfare with ISIS.

Q.   All right.  How many of the guards at the Derik prison have family members who have been engaged in battles with ISIS?

THE COURT:  That goes beyond the scope of direct.  It also has nothing to do with the credibility of this witness.  So I'll indicate that you should go on.  In other words, there isn't an objection, but I'm noting that it's beyond the scope of direct, it doesn't have to do with the credibility of this witness, and therefore in the interest of getting this matter along, I'll have you move along.

MS. GINSBERG:  This witness has reported that he's not -- that the guards at Derik prison do not abuse -- that he has no knowledge of any reports of abuse by the guards --

THE COURT:  That's right.

MS. GINSBERG:  -- at Derik prison.

THE COURT:  That's what he's testified.

MS. GINSBERG:  And I'm trying to ask him questions about what motives the guards might have to inflict mistreatment on the prisoners.

THE COURT:  That wouldn't affect his credibility, it would only affect whether or not he made the correct judgment on whether to rely on it.  Let's go on.

If you want me to take -- I would almost take judicial

notice that people in the SDF who might be guards might have some family members engaged in the battlefield against ISIS. I doubt that that's not true.

But -- and your argument is that that means that these people would be incentivized to abuse prisoners, and that these people, these guards, would be incentivized not to report abuse of prisoners. That's your argument?

MS. GINSBERG: That's correct.

THE COURT: I understand that some guards may have family members on the battlefield with ISIS.

MS. GINSBERG: This witness seems reluctant to --

THE COURT: No, he's not. I think he's been quite forthcoming with answers.

BY MS. GINSBERG:

Q. Sir, you know that initially Mr. Elsheikh and Mr. Kotey gave fake names when they were captured?

A. I did not know that.

Q. Did you receive the reports of prior interrogations and intake interviews that had been conducted of Mr. Elsheikh when he was transferred to Derik prison?

A. No.

Q. So your function is to gather intelligence. Is that correct? Or one of your main functions?

A. From the detainees, yes. There's a difference between collecting information from other parties or getting direct

information from a detainee.

Q.  All right.  And as an interrogator, you were not interested in knowing what information the SDF had already collected about Mr. Elsheikh when he was brought to Derik prison?

A.  Yes, of course I do have interest in this area.  But whatever they might be talking about even with the media, that's not something that really interests me.

Q.  So if Mr. Elsheikh had made admissions to the media, that would not be -- admissions of his involvement with ISIS, that would not be of interest to you?

A.  First of all, they speak English in those interviews and I do not speak English.

Q.  But you know those interviews were recorded --

THE COURT:  I'm not sure he finished his answer.  Had he finished his answer?

THE INTERPRETER:  Yes.

THE COURT:  Next question, Ms. Ginsberg.

Q.  You know that the SDF guard who accompanied Mr. Elsheikh to his interviews had recorded those interviews.  Correct?

A.  Yes.

Q.  And that those interviews were available to you to be translated?

A.  Yes.  But it takes time.

Q.  Yes.  And in fact, on several occasions when you interviewed Mr. Elsheikh, you asked him to repeat his statements that he

33

made to the media to you.  Correct?

A.  No.

Q.  No.  And did you not tell the Government, when you were preparing for this hearing, that you knew that he had made some admissions in these media interviews?

A.  Yes, but I don't know what these confessions were.

Q.  And you didn't ask Mr. Elsheikh to tell you what those admissions were?

A.  I did not.

Q.  No.  And you weren't angry when he didn't tell you?

A.  Not at all.  He has the right to deny or to choose not to speak.

Q.  All right.  So all of these interviews, if a prisoner said, "No, thank you, I don't want to interview," that didn't make you angry?

A.  No, that's his natural right.

Q.  No.  But it was evidence that you were not being successful at your job.

MR. PAREKH:  Your Honor, Ms. Ginsberg is now being argumentative with the witness.

THE COURT:  I think you're right but I'll overrule the objection.  I'll let her continue this.

A.  No.  When a detainee chooses not to speak, I put that aside and I continue and I give it time.  So when they do not choose to speak, I do not consider that a failure, because when they

choose to speak after time, I consider that more of a success. When I create a cordial relationship with the detainee, that's a good thing for me.

Q.  Oh, and it's a good thing for you to have a cordial relationship with your enemy?

A.  When he is detained, he's not my enemy.

Q.  Sir --

A.  I was not fighting face to face with him in the trenches in the front line.  There's not a personal animosity between me and him, but through the line of my work, I came to meet him face to face.

Q.  So you preferred to have a pleasant relationship with an ISIS member and fail at your job?

        MR. PAREKH:  I don't understand this question.

        THE COURT:  I don't understand the question, Ms. Ginsberg.

        MS. GINSBERG:  I'll ask it another way, Your Honor.

        THE COURT:  Yes, I'll require that you ask it another way at least so that I can understand it.  Go ahead.

BY MS. GINSBERG:

Q.  You prefer to have a pleasant relationship with an ISIS prisoner instead of having -- instead of receiving intelligence information from him?

        MR. PAREKH:  Your Honor, I still don't understand.

        THE COURT:  I don't understand that.  Let me ask it

this way, Ms. Ginsberg.

Is establishing a pleasant relationship with an ISIS detainee a method by which you can obtain information from a detainee?

THE WITNESS:  Yes, sir.

THE COURT:  In fact, that's what you try to do, isn't it?

THE WITNESS:  Yes.

BY MS. GINSBERG:

Q.  And when you were not successful, you resorted to other means.  Correct?

A.  As trying the same thing.

Q.  And when you were unsuccessful, you did not resort to other means?

A.  No.  Repeating the same method brings success.

Q.  It never brought success with Mr. Elsheikh, did it?

A.  We still had our investigation with him ongoing.  We had not finished with him.

Q.  Okay.  How many reports of abuse from the guards did you receive?

MR. PAREKH:  Your Honor, when?

THE COURT:  I beg your pardon?

MR. PAREKH:  When?  She says how many reports they have received in six years, in 2018?

THE COURT:  Ms. Ginsberg, if you can --

MS. GINSBERG:  In -- in --

THE COURT:  Just a moment.  When I'm speaking, please stop, because the court reporter can only get one of us.

Can you rephrase your question so that you focus it on a relevant time period?

MS. GINSBERG:  Yes.

BY MS. GINSBERG:

Q.  In 2018 and 2019, how many reports of abuse did you become aware of?

A.  Not one.

Q.  No.  Do you know that the United States Government took at least 15 reports of abuse by SDF prisoners in 2018?

THE INTERPRETER:  Could you repeat the question?  I heard you say "SDF prisoners."  Pardon me.

Q.  ISIS prisoners.  Were you aware that the U.S. Government received at least 15 reports of abuse from ISIS prisoners in 2018?

A.  No, I do not know.  I know of 1 case only.

Q.  And what case was that?

A.  This is something that happened in Derik prison.  The detainee did not let any of the investigators know that there was some kind of abuse that had happened.  He notified the U.S. Government, and the head of the prison, director of the prison, opened an investigation.

He listened to the detainee about what happened and he

37

also listened to the individual who had committed this, and the situation was resolved.  And this individual was stopped from their duties, because that individual was not appropriate for that position.  Because when it comes to treatment, we have very strict regulations.

Q.  And the reason that the prisoner did not report the abuse to your prison authorities was because he was afraid of what would happen to him if he reported the abuse?

THE COURT:  You're asking this witness to tell you why somebody, unidentified, you say a prisoner, didn't report something.  Am I right, Ms. Ginsberg?

MS. GINSBERG:  He was questioned by the prison authorities.  He might know the answer to that.

THE COURT:  Who was questioned?

MS. GINSBERG:  The prisoner.

Q.  The prisoner reported the abuse to the U.S. Government. Correct?

A.  Yes, when this happened, we had a team of -- from the U.S. Government when this happened.

Q.  All right.  And he did not report the abuse to anybody at Derik prison?

A.  He had the right to report it.

Q.  But he didn't?

A.  That is something that goes back to him.

Q.  And you have no idea why he might not have reported being

abused at the Derik prison to some other guard at the prison?

A.   No.

Q.   And is it -- this instance of abuse, the prisoner accused the guard of choking him.  Do you know that?

A.   No.

Q.   Do you know that the prison guard was suspended?

A.   Yes.

Q.   And he was suspended for what period?

A.   He was suspended from that position completely.

Q.   And did the other guards know that if they were reported for abuse, they would also lose their jobs?

THE COURT:  You're asking this witness what other guards knew.

MS. GINSBERG:  He was in charge of the prison, certain aspects of the prison.

THE COURT:  You may ask him if they knew what had happened as a result of this particular incident that you're talking about, and you may argue the rest.

Q.   Sir, did the other guards know what occurred as a result of this incident?

A.   I don't know.

Q.   You don't know.  And are you certain that this prison guard was not only suspended for ten days; that he actually was removed from his position?

A.   What I do know is that he was completely suspended.

Q.   Now, you said you did not -- that there were no reports by Mr. Kotey that he had been abused.  Is that correct?

A.   Yes.

Q.   And did you ever become aware that after he was turned over to U.S. custody, he made reports of abuse that the U.S. Government believed were credible?

A.   When he was handed over?

Q.   After he was handed over.

A.   Before he was handed over to the U.S. Government, he also did interviews with the U.S. Government, and there were no similar claims.

Q.   He did interviews with the U.S. Government in -- while he was in SDF custody.  Is that what you're saying?

A.   He had interviews, media interviews, he had other kind of interviews, he had interviews with other nations.  All of these instances, nothing was said.

Q.   Sir, that's not the question I asked you.  I asked you, after -- if you knew, if any time you became aware that after he was out of Kurdish custody and in the custody of the United States Government, that he made complaints that he was abused at Derik prison that the U.S. Government believed were credible.

A.   I do not know.

Q.   Did you ever participate in discussions about what would happen to foreign prisoners if their own countries didn't take

them back?

MR. PAREKH:  Objection, Your Honor.  This is totally beyond the scope.

THE COURT:  It is beyond the scope.  It's also, did he ever engage in discussions.  You don't say with whom.  With his wife, with a mullah, with a man on the street?  What do you want to know, Ms. Ginsberg, and then I'll hear the objection and I'll decide whether it's beyond the scope or otherwise objectionable.

BY MS. GINSBERG:

Q.  Did you engage in discussions with any SDF officials about what the SDF planned to do with prisoners who could not be returned to their own countries?

MR. PAREKH:  And Your Honor, objection, because I'm not sure what we're talking about, this broad umbrella of any foreign prisoners, when the issues being litigated in this case have to do with Mr. Elsheikh and tangentially Mr. Kotey.

THE COURT:  It is still excessively broad, but let me hear what his answer is.

THE INTERPRETER:  He answered no.

Q.  Did you ever tell Mr. Elsheikh that he would be sent to Iraq if he didn't cooperate with your interrogations?

A.  No.

Q.  So you said there were strict rules in the prisons about weapons, what weapons could come into the prisons?

A.  Yes.

Q.   And the SDF guards were not permitted to have firearms in the prison.  Correct?

A.   Of course.

Q.   And as far as you knew from your visits to Ayn Issa and Derik, the U.S. Government officials were not allowed to have firearms in the prison either?

A.   I don't know that.  I haven't seen it.

Q.   Do you know if there was a rule established by the SDF that the U.S. Government officials were prohibited from bringing firearms into the prison?

A.   Prohibiting any person.

Q.   Okay.  And do you know if those rules were broken?

A.   I don't know.

Q.   Don't know.  And you also don't know if other prison rules were broken?

A.   I don't have any knowledge.

Q.   So if prison rules were broken, it's possible that you would not have knowledge of the fact that --

THE COURT:  I'll even take judicial notice of that.  That's not very probative.  There may have been rules against, for example, saying certain things or where you defecated or where you urinated, and that might have been prohibited and it might have been violated.

But we have a job to get done here, Ms. Ginsberg, and I'll ask you to focus sharply on what's relevant.  Just to talk

about rules in general, any argument you might make stemming from that is not going to be terribly persuasive.  You understand what I'm saying?

MS. GINSBERG:  I understand.

Q.  You also have no way to know for sure that the rules against torturing or abusing prisoners were not broken in your prison?

THE INTERPRETER:  I'm sorry, can you repeat that without the double negatives?  This is making -- this is very difficult to translate properly.

THE COURT:  Yes, even in English it's a problem.

But go ahead and repeat your question, Ms. Ginsberg.  You may repeat --

THE INTERPRETER:  My apologies, but it will be hard to --

THE COURT:  Just a moment.  Of us at a time.

THE INTERPRETER:  Apologies.

THE COURT:  Go ahead and repeat your question, Ms. Ginsberg.  You may repeat it any way you want to, but you should be sensitive to the problem of double negatives but you don't have to be.  You do it any way you want, and when it's clear, I'll have the interpreter interpret it and the witness answer it.

BY MS. GINSBERG:

Q.  There's no way that you can sit here today and tell us that the guards did not break any of the prison rules regarding

mistreatment of prisoners?

A.   If they were broken, they will have been disciplined.

Q.   But you cannot be sure that the rules were not broken?

A.   I am certain because we have monitoring cameras in the rooms and in the corridors of the prisons.  If it had happened, we would have seen it and we would have heard about it.

Q.   All right.  But the cameras didn't record -- they didn't record what was occurring, they were there only to monitor.

THE COURT:  I'm not sure that question is clear, Ms. Ginsberg.  I think what you're asking when you say "recorded," you mean something was --

MS. GINSBERG:  A tape.

THE COURT:  -- created as a record of it and maintained?

MS. GINSBERG:  Yes.

THE COURT:  And you were contrasting that with instantaneous supervision or viewing?

MS. GINSBERG:  Yes.

THE COURT:  All right.  Re-ask your question.

MS. GINSBERG:  All right.

BY MS. GINSBERG:

Q.   Were the records of the recordings -- were there recordings made of what was observed on these cameras?

A.   Yes, they will be automatically recorded on a device, and that device will automatically delete after one month.

Q.   Okay.  And how many people were responsible for reviewing those recordings?

A.   There are persons.  It's not -- that's out of my field of specialty, so I don't know how many there were.

Q.   And were you dependent on the other guards, on the guards, to report abuse that they personally observed?

A.   Yes.

Q.   And you can't be sure that the guards actually reported all the abuse that they may have seen?

A.   These are not violations.  Because we have the cameras, there are sometimes incidents of disagreements amongst the inmates themselves for idealogical reasons.  And then I can go back and review that video to see what had occurred, and then I will go and meet with the inmates about that disagreement.

Q.   And were there disagreements between the guards?

A.   No.

            THE COURT:  How much more do you have, Ms. Ginsberg?

            MS. GINSBERG:  Not very much, Your Honor.

            THE COURT:  How much more?

            MS. GINSBERG:  A few -- five or ten minutes.

            THE COURT:  All right.  Proceed.

            How much do you have by way of redirect, Mr. Parekh?

            MR. PAREKH:  So far just two or three questions.

            THE COURT:  All right.  Proceed.

BY MS. GINSBERG:

Q.   How -- it's your testimony here today that none of the prisoners was punished in any way for refusing to answer your questions or participate in interviews?

A.   No, they never were subjected to any punishment.

Q.   And were the guards told when -- were the guards told that the inmates had not provided information during these interviews when that occurred?

A.   The guards have no interest or knowledge of what is going on in the interrogation rooms.  Their job is only to provide food, bring to the inmates, and bring the inmates back and forth to the interviews.

Q.   So the guards had no idea which inmate was cooperating and which inmate was not?

A.   That's correct.

Q.   And did the guards but Syrian inmates in the rooms with the foreign inmates?

A.   I don't have any knowledge.  This is a decision that will be made by the administration of the prison, neither by me nor by the prisoners.

Q.   So you didn't select Syrian inmates to put as informers in the rooms with the foreign prisoners?

A.   If they were an inmate, how would they be informant for us?

THE COURT:   What she asked you is:  Did you select people, Syrians, to be put in with detainees to report on what

the detainees said?

THE WITNESS:  No.

THE COURT:  Next question.

BY MS. GINSBERG:

Q.  Isn't that how you learned that Mr. Elsheikh was not a participant in the riot in April of 2019?

MR. PAREKH:  Objection, Your Honor.  None of my questions focused on the riot.

THE COURT:  That's right.  It's beyond the scope of direct.  But I have given Ms. Ginsberg incredible latitude here, and I'm going to permit this question.  But I'm very close to the end of my patience.

MS. GINSBERG:  I understand.

THE COURT:  All right.  He may answer that question.

A.  I have no knowledge of that at the time when it happened.

BY MS. GINSBERG:

Q.  Okay.  There was a very substantial riot at Derik in 2019. Correct?

A.  Yes, in April.

Q.  And the inmates rioted because of the horrendous conditions at the prison.  Correct?

A.  No, it wasn't because of bad conditions.

THE COURT:  All right.  I'm going to take a recess at this time.  How much more do you now have?

MS. GINSBERG:  Five to ten minutes.

THE COURT:  That's what you had more than 20 minutes ago.  All right.  I'll permit it, but let's be accurate in our estimates.

How long do you think you have, Mr. Parekh?

MR. PAREKH:  Two or three minutes.

THE COURT:  All right.  Thank you.  Court stands in recess for 15 minutes.

(Recess taken at 10:46 a.m.)

THE COURT:  Ms. Ginsberg, you may complete your cross-examination of this witness.

MS. GINSBERG:  Thank you, Your Honor.

BY MS. GINSBERG:

Q.  The riot that occurred at Derik prison was so substantial that it required you to close down parts of the prison. Correct?

A.  Yes.

Q.  And in fact, the prisoners took the bunk beds apart and used the metal to break through walls and to attack the guards. Right?

A.  Yes.

Q.  And do you also know that Mr. Elsheikh was removed from Derik prison to -- temporarily taken to another prison while the repairs were being made?

A.  No.

Q.  You don't know that.  Okay.

48

And as a result of what happened at the prison, the prisoners were beaten because of their behavior during the riot?

MR. PAREKH:  Objection, Your Honor.  We're -- it seems like Ms. Ginsberg is trying to do another cross of SDF Witness 2.  On SDF Witness 3, my cross-examination was less than 30 minutes.  We didn't go into any of this on direct.

THE COURT:  Yes, I'm aware of that.  I'll sustain the objection.

MS. GINSBERG:  Judge, we won't have the ability to call him as a witness at trial unless the Government finds some way to bring him back.

THE COURT:  I'm not sure that I find the issue of whether people were beaten as a result of the trial [sic] to be relevant to any decision I have to make with respect to the motion to suppress.

MS. GINSBERG:  Well, Your Honor, it's relevant to acts of abuse by the guards.

THE COURT:  Well, you have asked a great many questions about abuse by the guards.  I'm not sure that makes any difference.

Now, you have a declaration from your client saying that he was beaten by guards on more than one occasion, as I recall his declaration, and we have testimony from the prison people, including this witness, that they're not aware of any reports that this defendant and the other defendant were beaten,

or indeed that others were, except an incident that he's talked about in which a guard was disciplined by being fired. And you point out that, well, you thought he was only suspended for ten days, he thought he was entirely dismissed.

I don't think that matters to the motion to suppress. Now, if you're here on behalf of the United Nations or some other entity to castigate the SDF for the way in which they conducted the prison overall, I can see that that might be relevant. I'm focused on whether statements made by your client were so involuntary as to be excluded and because you may -- at the time of trial, if I admit the statements, you are still entitled to argue to the jury, on the basis of reasonably relevant evidence, that he was -- it was involuntary.

So you will have that argument to the jury. I merely serve as the gatekeeper. I either keep it out or let it in. And I've made that clear any number of times.

Now, I don't think that any questions that you've asked here go to that. We've heard enough of that. What's the last question --

MS. GINSBERG: Judge, this witness has said that there were never -- he knew of no reports of any abuse by any guard. One of the witnesses yesterday testified that none of the prisoners --

THE COURT: That's not true. He did testify --

MS. GINSBERG: With the one exception.

THE COURT: Just a moment. When I start, you stop. I don't know how many times I need to make that clear to you. It's one of the few privileges I have. So when I start, you stop.

He did testify about an incident today, didn't he?

MS. GINSBERG: One incident, yes.

THE COURT: Yes. All right. Now, what is it that you want to ask this witness and why?

MS. GINSBERG: Your Honor, there were -- other than that one incident, all of the SDF witnesses have testified that they heard no reports of abuse, including no reports of abuse after a very violent prison riot. Frankly, it is inconceivable and --

THE COURT: It's not inconceivable. It certainly is conceivable. What you're saying is that it's not credible.

MS. GINSBERG: It's not credible to believe --

THE COURT: You have got to be careful with your words in your questions as well as in your arguments.

MS. GINSBERG: It is not credible to believe that after a prison riot as violent as the one that was described, that none of the prisoners who were responsible for that were abused or mistreated in any way, and that that did not become known to this witness.

THE COURT: Well, that's an argument you can make to me. If he testifies he doesn't know of any that were

disciplined or beaten or mistreated as a result of their participation in the riot, if that's his testimony under oath, that's it.  And you can argue that it's not credible to me.

MS. GINSBERG:  That's what I was trying to ask him, if he knew that -- if he received any reports of prison mistreatment after this riot.  That was the question I was asking.

THE COURT:  All right.  Ask him that one question and then let's move on.

BY MS. GINSBERG:

Q.  Did you receive any reports of prisoner mistreatment after the riot?

THE COURT:  And I'll overrule your objection, but just to this question.

Go ahead.  You may answer.

A.  No.

Q.  Sir, was there a code of silence among the guards?  Do you know what a code of silence is?

THE COURT:  Ms. Ginsberg, I don't know what a code of silence is.  But specifically, I don't know what you mean by a code of silence.  So ask the question so that the witness can answer it.

In other words, do you know whether there was an agreement among guards not to report on each other in cases where there might have been mistreatment of detainees?

THE WITNESS:  No.

THE COURT:  Next question.

MS. GINSBERG:  Your Honor, that's my last question.

THE COURT:  Mr. Parekh, do you have any redirect?

MR. PAREKH:  Very briefly, Your Honor.

**REDIRECT EXAMINATION BY COUNSEL FOR THE UNITED STATES**

**BY MR. PAREKH:**

Q.  Mr. SDF Witness 3, you answered questions from Ms. Ginsberg about an incident that occurred where a guard was disciplined. That incident occurred in or around February 2018.  Correct?

A.  Yes.

Q.  Was Mr. Elsheikh even at the Derik prison in February of 2018?

A.  No, he came in April.

Q.  So the individual who was disciplined, would he have had any contact whatsoever with Mr. Elsheikh?

A.  He was suspended from working before Elsheikh arrived in the prison.

MR. PAREKH:  Thank you.  No further questions.

THE COURT:  All right.  You may step down.

Call your next witness.

MR. PAREKH:  Thank you, Your Honor.  The United States calls Special Agent John Chiappone.

THE COURT:  Are you still intending to present Langan?

MR. PAREKH:  Yes, Your Honor.  He will be presented

after Special Agent Julius Nutter. So right now we'll have Special Agent Chiappone, then Special Agent Nutter, then Sean Langan, who will also be recorded for a Rule 15 deposition, and then our final witness will be Special Agent Dan O'Toole.

With the Court's permission, we would like to turn off the video recorder.

THE COURT: Yes, you may do so.

(Oath administered by courtroom deputy clerk.)

MR. PAREKH: Your Honor, just for the record, we can excuse SDF Witness 3 entirely. Correct?

THE COURT: That's correct.

MR. PAREKH: Thank you.

**(SPECIAL AGENT JOHN M. CHIAPPONE, having been duly sworn, testified as follows:)**

**EXAMINATION BY COUNSEL FOR THE UNITED STATES**

**BY MR. PAREKH:**

Q. Good morning, sir.

A. Good morning, sir.

Q. Please state and spell your name for the record?

A. My name is Special Agent John M. Chiappone, C-H-I-A-P-P-O-N-E.

Q. Sir, will you please keep your voice level raised so we can all clearly hear you throughout your testimony?

A. Absolutely. No problem.

Q. How are you employed?

A.   I'm a special agent with the FBI.

Q.   What do you do for the FBI as a special agent?

A.   Currently I'm assigned to the legal attache' in Berlin, but my main responsibility is to investigate crimes against the United States.

Q.   You're currently in Germany?

A.   I am, sir.

Q.   What did you do for the FBI prior to moving to Germany?

A.   Prior to Germany I began my career in Boston investigating bank robberies, then moved to the Phoenix Division where I was a member of the joint counterterrorism task force and investigated counterterrorism crimes, and following that I moved to the New York Division and was on the New York Joint Terrorism Task Force.

Q.   And how long have you been at counterterrorism agent, approximately?

A.   I've been a counterterrorism agent for over ten years.

Q.   What types of counterterrorism matters have you investigated generally?

A.   In the last seven years or so most of my counterterrorism matters have focused Europe and external operations in Europe. I led the FBI's response from FBI New York to the Bataclan attacks in Paris in 2015, and I was a member of the joint investigation team in Belgium with the Belgian authorities on the bombing of the airport and the subway in 2016.

Q.   Would it be accurate to state that much of your counterterrorism work has focused on ISIS?

A.   Most of my counterterrorism work has been focused on ISIS in Western Europe.

Q.   Special Agent Chiappone, were you assigned to an investigation involving El Shafee Elsheikh, Alexanda Kotey, and other alleged co-conspirators?

A.   Yes, sir.  I got assigned to that investigation in August of 2014.

Q.   And in January of 2018, what, if anything, notable happened with respect to that investigation?

A.   Two of the subjects from that investigation, El Shafee Elsheikh and Alexanda Kotey, I was informed that they were captured in Syria and were being held in custody there.

Q.   Were they captured by the SDF in Syria?

A.   They were captured by the SDF, that's correct.

Q.   What was your role on the investigation after Elsheikh and Kotey were captured in Syria?

A.   Shortly after they were captured, I was informed, due to my experience in the case, I would become a member of the law enforcement interview team.

Q.   Please explain to the Court what that means.

A.   So in the FBI, there's many times we have to work both intelligence matters as well as developing criminal investigation.  And because there are times where there's an

intelligence interview that happens where it cannot be utilized in court, there are members, as part of the law enforcement team that are kept separate from the intelligence interviews, not allowed to see or hear any of that information, so that they can start a fresh interview with a Mirandized rights read to the subject so that that information can be utilized in court.

Q. So what did that mean to you when you were assigned to the law enforcement team in January of 2018?

A. So it meant numerous things. It meant, one, I need to keep myself separate from any of the intelligence-gathering apparatuses of the United States and ensure I did not hear anything that came from those intelligence interviews. And two, they told me my primary responsibility was to help continue to build a criminal prosecution in the case I had been working since 2014.

Q. I want you to turn to Exhibit 12-1 in the binder that should be on the witness stand.

A. I have Exhibit 12-1, sir.

Q. Do you recognize this document?

A. Yes, sir, I do.

Q. What is it?

A. This is an email I wrote on Thursday, January 25th, 2018, informing some individuals I was working with at that time in the FBI, in my position at that time, that I was a member of the law enforcement team so that they wouldn't send me any

information gathered from intelligence interviews.

Q.  Is this a true and correct copy of your email from that date?

A.  Yes, sir, with appropriate blackouts.

MR. PAREKH:  Your Honor, move to admit 12-1.

THE COURT:  All right.  It's admitted without objection.

(GOVERNMENT EXHIBIT Number 12-1 was admitted into evidence.)

THE COURT:  The book that the Government provided has been returned to the Government.  Do you have it?

MR. PAREKH:  Your Honor, we will provide you another copy.

MR. GIBBS:  Your Honor, may I approach?

THE COURT:  No, give it to the court security officer. Thank you.

MR. PAREKH:  Your Honor, for ease of reference, we are looking at 12-1, which I would like Ms. Lopez to publish now that it's been admitted.

THE COURT:  She may do so.

BY MR. PAREKH:

Q.  Very briefly, Special Agent, please summarize for the Court what the purpose of you sending this email on January 25, 2018, was?

A.  Well, at the time I sent this email I was on 18-month

temporary duty assignment as a supervisory special agent at FBI headquarters in the International Operations Division.  And as my responsibility in International Operations Division, I was responsible for the program management of the FBI legal attache' offices in Afghanistan and Pakistan, and our FBI LNOs at CENTCOM, which is U.S. military Central Command, and Special Operations Command Central, listed as SOCCENT, and I was the conduit for those individuals at those organizations back to FBI headquarters.

Q.   What were you trying to convey in this email?

A.   So I was trying to convey to numerous FBI agents that were working with the military that due to my responsibilities as a member of the law enforcement team, if in the course of their duties they received information from any intelligence interview from any U.S. Government entity, that I should not be forwarded that information.

Q.   Regarding Elsheikh and Kotey?

A.   Specifically regarding El Shafee Elsheikh and Alexanda Kotey.

Q.   What were you doing from that point onwards with respect to this investigation?

A.   So with respect to this investigation, I was just beginning to prepare for my interviews, reviewing my historic case file, making sure I was up to speed on what, and beginning to work with Special Agent Julius Nutter on how we were going to move

forward on our interview, as he was deemed to be the other member of the law enforcement interview team.

Q.  When you say "preparing" for your interview, what type of interview?

A.  Law enforcement interview, sir, so it would be a Mirandized interview.

Q.  When you said "reviewing" your historical case file, would your historical case file have any intelligence-gathering information regarding any interviews conducted with Elsheikh or Kotey in that capacity?

A.  Absolutely not, sir.  My file was everything previous to the detention of El Shafee Elsheikh and Alexanda Kotey by SDF.

Q.  Perceive to January 2018?

A.  Yes, sir.

Q.  Were you generally aware that the Department of Defense, otherwise known as DoD, was collecting intelligence -- conducting intelligence-gathering interviews of El Shafee Elsheikh and Alexanda Kotey following their capture until March 2018?

A.  Yes, sir, I knew those were taking place.

Q.  Were you asking anyone at DoD to do intelligence interviews?

A.  Absolutely not.

Q.  Were you asking anyone in the U.S. Government to do intelligence interviews?

A.  Absolutely not.

60

Q.  Were you asking anyone in any foreign government agency to do intelligence interviews?

A.  Absolutely not.

Q.  And this is all respect to El Shafee Elsheikh and Alexanda Kotey?

A.  Specific to El Shafee Elsheikh and Alexanda Kotey, sir.

Q.  Were you asking anyone to help you secure an eventual confession with respect to Elsheikh and Kotey?

A.  No, sir, I just worked with Special Agent Julius Nutter on what we would work on.

Q.  Special Agent Nutter, was he walled off from the intelligence interviews as well?

A.  Yes, sir.  He was taking the same steps I was.

Q.  So he was on the law enforcement team?

A.  He was on our law enforcement team.

Q.  Did you make any requests to anyone who was conducting the DoD intelligence-gathering interviews of Elsheikh and Kotey?

A.  No, sir, I didn't speak to anyone who conducted any intelligence interviews.

Q.  Did you make any requests to anyone on the intelligence-gathering team?

A.  No, sir.

Q.  Do you know what SDRs, also known as Source Directed Requirements, are?

A.  I do, sir.

Q.   What are they?

A.   Those are questions that people can provide to try to gain intelligence information to someone who is doing an interview, whether it be with a source or with a subject.

Q.   Did you give any SDRs to the intelligence-gathering team who were conducting interviews with Elsheikh and Kotey?

A.   No, sir, I did not.

Q.   Did anyone on the intelligence-gathering team give you SDRs?

A.   No, sir.

Q.   Did you give any questions to the intelligence-gathering team?

A.   No.

Q.   Did they give any questions to you to ask?

A.   No, sir, they did not.

Q.   Did you provide them with any advice or guidance whatsoever with respect to the intelligence-gathering interviews of Elsheikh or Kotey?

A.   No, sir, I did not.

Q.   Did anyone tell you what approaches were used in the intelligence-gathering interviews?

A.   No, sir.

Q.   Did you read any intelligence-gathering information from the DoD interviews of Elsheikh and Kotey?

A.   No, sir, I did not.  And to this day I haven't even fully read the interviews.

Q.   Did you speak to any of the intelligence interrogators regarding their interviews prior to conducting your Mirandized interview?

A.   No, sir.

Q.   Did there come a point in time that you traveled to Syria to conduct Mirandized interviews with Elsheikh and Kotey?

A.   Yes, sir, there was a point in time when that happened.

Q.   Where did you go?

A.   So we left -- Julius and I linked up, and we drove down to Fort Bragg, North Carolina.  We flew on a military plane from Fort Bragg to Ramstein Air Base in Germany; and from Ramstein Air Base we entered Iraq; and then from Erbil, Iraq, we took rotor wing out to the U.S. Government facility south of Kobani.

        THE COURT:  When you say "rotor wing," you mean a helicopter?

        THE WITNESS:  Yes, sir, I mean a helicopter.

        THE COURT:  Next question.

Q.   What month and year was that?

A.   It was in March of 2018.

Q.   Had the intelligence-gathering interviews of Elsheikh and Kotey ended by that point?

A.   To my understanding they ended prior to me leaving the United States of America.

Q.   Did anyone else from the FBI go with you other than

Special Agent Nutter?

A.   Yes, sir, there was a few other people on the flight with us.

Q.   Did an FBI linguist travel with you?

A.   He did.

Q.   Did the FBI linguist have any information whatsoever regarding the intelligence-gathering interviews of Elsheikh and Kotey that had taken place?

A.   No, he did not.

Q.   And did you travel with anyone who had any information whatsoever regarding what Elsheikh and Kotey may have stated during the intelligence-gathering interviews?

A.   No, sir, I did not.

Q.   Did you ask the FBI linguist whether he had stayed clean; in other words, had known whether Elsheikh and Kotey had made any statements during the intelligence-gathering interviews?

A.   I did, sir, because although the linguist was not coming out for those interviews, I determined early on that we were going to need his assistance.  So I also instructed him to make sure he did not receive any information from the time we met until he entered Syria and the interviews with us.

Q.   Did he confirm that that was indeed the case, that he had not received such information?

A.   He did, sir.  He confirmed that.

Q.   Where did you stay when you arrived in Syria?

A.   We stayed at the LCF, a military facility in Syria.

Q.   What did you do, if anything, to insulate yourself and Special Agent Nutter from anyone who may have conducted the intelligence-gathering interviews of Elsheikh and Kotey?

A.   Besides sending out a variety of emails prior to deployment, once we entered Syria, we slept in a separate tent from the other FBI personnel that were already in Syria.  So Special Agent Nutter and myself and our linguist were separated from those other individuals.

And then any time -- the FBI had a trailer in Syria that we utilized to operate out of, and any time we entered that trailer, the supervision there ensured that no member who had conducted an intelligence interview would be in that trailer at the same time as Special Agent Nutter or I.

Q.   You just mentioned in your testimony you sent out a series of emails prior to you traveling to Syria with respect to the questions that I just asked you?

A.   Yes, sir.

Q.   I want you to turn to Government Exhibit 12-2 in your binder.

A.   Yes, sir.

Q.   Is this one of those emails?

A.   This is an example of one of those emails, sir.

MR. PAREKH:  Your Honor, move to admit 12-2 and publish.

THE COURT: Admitted. You may do so.

(GOVERNMENT EXHIBIT Number 12-2 was admitted into evidence.)

BY MR. PAREKH:

Q. Please explain to the Court why you sent this email.

A. Due to my historic knowledge of investigations, individuals in New York and other places would send me emails.

By the subject line, if the email felt to me that it could potentially touch at all on an intelligence interview, I would delete it and send that -- an email to the individual telling them: I was required to delete your email because of my role on the law enforcement team. I don't know what it says. If it's something I can see, please resend it and let's discuss.

Q. Prior to deleting the email, would you read it?

A. No, sir.

Q. I want you to turn to Exhibit 12-4, please?

A. Yes, sir.

Q. 12-4, an email that you were involved in?

A. It is an email I was involved in.

MR. PAREKH: Move to admit 12-4.

THE COURT: What do you mean by you were involved in it?

THE WITNESS: I received the original email, sir, and then I responded.

THE COURT: All right. It's admitted. You may display

it.

MR. PAREKH:  Thank you.

(GOVERNMENT EXHIBIT Number 12-4 was admitted into evidence.)

BY MR. PAREKH:

Q.  Please explain to the Court what the purpose of this email chain was.

A.  So the acting supervisor of the extraterritorial squad in New York that covered London --

(Reporter clarification.)

THE WITNESS:  Extraterritorial, ma'am.

A.  -- sent me an email about news articles regarding El Shafee Elsheikh and Alexanda Kotey, advising me to not read those articles because there could possibly be information about the intelligence interviews in those articles.

Q.  And that was in February 2018?

A.  Yes, sir, that was February 2018.

Q.  And by "news articles," you mean publicly available articles such as *New York Times*, *Washington Post*?

A.  That's correct.

Q.  Did you read any news articles prior to conducting your Mirandized interview regarding El Shafee Elsheikh and Alexanda Kotey's capture?

A.  No, sir.

Q.  Did you read any news articles whatsoever that contained

information regarding interviews that El Shafee Elsheikh and Alexanda Kotey were undergoing prior to your Mirandized interview?

A.  No, sir.

Q.  I want you to turn to Exhibit 12-5, please.

A.  Yes, sir.

Q.  Is 12-5 an email that you received?

A.  It is.

Q.  On March 8th, 2018?

A.  That's correct.

MR. PAREKH:  Move to admit.

THE COURT:  All right.  Without objection, it's admitted.  You may display it.

(GOVERNMENT EXHIBIT Number 12-5 was admitted into evidence.)

Q.  Please explain to the Court what's happening in this email.

A.  So there was a meeting regarding the case, a SVTC, a virtual meeting regarding the case.  And --

Q.  Hold on.  Let's not talk in acronyms.  Explain to the Court what you mean by SVTC?

A.  A secure virtual teleconference, is the acronym.  So a virtual meeting that was involving people from around the FBI.

Supervisory Special Agent Anderson was the program manager for my New York investigation against El Shafee Elsheikh and Alexanda Kotey, and she was advising everybody that would

attend the meeting that members of what she referred to as the clean team, the law enforcement interview team, including myself and Special Agent Nutter would be on this virtual meeting, and that if there was going to be any discussion about the intelligence interviews, that that should occur after he signed off.

Q.   Is this another example of the careful steps you were taking to ensure that your subsequent Miranda interview was not tainted by any intelligence-gathering information?

A.   Yes, sir, that's another example.

Q.   And did you in fact excuse yourself from this meeting prior to any intelligence information being discussed regarding Elsheikh and Kotey's interviews?

A.   Yes, sir, I did.

Q.   Now, you previously testified that you traveled to Syria after the intelligence-gathering interviews of El Shafee Elsheikh and Alexanda Kotey ended.  Do I have that correct?

A.   Yes.

Q.   Are you familiar with the term "attenuation period"?

A.   I am, sir.

Q.   What is that?

A.   So that is a term that happens, the period of time between the intelligence interview and between a Mirandized law enforcement interview.

Q.   Was that done here?

A.   It was, sir.

Q.   What's the purpose of an attenuation period based on your training and experience?

A.   So based upon my training and experience, attenuation period is one of many prongs that has been developed from case law that we reviewed, and it's to give time and distance from the intelligence interview to the law enforcement interview to show the separation of those two interviews.

Q.   Special Agent Chiappone, you just mentioned that you reviewed case law.

A.   Yes, sir.

Q.   Did you review case law prior to traveling to Syria to conduct Mirandized interviews with Elsheikh and Kotey?

A.   I did, sir.  I was given good advice by many prosecutors and Supervisory Special Agent Greg McNutt to review the *Khweis* decision from the Eastern District of Virginia, as well as the *Khatalla* decision from the Southern District of New York.

Q.   And the *Khweis* case, that was a trial here in which Judge O'Grady presided?

A.   Yes, that's correct, sir.

Q.   Why did you read that decision?

A.   Because in that decision or that case it was very similar to the circumstances that we were undertaking now, so the lessons that were learned in that case and that decision, it allowed us

to employ those and other methods to ensure that the law enforcement team did not get tainted by any intelligence interviews.

Q.   And you read Judge O'Grady's decision in that case prior to having any contact with Elsheikh and Kotey in this case?

A.   I did, sir.

Q.   Did you ever speak with or correspond in any way with Jonathan Kath about any of his intelligence-gathering interviews?

A.   No, sir, I did not.

Q.   Okay.  Let's focus now on your Mirandized interviews in Syria in this case.

A.   Yes, sir.

Q.   Did you end up meeting El Shafee Elsheikh?

A.   I did, sir.

Q.   In person?

A.   In person.

Q.   What was the first date that you met him?

A.   The first date I met him was on March 27th, 2018.

Q.   Do you recognize whether he's in the courtroom today?

A.   I do, sir.

Q.   Can you identify him?

A.   He's the gentleman sitting with the mask in the green jumpsuit over there, sir.

         MR. PAREKH:  Your Honor, may the record reflect an

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

in-court identification of the defendant?

THE COURT:  So ordered.

BY MR. PAREKH:

Q.  Where did you go to interview Elsheikh?

A.  I went to Kobani, Syria and the prison that the SDF ran in Kobani, Syria.

Q.  Describe what happened when you went to the Kobani prison?

A.  So immediately upon arriving at the prison, myself, Special Agent Nutter were brought in to meet with the head of the prison.  We asked him for permission to conduct interviews in his prison --

Q.  Prior to that, before you got inside the prison, did you do anything?

A.  Well, yeah.  Prior to entering his -- or after speaking with him in his office but prior to entering the prison, we removed our body armor and our rifles and left them with other FBI special agents outside.

Q.  Okay.  Please continue.

A.  And we met with the commander of the prison and asked him for a number of things.  One, we asked him for permission to conduct an interview.  He concurred.

We also asked to use a different room than was previously used by any other Americans to interview El Shafee Elsheikh or Alexanda Kotey.  He said yes, he could do that.

And we asked for a different, I would call it guard, prison guard, that was not present on any other American interviews. And he said yes, he could do that.

Q. And why were you asking for permission for all of these things that you've described?

A. Because it was his prison, sir. He controlled the prison.

Q. And by "his," you're referring to the SDF commander?

A. The SDF commander, sir.

Q. Why did you ask for a different room to interview Elsheikh than versus any other room that had been used by the American intelligence-gathering team?

A. Those were all different tactics and lessons learned from the *Khweis* decision, sir, to include the attenuation period, that we wanted to put into place to ensure it was very clear that this law enforcement interview, Mirandized, it was different from any previous U.S. Government interviews.

Q. Why did you ask for a different SDF guard to be present during your interview than had been present during the intelligence-gathering interviews?

A. For the same reasons I just stated, sir.

Q. Now, did you ultimately arrive at a room in which you could sit down with Elsheikh?

A. We did.

Q. I would like you to turn to Government Exhibit 12-6A.

A. Yes, sir.

Q.   What is this?

A.   It is a picture of the room, sir.

MR. PAREKH:  Move to admit 12-6A.

(Reporter clarification.)

THE WITNESS:  It's a picture of the room, ma'am, yes.

MR. PAREKH:  And Your Honor, just so it's clear for the record, you actually admitted 12-6A on day one, but I think you indicated you weren't sure of the relevance.  But at this point I would like to publish it.

THE COURT:  I will admit it formally again.

(GOVERNMENT Exhibit 12-6A was moved into evidence.)

THE COURT:  Proceed.

MR. PAREKH:  Thank you, Your Honor.

BY MR. PAREKH:

Q.   Describe the room for us.

A.   So this room was in the far back left corner of the prison. This picture was taken actually on March 29th.  You can see two leather chairs, three plastic chairs.  In the back there's a door that goes to a restroom, there's windows to the exterior as well as air conditioning and a ceiling fan that's there.

On March 27th there was one chair that was leather and four plastic chairs.

Q.   That's March 27, 2018?

A.   That's correct, sir.

Q.   Describe the temperature in the room when you walked in?

A.   The temperature was quite comfortable, to the point of we did not need the air conditioner.

Q.   Did it remain that way throughout your visit that day?

A.   It did.  My guess would be because of the time of year.

Q.   By "time of the year," you mean?

A.   March.

Q.   And how was the lighting during your interview?

A.   The lighting was great.  I believe this photo was taken without a flash, so you could see that the natural light was wonderful.

Q.   Were there any pungent smells in the room?

A.   No, sir.  Actually, that was one of the things I was quite impressed with, is I've been in multiple third world country prisons, and there was no smell.  It was actually quite clean.

Q.   Now, at some point did the defendant, Elsheikh, get brought into this room shown in Government Exhibit 12-6A?

A.   He did, sir.

Q.   Who brought the defendant into the room?

A.   Someone from the SDF, sir.

Q.   Was the defendant restrained?

A.   He was.

Q.   Describe.

A.   He had handcuffs on and had a cloth mask/bag over his head where he could not see.

Q.   And during your conversation with the defendant, was he

restrained?

A.   No, sir.  Once he entered the room, we requested that the SDF guard take the head covering off and remove the handcuffs.

Q.   And was your request honored?

A.   It was.

Q.   What was the defendant's demeanor when he was brought into the room by the SDF?

A.   He was relaxed.

Q.   Did he seem stressed in any way?

A.   He did not.

Q.   Did he seem angry?

A.   No, he did not.

Q.   Did he seem scared?

A.   No, he did not.

Q.   Timid in any way?

A.   Not at all, sir.

Q.   And at any point in time did you take physical custody of Elsheikh?

A.   No, sir.  There was an SDF prison guard in the room with us the whole time.

Q.   Did the defendant sit down?

A.   He did.

Q.   Which one of the chairs in Government Exhibit 12-6A did he sit down in?

A.   He sat down in the leather chair.

Q.   Where did you and Special Agent Nutter sit?

A.   We sat in plastic chairs, sir.

Q.   Did you bring your translator?

A.   We did.  He also sat in a plastic chair.

Q.   Did Mr. Elsheikh have enough space around him, personal space?

A.   He did, sir.

Q.   Where did the SDF official sit?

A.   On the first day he sat in a plastic chair.  On the second day we were able to get a leather chair for the SDF official.

Q.   And by "first day," you're referring to March 27th, 2018?

A.   First day March 27th, second day March 29th, both 2018.

Q.   Was the SDF official in Mr. Elsheikh's space at all?

A.   Not at al, sir.

          THE COURT:  When you say "SDF official," are you talking about the guard?

          THE WITNESS:  I'm talking about the guard, sir.

          THE COURT:  All right.  Because that wasn't clear.  There was only one SDF person in the room with you and Mr. Elsheikh?

          THE WITNESS:  Yes, Your Honor.  There was only one SDF guard, official, in the room.

          THE COURT:  Next question.

          MR. PAREKH:  Thank you, Your Honor.

Q.   When Mr. Elsheikh was brought into the room, did you notice

any injuries on him?

A.   No, sir.

Q.   Did he have any stains of blood on his shirt?

A.   He did not.

Q.   Any signs of abuse?

A.   No, sir.

Q.   Any signs of mistreatment?

A.   None at all, sir.

Q.   Did he have any bruises on his face?

A.   No.

Q.   Was he wearing a short-sleeved shirt?

A.   He was wearing like a running jacket, a sports type jacket.

Q.   Was he -- were his movements constrained in any way?

A.   Not at all, sir.

Q.   Did he appear to be in any pain whatsoever?

A.   No, sir.

Q.   Did you ask him about his health?

A.   I did, sir.

Q.   Please describe.

A.   He said he was surprised at how well he's been treated and that the treatment that he has received from the SDF was actually different than the propaganda that the Islamic State had previously published to its members.  He said he was able to clean clothes, he was able to work out, he was able to play chess, he was able to converse with other inmates, prisoners.

Q.   How about sleeping?  Did he talk -- state anything about sleeping well?

A.   Yeah, he was allowed to sleep as well, sir.

Q.   And did he make any statements about medical -- requiring medical attention?

A.   Yeah, he never mentioned needing any medical attention, sir.

Q.   What did you wear during the interview?

A.   I wore khaki type pants, Docker type pants, and I believe the first day was a button down shirt, tucked in, and the second day what I would describe as a polo shirt, also maybe tucked in, maybe not.  I don't remember.

Q.   In all my questions I'm going to focus on the first day, March 27, 2018.  Do you understand that?

A.   Yes, sir.

Q.   Did you have any visible weapons on you?

A.   I did not have any visible weapons on me.

Q.   Any concealed?

A.   I did have a concealed Glock 19M that was inside my pants, inside my tucked button down shirt that could not be viewed from the exterior.

Q.   Did you tell the SDF about that concealed weapon?

A.   I did not.

Q.   How about Special Agent Nutter?  What was he wearing?

A.   He was dressed similarly, and also armed in a similar fashion, concealed, unknown to everybody in the room, with the

exception of our FBI linguist, but including El Shafee Elsheikh and the SDF prison guard official.

Q. Did you provide the defendant with any food or drinks?

A. We offered the defendant food and drinks. We offered him soda, water, Haribo gummy bears, quite popular in Germany where we are now, and other candies. He declined all, but very politely declined all.

Q. Cigarettes?

A. Cigarettes as well, sir.

Q. Did he decline?

A. He declined that as well.

Q. Did you offer the defendant restroom and prayer breaks?

A. We did. And as you can see in the photo, there's a restroom close by.

Q. Did SDF officials offer to provide anything to the defendant, El Shafee Elsheikh, during the interview?

A. The SDF individual in the room with us offered Chai tea, and the defendant politely declined that as well.

Q. Did you need the assistance of a translator?

A. We did not.

Q. Why was the translator present?

A. The translator was present as a requirement that the SDF put on us because they wanted to know what was being said in the room, and their individual that was in the room with us did not speak English. They wanted a translator there to translate for

him so that they knew what was going on.

Q.  How was the translator dressed?

A.  The translator was dressed in a similar fashion to myself and Special Agent Nutter.

THE COURT:  How would the SDF guard know what was being said if he didn't speak English?

THE WITNESS:  Sir, we utilized our translator for that. So when the defendant or myself spoke, our translator sat next to the SDF and translated that directly for the SDF, sir.

THE COURT:  Into Arabic?

THE WITNESS:  Into Arabic, yes.

THE COURT:  Next question.

BY MR. PAREKH:

Q.  Was Elsheikh comfortable correcting the translator?

A.  Very much so.  So sometimes Elsheikh would respond in Arabic and our translator would translate that for us, and if he felt that was wrong, he would make a correction.

Other times Elsheikh would respond to us in English, which obviously I did not need a translator to understand that.

Q.  When Elsheikh spoke in English, did you observe anything notable about his voice?

A.  I observed he had a British accent, sir.

Q.  Just going back to the translator, was the translator armed?

A.  The translator was not armed.

Q.  Did Elsheikh appear comfortable answering your questions?

A.   Yes, he seemed very comfortable answering my questions.

Q.   Was he meek or shy to speak up?

A.   He was not.

Q.   What did the SDF guard do in the room during your interview?

A.   He just sat there, sir.

Q.   How was the SDF guard dressed?

A.   He was wearing blue jeans, a gray shirt with no face covering, and he also had no visible weapons.

Q.   Was the SDF guard recording the interview?

A.   He was not.

Q.   Was he taking notes?

A.   He was not.

Q.   Now, when you were first introduced to the defendant, March 27th, 2018, how did you introduce yourself to Elsheikh?

A.   I introduced myself as FBI Special Agent John Chiappone.  I showed my credentials and told him I was a law enforcement with the Federal Bureau of Investigation.

Q.   And when you say you showed him your credentials, are you referring to your FBI credentials?

A.   Yes, sir, my FBI credentials that had "FBI" written on there, "Special Agent," my photograph, and my name.

Q.   Do your credentials have any other agency listed?

A.   They do not, sir.

Q.   Is it clear that it 's referring to the FBI?

A.   Yes.  I think it might also say "Department of Justice," but it says "FBI" very clearly.

Q.   How did the defendant react when he saw you and your credentials?

A.   He did not seem surprised, sir.

Q.   What happened after the introduction?

A.   After the introduction and after we asked him what you had already spoke about the well-being questions, I read him his Miranda rights.  Or I should say I read his modified Miranda rights, sir.

Q.   And prior to doing so, did you observe Special Agent Nutter also show his FBI credentials?

A.   Yes, sir, I did.

Q.   And was he also introduced to Elsheikh as a special agent from the FBI?

A.   Yes, sir.

Q.   In what language did you read the defendant his Miranda rights?

A.   I did that in English, sir.

Q.   And at what point during the interview did you read him his Miranda rights?

A.   In the first few minutes.

Q.   Was that before any substantive questioning?

A.   Yes, sir.

Q.   Other than exchanging pleasantries and the statements you

testified about his health and well-being?

A.   And my introduction, yes, sir.

Q.   Did you read the rights from a form?

A.   I did, sir.

Q.   Can you turn to -- well, before we get to 12-7, can you just quickly turn to Exhibit 12-6B?

A.   6B.  Yes, sir.

Q.   What is that?

A.   That is the sink in the bathroom that you could see in the back corner of the first photo.

Q.   Of the interview room?

A.   Yes, sir.

        MR. PAREKH:  Move to admit 12-6B.

        THE COURT:  All right.  It's admitted.  Next question.

        (GOVERNMENT EXHIBIT Number 12-6B was admitted into evidence.)

Q.   Please turn to Exhibit 12-7.

A.   Yes, sir.

Q.   What is this?

A.   This is the Advice of Rights, modified Miranda form, that I read to El Shafee Elsheikh.

Q.   On March 27, 2018?

A.   On March 27, 2018.

        MR. PAREKH:  Move to admit 12-7.

        THE COURT:  It's admitted.

(GOVERNMENT EXHIBIT Number 12-7 was admitted into evidence.)

THE COURT:  You may display it if you wish.

MR. PAREKH:  Thank you, Your Honor.  Yes.

And please leave it up for a few minutes.

BY MR. PAREKH:

Q.  Did you show this form to the defendant, Elsheikh?

A.  Yes, sir, after I read it.

Q.  Did he have an opportunity to read the form himself?

A.  Yes, sir.

Q.  Did you read --

THE COURT:  Did you observe him doing so?

THE WITNESS:  Your Honor, I don't remember if he read the entire form or not.

THE COURT:  Next question.

Q.  Did you read the entire form to him?

A.  Yes, sir, I did.

Q.  Every single word?

A.  Every single word.

Q.  Did you ask the defendant if he had any questions while you were reading him his Miranda rights?

A.  I did, sir.

Q.  And did he?

A.  He did, sir.

Q.  What did he ask about?

A.   Specifically there's a line in the form that you can see in the second paragraph that says:  "We are starting anew."

Q.   Please read that line?

A.   "We are starting anew.  You do not need to speak with us today just because you have spoken with others in the past."

Q.   What did he ask?

A.   He asked me:  "What does we are starting anew mean?"

Q.   How did you respond?

A.   I explained to him that I don't know what statements he made before to anybody else in the U.S. Government, and nor did I care what any statements he made before to anyone else in the U.S. Government; that this interview is starting fresh, and whether he made statements or not does not mean -- or not affect what he -- statements he makes today or doesn't make today.

Q.   Do those include whether or not he wishes to speak to you?

A.   That's correct.

Q.   What happened after that point?

A.   After that point, I continued on reading the form, and then when we reached the end of the form, I asked the subject if he would sign the form.  And he would not sign, but he had said that he would continue to talk to us but was not willing to sign anything.  So therefore I wrote in his name, the subject would not sign, put my name, my signature, and the date and time in those blocks.

Q.   After you read him these Miranda rights as displayed in

Government Exhibit 12-7, did the defendant agree to voluntarily answer your questions?

A.   Yes, sir, he did.

Q.   Did the defendant ask, after you read him his Miranda rights, where his lawyer was?

A.   No, sir, he did not.

Q.   Did either you or Special Agent Nutter tell him that there was no lawyer for him, and that getting one here was going to be extremely difficult given the unusual situation he was in?

A.   No, sir.  The only thing we referenced a lawyer is what is in these Advice of Rights that you can see.

Q.   Did the defendant tell you that he did not wish to speak with anyone until he got his lawyer?

A.   No, sir, he did not.

Q.   Did the defendant ever ask for a lawyer at any point during your March 27, 2018, interview with him?

A.   No, sir, he did not.

Q.   Did you use any jokes that the defendant made to lure him into waiving his Miranda rights and speaking voluntarily with you?

A.   No, sir, we didn't use any jokes to lure him.

Q.   Now, there's an additional warning in Government Exhibit 12-7, which states:  "You do not need to speak with us today just because you have spoken with others in the past."

        And the form continues.

Are those, everything that I just read as well as the additional paragraph:  "If you previously made statements to others in the U.S. Government, it is likely that those statements will not be usable against you in a U.S. court. Anything you now say can be used against you in a U.S. court," some of the statements I've read, are those part of the usual Miranda rights that you're accustomed to reading as an FBI special agent?

A.   No, sir, these were additional statements put in the Advice of Rights.

Q.   And what was the point of these additional statements?

A.   Due to the unique circumstances of there being an intelligence interview prior to this law enforcement interview, ourselves, Special Agent Nutter and I, as well as our legal counsel at the prosecutor's office and the FBI, wanted to ensure it was abundantly clear that this interview was completely separate from any interview that was previously done.

Q.   And did the defendant ever say he was uncomfortable with waiving his Miranda rights?

A.   No, sir, he did not.

Q.   Did he appear uncomfortable at all during your interview with him?

A.   No, sir, he appeared very much in control.

Q.   Did the defendant appear apprehensive or fearful of the SDF guard who was there?

A.  No, sir.

Q.  Describe the SDF guard who was there.  Was he experienced or was he --

THE COURT:  The question is now compound.

MR. PAREKH:  Yes, you're right, Your Honor.

Q.  Describe the SDF guard who was there.

A.  As I previously mentioned, the SDF guard was wearing a gray shirt and blue jeans.  He appeared very young to me.  I don't know his exact age, but he looked like he could have been as young as 18 years old.

Q.  Did you ever observe that the SDF guard appeared to be frustrated with the defendant?

A.  No, sir.

Q.  Did you ever observe that the SDF guard appeared to be upset with the defendant?

A.  No, sir.

Q.  And of course as I previously stated, all of my questions go to March 27, 2018.

A.  Understood, sir.

Q.  Did the defendant ever tell you that he was being mistreated?

A.  He did not, sir.

Q.  Did the defendant ever appear confused during your interview with him?

A.  Not at all, sir.

Q.  Did his answers appropriately track your questions?

A.  Yes, they did.

Q.  What was the defendant's demeanor during your interview with him?

A.  He was calm and relaxed.

Q.  Was he making eye contact with you?

A.  He was.

Q.  Was he engaged with you?

A.  He was.

Q.  During the March 27th, 2018, interview, did you confront the defendant with any prior statements whatsoever that he previously made?

A.  None at all, sir.

Q.  Now, after he voluntarily waived his Miranda rights, did you ask him a series of questions?

A.  We did.

        THE COURT:  To return for a moment, Agent Chiappone, how did he indicate that he waived his Miranda rights?

        THE WITNESS:  Sir, he told me he was willing to speak, and he continued to indicate that he would answer certain questions but not other questions.

        THE COURT:  All right.  And you understood that to mean what?

        THE WITNESS:  When he told me he was willing to speak with me, Your Honor, I understood that to mean that he was

willing to continue to speak with me; but if he decided he did not want to answer a question, he would not.

THE COURT:  Next question.

Q.  And to follow on to Judge Ellis' very good questions, during that conversation, did he ever ask for a lawyer?

A.  He did not, sir.

Q.  Now, the questions that he --

THE COURT:  My point, Mr. Parekh, is that I don't think there's a question of waiver of Miranda rights.  It's the Government's position that he was given his Miranda rights.

MR. PAREKH:  Yes.  And Miranda plus, we would say, Your Honor.  This is a --

THE COURT:  But the use of the term "waiver of Miranda rights" is not, I think, understandable in this context.  That didn't occur, did it?

MR. PAREKH:  Well, he agreed to participate in the interview.  That would be a better way to put it, Your Honor.

THE COURT:  Yes, that is a better way to put it.

Q.  So continuing, did you ask him questions about his involvement with ISIS?

A.  I did, sir.

Q.  And were his statements summarized into a report?

A.  They were summarized into an FD 302, the FBI's standard interview report.

Q.  I want you to turn to Government Exhibit 12-8.

A.   Yes, sir.

Q.   What is this?

A.   This is the FD-302 written by myself and Special Agent Nutter on -- we drafted it on March 28th, 2018, following our interview on March 27th, 2018.

Q.   And are these reports in Government's Exhibit 12-8 all of the substantive reports, other than minor typographical corrections, regarding your interview with El Shafee Elsheikh on March 27, 2018?

A.   Yes, sir, that's correct.

Q.   And do you still stand by the accuracy of this report?

A.   100 percent, sir.

        MR. PAREKH:  Move to admit 12-8.

        THE COURT:  It's admitted.  You may display it if you wish.

        (GOVERNMENT EXHIBIT Number 12-8 was admitted into evidence.)

Q.   Now, Special Agent Chiappone, the entire report has been admitted and you've already testified that you stand by the accuracy of the report.  But if the Court will permit me, I'll just ask just a few general questions.

        THE COURT:  You may do so.

        MR. PAREKH:  Thank you.

Q.   Did the defendant talk about where he grew up?

A.   He did, sir.

Q.   Where did he say?

A.   So I was just going to say, sir, that's in the second report.  But he stated that he grew up in London, sir.

Q.   And did he talk about any type of military training that he received while in the UK?

A.   Yes, sir.  He talked about being a member of the British Army Cadets.

Q.   What type of training did he receive?

A.   He received physical fitness training, map and compass training, and marksmanship training, sir.

Q.   Did the defendant state whether he was engaged in any criminal activity while he lived in the UK?

A.   He did, sir.

Q.   What did he say?

A.   He had mentioned robberies.  He had mentioned --

         MR. DEUBLER:  Your Honor, objection to relevance. We're here for voluntariness.  Now we're going into the substance of what he either did or did not do.  This isn't going to the question of voluntariness or the question of his Mirandized statements or not.

         MR. PAREKH:  If Your Honor will permit me to ask one more question, you will see it goes directly to voluntariness.

         THE COURT:  All right.  I'll delay the ruling on the objection until you ask that further question.

         MR. PAREKH:  Thank you, Your Honor.

BY MR. PAREKH:

Q.  Can you just please finish your answer, and then I'll have a follow-up question for you.

A.  Yes, sir.  So the defendant told me that he had committed robberies, that he was involved in neighborhood-to-neighborhood fighting, and also with knife fighting, although he said he never stabbed anybody.  And he said the neighborhood-to-neighborhood fighting was different than in the United States, where it's not like the Bloods and the Crips and they're not doing drive-by shootings.

Q.  Did he decline to give you any details with respect to any criminal activity that he participated in while living in the UK?

A.  He did, sir.  When I asked further questions about robberies he committed, defendant told me he did not want -- wish to answer any further questions on robberies that he committed and would not provide any further information on those.

Q.  So he chose what details to provide and what details to not provide --

THE COURT:  You're now leading.

MR. PAREKH:  You're right.  I'm just trying to tie it up as to why it goes to voluntariness.

THE COURT:  Well, you can do it without leading.

MR. PAREKH:  Thank you, Your Honor.

Q.  So did he choose how to answer your questions?

A.   Yes.  So that is the first example in the FD-302 where he chose how to answer the questions.

Q.   Did you press him further when he declined to provide you with those details?

A.   No, sir, we moved on to the next topic.

THE COURT:  Are you moving on now?

MR. PAREKH:  Yes, we are, Your Honor.

THE COURT:  All right.  I think the objection must be overruled.  I can see some relevance to it now.  Next question.

MR. PAREKH:  Thank you, Your Honor.

Q.   You said that was the first example.  Was there a second example?

A.   Yes, sir, there was.

Q.   Please provide it.

A.   There were specific examples involving discussion with Mohammed Emwazi, sir.

(Reporter clarification.)

THE WITNESS:  Excuse me.

A.   There were specific examples involving discussion with Mohammed Emwazi.

Q.   And describe what that example was.

A.   So we were discussing with Elsheikh Mohammed Emwazi and Mohammed Emwazi's involvement in the beheading of Americans. The defendant had stated that he knew Mohammed Emwazi was the individual there based upon having seen Mohammed Emwazi wearing

a mask and also his voice.  And in the video, Mohammed Emwazi was also wearing a mask.  The defendant stated that he had previously also worn a mask.

And when I asked if he had ever asked Mohammed Emwazi about that video, the defendant said he did not, but eventually Mohammed Emwazi had told him something about the video.  When I asked what did he tell you about that video, the defendant refused to answer that question, sir.

Q.  And did you press him further after he refused to answer?

A.  I asked under what circumstances or when would he be willing to answer that question.

Q.  What did he say?

A.  He said under the circumstance when he knew what he was charged with and if he had an attorney present, he would answer that question.

Q.  Did he ever ask for an attorney?

A.  He did not ask for an attorney, sir.

Q.  Did the defendant make statements to you about his time with ISIS?

A.  He did, sir.

Q.  Did he reveal his full involvement with ISIS to you?

A.  No, sir.

Q.  Did you ask the defendant about Alexanda Kotey?

A.  I did, sir.

Q.  And did he wish to provide you the full details of what he

knew about Alexanda Kotey?

A.   No, he provided minimal information with Alexanda Kotey, and told me if I wanted to learn anything about Alexanda Kotey, I should speak to him.

Q.   Did you ask the defendant about whether or not he participated in a hostage-taking scheme?

A.   Yes, sir.

Q.   And did he wish to disclose that information to you?

A.   He did not, sir.

Q.   Did you press him further on that?

A.   No, sir.

Q.   Now, moving off of this interview with Elsheikh on March 27th, 2018.

A.   Yes, sir.

Q.   Did you attempt to conduct a Mirandized interview at the Kobani prison in Syria with Alexanda Kotey on the same date?

A.   I did, sir.  About approximately ten minutes after the conclusion of the interview with El Shafee Elsheikh.

Q.   On March 27, 2018?

A.   That's correct.

Q.   Just briefly summarize for the Court what happened when you attempted to conduct that Mirandized interview?

A.   Alexanda Kotey came in --

MR. DEUBLER:  Your Honor, objection.  Another defendant's interview, how is that relevant to Mr. Elsheikh's?

THE COURT:  Well, we'll see.  You may be right.

MR. PAREKH:  I can proffer to the Court or I can ask questions, Your Honor.

THE COURT:  Go ahead and ask questions.  It will save time.

MR. PAREKH:  Okay.

BY MR. PAREKH:

Q.  Just very briefly summarize what happened when you attempted to conduct that Mirandized interview?

A.  He came in, ate some candy, asked me if I was the individual who was going to read him his rights or if I was just another person that was going to talk to him.  He told me if I was the individual who was going to read his rights, to please read them, and he would like an attorney.  If not, we can talk.

At that point I read Alexanda Kotey his Miranda rights, he invoked those rights, said he did not wish to speak until he had an attorney present.

At that time I pointed out to the Miranda form that I don't know my capability of getting him a defense attorney, but I would request from the prisoner commander to see if I could get him a defense attorney.  And then I asked permission to meet him on another day so I could tell him what the prison commander's answer was on the defense attorney, and he said yes, he would be willing to meet with me and hear that answer.

Q.  On March 27, 2018, did you read Alexanda Kotey the

same exact Miranda rights that you had read to El Shafee Elsheikh?

A. Yes, sir, I did.

Q. And after Alexanda Kotey --

THE COURT: All right. Let me note that the objection as to relevance is overruled. I can see some relevance to what happened thereafter. So proceed.

MR. PAREKH: Thank you, Your Honor.

THE COURT: That means, of course, if you wish to renew any objection, you should do so.

MR. DEUBLER: Yes, Your Honor.

THE COURT: Proceed.

MR. PAREKH: Thank you, Your Honor.

BY MR. PAREKH:

Q. And after Alexanda Kotey invoked his right to silence, did you respect those rights?

A. Yes, sir, I did.

Q. Did you press forward with any questions whatsoever?

A. No, sir, the only question is what I stated, asking if I could meet him again to give him an answer of what the commander would tell us.

MR. PAREKH: Court's indulgence.

No further questions, Your Honor.

THE COURT: Cross-examination?

MR. DEUBLER: Thank you, Your Honor.

**CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

**BY MR. DEUBLER:**

Q.   Good morning, sir.

A.   Good morning, sir.

Q.   So we're going to back up --

A.   Absolutely.

Q.   -- and talk about your prep time.

A.   Correct.

Q.   So you were assigned to the law enforcement team in January?

A.   Late January, sir.

Q.   And you were attempting to keep clean, so to speak?

A.   That's correct.

Q.   This is an honor system.  Correct?

A.   I guess so, sir.

Q.   There is no mechanism within the FBI in which they are preventing you from getting information?

A.   There are steps we take, sir.  But there's no -- there are steps we take based upon previous decisions, like I had mentioned.

Q.   That's steps that you take?

A.   The steps that everyone in the FBI advises to take, sir.

Q.   Right.  But there is not a mechanism in which anybody is preventing you from getting information?

A.   I guess not, sir.

Q.   Okay.  And in fact, we saw in a couple of emails that people

were sending you information.  Whether you were reading it or not, you did have access to potential, I'm going to call it intelligence information, or information that was coming out of the un-Mirandized DoD interviews?

A.   It's possible, sir.  I didn't read those emails so I don't know if there was intelligence information or not in them.

Q.   But you had access to them if you wanted to?

A.   I had access to those emails if I wanted to read them.

Q.   And you were in communication with people who were in fact reading those intelligence reports.  Correct?

A.   Yes, sir.

Q.   And in fact, you were developing strategies with them?

A.   I was not, sir.

Q.   You were not.

MR. DEUBLER:  Does he have the defense exhibit book?

COURT SECURITY OFFICER:  No.

(OFF THE RECORD.)

Q.   If you can please flip to Exhibit Number 1 and give it a look.

A.   Yes, sir.

Q.   What does that appear -- what does this exhibit appear to be?  It's a multipage exhibit.

A.   This appears to be a printout of FBI Lync chats, sir.

Q.   Is your name on it?

(Reporter clarification.)

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

THE WITNESS:  Lync, L-Y-N-C.

A.  My name is on it, sir.

BY MR. DEUBLER:

Q.  Do these appear to be an accurate copy of some of your messages between January 29th and April 9th?

A.  They do, sir.

MR. DEUBLER:  Move to admit, Your Honor.

THE COURT:  Did you say your messages?

THE WITNESS:  Mine and others, Your Honor.

THE COURT:  All right.  I'm looking at 12 -- what is it?

MR. DEUBLER:  It is -- Your Honor, you should also have a copy of our exhibits.

THE COURT:  I do.  But it's one page.

MR. DEUBLER:  Your Honor, I think you're looking at the Government's exhibit binder.

THE COURT:  I am not.  It says Defendant's Exhibits.

MR. DEUBLER:  It is Exhibit Number 1.

THE COURT:  I beg your pardon.  Exhibit 1, yes, I have it.

MR. DEUBLER:  Your Honor, move to admit.

THE COURT:  What is it?  Exhibit 1?

MR. DEUBLER:  Exhibit 1, Your Honor.

THE COURT:  All right.  What is it, Agent Chiappone?

THE WITNESS:  Your Honor, these are printouts,

obviously a blacked-out printout of my messages between myself and other FBI employees at various dates.

THE COURT:  I see Exhibit 1 as four, five -- five pages.  Am I right?

MR. DEUBLER:  Correct, Your Honor.

THE COURT:  And of those five pages, I would say 80 percent of it is blacked out.  I don't see any messages, I only see names.  Am I correct?

MR. DEUBLER:  Your Honor, so it's broken out into columns.  If you look on the far left, you have a "Date" column.  Then the middle two columns is the "To" and "From," who the message is to and who the message is from.  And then the far right column is actually the content of those messages.

But Your Honor is correct, there is quite a bit of redactions in this exhibit.

THE COURT:  All right.  Any objection to its admission?

MR. PAREKH:  No, Your Honor.

THE COURT:  It's admitted.

(DEFENDANT EXHIBIT Number 1 was admitted into evidence.)

THE COURT:  You may display it.

MR. DEUBLER:  I'm going to have this blown up because the text is very, very small.

THE COURT:  All right.  That would be helpful.

BY MR. DEUBLER:

Q.  If we can go to page 2.

A.  Yes, sir.

Q.  And if you can look for the chat on January 29th around 18:32, and it begins with:  "McNutt, Nutter, and I"?

A.  Yes, sir.

Q.  It is on the top of the page.

A.  Yes, sir.

Q.  Can you read that, the contents of those messages?

A.  "McNutt, Nutter, and I -- what's with WFO and nuts" -- that was a joke -- "spoke this morning to develop strategies."

Q.  So you were developing strategies with these people?

A.  Sir, I should clarify.  I was developing strategies with Special Agent Nutter.  Supervisory Special Agent McNutt was a supervisor and he was supervising that.

Q.  So you were not developing strategies with Mr. McNutt?

A.  Mr. McNutt was supervising the developmental strategies.

Q.  So he was a participant in these strategy sessions?

A.  He was present in part of the conversations, sir.

        THE COURT:  Did he have anything to do with the intelligence gathering?

        THE WITNESS:  He did not conduct any intelligence interviews, Your Honor.  He was the supervisor of Washington field office CT2, so he supervised some of the agents that were supposed to do intelligence interviews but never did.  And he

also supervised Special Agent Nutter.  And due to my role in this and trying to take a New York agent and merge him with WFO, in this instance he was acting as my supervisor, Your Honor.

THE COURT:  And what strategies are being referred to there?

THE WITNESS:  How we would approach the defendant, Your Honor, and how we would conduct the interview.  And Special Agent Nutter and I eventually discussed what type of questions we would ask.

THE COURT:  All right.  Now, in that regard, was any reference made to any previous intelligence-gathering questions or strategies.

THE WITNESS:  None at all, Your Honor.

THE COURT:  And who was the other agent involved?

THE WITNESS:  The three agents, supervisory Special Agent Greg McNutt, who was the supervisor, who was aware of both what was going on on the intelligence side and the law enforcement side.  And Special Agent Julius Nutter and myself. And Special Agent Nutter went to Kobani, Syria with me and he conducted the law enforcement interviews with me.

THE COURT:  Yes.  Now, the third person, what's his name again?

THE WITNESS:  Greg McNutt, Your Honor.

THE COURT:  Was this a face to face conference or only what we see here in the exhibit?

THE WITNESS:  No, Your Honor, it was similar to what I described before, secure video teleconference.

THE COURT:  All right.  Was there any discussion during any of those teleconferences about the content or techniques or strategies used by the intelligence interviewers?

THE WITNESS:  None at all, Your Honor.

THE COURT:  So what was McNutt's role in this?

THE WITNESS:  McNutt was actually a great advisor, Your Honor because supervisory Special Agent McNutt had been the supervisor over the *Khweis* case when that happened.  So he was quite familiar with all of the nuances of that case and what happened with the law enforcement team and the intelligence team.

So Special Agent McNutt was able to advise Special Agent Nutter and I the best way to not get tainted, to stay away from the different methods.  And you can see that in some of his emails to us, Your Honor.

THE COURT:  All right.  Let me ask you once again, in any of these conferences with McNutt, did McNutt disclose, reveal, or suggest to you anything about the intelligence interviews that had previously been undertaken by the United States, and how that should affect your strategy in these law enforcement interviews?

THE WITNESS:  Never, Your Honor.

THE COURT:  Next question.

MR. DEUBLER:  Thank you, Your Honor.

BY MR. DEUBLER:

Q.  So there was not a -- I'm going to use the term "firewall." There was not a firewall between you and the people on the intelligence team getting the -- and what I mean by this question, let me kind of narrow it down, is when I think of the clean team, i think of someone who has --

THE COURT:  I'm not interested in what you think.  Ask the question and the witness can answer it.  You can later argue, but I don't want you to be making a speech and then it's unclear to me what it is he's answering.

MR. DEUBLER:  Yes, Your Honor.

Q.  You were communicating about Mr. Elsheikh's case with individuals who had access to intelligence information. Correct?

A.  I was speaking about Mr. Elsheikh's case with individuals who had access to intelligence information, but not with individuals who conducted intelligence interviews.

Q.  Understood.  Regarding your personal knowledge of the intelligence interviews themselves, were you aware that the SDF was present at those interviews?

A.  No, sir.  I didn't know anything about the intelligence interviews other than they took place.

Q.  So you didn't know that the SDF was taking notes during those interviews?

A.   Not at all, sir.  I would presume they would be present, but I didn't know any details about that.

Q.   Understood.  Did you understand that there was a policy in which the SDF and the DoD or the FBI were sharing intelligence with the SDF?

A.   I didn't know any specifics about it, sir.  I knew the U.S. Government, having cooperated with the SDF for multiple counter-ISIS operations, so I would presume that they were sharing information but no details involving a specific case.

Q.   And would it come as a surprise to you that your interview partner -- so Special Agent Nutter.  Correct?

A.   Yes, sir.

Q.   He actually stated on March 26th, 2018, that unless the SDF was going to get FBI 302s, they were going to cut off access? Would that come as a surprise?

A.   I have no clue if he said that or not, sir.

        MR. DEUBLER:  One moment, Your Honor.

Q.   And when you asked the SDF official for a different room for your law enforcement interviews --

A.   Yes.

Q.   -- as opposed to the intelligence interviews, you had no way to confirm that.  Correct?  Whether that in fact happened?

A.   That's correct, sir.

Q.   Or if the personnel were different?

A.   That's correct, sir.

Q.   You just submitted the request?

A.   I submitted the request.  I was told by that official that it was a different room, and that was a different individual, and I took him at his word.

And I had to do that, sir, because Special Agent Nutter, myself and our linguist, none of us were present or knew which room or which officials were in the room, so we had no way to tell if that commander was lying to us or not.

Q.   Understood.  If you could turn to Exhibit Number 7 and flip through those pages.

A.   Yes, sir.

Q.   Do you recognize this?

A.   Yes, sir.

Q.   What does it appear to be?

A.   This is my personal notebook from some meetings that took place on January 24th, 2018, January 25th, 2018, January 28th, 2018, and February 6th, 2018, sir.  And one in March as well.

Q.   So these are your notes?

A.   These are my personal notes, sir.

MR. DEUBLER:  Your Honor, I would move to admit Defendant Exhibit Number 7, please.

THE COURT:  Admitted without objection.

(DEFENDANT EXHIBIT Number 7 was admitted into evidence.)

Q.   You were aware, before the March 27th, 2018, law enforcement

interview, that the SDF - I'm talking about the SDF - conducted a, quote, unquote, intake interview.  Correct?

A.  I was aware that the SDF had filled out an intake form, sir.

Q.  And you were aware -- I'm not asking if you had it, but you were aware of the contents of that statement.  Correct?

A.  No, sir.

Q.  No?

A.  No.

Q.  If you can turn to the third page of it looks like your diary.

A.  Yes.  February 6th, sir.

Q.  And it looks like the second point:  "Interview intake officer"?

A.  Yes.  Yes, sir.

Q.  If you can read your writing from "Interview intake officer," all the way down?

A.  That there was an "Interview intake officer," it says, "All detainee" -- I don't know if it's supposed to "all detainee said" or "all said detainee claimed."  I could clarify, sir, if you like.

Q.  It's all right.  Keep reading.

A.  Okay.  "Summary from intake form, intake form exists and trying to get intake form."

Q.  And next point.

A.  "Present form to Kotey, E Shafee.  Get them to adopt."

Q.  And last point?

A.  "Admit to everything Emwazi murder."

Q.  So you did know the contents of that intake interview, then?

A.  No, sir.

Q.  So you're taking a note to get him to adopt something that you have no idea about?

A.  Getting him to adopt this form, sir.

Q.  How were you going to get time to adopt something that you have no idea about?

A.  Because the discussion in this meeting, sir, was that this form exists.  You can see my note that said we're trying to get the intake form, so the FBI was trying to get the intake form and that the concept was if there was value to that intake form, there would be discussion on whether we can present the form to Kotey and El Shafee.  That discussion did not occur until March 27th and March 28th on whether or not we would be able to present that form to them or not.

Q.  So admit everything in Emwazi?

A.  That's a separate conversation, sir.  That's a separate note from that.  I could explain if you like.

Q.  It's all right.

And you understand now that this SDF intake form actually contained information from the DoD interview sessions.  Correct?  You understand that sitting here today?

A.  I don't know that for 100 percent, sir.

Q.  Would it surprise you that Government has agreed to that; that that SDF intake form did contain, I'm going to call it spillover intelligence, from the DoD interviews?

A.  It would not surprise me because in the last 30 days, I have heard there's debate on whether it was before or after U.S. interviews.

Q.  All right.  And so you've talked to the prosecutors about why we're here today.  Correct?  You've been informed of our arguments?

THE COURT:  The question is now compound.

MR. DEUBLER:  I'm sorry, Your Honor.

Q.  Have the prosecutors informed you about the arguments that the defense has raised in their motion?

MR. PAREKH:  Objection, Your Honor.  He's getting into privileged information about our conversations with the agent.

THE COURT:  Sustained.

Q.  If you can turn back to Exhibit Number 1, please.

A.  Yes, sir.

THE COURT:  While he's going back to Number 1, would you tell me what your estimate is, since we're approaching lunch?

MR. DEUBLER:  I would say, Your Honor, no more than 15 more minutes.

THE COURT:  All right.  Proceed, sir.

MR. DEUBLER:  All right.

Q.   Page Number 3, Special Agent.

A.   Page Number 3.  Okay, sir.

Q.   And we are looking at -- I'm sorry, hang on.  It's very small.  Oh, okay.  "McNutt was telling me that."

A.   I'm not sure we're on the same page, sir.

Q.   Let me make sure my page is -- I'm sorry, page number 2. I'm very sorry.

A.   Okay.  No problem, sir.

Q.   Page Number 2.

A.   Yes, okay, I gotcha, sir.

Q.   "McNutt was telling me that."

A.   Would you like me to read it, sir?

Q.   Yes, please.

A.   "McNutt was telling me that" -- and this is in quotes. "'The deputies only want murder.  We are not bringing them back for material support.'  And I was, like, so?  Doesn't change the interview strategy."

     And then the next comment is:  "No, it does not."

Q.   So this was an important case, wasn't it?

A.   Yes, sir.

Q.   And you were basically being told that unless you got a confession, there wasn't going to be a prosecution?

A.   No, sir, that's not what I was being told.

Q.   Really?  Because "The deputies only want murder.  We're not bringing them back for material support."  They're basically --

I'm assuming it's the prosecutors telling you that unless we get some kind of murder-related charges, we're not bringing this individual back to the United States?

A.  Yes, sir, this discussion goes back to between the differences between the New York field office, which is where my investigation was out of, and what we were investigating, which was external operations planning and material support, versus what the Washington Field Office was investigating at that time, which was the hostage taking and subsequent murder of American citizens.

Q.  Understood.  Now, moving to the March 27th interview itself.

A.  Do you have --

Q.  No, we're moving forward in time.

A.  Right, sir.

Q.  So you're telling the Court that you read the modified Miranda form to my client?

A.  That's correct, sir.

Q.  That he waived his rights under that from?

A.  Yes, sir, he said --

Q.  As explained to him?

A.  Yes, sir.

Q.  But he refused to sign it?

A.  That's correct, sir.

Q.  And then proceeded to tell you what was documented in the 302?

A.  Yes, that's correct, sir.

Q.  Did you bother to tell him that you had no ability to give him a lawyer?

A.  I read him what was on the form, sir, which references my ability that I may or may not be able to.

Q.  Do you think his answer would have been different at all if you would have told him:  Mr. Elsheikh, I have no ability to get you a lawyer?

        MR. PAREKH:  Objection.  Calls for speculation.

        THE COURT:  I'll overrule it.  He may answer.

A.  Yes, sir.  I think that I informed him of what we had the capability to do in the Miranda form.  The form was very detailed in what our capabilities may or may not be, and I could read the form for you, sir, if you like.

        THE COURT:  Wasn't there a statement that you made to Elsheikh that you were going to ask the prison commander to get him a lawyer?

        THE WITNESS:  I made that statement to Alexanda Kotey, Your Honor.

        THE COURT:  Oh, Kotey.  All right.

        THE WITNESS:  Yes, sir.

        THE COURT:  Next question.

BY MR. DEUBLER:

Q.  This explanation, if you can draw my attention to it, I don't see it detailed anywhere in your 302 that you explained to

him that you were not able to get him an attorney.

(OFF THE RECORD.)

MR. DEUBLER:  And we're looking at, Your Honor --

THE COURT:  No, he's going to look at whatever he wants to look at, and then he'll tell us what he's looking at.

MR. DEUBLER:  Understood.

THE WITNESS:  Does anybody know the number of the intake form, of the Miranda form?

MR. DEUBLER:  Oh, the Miranda form?

THE WITNESS:  The Miranda form, yes.

MR. DEUBLER:  That would be 12-7.

THE WITNESS:  Thank you.

A.  So on Government Exhibit 12-7, I would point to the second to last paragraph prior to "Consent," where I read to the defendant:  "However, our ability to provide you with counsel at this time may be limited by the decisions of the local authorities or the availability of an American-trained attorney."

BY MR. DEUBLER:

Q.  I understand that.  But you never explained to Mr. Elsheikh that you didn't have the ability to get him a lawyer?

A.  Sir, at that time I didn't know if I had the ability to get him a lawyer or not.  I did not find out if I had the ability to get a lawyer or not until following 15:22 hours of that day, which has happened at 12:28, when I went and met with the SDF

commander on behalf of Alexanda Kotey and asked if I could bring a lawyer in.

Q.   You don't consider that an important step in a major terrorism case to see if you have the ability to fulfill one of your promises that you're asking the subject to understand and sign away; that maybe I don't have the right to a lawyer because there's no ability to have one presented to me?

A.   Like I just stated, sir, the reason we use the modified Advice of Rights, which included the statement that said, my ability may be limited, was my ability to tell him that I don't know.  Right?  My ability may be limited by the decisions of the local authorities.  I knew my ability was limited and I informed El Shafee Elsheikh that my ability was limited.

Q.   Isn't it true, Special Agent, that you used your years of training as a special agent to steer any conversation around or any discussion around this Advice of Rights form to what you were investigating?

THE COURT:  Do you understand the question?

THE WITNESS:  I don't, Your Honor.

THE COURT:  I don't either.

Q.   You were trying to minimize this --

THE COURT:  I'm sorry, are you going to recast your question?

MR. DEUBLER:  Yes, Your Honor.  I'm doing that right now.

THE COURT:  All right.

Q.  You were trying to minimize this form.  Correct?  You didn't want to discuss it?

THE COURT:  Your question is now compound.

Q.  You were trying to minimize this form.  Correct?

A.  No, sir, I presented the form in the same way I've always presented it, Miranda forms or modified Marine forms.

Q.  You weren't trying to minimize it at all.  Let me back up so we're all clear.

Your presentation of this form to my client, you are not trying to minimize it?  Any of the rights in that form?

A.  No, sir.  I read the form in its totality exactly verbatim as it's listed.

Q.  If we can direct your attention to Defense Exhibit Number 10.

MR. PAREKH:  Your Honor, I'm going to object to this exhibit, especially -- he wants to show him an email from Special Agent Nutter.  He's testifying next.  So I'm actually going to use this as a Government exhibit with the next witness.

MR. DEUBLER:  Respectfully, Your Honor, that's incorrect.  The email is from this agent.  The top of the email, Chiappone, John, and it incorporates an email from Nutter, but this agent's email is talking about Nutter's email.  They're having a discussion about this exact topic, the interview strategy.

MR. PAREKH:  Your Honor, I'm confident that Mr. Deubler wants to ask him about words that Special Agent Nutter wrote rather than Special Agent Chiappone, and he is testifying next as soon as Mr. Deubler can efficiently finish his cross-examination.

THE COURT:  So what's your objection, Mr. Parekh?

MR. PAREKH:  That the email that Mr. Deubler wants to show is Special Agent Nutter's email.  Yes, Special Agent Chiappone is on this email, but the words written that he wants to show come from Special Agent Nutter, who is testifying next.

THE COURT:  All right.  I understand that.  But I don't see that that's an objection.  Overruled.

You may proceed.

MR. DEUBLER:  Thank you very much, Your Honor.

THE COURT:  No, don't thank me.  It's a very irritating thing, by the way.  I don't do it for thanks.

MR. DEUBLER:  Understood.

THE COURT:  You either get it because the law requires it or you don't because the law forbids it.  I don't need or want to be thanked.

MR. DEUBLER:  Understood.

THE COURT:  That's something that lawyers do.  You're not the only one, sir.  Almost every lawyer thanks me, and I let it go and I let it go.  But it's much like -- well, never mind. I have my idiosyncrasies, and that's one of them which you must

live with.

MR. DEUBLER:  Understood.

THE COURT:  Proceed.

BY MR. DEUBLER:

Q.  Agent, can you explain what we're looking at in Exhibit 10?

A.  Yes, sir.  So Special Agent Nutter had sent me an email that stated what he felt the interview strategies would be and what charges, when conducting an interview, we should try to obtain in that interview.

I wrote back:  "Hey, man, looks good."  I added some bullets in blue for the other charges.  I know yours is probably black and white but I could point out what bullets I added. Those bullets were specific to what I had mentioned earlier about the New York field office case and external operations and material support charges, sir.

MR. DEUBLER:  Your Honor, I would move into evidence Defendant's Exhibit Number 10.

THE COURT:  All right.  You have no objection?

MR. PAREKH:  No objection, Your Honor.

THE COURT:  Admitted.

(DEFENDANT EXHIBIT Number 10 was admitted into evidence.)

Q.  So you read Agent Nutter's full email and it appears that you are in agreement.  Correct?

A.  Yes, sir.

Q.   Let's turn to the second page.

A.   Yes, sir.

Q.   Under the point heading:  "Interview course of action."

A.   Yes, sir.

Q.   And it looks like you outlined -- well, first of all, what is an interview course of action?  Let's start there.

A.   To be honest, sir, I've never used that term.  The first time I saw "interview" and "course of action" together was in Special Agent Nutter's email.  From my time in the military, a course of action is one -- especially when you have them numbered, is one possibility that you can take.  So you brief your commander on Course of Action 1, Course of Action 2 and then your commander would decide.  I've never seen it used, interview course of action, so you would have to kind of ask him that.

THE COURT:  Mr. Deubler, you gave me an estimate earlier.  Has that changed?

MR. DEUBLER:  No, sir, I'm wrapping up.

THE COURT:  All right.  Because it's past 12:30 now. Go ahead you may do so.

Q.   Read the very first -- under "COA1," read the very first sentence.

A.   "Downplay the Advice of Rights and procedural requirement to conduct the interview."

Q.   "Second plan, COA2," read that first sentence.

A.   "Minimize subject" -- oh, sorry.  COA2.

Q.   COA2.

A.   Excuse me.

     "Downplay the Advice of Rights as procedural requirement to conduct interview."

Q.   And finally, COA3.

A.   It says the same thing, sir:  "Downplay the Advice of Rights as procedural requirement to conduct interview."

Q.   Remind me, how many years have you been a special agent?

A.   I've been a special agent for over 11 years, sir.

     THE COURT:  Did you downplay the Advice of Rights?

     THE WITNESS:  Sir, I read the Advice of Rights exactly as it was written.

     THE COURT:  All right.  Next question.

     MR. DEUBLER:  Court's indulgence.

     THE COURT:  Yes.

     MR. DEUBLER:  All set, Your Honor.

     THE COURT:  Any redirect?

     MR. PAREKH:  Yes, Your Honor.

     THE COURT:  How long do you anticipate?

     MR. PAREKH:  I anticipate less than 5 minutes.

     THE COURT:  All right.  Proceed.

     **REDIRECT EXAMINATION BY COUNSEL FOR THE UNITED STATES**

**BY MR. PAREKH:**

Q.   Special Agent Chiappone --

A.   Yes, sir.

Q.   -- you were asked a number of questions about whether or not you were allowed access to read the intelligence-gathering interviews about Elsheikh and Kotey prior to conducting your Mirandized interviews.  Do you recall that?

A.   I do, sir.

Q.   And were you allowed access to prior to conducting your Mirandized interviews?

A.   No, sir, I was not.

Q.   Irrespective of whether someone sent you by accident something, did you read it?

A.   No, sir.

Q.   Okay.  Regarding the intelligence-gathering interviews?

A.   Regarding anything that could possibly even get close to the intelligence interviews, sir.

Q.   Did you have any information whatsoever regarding DoD's intelligence-gathering interviews prior to meeting with Elsheikh on March 27th, 2018, and conducting your interview on that day?

A.   No, sir, I did not.

Q.   I want you to turn to Exhibit 12-11, please.  It's in the Government's exhibit binder.

         (Reporter clarification.)

         MR. PAREKH:  12-11.

Q.   And when you have it in front of you, please let us know.

A.   Yes, sir.

Q.  Is this an email that you wrote?

A.  Yes, sir.

Q.  On what date?

A.  On Wednesday, April 18th, 2018.

MR. PAREKH:  Move to admit.

THE COURT:  It's admitted.  You may display it.

(GOVERNMENT EXHIBIT Number 12-11 was admitted into evidence.)

Q.  Special Agent Chiappone, April 18, 2018, at the time this email was written, had you already come back from Syria?

A.  Yes, sir.

Q.  Please explain -- well, just read your portion of the email.

A.  Yes, sir.  I said?  "Thank you," blacked out.  "As the law" enforcement -- or "LE team," meaning law enforcement, "has just recently been allowed access to hear/read TIRs," which is a tactical intelligence review, I believe, "I haven't dug into them yet.  Do the reports give any idea of the location of those phones"?

Q.  Please explain to us what's going on in this email.

A.  There was a conversation on whether there were phones that existed or not existed on one of the defendants, and as of April 18th, although I was allowed to read the intelligence interviews, I still had not done so.  And to this day I have not read those interviews in the entirety.  I've seen -- at this present time I've seen bits and pieces, but I've never sat down

and read the intelligence interviews in its entirety.

THE COURT:  What is the reference to phones? Telephones?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Who had telephones?

THE WITNESS:  Your Honor, I believe it turned out to be false.  But there was a report, and I believe it was Alexanda Kotey, Your Honor, but I would have to reference the previous emails that I think are blacked out.  But there was some information happening on April 18th that somebody was saying that one of the defendants had a cell phone on them at the time of capture.

THE COURT:  Next question.

Q.  And just now in your testimony you said, even though you had been allowed to access, are you talking about before or after your Mirandized interview?

A.  I'm talking about after my Mirandized interviews, after leaving Syria and coming back to the United States.

Q.  And do you have any knowledge whatsoever regarding -- at the time that you conducted your Mirandized interview, do you have any knowledge whatsoever about how much overlap there would be between the questions asked by the intelligence-gathering team and the questions that you and Special Agent Nutter were posing to the defendant?

A.  No, sir, I had no way to know that because I didn't know

what questions the intelligence team asked.

Q.  To this day do you even know?

A.  I still don't to this day, sir.

Q.  You were asked a series of questions about Greg McNutt.

A.  I was, sir.

Q.  Did Greg McNutt, during any meetings whatsoever, give you guidance about what questions you should be posing to El Shafee Elsheikh or Alexanda Kotey when you would travel to Syria to interview them?

A.  No, sir.  The people that developed the questions were myself and Special Agent Nutter.

Q.  Did Special Agent -- Supervisory Special Agent McNutt tell you how you should approach El Shafee Elsheikh?

A.  No, sir.

Q.  Did he give you any direction whatsoever regarding your at that time forthcoming interview with El Shafee Elsheikh in terms of what you should be focusing on?

A.  Stay clean and stay safe, sir.

Q.  What does that mean?

A.  It means I'm going to Syria, so please be safe.  And stay clean, avoid anybody who was part of the intelligence interviews and do not get tainted before you do that Mirandized interview.

Q.  You were asked some questions about an SDF intake form.  Do you recall that?

A.  I do, sir.

Q.   On March 27th, 2018, had you read that SDF intake form?

A.   I had not, sir.

Q.   Did you have any printout of it at that time?

A.   No, sir.

Q.   Did you use it at all in any way whatsoever during your interview with Elsheikh on March 27, 2018?

A.   I did not, sir.

Q.   Did anyone tell you that the SDF intake form at that time contained intelligence-gathering interviews from DoD?

A.   No, sir.

Q.   Did you have any knowledge whether it did whatsoever?

A.   No, sir.

Q.   Did you cross-examine Elsheikh on March 27, 2018, with any prior statements that he may have made?

A.   No, sir, I didn't know any of the statements that he made prior, so there's no way to do that.

MR. PAREKH:   Finally, Your Honor, I want to turn back to Exhibit 12-7.

THE COURT:   I have it.

MR. PAREKH:   The Miranda form.   Can we please display that?

THE COURT:   You may.

Q.   The line that Mr. Deubler asked you about:   "However, our ability to provide you with counsel at this time may be limited by the decisions of the local authorities or the availability of

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

an American-trained attorney."

A.   Yes, sir.

Q.   Just so the record is crystal clear, did Elsheikh at any point in time ask you to find out whether or not he could have an attorney present?

A.   No, sir.

Q.   Did he invoke his right to counsel at any point in time during the March 27, 2018, interview?

A.   No, sir.

Q.   And this line on the Advice of Rights form Government's Exhibit 12-7 --

A.   Yes.

Q.   -- you previously testified in direct examination that you read the *Mohamad Khweis* decision issued by Judge O'Grady of this court?

A.   Yes, sir.

Q.   Do you recall whether this exact line that Mr. Deubler read to you about, "our ability to provide you with counsel at this time may be limited by the decision of the local authorities," was in fact on the Miranda form used in the *Khweis* case coming out of this court?

A.   This line was definitely in there, sir.  I can't say if it's verbatim, but the context of this line was definitely in that decision, sir.

Q.   Thank you.

MR. PAREKH:  No further questions, Your Honor.

THE COURT:  I have on further question.  I asked it before; I'll ask it once again.  In the Defense Exhibit 10, on 3COA, COA1, COA2, and COA3, the statement made by McNutt is to: "Downplay the Advice of Rights as procedural requirement to conduct interview."

Did you do that?  Did you downplay it?

THE WITNESS:  No, Your Honor.  I read it verbatim, like I stated.

THE COURT:  All right.  And did you discuss with Mr. Nutter what he meant by "downplay"?

THE WITNESS:  No, Your Honor.  I just told Mr. Nutter how I typically read Miranda forms.

THE COURT:  And what did you tell him?

THE WITNESS:  I told him many times when I'm starting the Miranda form I will tell a defendant or a subject I'm interviewing:  Hey, you may or may not be familiar with this, you might have seen this in a TV show, but I'm required by law to read this to you.

And then I will read the form, sir.

THE COURT:  And when you read the form to Mr. Elsheikh, did you look at him as you were doing it?

THE WITNESS:  Yes, Your Honor, similar to how I would read here, I would read and then look up.

THE COURT:  Was he paying attention?

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  You may step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  All right.  We will recess for the luncheon period here now, and we'll recess until 1:40, at which time you have one more witness in this area?

MR. PAREKH:  Yes, Your Honor.  Special Agent Julius Nutter will testify and then we have Sean Langan which will be the Rule 15 deposition as well, and then we'll wrap up with Special Agent O'Toole.

THE COURT:  And with the journalist, will that be brief?

MR. PAREKH:  One moment, Your Honor.  Mr. Gibbs will address that.

MR. GIBBS:  Judge, I think probably about 30 to 45 minutes for my direct and then however long the cross is.

THE COURT:  Thank you.  Court stands in recess until 1:40.

(Recess taken at 12:44 p.m.)

THE COURT:  We had to delay resuming because of some electronic problem which I think has been remedied.  But I need to make arrangements, because it is now nearly 2:00 o'clock on Thursday afternoon.

And let me just very briefly, Mr. Parekh, review what we have.  We have one more FBI agent.

MR. PAREKH:  That's correct.

THE COURT:  Then we have the journalist.

MR. PAREKH:  Yes.

THE COURT:  And then we have a wrap-up FBI agent.

MR. PAREKH:  Correct.

THE COURT:  That's it?

MR. PAREKH:  That is it, Your Honor.

THE COURT:  And you're reasonably confident you can finish that this afternoon?

MR. PAREKH:  We are, Your Honor.

THE COURT:  All right.  Now, Mr. Deubler, you're in the seat next there.  Do you intend to offer any testimony?

MR. DEUBLER:  One moment, Your Honor.

We are not calling any witnesses, Your Honor.

THE COURT:  All right.  That helps me decide what to do with my docket tomorrow.

All right.  Let's move ahead now and call your next witness, Mr. Parekh.

MR. PAREKH:  The United States calls Special Agent Julius Nutter.

(Oath administered by courtroom deputy clerk.)

THE COURT:  Before you begin, you may remove your mask if you're comfortable doing so.  You're sitting behind the Plexiglass division there and you're quite far away from other people.  But if you would be more comfortable wearing it, you

may do so.

THE WITNESS:  I'll remove it, Your Honor.

THE COURT:  Thank you.  And speak up, please, so we can be sure the court reporter hears you.

All right.  Mr. Parekh, you may proceed.

**(SPECIAL AGENT JULIUS NUTTER, having been duly sworn, testified**

**as follows:)**

**EXAMINATION BY COUNSEL FOR THE UNITED STATES**

**BY MR. PAREKH:**

Q.  Good afternoon, sir.

A.  Good afternoon.

Q.  Please state and spell your name for the record?

A.  My name is Julius Nutter, J-U-L-I-U-S, N-U-T-T-E-R.

Q.  How are you employed?

A.  I'm employed with the FBI.

Q.  What do you do for the FBI?

A.  I'm a special agent with the FBI.

Q.  How long have you worked for the FBI?

A.  I've worked for the FBI since 2007.

Q.  What are your roles and responsibilities?

A.  Currently my role and responsibility is assistant legal attache' in Nairobi, Kenya.

Q.  What did you do prior to your position in Nairobi, Kenya?

A.  I was an investigator on CT2 assigned to the Washington field office.

Q.   What does that mean, CT2?

A.   Counterterrorism squad 2.  We had responsibility for investigations centered around the Levant, Syria and Iraq.

Q.   Is that a counterterrorism squad?

A.   Yes.

Q.   How long have you been a counterterrorism special agent for the FBI?

A.   I've been a counterterrorism special agent for the FBI for approximately seven years.

Q.   Briefly summarize your experience and training.

A.   I went to the FBI Academy as a counterterrorism agent.  I have received several inservices and online courses related to terrorism.

Q.   Were you previously assigned to an investigation involving El Shafee Elsheikh, Alexanda Kotey, and other alleged co-conspirators?

A.   Yes.

Q.   When were you assigned to that investigation?

A.   Approximately 2014.

Q.   Turning your attention to January 2018, did anything notable happen at that time with respect to this investigation?

A.   Yes, at that time El Shafee Elsheikh and Alexanda Kotey were detained by the SDF.

Q.   In Syria?

A.   Yes.

Q.   What was your role on the investigation after you learned that Elsheikh and Kotey had been detained in Syria?

A.   I was assigned as an interviewer for the law enforcement interviews of those two individuals.

Q.   What did that mean to you?

A.   To me, that means I was charged with conducting an interview of them related to obtaining evidentiary statements regarding their activities while they were in Syria and Iraq and any alleged allegations regarding kidnappings of American citizens.

Q.   What type of interview?

A.   A law enforcement interview.

Q.   What does that mean?

A.   A custodial interview where they're advised of their Miranda rights.

Q.   What's the difference in your mind at that time between your assignment on the law enforcement team and anyone else who may be assigned to that particular investigation?

A.   Other individuals would not have to read the defendants their Miranda rights in order to interview them.

THE COURT:  You said who may be assigned to that particular investigation.  What were you talking about?

MR. PAREKH:  I'll clarify, Your Honor.

Q.   Was there an intelligence-gathering team assigned to the Elsheikh and Kotey investigation in January 2018?

A.   Yes.

Q.  And how were they different, the intelligence-gathering team, from your role on the case?

A.  The intelligence-gathering team had the ability to read all intelligence reports that came out from any interviews of the two defendants.

Q.  Did you have that ability?

A.  I did not.

Q.  Did there come a point in time in which you interviewed Elsheikh and attempted to interview Kotey in March 2018?

A.  Yes.

Q.  We'll turn to those in a moment.

Special Agent Nutter, were you generally aware at the time in January 2018 that the Department of Defense, otherwise known at DoD, was conducting intelligence-gathering interviews of Elsheikh and Kotey following their capture by the SDF?

A.  I was generally aware in the assumption that there were interviews being conducted.  I did not know who was conducting the interviews.

Q.  Were you asking anyone to conduct intelligence-gathering interviews with those individuals?

A.  No, I was not.

Q.  Did you ask anyone to help you secure an eventual confession when you got in front of them for a Mirandized interview?

A.  No, I did not.

Q.  Did you make any requests whatsoever to the

intelligence-gathering team?

A.   No, I did not.

Q.   And all of my questions right now are focused on the intelligence-gathering team as it relates to interviews that may have been happening with respect to Elsheikh and Kotey.  Do you understand that?

A.   Yes.

Q.   Did the intelligence-gathering team make any requests to you?

A.   No.

Q.   Do you know what Source Directed Requirements, otherwise known as SDRs, are?

A.   Yes.

Q.   What are they?

A.   Those are questions.

Q.   Did you give any SDRs to the intel team?

A.   No.

Q.   Did anyone on the intelligence-gathering team give you SDRs?

A.   No.

Q.   Did you give the intelligence-gathering team any questions to ask during their interviews with Elsheikh and Kotey?

A.   No.

Q.   Did the intelligence-gathering team give you any questions to ask those individuals?

A.   No.

Q.   Did you provide the intelligence-gathering team with any advice or directions whatsoever prior to your Mirandized interview with Elsheikh and Kotey?

A.   No.

Q.   Did anyone tell you what approaches were being used during the intelligence-gathering interviews?

A.   No.

Q.   Did you read any intelligence-gathering information from the DoD interviews whatsoever prior to your Mirandized interviews of Elsheikh and Kotey?

A.   No.

Q.   Did you --

THE COURT:  Did the intelligence-gathering team or anyone on there give you any advice or directions about interrogating Elsheikh and Kotey prior to your conducting a law enforcement interview of either of them?

THE WITNESS:  No, Your Honor.

THE COURT:  Next question.

Q.   Did you speak to any intelligence-gathering interrogators prior to conducting your Mirandized interview?

A.   No.

THE COURT:  Do you even know who they were?

THE WITNESS:  No, Your Honor.

THE COURT:  Next question.

Q.   At some point you went to Syria to conduct Mirandized

interviews in this case?

A.   Yes.

Q.   When was that, approximately?

A.   That was approximately March 2018.

Q.   Where in Syria did you go?

A.   A DoD facility in Syria.

Q.   And did anyone else with the FBI travel with you?

A.   Yes.  Special Agent John Chiappone, a linguist from the FBI, and two electronic technicians from the FBI.

Q.   Did ay of those individuals that you just named have information regarding the statements that may have been made during the intelligence-gathering interviews?

A.   No.

     THE COURT:  And were any of those persons special agents?

     THE WITNESS:  Yes, sir, Special Agent John Chiappone.

     THE COURT:  Other than Chiappone, were any of them special agents?

     THE WITNESS:  No, sir.  It was a linguist and two electronic technicians, Your Honor.

     THE COURT:  Next question.

Q.   What, if anything, did you do to insulate yourself from the intelligence-gathering interviews prior to your Mirandized interviews?

A.   When we were located in Syria, myself,

Special Agent Chiappone, the linguist, and the two electronic technicians were billeted separate from all other personnel.

Q. Explain that, "billeted separate."

A. We slept in a separate tent from all other people. We were the only five individuals in that tent.

Q. And prior to traveling to Syria, what, if anything, did you do to insulate yourself from the intelligence-gathering interviews?

A. We ensured that we did not read any intelligence reports or talk to any individuals, or if we talked to any individuals that may have had information about the intelligence report, it was strictly about nonintelligence matters or other investigative matters that we needed to discuss with them.

Q. Such as logistics?

A. Such as logistics.

Q. Did you document how careful you were being in your own FBI emails?

A. Yes.

Q. I want you to turn to Government Exhibit 13-2, please. And when you have 13-2 in front of you, please let us know.

A. I have 13-2 in front of me.

Q. What is this document?

A. This is an email from myself to Special Agent Dan O'Toole.

MR. PAREKH: Move to admit 13-2.

THE COURT: Yes, so admitted. You may proceed.

(GOVERNMENT EXHIBIT Number 13-2 was admitted into evidence.)

MR. PAREKH:  Ms. Lopez, can you publish the exhibit? Thank you.

BY MR. PAREKH:

Q.  This appears to be an email on February 28, 2018.  Is that correct?

A.  Yes.

Q.  Please explain to the Court what's going on in this email?

A.  This is me advising Special Agent O'Toole that I am on the distro for this reporting, but I have not been reading it in order to stay free of taint for the law enforcement interviews.

Q.  Is that what you meant when you said, "in order to stay clean"?

A.  Correct.

Q.  Do you even know what Special Agent O'Toole sent in this email?

A.  I do not.

Q.  Why not?

A.  Because I did not read it.

Q.  Did you open any attachments?

A.  No.

Q.  I want you to turn to Government Exhibit 13-3, please.

A.  (Witness complies.)

Q.  Do you have it in front of you?

A.   Yes.

Q.   Is this an email that -- email chain that you were on?

A.   Yes.

MR. PAREKH:  Move to admit 13-3.

THE COURT:  Admitted without objection.  Proceed.

(GOVERNMENT EXHIBIT Number 13-3 was admitted into evidence.)

Q.   Special Agent Nutter, you see there's three emails in this chain.  Correct?

A.   Yes.

Q.   Please explain, starting from the bottom and proceeding to the top, what is occurring in this email chain.

A.   Starting from the bottom to the top, I'm advising my supervisor and Special Agent Chiappone's supervisor that we have arrived in Erbil, but we do not have a timeline moving forward to enter into Syria.

Q.   And Erbil is in which country?

A.   Iraq.

Q.   And then the next email above that?

A.   Is from my supervisor advising us to stay clear and to stay clean.

Q.   What did those words mean to you at that time?

A.   Those words meant to me to remain clear and clean of any taint information from any type of intel interview.

Q.   What do you mean by taint information?

A.   Information that may have given us additional insight or information into what the defendants may have said prior to our law enforcement interview.

Q.   So any statements whatsoever?

A.   Yes.

Q.   And then going to your email, what does that mean?

A.   Copy that I understood what my supervisor was telling me.

Q.   And did you in fact stay clean of any intelligence-gathering information prior to your Mirandized interview?

A.   Yes.

Q.   And this is true for Elsheikh and Mr. Kotey?

A.   Yes.

Q.   Now, at some point in time you made it into Syria?

A.   Yes.

Q.   And on what date did you conduct your first Mirandized interview with Mr. Elsheikh?

A.   The 27th of March.

Q.   Of what year?

A.   2018.

Q.   Where did you go?

A.   We went to the Kobani prison.

Q.   And when you arrived at the Kobani prison, what did you do?

A.   We met -- well, before we went into the prison, we downloaded our long rifles, our M4s, and proceeded into the prison and met with the head of the prison.

Q.   And when you say "we," who is going into the prison with you?

A.   Myself, Special Agent Chiappone, and the linguist.

Q.   And when you met with the head of the prison, what did you talk about?

A.   We discussed the purpose, why we were there, to conduct law enforcement interviews of El Shafee Elsheikh and Alexanda Kotey, and to ensure that we had the head of the prison's permission to conduct those interviews.

Q.   Why did you need their permission?

A.   Because the two individuals were being held by the SDF.

Q.   Did you ask the head of the Kobani prison, the SDF Kobani prison in Syria, permission for anything else?

A.   Yes.

Q.   What?

A.   We wanted to ensure that the room that we conducted the interview in was separate from any type of interviews of the two individuals that had been conducted before.

Q.   Did you ask him anything else?

A.   We asked also permission to bring in some drinks and food that we brought in for the two individuals we were going to interview.

Q.   Anything else?

A.   Um...

Q.   Regarding specifically personnel who may be accompanying

you, Special Agent Nutter and the linguist, into the interview room.

A.   Yes.  We wanted to make sure and asked that whoever the guard was from the SDF that was going to sit in the room was not also the guard that sat in on any of the intel interviews.

Q.   Why did you make this specific request to the head of the SDF prison to have the room be a different room and the personnel, the SDF guard, be a different guard than what was occurring in the intelligence-gathering interviews?

A.   Because we wanted to show a clear distinction between the intelligence interviews and the law enforcement interviews by changing the room and changing the personnel in the room.

Q.   Are those conditions with which you had some experience on your squad that you called CT2?

A.   Yes.

Q.   How so?

A.   That was our standard operating procedure when we did intel interviews and law enforcement interviews, to have that separation, that distinct separation between the two types of interviews.

Q.   And after that conversation, did you proceed to the interview room?

A.   Yes.

Q.   I want you to turn to Government Exhibit 12-6A.  It's already been admitted.

144

THE COURT:  All right.  You may exhibit it.

Q.  Special Agent Nutter, do you know what we're looking at?

A.  Yes.

Q.  What is this?

A.  That is the interview room where the interview was conducted.

Q.  On March 27, 2018, of Elsheikh?

A.  Yes.  This picture is actually from March 29th.  March 27th, it was a similar setup, with the addition of one plastic chair.

Q.  Who took this photo?

A.  I took this photo.

Q.  Why?

A.  To document where the interview took place.

Q.  And going to Exhibit 12-6B, do you recognize that photo?

A.  Yes.

Q.  Did you also take this photo?

A.  I did.

Q.  What does it show?

A.  It shows a water basin and a door to the left which I believe was to the bathroom.

Q.  Can you turn to Government Exhibit 13-4?

A.  I have 13-4 in front of me.

Q.  What is it?

A.  It is a diagram of the interview room that I drew on the 29th.

Q.   You personally drew this?

A.   Yes.

        MR. PAREKH:  Move to admit 13-4.

        THE COURT:  Admitted.  You may display it.

        (GOVERNMENT EXHIBIT Number 13-4 was admitted into
evidence.)

Q.   Why did you draw this diagram?

A.   To show the dimensions of the interview room, because the
photos did not capture the entirety of the room.

Q.   Just so the record is clear, these are the dimensions of the
interview room used on March 27, 2018, with Elsheikh?

A.   Yes.

Q.   Now, on that date, at some point did Elsheikh arrive to the
room that you've been testifying about?

A.   Yes.

Q.   And who brought him into the room?

A.   An SDF guard.

Q.   Was the defendant restrained?

A.   Yes.

Q.   How so?

A.   He had -- his hands were restrained.  I can't remember if it
was handcuffs or it was some other type of restraint.  And he
also had a cloth over his face.

Q.   Was the cloth removed?

A.   Yes.

Q.  Were the handcuffs removed?

A.  Yes.

Q.  Who removed them?

A.  The SDF guard.

Q.  What was the defendant's demeanor when he was brought into the room?

A.  The defendant's demeanor in my view was he was calm.  No indication of any distress or anything like that.

Q.  Did he seem angry at all?

A.  No.

Q.  Did he seem scared?

A.  No.

Q.  Timid in any way?

A.  No.

Q.  Just going back to the environment in the room, how was the temperature in the room?

A.  The temperature was comfortable.

Q.  Did you need heating?

A.  No.

Q.  Did you need AC?

A.  No.  But AC was available.

Q.  How was the lighting?

A.  The lighting was good.

Q.  And were there any strong or pungent smells coming from the room?

A.   No.

Q.   Inside the room?

A.   No.

Q.   Did the defendant eventually sit down when he was brought into the room and his restraints and cloth were removed by the SDF guard?

A.   Yes.

Q.   Where did he sit?

A.   He sat in the leather chair across from myself and Special Agent Chiappone.

Q.   The leather chair that was shown in Government's Exhibit 12-6A?

A.   Yes.

Q.   And where did you and Special Agent Chiappone sit?

A.   We sat in the plastic chairs.

Q.   Where did the linguist sit?

A.   He sat in the leather chair, the other leather chair that was available.

Q.   And where did the SDF guard sit?

A.   Sat in the plastic chair.

Q.   Were any of you in the defendant's personal space at all?

A.   No.

Q.   Throughout the entirety of the interview on March 27, 2018, did anyone get in his personal space?

A.   No.

Q.   Did he have free movement?

A.   Yes.

Q.   When the defendant walked in, did you have the opportunity to observe his face?

A.   Yes.  Once the cloth was removed.

Q.   Did he have any signs of injury?

A.   No.

Q.   Any bruising whatsoever?

A.   No.

Q.   Any blood on his shirt?

A.   No.

Q.   Did he appear distressed at all?

A.   No.

Q.   When the defendant sat down, did you ask him about his health, you or Special Agent Chiappone?

A.   Yes.

Q.   How did the defendant respond?

A.   Said he was doing well.

Q.   Did you-all ask about his treatment in SDF custody?

A.   Yes.

Q.   How did the defendant respond?

A.   The defendant said that his treatment in SDF custody was good.  It was not what he expected based on Islamic State propaganda.  He also said that he had the ability to wash clothes, drink tea, talk with other prisoners, work out.

Q.   And just explain that.  What do you mean by it was not what he had expected regarding his SDF treatment?

A.   What he believed, he believed that there would be some type of mistreatment based on what ISIS had pushed out to ISIS fighters.

Q.   Mistreatment, in other words, by the SDF?

A.   Yes.

Q.   And he stated that he had been treated well, contrary to what he thought -- how he thought he was going to be treated?

A.   Yes.

          THE COURT:  Leading.  Avoid leading.

          MR. PAREKH:  Yes, Your Honor.

Q.   What did you wear during the interview?

A.   What I wore?  I believe I had a button down shirt and khakis.

Q.   What did Special Agent Chiappone wear?

A.   Very similar attire, which the defendant commented on.

Q.   And just so the record is clear, all of my questions are focused on March 27th, 2018, your interview with El Shafee Elsheikh.  Do you understand that?

A.   Yes.

Q.   What did the linguist wear?

A.   I do not specifically recall what the linguist wore, but it was casual attire.

Q.   And the SDF guard?

A.  Civilian clothing.

Q.  Did you have on you any visible weapons?

A.  No.  Myself and Special Agent Chiappone's pistols were concealed.

Q.  How about the linguist?

A.  The linguist did not have a weapon.

Q.  And the SDF guard?

A.  Did not have a weapon.

Q.  Did you provide the defendant with any food or drinks?

A.  Yes.

Q.  What?

A.  We had water, we had Coke, and some candy and cigarettes. And the SDF also brought in tea, which the defendant refused.

Q.  Did you offer restroom breaks to the defendant?

A.  Yes, we offered restroom breaks and prayer breaks if needed.

Q.  Why was a translator present?

A.  A translator was present due to the defendant being in SDF custody and the SDF requiring that the interview be translated into Arabic, so they could understand what was going on.

Q.  Did it appear to you that Elsheikh was fluent in English?

A.  Yes.

Q.  What makes you say that?

A.  As we were speaking with him and conducting the interview, we had to slow down the interview because he was responding before the translation could occur, indicating to me that he

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

understood English and understood the questions that we were asking and was ready to respond.

Q.   Just so it's clear, he was responding in English?

A.   Yes.

Q.   When he spoke in English, did you observe anything about his voice?

A.   Yes, he spoke with a British accent.

Q.   Did Elsheikh appear comfortable correcting the translator, if needed, during the interview?

A.   Yes.  Either he would convey what was mistranslated either in English to us, or adjust his Arabic so that what he was trying to convey would be conveyed through the translation.

Q.   Did Elsheikh appear meek or shy to speak up at any point during the interview?

A.   No.

Q.   Did the SDF official ever appear upset if and when Elsheikh was correcting the translator or speaking in English?

A.   No.

          THE COURT:  You keep using the word "official."  Do you mean the guard?

          MR. PAREKH:  Yes, Your Honor.  The SDF guard.

          THE COURT:  All right.  Proceed.

Q.   Was the SDF guard taking any notes?

A.   Not that I recall.

Q.   Was the SDF guard recording the interview?

A.   No.

THE COURT:  So far as you could determine.

THE WITNESS:  So far as I could determine, Your Honor.

THE COURT:  Next question.

Q.   Did you introduce yourselves to the defendant?

A.   Yes, myself and Special Agent Chiappone introduced ourselves as special agents from the FBI.  Additionally, we showed the defendant our credentials.

Q.   And are those your FBI credentials?

A.   Yes, our FBI credentials.

Q.   Both you and Special Agent Chiappone showed your FBI credentials?

A.   Yes.

Q.   When you did so, did the defendant appear to look at your credentials?

A.   Yes.

Q.   How did the defendant react when you introduced yourselves to him?

A.   No real visible response, in my opinion.

Q.   Did he seem surprised?

A.   No.

Q.   And what happened after the introduction?

A.   After the introduction, there was some small talk, and then we naturally rolled into the Advice of Rights.

Q.   I want you to take a look at Defense Exhibit 10, I believe

it is.

MR. PAREKH:  Your Honor, I believe this has already admitted and I would like to publish it.

THE COURT:  You may do so.

Q.  If you can go to the second page of Defense Exhibit 10.

MR. PAREKH:  And if we can enlarge the COAs.

Q.  Do you recognize this exhibit?

A.  I do.

Q.  What is it?

A.  It is an email.

Q.  And is this an email that you wrote?

A.  Yes.  This is an email that I wrote to Special Agent John Chiappone.

Q.  Do you see in the email there's a phrase starting with: "Downplay the Advice of Rights as procedural requirement to conduct interview"?

A.  Yes.

Q.  And what was the date of this particular email that you wrote?

A.  February 5th, 2018.

Q.  And your Mirandized interview that we've been testifying about was on March 27th, 2018?

A.  Yes.

Q.  On February 5th, 2018, when you wrote this, "Downplay the Advice of Rights as procedural requirement to conduct

interview," what did you mean?

A.   What I meant by that was to incorporate the Advice of Rights into the natural progression of the interview, which we did, as documented in the interview report.

The Advice of Rights was provided by Special Agent Chiappone.  Special Agent Chiappone had a copy of the Advice of Rights form, provided the defendant a copy of the Advice of Rights form, read through the Advice of Rights form in English, and it was subsequently translated into Arabic for the defendant.

As we read through the -- or as Special Agent Chiappone read through the Advice of Rights form, the defendant asked a question.  Special Agent Chiappone answered that question for the defendant.

Q.   Let's get to that in a moment.  I'm going to unpack all of that.

A.   Okay.

Q.   But my question now is focusing on that particular sentence.  Did you or Special Agent Chiappone in any way downplay the Advice of Rights?

A.   No.  And that was a poor choice of words on my part in this email.  I did not downplay the Advice of Rights, nor did Special Agent Chiappone.

Q.   I want to turn to Government Exhibit 12-7, which has already been admitted, and I'll now have it published.  And it may be on

your screen as well.

A.   I have it in front of me.

Q.   Is Government Exhibit 12-7 the exact Advice of Rights form that was read to the defendant on March 27, 2018?

A.   Yes.

Q.   Who read the form to him?

A.   Special Agent Chiappone.

Q.   Did you have anything whatsoever to do with giving the Advice of Rights to the defendant on that date?

A.   No, it was Special Agent Chiappone.

Q.   And describe to us how the process played out.  You started testifying about it, but I want to ask some specific questions. How did the Advice of Rights form process play out initially?

A.   So the Advice of Rights form, a copy was provided to the defendant.  Special Agent Chiappone started reading through the Advice of Rights in English, allowing the translator time to translate it into Arabic.  So the defendant heard it both in English and in Arabic, and he went through it paragraph by paragraph.

Q.   Did Special Agent Chiappone rush through the form?

A.   No.

Q.   Did he read each and every word on Government Exhibit 12-7 with respect to the Advice of Rights?

A.   Yes.

Q.   And the same for the consent form of -- the consent

headline?

A.   Yes.

Q.   Everything underneath the consent headline?

A.   Yes.

Q.   At some point in the Advice of Rights you indicated that the defendant asked a question.

A.   Yes.

Q.   What did he ask?

A.   He had a question about -- he had a question, in the second paragraph, the second line:  "We are starting anew."  He wanted to know what "We are starting anew" meant.

Q.   And did either you or Special Agent Chiappone explain what that meant to the defendant?

A.   Yes.  Special Agent Chiappone advised the defendant that starting anew meant it did not matter who he had spoken to earlier.  This is a new and totally separate interview, that he is not obligated to speak to us based on any previous statements that he has made or any other individuals that he has spoken to prior.

Q.   Did the defendant ask any other questions after that?

A.   No.

Q.   Did Special Agent Chiappone's answer to the defendant's question appear to satisfy his curiosity?

A.   Yes.

Q.   Did the defendant ask at any point during or after the

Advice of Rights being read where his lawyer was?

A.  No.

Q.  Did either you or Special Agent Chiappone tell the defendant that there was no lawyer for him, and that getting one here was going to be extremely difficult given the unusual situation that he was in?

A.  No.

Q.  Did the defendant tell you that he did not wish to speak with anyone until he got his lawyer?

A.  No.

Q.  Did the defendant ever ask for a lawyer at any point during the entirety of the March 27, 2018, Mirandized interview?

A.  No.

Q.  Did you --

THE COURT:  Mr. Parekh.

MR. PAREKH:  Yes.

THE COURT:  To help me understand, at the time of the trial, what is it that the Government intends to offer as the product of this interview?

MR. PAREKH:  Yes, Your Honor.  The reports that have already been admitted in Government Exhibit 12-8 contain a number of post-Miranda-advised statements by the defendant.  The first few pages are the conditions of confinement.  And so we would elicit from the agents the conditions of the interview, how the room was set up, the temperature of the room, other

comfort factors.

We would then talk about the Miranda process, how that played out, how the defendant was advised to make it clear that he was advised of his Miranda rights and then wished to speak with the agents.  And then we would roll into the statements that the defendant made on March 27th, 2018.

I believe Mr. Deubler is planning to put on the record whether or not the defendant -- whether or not the Government will elicit any statements the defendant made on March 29th, 2018.  The Government will not, in its case-in-chief.  And that's why my direct examination of the prior witness and of this witness is focused specifically on March 27, 2018, and the reports in Government Exhibit 12-8 only deal with March 27th, 2018.

THE COURT:  All right.  And the other interview, what was it, March?

MR. PAREKH:  29th, Your Honor.

THE COURT:  29th.  You would not offer those in the case-in-chief of the Government, but you may in rebuttal?

MR. PAREKH:  In rebuttal, or if the defendant decides to testify at the time of trial.

THE COURT:  All right.  Proceed.

MR. PAREKH:  Thank you, Your Honor.  No thank you, Your Honor.

BY MR. PAREKH:

Q.  All right, Special Agent Nutter.  So where we left off, I was about to ask you:  Did you or Special Agent Chiappone use any jokes to lure the defendant into waiving his Miranda rights and speaking with you?

A.  No.

Q.  And by waiving his Miranda rights, do you understand that I'm talking about him declining to invoke his right to silence?

A.  Yes.

Q.  After the Miranda rights form that we saw in Government Exhibit 12-7 was read to the defendant and after he asked a question that you testified about and that process concluded, did Special Agent Chiappone or you ask the defendant if he was willing to speak with you both that day?

A.  Yes.

Q.  What did the defendant say?

A.  Yes, he was willing to speak with us.

Q.  Did the defendant wish to sign a form?

A.  The defendant did not wish to sign the form.

Q.  And despite not willing to sign the form, did you indicate that -- did he indicate that he was willing to talk?

A.  Yes.

Q.  Focusing on the defendant's demeanor during the Miranda Advice of Rights process, was he engaged?

A.  Yes, he was engaged.

Q.  Was he --

            THE COURT:  What do you mean by "engaged"?

            THE WITNESS:  It appeared to me, Your Honor, that he understood what was being told to him, both in English and in Arabic, sir.

            THE COURT:  Next question.

BY MR. PAREKH:

Q.  Was he making eye contact with Special Agent Chiappone as the Advice of Rights were being read to him?

A.  Yes.

Q.  Did you observe that?

A.  Yes.

Q.  Did he appear confused at all?

A.  No.

Q.  Was he raising his eyebrows or making any facial gestures that would indicate that he was having difficulty understanding the Advice of Rights?

A.  No.

Q.  And I know we're in a different era these days where we all wear face masks, but at the time was anyone wearing even a half face mask, the way we do right now during the pandemic?

A.  No.

Q.  So you could see the defendant's full facial expressions?

A.  Yes.

Q.  A few questions about the SDF guard that was in the room.  I

know it's never polite to guess someone's age, but approximately how old did he appear?

A.   Early twenties.

Q.   And did the defendant appear apprehensive or fearful of the SDF guard?

A.   No.

Q.   Did you ever observe the SDF guard appear frustrated or upset with the defendant on March 27, 2018?

A.   No.

Q.   During the interview, did the defendant ever indicate that he was uncomfortable?

A.   No.

Q.   At any point during the interview, not just the beginning, but at any point during the interview, did the defendant tell you that he was being mistreated?

A.   No.

Q.   Abused?

A.   No.

Q.   Tortured?

A.   No.

Q.   And at any point during the interview, did the defendant appear to be confused?

A.   No.

Q.   And that includes not just during the Miranda waiver process, but during the interview itself.  Do you understand

that?

A.  Yes.

Q.  Is your answer still the same?

A.  It's still the same.

Q.  Not confused?

A.  Not confused.

Q.  Did the defendant's answers appropriately track your questions?

A.  Yes.

Q.  And Special Agent Chiappone's questions?

A.  Yes.

Q.  Was the defendant's demeanor the same throughout the interview?

A.  Yes.

Q.  That is, was he relaxed?

A.  Relaxed, yes.

Q.  Was he making eye contact?

A.  Yes.

Q.  During the March 27, 2018, interview, did you or Special Agent Chiappone confront the defendant with any prior statements whatsoever that he made?

A.  No.

Q.  Any media statements?

A.  No.

Q.  Any intel-gathering statements?

A.   No.

Q.   Did you even know of any statements that he made after his capture --

A.   No.

Q.   -- in January of 2018?

A.   Can you repeat the question?

Q.   Did you even know about the content of any statements the defendant made following his capture in 2018, prior to you conducting this Mirandized interview on March 27, 2018?

A.   No.

Q.   Did you and Special Agent Chiappone prepare reports regarding the defendant's Mirandized statements to you both on March 27th, 2018?

A.   Yes.

Q.   Can you just briefly flip through the reports in Government Exhibits 12-8, please.

A.   (Witness complies.)

Q.   Have you had a chance to flip through them?

A.   Yes.

Q.   Are these in fact the reports regarding the substance of the defendant's statements on that date?

A.   Yes.

Q.   And other than typographical issues such as correcting the date or the time, do you stand by the accuracy of these reports?

A.   I do.

Q.   Do you stand by the accuracy of the defendant's statements as described in these reports?

A.   Yes.

Q.   Just briefly, I don't want to get into the full interview, but generally what did the defendant agree to talk about after Special Agent Chiappone read him his Miranda rights, as we've been talking about?

A.   The defendant agreed to talk about his time in the United Kingdom, some of his run-ins with the law in the United Kingdom, his time with the Islamic State, and some other -- briefly about Alexanda Kotey and Emwazi, and his direct supervisor within ISIS --

MR. DEUBLER:  Objection, Your Honor.  At this point this is cumulative.  We just had a witness on the stand testifying to this exact same material.

THE COURT:  Overruled.

Q.   You may continue.

A.   And his time with ISIS.

Q.   Now, going back to what you previously just said, did the defendant --

THE COURT:  I'm sorry, his answer, some of his run-ins with the law in the United Kingdom, his time with the Islamic State and some other -- and then there was an objection.  Would you finish your answer, please?

THE WITNESS:  Some other individuals that he knew

within the Islamic State.

THE COURT: Did he mention names?

THE WITNESS: Yes, Your Honor. He mentioned Alexanda Kotey, Emwazi, and his direct supervisor.

THE COURT: And who is his direct supervisor?

THE WITNESS: If I can refer to the interview report?

THE COURT: Is it in the interview report?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Then let's proceed.

MR. PAREKH: Yes, Your Honor.

BY MR. PAREKH:

Q. When you say the defendant talked about his run-ins with the law in the United Kingdom, what do you mean?

A. He talked about being involved in some, what he described as neighborhood -- violence between neighborhoods. He said it wasn't as violent as the Bloods and Crips in the United States. Mostly it was criminal activity involving knives and robberies. But he did not want to go into in depth about what type of robberies.

Q. Please explain what you mean by that?

MR. DEUBLER: Objection as to relevance, Your Honor. I don't see how this is relevant to the voluntariness of his interview, whether it was clean or tainted.

MR. PAREKH: Your Honor, may I explain?

THE COURT: Yes, you may.

MR. PAREKH:  It's highly relevant, Your Honor, because what it establishes is a clear record that the defendant wished to talk and he wished to answer questions in the way he wanted to answer questions.  And when he did not want to provide details about some of those answers, he declined to provide details.

That, Your Honor, we would posit, is the hallmark of voluntariness because it shows the defendant wanted to talk about what he wanted to talk about, and when he refused to talk about other topics, the agents moved on.

THE COURT:  I'll overrule the objection.  Proceed.

BY MR. PAREKH:

Q.  Special Agent Nutter, can you explain what you mean by he declined to provide details about -- I believe you said robberies, but please correct me if I'm mistaken.

A.  Correct.  And when we asked him what -- tried to get in depth of what type of robberies, he declined to answer.

Q.  Did the defendant decline to provide details about any other topics that you asked him, or Special Agent Chiappone asked him on that date?

A.  Yes.  He declined to provide any information related to the kidnappings and murders of Western hostages.

Q.  And when he would decline to provide details on the topics that you've testified about, would you continue probing him on those topics?

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

A.   No, we would move on.

Q.   You testified that the defendant spoke about his time in ISIS.  Did he give you a full picture of everything he did as a member of ISIS?

A.   He gave us a full picture of what he wanted to talk about as far as his time in ISIS.

Q.   And did the defendant give you a full picture of his relationship with Alexanda Kotey?

A.   Yes, he described Alexanda Kotey as a friend.

Q.   But did he tell you details about everything that he may have allegedly been involved with --

A.   No.

Q.   -- with Alexanda Kotey?

A.   No, he did not.  He told us that Alexanda Kotey was in Kobani prison; if we wanted information about Alexanda Kotey, we needed to speak to Alexanda Kotey.

Q.   And the same question for Mohammed Emwazi.  Did he give you a full picture and accounting of everything he was allegedly involved with Emwazi?

A.   No.

Q.   Now, how much of your Mirandized interview with Elsheikh on March 27, 2018, contained overlapping statements from what he said during his intelligence-gathering interviews?

A.   I have no idea.

Q.   Why don't you have any idea?

A.   Because I did have access to his intelligence interviews.

Q.   To this day, sitting here and testifying, have you read Elsheikh's intelligence-gathering interviews?

A.   I have not.

Q.   Have you read Kotey's?

A.   I have not.

Q.   Do you even know what questions the intelligence-gathering team asked any of them?

A.   I do not.

Q.   At some point did you and Special Agent Chiappone attempt to conduct a Mirandized interview with Alexanda Kotey?

A.   Yes.

Q.   When was that?

A.   That was on the --

          MR. DEUBLER:  Objection as to relevance.  Another defendant's Mirandized or un-Mirandized interviews is not relevant.

          MR. PAREKH:  Your Honor overruled the objection for the last witness because if the agents are respecting Kotey's rights, it's highly probative of the issue that the defendant has raised; namely Elsheikh's declaration says that the agents did not respect Elsheikh's rights.

          THE COURT:  Overruled.

          MR. PAREKH:  Thank you, Your Honor.  Or no thank you, Your Honor.

Q.   When did you go to interview Alexanda Kotey?

A.   We interviewed Alexanda Kotey after Mr. Elsheikh.

Q.   On the same day?

A.   On the same day, the 27th of March.

Q.   2018?

A.   Yes.

Q.   Did you and Special Agent Chiappone read the exact Advice of Rights that you had read earlier in the day to Elsheikh?

A.   Yes.

Q.   And that's to Alexanda Kotey?

A.   Yes.

Q.   Same form?

A.   Yes.

Q.   Just briefly summarize what happened.

A.   Alexanda Kotey refused -- invoked his rights.  He wanted to have a lawyer present.  He requested a lawyer.  We told him it's not our decision because he's in SDF custody, but we would ask the SDF prison commander if that was possible.

Q.   And did you respect his invocation of silence at that point?

A.   Yes.  After he invoked and made the request, we terminated the interview.

        MR. PAREKH:  Court's indulgence.  No further questions, Your Honor.

        THE COURT:  Cross-examination.

CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT

**BY MR. DEUBLER:**

Q.   Good afternoon, sir.

A.   Good afternoon.

Q.   Will you please flip --

     (OFF THE RECORD.)

Q.   Can you please flip to Exhibit Number 6, please.

A.   Yes.

Q.   And just leaf through the pages.  It should be roughly four pages.

A.   Yes, four pages.

Q.   And do you recognize what this is?

A.   Yes.

Q.   What is it?

A.   These are Lync chats.

Q.   Are they your Lync chats?

A.   Some of them are mine, yes.

Q.   And do they cover the time period between January 23rd, 2018, and March 26th, 2018?

A.   Yes.

     MR. DEUBLER:  Your Honor, I move into evidence Defense Exhibit Number 6.

     MR. PAREKH:  No objection.

     THE COURT:  Admitted.

171

(DEFENDANT EXHIBIT Number 6 was admitted into evidence.)

BY MR. DEUBLER:

Q.  If I can call your attention, sir, to the very first page of Exhibit 6.

MR. DEUBLER:  And actually, if we can publish it because the text is very hard to read.  And I apologize for that.

THE COURT:  You may do so.

MR. DEUBLER:  And if we can enlarge the very first portion, that makes it a little bit easier.

Q.  I believe it starts with:  "Beatles question."  Can you read that?

A.  Yes.

Q.  Can you please read it.

A.  Oh.  "Beatles questions.  Did any of the hostages positively ID El Shafee Elsheikh?"

Q.  "I don't think so."  Continue on.

A.  "I do not think so, but double check with Bill."

Q.  And finally, the last line?

A.  "Did Bill or Greg tell you SDF picked up El Shafee Elsheikh?"

Q.  Who are you speaking with in this brief exchange?

A.  So when -- "Beatles question, do any of the hostages positively ID El Shafee Elsheikh" is from Ed Lane to myself.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

And I responded:  "I do not think so but double check with Bill."

Q.  And Ed Lane you said?

A.  Yes, Ed Lane.

Q.  Is this person on the clean team?  Meaning does this -- is this person supposed to be firewalled off, staying out of the intel interviews?

A.  This person was not assigned to my squad at the time.  I really could not tell you if this person -- I do not know if this person was walled off from being on the clean team.

Q.  Okay.  And Bill and Greg, who are they?

A.  Bill is a special agent on CT2 and Greg is the supervisor of CT2, or was the supervisor of CT2.

Q.  Thank you.  And both of these two individuals did have access to Mr. Elsheikh's -- the information coming out of Mr. Elsheikh's intelligence interviews.  Correct?

A.  I would assume so.

Q.  All right.  And you're specifically asking these individuals questions?  Am I understanding that?

A.  No.  I talked --

Q.  Well, you're discussing Mr. Elsheikh's case, correct, the substance?

THE COURT:  He didn't finish his answer.

MR. DEUBLER:  I apologize, Your Honor.

A.  No, I'm not directly talking to Bill or Greg in this, I'm

talking to Ed Lane.  He's asking me a question and I'm responding to it.

Q.  Understood.

All right.  Moving up to the March 27th interview, where was it conducted?

A.  It was conducted in Syria.

Q.  Was it conducted at a civil police station, like an American equivalent of a civilian police station?

A.  I would say it was conducted in the equivalent of an American jail or prison.

Q.  Would it be fair to characterize the location of Kobani prison as a war zone?

THE COURT:  What difference does it make?

MR. DEUBLER:  Your Honor, where these interviews happened - and I'm going to get to the downplaying of rights in a minute - has a massive importance about whether these supposedly voluntary FBI interviews were in fact voluntary.  If these are taking place in a war zone and being held by paramilitary forces and the FBI agents are downplaying this individual's rights, I think it goes directly to the question of voluntariness.

THE COURT:  I'm not sure I agree with you.  You can make that argument.  I don't find it as compelling as you seem to think it is.  I'm not sure how people define a war zone.  For example -- well, I won't give you a personal example.

I don't know what you mean by a "war zone."  Make it that simple.  What do you mean by a "war zone"?

MR. DEUBLER:  An area involved in armed conflict.

THE COURT:  Well, suppose it's 5 miles from there.

MR. DEUBLER:  I would consider that a war zone, sir.

THE COURT:  Suppose it's 25 miles.

MR. DEUBLER:  I would still consider that a war zone, sir.

THE COURT:  Well, I don't know why you would.  Have you ever been in a war zone?

MR. DEUBLER:  No, I have not, sir.

THE COURT:  Well, it depends on what kind of war zone. I think people who were in Key West, Florida thought they were in a war zone during the Bay of Pigs.  They weren't.  So it's a very subjective notion.

If you want to ask this witness whether he knows whether this place was within a certain distance from front line fighting, if he knows, he can tell you.  If he doesn't know, he'll simply say he doesn't know.

MR. DEUBLER:  How about I go about it a different way, Your Honor.

THE COURT:  You may try.

BY MR. DEUBLER:

Q.  Before you met -- you met -- let me back up.

You eventually asked the head of Kobani prison whether

you could procure an attorney for my client's co-defendant, Alexanda Kotey. Correct?

A. Correct.

Q. And it was on the same day --

THE COURT: Was that you or was that the other agent who asked the head of Kobani prison?

THE WITNESS: We both asked, Your Honor.

THE COURT: All right. Next question.

Q. Actually, on that point, sir, can you turn to Exhibit Number -- Defense Exhibit Number 11?

THE COURT: He's already said he did and the other agent did as well. Is it necessary to do this?

MR. DEUBLER: No, sir.

THE COURT: All right. Then don't.

Q. Before this point, did you have any reason to believe that if Mr. Elsheikh requested an attorney, you could provide an tone for him?

A. Can you repeat the question?

Q. Before you spoke to the leader of the Kobani prison, did you have any reason to believe that you could provide Mr. Elsheikh an attorney, a detainee being held by paramilitary forces?

A. We would ask the SDF commander. I don't know what lawyers were in Kobani at that time. But if the SDF commander said that he could provide a lawyer for Mr. Elsheikh, I would take him at his word that he could provide a lawyer.

Q.  Sir, that wasn't my question.  I asked:  Did you believe, until you spoke to the head of the prison, that you could procure a lawyer?  No, yes, I don't know?

A.  I don't know because I don't know what lawyers were in Kobani.

Q.  Understood.  Don't you think that would have been an important question to figure out before you start advising a detainee of their rights, whether some of the -- any/some of those rights might be hollow promises?

A.  It's not a hollow promise.  We'll make the effort to get him a lawyer.  Which we did.

MR. DEUBLER:  One moment, Your Honor.

THE COURT:  All right.

Q.  You said previously that you stayed out -- and correct me if I'm wrong, please.  But you testified earlier that you stayed away from the intel team.  Isn't that correct?

A.  Correct.

Q.  And I also believe that you testified earlier that you didn't know who was on the intel team?

A.  Correct.

Q.  I'm a bit confused.  How can you be sure to stay away from someone who you don't know who they are?

A.  I can stay away from them by not engaging them on anything related to the intel interviews.

THE COURT:  To this day, do you know who those people

are?

THE WITNESS:  No, I don't know who conducted the intel interviews.

THE COURT:  And to this day, do you know anything about the intel interviews?

THE WITNESS:  No, Your Honor.

THE COURT:  Did anybody tell you or Agent Chiappone anything about the intel interviews?

THE WITNESS:  No, Your Honor.

THE COURT:  Do you know whether you had any contact with any FBI agent or any DoD person who had anything to do with intel interviews?

THE WITNESS:  No, Your Honor.

THE COURT:  If someone had come up to you and said: I'm an FBI agent who was involved in intelligence questioning of Elsheikh or I'm a DoD person who was involved, would you have talked to the person?

THE WITNESS:  I would not have talked to them about anything derived from those intelligence interviews.  If I had to talk to them about any other matter unrelated to that, whether it be logistics to get in and out of Syria, I would have talked to them about that.

THE COURT:  Next question.

BY MR. DEUBLER:

Q.  You had testified earlier with Mr. Parekh about your visual

exam of my client when he entered the room.  You didn't notice any bruises or other visual marks.  Correct?

A.  Correct.

Q.  But you didn't perform any kind of medical exam.  You didn't ask him to lift up his shirt?

THE COURT:  Your question is compound now.

Q.  You didn't actually perform a medical exam, did you?

A.  No.

Q.  Did you ask him to undress at all?

A.  No.

Q.  So you're just talking about what you could see on the outside of his clothing?

A.  Yes, what I visually observed when he walked in, I didn't see any indications of limps or anything like that that would indicate any type of ailments or physical issues.

Q.  If you can flip to Tab 18 in the defense exhibit notebook, please.

A.  (Witness complies.)

Q.  What is this?  It's a couple of pages.  What is this document?

A.  This is a report documenting the eight pictures that I took of the interview room where the interview was conducted.

Q.  And I believe you previously identified these images as Government's Exhibit 12A.  And the Government can correct me if I'm wrong.

MR. PAREKH:  Mr. Deubler is incorrect, because we've put in two of the photos.  We haven't put in, to avoid being cumulative, all of the photos.

THE COURT:  All right.  And what were the Government exhibits?

MR. PAREKH:  12-6A and 12-6B, Your Honor.

THE COURT:  All right.  Next question.

BY MR. DEUBLER:

Q.  And you said these were photos of what?

A.  The interview room.

Q.  Of who?

A.  Where we conducted the interview of Alexanda Kotey and El Shafee Elsheikh.

Q.  And before the interview, I believe you said you had requested that the SDF make sure that the room was different, the interview room for your-all's interviews, and that the SDF present was also different than the prior intelligence team interviews.  Is that correct?

A.  Correct.

Q.  Would it surprise you to find out that FBI Fly Team member Special Agent Kath --

MR. PAREKH:  I object, Your Honor.  He's already testified he's never talked to anyone in the intel interviews. This seems to be asking about prior testimony when the witness has clearly said:  I don't even know who conducted the

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

interviews.

THE COURT:  Go ahead and finish your question, Mr. Deubler.

MR. DEUBLER:  Thank you.  Understood, Your Honor.

BY MR. DEUBLER:

Q.  Would it surprise you to know that Special Agent Kath, who is a member of the intelligence team, identified that room in your photos as the same room that at least some of the DoD interviews took place in?

MR. PAREKH:  Objection, Your Honor.  That's not what he said.  He said for Kotey.  He never testified about Elsheikh.

Q.  I'll clarify it.  For Mr. Kotey, that some of Mr. Kotey's intelligence interviews took place in that room?

A.  I guess so.

Q.  It would surprise you?

A.  Yes.

Q.  Because you have no way of verifying whether the SDF gave you a separate room for Mr. Elsheikh than his intel interviews. Correct?

A.  Right.  Because I have no idea where the intel interviews took place.

THE COURT:  And the Court has little or no idea as to why that's at all relevant.

MR. DEUBLER:  It's part of the *Khweis* factors, Your Honor, whether they overlap in between personnel and rooms,

but I can move on.

THE COURT:  Not rooms, for goodness' sake.  You're talking about secret?

MR. DEUBLER:  Yes, Your Honor.

THE COURT:  Secret is a decision about a police department making a determination or a judgment about how to avoid Miranda and anything said about different rooms is not going to be terribly persuasive.  Let's move on.

MR. DEUBLER:  Understood, Your Honor.  One moment, Your Honor.

THE COURT:  Yes.

MR. DEUBLER:  All set, Your Honor.  Thank you very much.

THE COURT:  All right.  Any redirect?

MR. PAREKH:  Less than two minutes, Your Honor.  I hope to be even faster than that.

**REDIRECT EXAMINATION BY COUNSEL FOR THE UNITED STATES**

**BY MR. PAREKH:**

Q.  Special Agent Nutter, you were asked about whether you observed any signs of injury on the defendant.  Do you remember that?

A.  Yes.

Q.  And you were asked some questions about did you lift up the defendant's shirt.  Do you remember that?

A.  Yes.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

Q.   During the interview, did you have the opportunity to observe all the defendant's movements?

A.   Yes.

Q.   Did he appear to be in any physical pain?

A.   No.

Q.   Did he appear to be wincing during the interview?

A.   No.

Q.   Did he have any difficulty moving around?

A.   No.

Q.   Could he adjust his chair?

A.   Yes.

Q.   You were asked some questions about your conversation and Special Agent Chiappone's conversation with the SDF commander?

A.   Yes.

Q.   Was that related to Elsheikh or Kotey?

A.   Regarding the lawyer?

Q.   Yes.

A.   That was related to Kotey.

Q.   Did Mr. Elsheikh at any point ask you any questions about how he could obtain a lawyer?

A.   No.

Q.   Did he ever ask for a lawyer at any point whatsoever on March 27, 2018?

A.   No.

MR. PAREKH:  And finally, if we could put up Defense

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

Exhibit 6.  And this will be the last topic that I ask about, Your Honor.

If we can enlarge the portion that Mr. Deubler asked on cross-examination about.

BY MR. PAREKH:

Q.  What's the date of these Lync chats?

A.  The date of those Lync chats are January 23rd.

Q.  And the portion that Mr. Deubler asked you about, can you read that -- "Did any of the hostages," can you just read that for us?

A.  Yeah.  "Beatles question, did any of the hostages positively ID El Shafee Elsheikh?"

Q.  Were any of the hostages -- well, let me back up for a moment.

Did this question have anything whatsoever to do with the intelligence-gathering interviews?

A.  Not to my knowledge.

Q.  Do you even know if the hostages participated in any intelligence-gathering interviews of Mr. Elsheikh?

A.  I don't believe so.

MR. PAREKH:  No further questions.

THE COURT:  Well, Mr. Parekh -- yes?

MR. DEUBLER:  Your Honor, may I ask one single question?

THE COURT:  All right.

**RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

**BY MR. DEUBLER:**

Q.  Sir, I was confused about one bit, if you can clarify.

            THE COURT:  Do it at the microphone.

            MR. DEUBLER:  Yes, your honor.

Q.  Can you confirm what language the interview was conducted in, your law enforcement interview?

A.  The law enforcement interview was -- when myself and Special Agent Chiappone asked questions, it was in English.  It was translated into Arabic per the SDF request.

Q.  Understood.

            MR. DEUBLER:  Your Honor, if I can also be heard on one issue.  I just wanted to clear up the record about what I believe so we're all understanding what the Government is trying to seek to introduce and what they're not introducing.  From my understanding, the March 29, 2018, FBI interview, the Government is not seeking to introduce in its case-in-chief.  Nor is it seeking to introduce any statement given to the SDF, period, in its case-in-chief.  Is that correct?

            MR. PAREKH:  Well, Your Honor, we do have an outstanding motion about --

            THE COURT:  Come to the podium, please.

            MR. PAREKH:  Yes, Your Honor.  We do have an outstanding motion about some booking questions that were asked of the defendant while he was in SDF custody.  But as far as any

SDF interview reports, if I can just confer with the team one moment.

THE COURT:  I'm going to ask you as well, Mr. Parekh, I've listened to a good deal of testimony about -- I've heard a good deal of testimony about the meeting between the FBI agents, including Agent Nutter, who is still here, on -- what was it, March --

MR. PAREKH:  27, 2018.

THE COURT:  -- 27th.  Now, as I understood it, the purpose of that was the Government's attempt to show that this particular defendant, Elsheikh, did not invoke his right to remain silent, but indicated he would speak further with the agents.  Am I correct?

MR. PAREKH:  You are, Your Honor.

THE COURT:  And then I asked you earlier, and I'll ask you again, is there some product of that further discussion that you intend to offer at the trial of this case that would suggest that Elsheikh is somehow guilty of one of the offenses in the indictment?

MR. PAREKH:  That's a good question, Your Honor.

THE COURT:  Well, it's prompted by we've sat here for two days leading up to the Miranda situation, and I would like to know, if I can - in fact, I will take a very short recess - but I would like to know, what is the purpose of all of this?

MR. PAREKH:  So the purpose, Your Honor, is that the

defendant made a series of statements regarding his upbringing in the United Kingdom leading to his travel into Syria.  First he joined a different terrorist organization, Al-Nusra Front, then he joined ISIS.

The reports also state that the defendant acquired weapons as an ISIS member, that he underwent military training as an ISIS member, that he knew Alexanda Kotey, that he knew Mohammed Emwazi --

THE COURT:  All right.  Now, is all -- I want you to finish, but is all of that statements he made to Nutter and the Chiappone?

MR. PAREKH:  That's correct, Your Honor.  And they're documented in the reports that have been admitted into evidence.

THE COURT:  And which particular exhibit so that I can look at that?

MR. PAREKH:  Sure.  That would be Exhibit 12-8, Your Honor.  They're the reports that both Special Agent Chiappone and Special Agent Nutter confirmed that they stand by the accuracy of them.  And to save time, I didn't go into all the details of the reports.

THE COURT:  Right.  But now you've told me that the substance of those reports, the questions that were asked and the information that was provided by Elsheikh, is information the Government intends to offer in its case-in-chief in the event that I deny the motion to suppress.

MR. PAREKH:  Correct, Your Honor.

THE COURT:  Now, what else?

MR. PAREKH:  I think the only issue, Your Honor, that we have to talk about as a team is whether we would also offer evidence that when he was asked about anything related to hostages, he declined to provide any information.  We're certainly introducing everything else that we talked about, but that particular information, I'll certainly have an answer for you when you return to the bench as to whether or not we would seek to introduce that particular statement.

THE COURT:  All right.  I don't know that I need that today.  It's unclear to me, given all of the offenses alleged in the indictment, conspiracy to commit hostage taking, hostage taking, conspiracy to murder United States citizens outside of the United States, conspiracy to provide material support -- now, that one, I can see how that one is clearly covered by what you think is in the FBI reports that results in statements made by Elsheikh to these two agents, but -- those last two, Counts 7 and 8.

But I don't know that any of the rest of it involves hostage taking and knowledge that hostages were being murdered.

MR. PAREKH:  I'll be glad to explain, Your Honor.  The statements indicate that he was a member of ISIS.  It corroborates the timeframe.  It corroborates information that he's indicated in some of his media interviews that we would be

seeking to admit at trial.

He also talked to a limited extent, but he talked a little bit about Alexanda Kotey. He talked about Emwazi, again, to a limited extent. And Emwazi, as we've alleged in the indictment, was the actual individual who was responsible for beheading hostages. We've alleged that Emwazi is a co-conspirator of this defendant as well as Alexanda Kotey.

And so it does corroborate details of the hostage-taking scheme. Furthermore, the hostage-taking scheme and the resulting in the murder of hostages, as we've alleged in the indictment, took place on behalf of ISIS, as we've alleged. It was an ISIS hostage-taking scheme and conspiracy. So what the defendant did on behalf of ISIS we believe is relevant.

Furthermore, we have additional evidence that the defendant is not challenging regarding Elsheikh's statements that he made to his brother and other individuals. We have voice recordings about his time earlier on in ISIS, his participation in battles with ISIS, and some of that electronic evidence is corroborated by his Mirandized statements to Special Agent Chiappone and Special Agent Nutter, among other things, Your Honor.

THE COURT: Now, a conspiracy to commit hostage taking resulting in death is, you can show that he's a member of a conspiracy to comit hostage taking. He doesn't even have to be shown that he knew it would result in death for that offense.

Am I correct?

MR. PAREKH:  You are correct, Your Honor.

THE COURT:  But Count 6, conspiracy to murder United States citizens and conspiracy -- yes, conspiracy to murder United States citizens, that does require that he knows that the conspiracy involved taking the life of a hostage?

MR. PAREKH:  That death could have resulted and, in this case, did result, Your Honor.

THE COURT:  All right.  I'll take a recess at this time.  Who is your next witness?  Are we done with this agent?

MR. PAREKH:  Yes, Your Honor.  May he be excused?

THE COURT:  Yes, he may be excused.

Agent Nutter, you may be excused.

THE WITNESS:  Thank you, Your Honor.

MR. PAREKH:  Our next witness, Your Honor, is the UK documentary filmmaker, Sean Langan, and his testimony, as Your Honor has authorized, will be recorded for a Rule 15 deposition to be played back at trial.

THE COURT:  All right.  And will you be doing that?

MR. PAREKH:  Mr. Gibbs will be doing our last two witnesses, Sean Langan and Special Agent O'Toole.

THE COURT:  All right.  Did you have something Mr. Deubler?

MR. DEUBLER:  Very briefly, Your Honor, just so it 's on the record.  The defense does contest how the Government has

characterized some of the evidence and we contest that it -- specifically evidence regarding the phone.

Your Honor, can we address on the record when you get back about the SDF statements, just to make sure we're all operating on the same page about these SDF statements? I don't believe the Government is seeking their introduction in its case-in-chief. I'll let them huddle. I just wanted to make sure --

THE COURT: What difference does it make at this point?

MR. DEUBLER: We would be then filing a separate motion to suppress those statements, statements made to the SDF officials.

THE COURT: I think the time has come for filing motions to suppresses has passed.

MR. DEUBLER: Well, we just received several of these statements about a week and a half ago, Your Honor. That's why I'm bringing it up.

THE COURT: I see. Then you may not have violated any pretrial requirement.

MR. PAREKH: Your Honor, I can speak now, or I know you want to take a break, so...

THE COURT: Yes, let me take a break. And your next witness, then, will be the journalist?

MR. PAREKH: Yes, Your Honor. We can address Mr. Deubler's question if Your Honor so wishes to hear our

position.

THE COURT:  Go ahead.  Tell me now if you can do so succinctly.

MR. PAREKH:  Yes, Your Honor.  Mr. Deubler is correct. In our case-in-chief we would not be seeking to introduce any of the SDF interviews that were conducted solely by the SDF.  And so I want to be clear that obviously some of the interview, such as the law enforcement interview, there's an SDF guard present. So we would be seeking to elicit those statements.

But Mr. Deubler is referring to SDF statements that we received recently from the SDF officials who testified.  We're not seeking to introduce those, nor are we seeking to introduce what I believe Mr. Deubler is referring to as a January 2018 SDF report.  We're not seeking to introduce those in our case-in-chief either.

So I think that satisfies Mr. Deubler's questions.

MR. DEUBLER:  Yes, Your Honor, it does.

THE COURT:  Court stands in recess until 3:35.

(Recess taken at 3:13 p.m.)

THE COURT:  The Government may call its next witness.

MR. GIBBS:  We call Sean Langan, Your Honor.

THE COURT:  And this will be recorded in the event that he's not accessible for trial.  Is that right?

MR. GIBBS:  It is right.  And on that note, Judge, may we turn -- I don't know if the camera is on, but if we could

turn it on.

(Oath administered by courtroom deputy clerk.)

THE COURT:  Mr. Langan, if you're comfortable doing so, you may remove your mask.  It will aid the court reporter in understanding your answers and it will also aid me.  I have aged ears.

All right.  You may proceed, Mr. Gibbs.

MR. GIBBS:  Thank you, Your Honor.

**(SEAN LANGAN, having been duly sworn, testified as follows:)**

**EXAMINATION BY COUNSEL FOR THE UNITED STATES**

**BY MR. GIBBS:**

Q.  Sir, would you please state your name and also spell it for the record?

A.  My name is Sean Langan, S-E-A-N, L-A-N-G-A-N.

Q.  Mr. Langan, what is your occupation?

A.  I'm a documentary filmmaker and journalist, mainly foreign journalist.

Q.  And are you based in Britain?

A.  London.

Q.  And given your accent, you are English.  Correct?

A.  Irish father.  But yes, British.

Q.  How long have you been a documentary filmmaker, Mr. Langan?

A.  20 years, focusing really on Middle East conflict, the wars in Afghanistan and Iraq.  For 20 years I think I've made around 16 documentaries.

Q.   In these 16 documentaries, you said they focused on war zones.  Is that correct?

A.   Pretty much I'm known for -- my first ever documentary was in Kashmir.  So Islamist movements, the wars in Afghanistan and Iraq, and I was known in the UK for always filming with all sides, the civilians, the American combatants, and the local insurgents.  So that's my focus for 20 years.

Q.   And Mr. Langan, in the course of your career as a freelance journalist, did you have an occasion to meet a gentleman by the name of James Foley?

A.   Yes.

Q.   How did you meet James Foley?

A.   In a hostile environment course.  I'm smiling somewhat, because before being dispatched to a war zone they send you to a leafy place in England in Hertfordshire.  It's a hostile environment course, and we met on one, I think in 2011.

Q.   Just for the record, what is a hostile environment course?

A.   It's a training course for journalists going to Category A, it's known as, war zones.  So it's to train in medical, health and safety, and it's a training course to allow you to travel and get insurance.

THE COURT:  And is it operated by a news organization?

THE WITNESS:  Yes.  There will be different ones, but there's a few accepted ones, and the BBC, CNN, *Washington Post* will all send their journalists and aide workers get sent to

them.  And they're usually three days to a week long to give you training.  And this was a BBC-sanctioned one.

THE COURT:  All right.  Next question, please.

BY MR. GIBBS:

Q.  And you said it was your testimony you met James Foley in one of these courses.  Correct?

A.  Yeah, we met during my week at this hostile environment course.

Q.  Did the two of you become friends?

A.  Yeah, we bonded very quickly, two journalists.  And he was, at that point had just been hired to work for *Stars and Stripes*, I believe.  And he didn't have much money, so I invited him to come stay with me in my apartment in West London.

Q.  How long did he stay with you in your apartment?

A.  I think about at that point two weeks, two or three weeks he was there.

Q.  And did he ever stay with you at your apartment on any other occasions beyond that one?

A.  No.  We met briefly, but he didn't need a place to stay when he returned from Afghanistan on that first -- his first assignment.

Q.  And I don't know if I asked you this, but the training course where you met Mr. Foley, what year did you say that was again?

A.  I think it was around 2010, 2011, just prior to him going

off to Afghanistan where he was working for *Stars and Stripes*.

Q.  And how experienced of a foreign correspondent was James Foley at that point?

A.  My impression was we were meeting -- I had been a foreign correspondent or war correspondent for many years.  His career was just starting, and he had been doing freelance stuff.  I believe he may have been going to Afghanistan.  I'm not sure. But I pelt like I was passing the baton to this next generation and he was looking forward to going away.  I think that was his first major commission.

Q.  So what was the relationship between you two like with you being a more experienced journalist?

A.  We bonded because in the class we were both sitting at the back, and the soldiers running this course were showing videos of really, look at these idiotic journalists, and that happened to be me.  And Jim turned over and said, "Hey, look, dude, you're on TV."

And we became friends and I was sort of his mentor.  I had been to Afghanistan a lot, so once he was out there, I was helping him with contacts.

So it was two men, one older journalist and another one very excited, wanting to go abroad.  So it was a nice relationship, which happens a lot in our world because going abroad to war zones, you know, it's a risk.  So we're kind of comrades.

Q.   And in fact is sort of being a foreign correspondent like this, is it a fairly tight-knit group in that world?

A.   It's an incredibly tight-knit group and relative to the rest of the media, we meet each other, it's like a band of -- traveling band where we meet in Baghdad, Kabul.  May never see each other again, but it's an intensely strong personal bond because in war zone bonds forged in that kind of intensity are very strong and loyal.

Q.   Mr. Langan, I believe you said that after the course Mr. Foley went to Afghanistan with *Stars and Stripes*?

A.   Yeah.

Q.   And then I think you said this, but did he then go to Libya after that point?

A.   So he called me after he got back from Afghanistan.  We were in touch by email.  I met him a few times in London.  Then he went off to Libya.  I never saw him again after we met in London coming back from Afghanistan.  But he went off to Libya, where I think he was abducted by the Qaddafi regime, and I was in touch with him by email when he got back from Libya.

Q.   After the trip to Libya, did he take another overseas trip as a foreign correspondent?

A.   So I became aware that, yes, he then went off to Syria.  He had been a number of times, but I was aware -- I became aware of James being in Libya and he had gone off with a British journalist, John Cantlie.

Q.   Can you spell John Cantlie's last name?

A.   C-A-N-T-L-I-E.

Q.   And is John Cantlie another foreign correspondent?

A.   He was a British foreign correspondent, freelance, had worked *The Sunday Times*, print, and I didn't know they went out together on that particular trip.  But I heard when John Cantlie was missing through the grapevine amongst the foreign correspondents that my friend, James Foley, and John Cantlie were missing.

Q.   Did you know John Cantlie personally?

A.   No.

Q.   But did you know of him because of the sort of tight-knit nature of --

A.   Full circle.  So it's six degrees -- less than that.  It's probably two degrees of separation in our world.

Q.   And so you learned that John Cantlie and James Foley had gone missing in Syria.

     I want to move forward to August of 2014.  At that time did you learn what had happened to James Foley?

A.   Yeah.  I was on holiday with my two children.  And I -- those holidays, I had been kidnapped myself and they suffered somewhat, so I would take my two boys on these sort of holidays.  And the phone started ringing and you always know it's bad news when it rings constantly.

     And it was 2:00 or 3:00 in the morning and I knew one

of my colleagues in the foreign press corps was either kidnapped or killed.  And that's how I found out.  And I cut the holiday short and returned to London.

Q.  And specifically what did you learn from those numerous phone calls you got on that day?

A.  That was all the people with the international foreign press corps, mainly freelancers, tossing around Beirut, Libya, Afghanistan, letting me know that that video being released by ISIS, and the man -- Mohammed Emwazi, but the man that the media were calling Jihadi John, that it was that when that video had been released of my friend, James Foley, being beheaded.

Q.  And did you actually see the video when it was released in 2014?

A.  Yes.

Q.  Mr. Langan, I want to move forward to 2018.  At some point in that year did you become aware that El Shafee Elsheikh and Alexanda Kotey were in Kurdish custody?

A.  Yeah, that was in the news.  So when they were -- that January and it was reported, yeah, I became aware of it, either from the newspaper from some of my friends who were writing for the next day, yeah.

Q.  And was this sort of within your circle, was what a big story?

A.  Yeah.  My war zone friends, it was a significant story.

Q.  And you said that you learned of it in January of 2018.

A.   Yeah.

Q.   At some point after January, moving forward, did you become aware that El Shafee Elsheikh and Alexanda Kotey were doing media interviews?

A.   So when I -- going back to your previous question, when I watched the video of Mohammed Emwazi beheading my friend, James Foley, I felt physically sick and it was the last story I'd ever want to tell.  It was too close to home.

January 2018, I watched all the interviews, read all the articles, and I reengaged with it.

So yeah, to answer your question, I watched I think pretty much every single one of them.

Q.   And what caused you to go from feeling like you would never want to cover this story in 2014 to reengaging with it in 2018? What was the motivation for that?

THE COURT:   The question is now becoming compound.  One question at a time.

MR. GIBBS:   I'm sorry, Your Honor.

Q.   What caused you to want to reengage on this story?

A.   I think enough time.  I had got over the fact -- it affected me, hearing a British, London accent.  That was very close to home.  But this was a few years later, and I was still feeling not like a journalist watching these videos.  And in fact, I was finding them quite unpleasant and difficult to watch because they the seemed to be enjoying themselves, taunting the hostage

families in the West.

But it was the beginning of me beginning to think, can I act like a journalist?  And the turning point was when I heard -- I read in one of the newspapers that the British government, the C -- Crown Prosecution Service lacked enough evidence to prosecute the suspects in the UK. and in fact it mentioned in the case of the defendant, Elsheikh --

MR. MACMAHON:  Your Honor, I'm sorry.  I know this is a trial deposition.  This is hearsay, him reading what he read in a newspaper.  So I would object on those grounds.

THE COURT:  Well, it would be hearsay only if it was offered for the truth of the matter asserted, not to indicate why he took certain action, what motivated him.

So I'll overrule the objection.  It's not admitted for the truth of the matter as to what any newspaper said, but it is admitted for this witness' explaining what caused him to take a certain action.

You may complete your answer.

THE WITNESS:  Thank you, Your Honor.

A.  Yeah, I was just explaining, because that for me, when I read the reports in the media that there wasn't enough evidence, that suddenly was my motivation for now putting back my journalist hat on and going to Syria to sit down and interview the two suspects.

BY MR. GIBBS:

Q.   And going back to something you said just a moment ago, you described some of the interviews in 2018 and you said the defendants seemed -- they were sort of taunting the families and seemed very jovial.

A.   Yeah.

Q.   Can you elaborate on that a bit?

A.   I then started studying them carefully, preparing now myself as I would as a journalist going off into a story.  But I'm also acutely sensitive, as a former hostage, how families will feel, families of hostages.

So when I was watching them, for example, joking, one of the early interviews, on of the correspondents said:  So you're in the Beatles?  He said, you know -- and then she said:  What about the Rolling Stones?  And they were joking about Beatles and Rolling Stones, and I was hypersensitive that the families watching this kind of sort of humor would find it physically very hard to watch.

And there was another one, a BBC interview, especially where Alexanda Kotey went:  "Kayla who?"  You know, he sort of feigned this ignorance.

So it seemed to me -- and they were also openly taunting the West and being highly critical of the West.  So it just seemed -- and yet they wouldn't talk about their role in the Beatles.  In fact, in all those interviews I watched, they

denied being members of the Beatles.

Q.  And you said a moment ago that in 2018 you became motivated to put your journalist hat back on and try to go interview these two.  Is that correct?

A.  Yes, correct.

Q.  And just describe briefly, first of all, who was financing the trip in 2018 that you attempted to do?

A.  So that was a BBC-commissioned trip, and they were talking to me about other projects related to terrorism.  And I said:  I would want to go to Syria, Kurdish-controlled Syria to interview these two suspects.  And I was commissioned by the BBC.  So it was a BBC commission, and...

Q.  Was there a particular series that the BBC was working on that this was a part of?

A.  Yes.  It became known as -- aired October 2020, "In the Face of Terror."  It's a three-part series; two episodes were about the Beatles case.

Q.  And did the BBC actually sort of foot the bill to get you to Syria to try to get an interview with these two?

A.  Yes.  It's run by a production company, but it's all -- when you work for BBC, doesn't matter if you're a production company or inhouse, you have to follow BBC guidelines.  So the BBC budget, I believe for this trip, was around 100,000 pounds.

        THE COURT:  Mr. Langan, you referred and I heard some mention in the questions about the Beatles.  What do you

understand the phrase "Beatles" to refer to?  Clearly it doesn't refer to the original Beatles.

THE WITNESS:  No.  I apologize, Your Honor.  And in fact, that was one of my comments in the early press interviews with them.  They were making a joke on that.  And when the woman reporter said:  Well, do you like the Rolling Stones, my understanding, obviously, is taken from the Beatles had the name given to the masked kidnappers that the European hostages came up.  And it was common knowledge in the media and the press that the hostages held by the British captors, that was the nickname they gave for these men with British accents.

THE COURT:  Who gave it to them?

THE WITNESS:  The hostages, the European hostages.

THE COURT:  Because the ISIS people would probably be ignorant of who the Beatles were.

THE WITNESS:  Very much so.

THE COURT:  Next question.

BY MR. GIBBS:

Q.  Mr. Langan, you said a moment ago that this particular BBC production cost about 100,000 pounds.  Is that correct?

A.  Yeah.

Q.  How did that compare to the size of other documentaries that you've worked on in the past?

A.  A vast budget for this shoot.  It was by far the most expensive shoot, we call it, when you go abroad filming.  That

doesn't include editing, post production.  It was one of the most expensive, but also in terms of -- which is why it was so expensive.  In terms of the team involved, in terms of drivers, fixers, producers, security, it was a big team.  It was the biggest team I had ever been involved with.

Q.  I don't want to go into too much detail on this, but I to do want to touch on it a bit.  So was there an advance team that went into Syria ahead of you?

A.  So the expense of the team is all because the BBC has strict guidelines, especially when you're working in a foreign -- a war zone.  There's health and safety for the people involved, so that implied there has to be a security consultant, a local fixer, and a producer on the ground in advance preparing the ground, researching.  They've all got their jobs to do.

There's another team in London, lawyers, human rights lawyers, who are guiding everything we do, and they would be taking advice from human rights orgs or Red Cross, Red Crescent, because there's a care of duty for the production team and there's a care of duty for those we interview, including suspects.

So that means a bigger team and more money.

Q.  And so you got, you know, this sort of advance team, and you did not go into Syria with the advance team.  Correct?

A.  No.

Q.  You came in later?

THE COURT:  Avoid leading, Mr. Gibbs.

MR. GIBBS:  Understood, Your Honor.

Q.  Prior to you going into Syria, what efforts did you make to get permission to talk to El Shafee Elsheikh and Alexanda Kotey?

A.  So because I was part of a BBC team at that point and, in fact, almost -- I wasn't the director or producer.  I'm, for want of a better word, a character in their film.  So I wouldn't personally have to do the procedure.  So there would be a production manager sorting flights, visas, and she's working with the producer who is on the ground, the fixer.  Media requests through the -- to get visas from the Iraqi border, the Syrian side, and then getting media applications from the foreign affairs in the Rojava, it's called.  That's the Kurdish-controlled Syrian area.

So the producers, production manager, and the local fixer were all the ones doing the applications and they would come to me merely and say:  Sean, can you give us your credentials?

But I was just really being told what to do and following their guidelines.

Q.  And how about trying to get in touch with the defendants and actually get their permission to do an interview?  What, if anything, was done to do that?

A.  So once you get the permission from the authorities, I was told you now have to -- and I was told that when I landed in

Syria, crossing the border.  My producer said:  Now the process is it's one thing having the Kurdish authorities saying, okay, we're happy to grant you access, but the final hurdle, as it were, we had to and I had to write a letter to the two suspects I wanted to interview and explain who I was, what kind of film I wanted to make.  And I was informed by my producer that they had the final say.

So I wrote a letter --

THE COURT:  They had the final say?  Who is "they"?

THE WITNESS:  Yes.

THE COURT:  Who is "they"?

THE WITNESS:  The two suspects I interviewed.

THE COURT:  All right.  Continue your answer, please.

A.  And that's what I was told.  So I wrote a letter and my producer sent it on her email, or via email, I think.  And that would have gone to the media affairs and the foreign affairs department of the Kurdish.

BY MR. GIBBS:

Q.  So that is the SDF foreign affairs department?

A.  Yes.

Q.  And who told you that that's where the letter to -- the letter would go?

A.  My producer, who was taking her instructions from the producer on the ground who was there two weeks before me, she was working closely with the local fixer, who is basically the

go-between between the media and the SDF foreign affairs and press people, the media.  And they informed her:  You have to write that letter.

She didn't do that thinking this could add to our chances; she was instructed by the authorities, it's not only up to us.  They were making it very clear, the final say is not ours; the final say are the two foreign detainees.

Q.  And who was making that very clear?

MR. MACMAHON:  Your Honor, this is all hearsay.

THE COURT:  It is.  And I'm not sure it's very relevant.

Mr. Langan, did you have to obtain the consent of the two detainees, British detainees, including Elsheikh, to get the interview?

THE WITNESS:  Well, I can't -- I wasn't in contact with them at that point, but that was what was being told to me; that not consent, they had the final say.  So yes, I had to get the consent from the Kurdish authorities, but the final part of that consent was I was told you have to write this letter, and they would have the final say.

THE COURT:  Did you write the letter?

THE WITNESS:  I did.

THE COURT:  Did the two detainees respond?

THE WITNESS:  Well, in 2018, the response, because I never met them in 2018.  This was a failed trip in that sense.

The BBC was informed by the local authorities:  They don't want to give you consent.  They declined the interview offer.

So we returned to London without the interview.

THE COURT:  Mr. Gibbs, let's see if you can go to what really matters.  I take it what really matters is that this witness at some point interviewed either one or both defendants.  Is that right?

MR. GIBBS:  It is, Judge.  Although I will say that the fact that he was unsuccessful in 2018 does undercut the defense argument about how SDF was supposedly mistreating Mr. Elsheikh and forcing him to do interviews against his will.  But I think we've covered it, Judge.  I think we've covered it.

THE COURT:  I understand that point.  But that was one question that I asked dealt with that.

All right.  Did you have something Mr. MacMahon?

MR. MACMAHON:  Just briefly.  That doesn't establish anything about whether the information even got to Mr. Elsheikh or Mr. Kotey.  That's the hearsay that was elicited here.  So the Government can't rely on that, that in 2018 the interview didn't take place.  There's no evidence that the request ever went to Mr. Elsheikh or that he rejected it.

THE COURT:  All right.

MR. GIBBS:  Well, if I can just respond briefly, though, Your Honor.  Again, this is a case where the defense is making allegations about abuse by SDF, and if the BBC were to

come into Syria with a production of this size, request an interview with Elsheikh and Kotey, and SDF wanted the interview to happen and was coercing them into submitting to the interview, it is undoubted that there would have been an interview. Mr. Langan would have gotten in front of them at that point.

The fact that he couldn't is very indicative of the fact that what he was told is true, that the letter went to the defendants, they didn't consent. They didn't want to do the interview.

THE COURT: All right. Let's go on.

BY MR. GIBBS:

Q. Mr. Langan, let's move forward to 2019, then. So having been unsuccessful in 2018, did you attempt a second interview the following year?

A. Yes. Because the BBC thought it was very successful in the sense of making good television. And in fact, my failed journey where you see on camera me saying to the mothers, I'm going to Syria to interview them, that journey was good TV. So they didn't want to send me back. And I was -- because for me it's like that's a failure if we don't do the interview and if I don't talk to them.

But I couldn't get a commission, because they got their program which aired in 2020, so I decided to self-fund, which I do often. Many of my documentaries which have been aired on the

BBC, rather than wait for a commission, I fund the trip and bring the footage back.  So that's the decision and I funded it -- I got funding and went out myself.

But just to add, you still have to follow the BBC compliance, the rules.  Because you can be pre-asked but if you then sell that film to the BBC, the lawyers will say:  Did you follow this procedure?  So I followed the same procedures, but this time on my own.

Q.  And in attempting to get the interview in 2019, did you send letters to El Shafee Elsheikh and Alexanda Kotey requesting an interview?

A.  So exactly the same process, contacted the same fixer.  He dealt with the local authorities.  And in fact, my understanding is that on this occasion he didn't ask for me to write that letter.  It was then when I -- in advance and when I got to Syria, he passed that on verbally to the media what I was going to say in the letter.  I may have written it down for them in their office but I didn't email it from London.

Q.  And who passed it along to the media?

A.  To the media representative.  I don't know if I'm allowed to mention his name, but it's the Syrian fixer who I worked with in 2018.  He was again my go-between applying for visas, media, and we met in person with one of the foreign affairs people from the SDF.

Q.  And so -- and I think it's probably best just to refer to

this person as a fixer.  But this is someone that is from the area that knows the --

A.  Yes.

Q.  -- culture, the language, and that can help facilitate.  Is that right?

A.  We use the term "fixer," but that is someone who, he helps media with applications, getting stories.  He's our eyes and ears on the ground.

Q.  And did you ultimately get a positive response from your fixer about the request to interview Elsheikh and Kotey?

A.  Yes.  But this time as well, when I actually met them, it was the equivalent of writing a letter.  They took down notes but I also specifically asked for three sessions, one with each suspect, and went away.

And very quickly I got a phone call from my fixer saying:  The answer is yes this time and you have to -- we'll come to your hotel tomorrow morning, be ready, and we're going.  So it happened very quickly.

Q.  And who was the person you met with to request the three sessions with the defendants?

A.  So I met a number of people.  Mr. Bahli (ph), I believe, was one of the ones in charge.  I don't know how to spell that.  Mr. Bahli; he was media affairs.  And then Mr. Siemens (ph).

Q.  Actually, Mr. Langan, we can just say their title.  We don't need to -- but these are SDF officials?

A.   SDF officials.  I met with them in person.

Q.   And who was the person that you requested three sessions from?

A.   It was the second person who -- not the media person, the other one.

Q.   And do you know what --

A.   I think he's --

Q.   -- job the other person did?

A.   He would be -- it would be part of the military and intelligence part of SDF, not -- so foreign affairs, military intelligence, not media.  He was the one I think was the one who I was specifically -- and he wanted to meet me.  I thought he was the one in more control than the media person.

Q.   All right.  So you met with a foreign intelligence person, requested the three sessions, and you said it didn't take long to get it approved.  How long are we talking about here?

A.   Very quickly I think.  Because the previous time we were there ten days, no answer.  I think it was within two or three days of that meeting, less than two days.

Q.   And describe what happened -- where did you go when you got the approval to go do the interviews?

A.   You're not told.  They're very careful.  They don't want the media to be able to locate the place of interview because it's a war zone and they don't want it to be identified.

So the fixer knew, he came to my hotel, he drove myself

and my cameraman to an unknown location which is a military base.  It's a Kurdish SDF base.  We were guessing where it is. I know where it is now.  It's a place called Rmelan.

And we were taken inside and there was an office, like a normal office rather like the prosecution/defense offices where the witnesses are seen.  And we were told to set up your cameras and we will bring the detainees to you.

Q.  And who escorted you to this office where you set up your cameras?

A.  So there were some in uniform, but I didn't see their weapons with them outside.  They showed us into this office. And this office was presumably an office of someone there on the base, a dark mahogany desk, a sofa, glass coffee tables.  It was the normal furniture, office you might see in the Middle East.

And they left us.  They went outside.  We were told to set up our cameras, and then two men in plain clothes, young men, Kurdish men, came in and they set up their own video camera and they stayed with us in the room.  They were unarmed as far as I can recall.  And the guards stayed outside.

Q.  And were any restrictions put on you in terms of what you could or could not do during this interview, or these interviews?

A.  The only thing was not to -- we weren't allowed to film anything that would identify the location.  So that was the only specification.  We were told certain things like you're not

supposed to secure, so we just hand them electronic devices, like a phone.  I remember that one because I kind of broke that rule.

Q.  And who did you break that rule with?

A.  With the defendant, Elsheikh.

Q.  And what did you do with -- you said electronic device, your phone?

A.  I showed him a photograph on my phone, and he held it and looked at it.

Q.  And this was a photograph of whom?

A.  It was of the defendant, his younger brother, his older brother, and his mother in London.

Q.  Now, were you able to interview the two defendants on this first day?

A.  Yes.

Q.  And roughly when was this, month and year?

A.  July 2019, I think July 12th, 14th, first interview. July 14th.

Q.  And what was the atmosphere like in the room when you interviewed the two defendants?  Was it relaxed?

THE COURT:  The question, again, is compound and it's leading.

MR. GIBBS:  Yes, Your Honor.

Q.  Can you describe the atmosphere where the interviews took place?

215

A.  So I've described what it looked like.  There was air conditioning.  We had some juices there, Pepsi.  And I set up a little kind of studio where it's two chairs opposite each other.  And I want the atmosphere to be relaxed.

I was told the two detainees were next door in a little guard room, and I actually went out by mistake to have a cigarette and saw them.  But that's one of the things, you're not supposed to see them outside this room.  But I went outside for a cigarette and they were there drinking a juice with the guards, no mask.

So then I came back into the room and the guard said to me?  Are you ready?

And so I was sitting down facing the door and they would bring the detainees one at a time, as I had requested.  I wanted to interview them separately.  And the first came in, Alexanda Kotey.  He sat down.  I stood up and shook hands.  In the case of -- it's the same process with Elsheikh.  When El Shafee Elsheikh came in, I stood up, greeted him.  And it's a little bit -- you know, they're being escorted in by two guards and I noticed when Elsheikh came in, you know, he's got the two men coming in and he's looking around, like where am I, what are you here?  And I try and put him at ease and we shook hands and we sat down and then the cameraman would be attaching our mics and me and the defendant would be chatting and slowly relaxing.

And I would say, once we're having drinks, talking

about London - we both had come from an area very close to each other - there was a point where, in this introductory moment, where we realized we must have lived a couple of streets away from each other.  And I would say at that point the atmosphere was very relaxed and we settled down into an interview, a conversation.

Q.  And based on your experience from, you know, being a foreign correspondent all around the world, how would you characterize the way the Kurds treated and behaved around the defendants with you?

A.  Yeah.  So for 20 years I've worked a lot - I mean, that's all I've done - in Afghanistan, Iraq, Egypt.  And so you become very aware of the local cultures and customs, and you rely as well on your previous friends who have gone in journalists, you know, colleagues, who do risk assessments.  And the Kurdish, just in reputation, I don't know if this is -- I mean, this is hearsay, but in my head they've got a good reputation, that they treat their -- and they were always reminding us:  Hey, we're going to treat them with respect, the refugees, so you've got to treat them with respect.

        MR. MACMAHON:  Your Honor, that is hearsay, what he's bringing forward with unnamed Syrians.

        THE COURT:  It is, Mr. Gibbs.  And I'm not sure it has anything to do with your purpose in presenting this witness.  Am I correct that your purpose in presenting this witness is that

you intend, in the case-in-chief against this defendant, to present an interview that Mr. Langan did with this defendant - and maybe Kotey - but this defendant.  And you intend, Mr. Gibbs, to introduce that interview?

MR. GIBBS:  We do.  Or at least portions of that interview.  The interview was about two hours, so we probably wouldn't play the whole thing at trial.

THE COURT:  Well, in any event, it certainly is permissible and appropriate for you to introduce evidence about the atmosphere and circumstances of the interview, but you crossed the line when you began to elicit from Mr. Langan his views about the comparative gentility of Kurds as opposed to the Taliban, which I think might be a sharp distinction.  And if you think that's sharp, compare it to the Japanese in 1938, '39, and '40.  Let's go.

BY MR. GIBBS:

Q.  You mentioned that you did meet the defendant face to face and shook his hand at this interview?

A.  Yeah.

Q.  Is the defendant in the courtroom here today?

A.  Yes.

Q.  Can you identify him by where he's sitting and what he's wearing?

A.  Yes.  He's wearing green overalls and it's --
El Shafee Elsheikh, he's looking at me now and I'm looking back.

He's sitting over here.

THE COURT:  All right.  The record will reflect that the witness has identified the defendant.  Next question.

BY MR. GIBBS:

Q.  And so you mentioned about starting the interview and sort of chatting, but the camera was rolling at this point.  Correct?

A.  It may have been.  And it's hard to know exactly when he was turning on, but very soon.  And we were being mic'd up.  There were problems, sound problems.  So at that point I'm chatting to the defendant to make him feel relaxed.  And I would have checked at some point, is the camera rolling, but very soon.

But I was at that point taking in the surroundings and doing my own risk assessment, not relying on reputation or hearsay, and trying to gauge -- you know, I have a duty of care to the person I'm talking, so I need to -- so I'm gauging the moment and feeling -- and the BBC, one of the guidelines is you have to get on-camera consent.

So that's when we start filming, and I asked the defendant:  Are you happy to talk, do you understand why I'm here, who I am?

So that's what was happening in that early part of the process.

Q.  And what did the defendant say when you asked him that?

A.  He said, yes -- I told him who I was, what kind of films I make.  He said:  Yes, I'm happy to talk, I agree to talk.

And I then said -- and I've been told, don't make it personal.  But my films are personal.

MR. MACMAHON:  Your Honor, I object.  There's a tape of this conversation.

THE COURT:  Say it again.

MR. MACMAHON:  There's a tape of this conversation, which would be the best evidence of it.

THE COURT:  Yes, it might be.  But I'll permit this.

BY MR. GIBBS:

Q.  Now, in the course of speaking to the defendant, did there come a certain time --

THE COURT:  I don't think he finished.  He said:  "But I've been told, don't make it personal.  But my films are personal."

Was that the end of your answer?

THE WITNESS:  No, because in fact this may not -- I don't know, this may not have been on tape or this is sometimes before.  I think maybe very soon now, I think my cameraman would have turned it on.  But just to finish that sentence, Your Honor, I shook hands, he said:  I'm happy to talk, I agree, I want to tell you everything and talk freely.

And we shook on that and I said:  I might as well just let you know now, your good friend, Mohammed Emwazi, cut the head off of my good friend, James Foley, but here we are talking without animosity.

220

THE COURT:  Next question.

BY MR. GIBBS:

Q.  And as you interviewed the defendant, were there certain points in the interview where the defendant seemed willing to even talk about the Kurds who were holding him prisoner at that time?

A.  Well, yes.  And that to me, when you're looking, you want to assure -- you don't want to rely on other people's advice or take, and at one point the defendant was - for an example, to give you an example of something he was talking about - was about to say, and I thought he was about to say, he was going to give an example where there was some bad behavior whilst he was in captivity, and I stopped him.  In Kurdish captivity.  And I was very surprised because to me that was a clear sign, it's not that bad because --

MR. MACMAHON:  Your Honor, I object.  Again, this is on tape.  We're not going to have his testimony as to how he interpreted the entire discussion that they had.  We can play the tape where he talks about Geneva, and I'm sure Mr. Gibbs is going to play it.  But his interpretation of their conversation is not relevant.

THE COURT:  Well, what I'm going to do, Mr. MacMahon, I'm going to let him finish his answer and I'll consider your objection, which I am not sure what it is precisely, and you can move to strike at that time.

Finish your answer, Mr. Langan.

THE WITNESS:  Thank you.

A.  Well, it was part of my following BBC guidelines duty of care, I thought he was about to, and he was actually already -- he was about to because he was already talking about something bad happened during his captivity with the Kurds, and my duty of care was not to get him in trouble just in case someone was not going to be happy with that.

But he didn't seem at all bothered in speaking frankly and openly about some misdemeanor.  And that's why I remembered it, finding that odd, and I concluded -- sorry to -- I concluded that you wouldn't do that in a Japanese war camp, prisoner of war camp or a Taliban one which I've been in captivity criticizing your guards.

THE COURT:  Next question.

MR. MACMAHON:  Your Honor, I move to strike.  His interpretation of what's on the tape is not relevant.  It's opinion testimony, if anything.

THE COURT:  Well, let's do it this way, Mr. MacMahon.  I'm not going to make that decision now, but I'm not going to foreclose your moving to strike.  This will be on film, and before it's played at a trial, you'll have an opportunity to make objections and I'll consider it at the time.  But I'll have a complete record at that time.

MR. MACMAHON:  That's fine, Your Honor.  Obviously I

can make these objections because it's a Rule 15.  If we want to deal with it later, I'll stop making objections here.

THE COURT:  No, you make your objections because there may be objections you can make that Mr. Gibbs may remedy by further questioning.  But I'm not likely to move to strike anything right now.

For example, Mr. Langan, you said something about a misdemeanor.  I don't know what you are referring to.

THE WITNESS:  Yes.  Do you want me to --

THE COURT:  Yes, what did you mean when you said "misdemeanor"?

THE WITNESS:  I was paraphrasing the defendant was about to tell me, was in the process of telling me that something bad had happened whilst he was in captivity with the Kurds, and I stopped him because I thought that's not -- I didn't want to go anywhere where he would be criticizing the people holding him.

THE COURT:  All right.  But you don't know whether what he was going to complain about was a misdemeanor or --

THE WITNESS:  Exactly.

THE COURT:  -- a felony or anything else.

THE WITNESS:  Yeah.  But my duty of care was not to have someone I'm interviewing get himself into trouble.

THE COURT:  Let's see, Mr. Gibbs, if we can get to the heart of this matter as quickly as possible.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

MR. GIBBS:  And actually, I would like to play the clip now, so maybe that's the way to get there.

THE COURT:  All right.  You may do so.

MR. GIBBS:  If Mr. Langan could have the binder.  And actually, unless the defense objects, what I would suggest, I have seven clips, which is 14-1A through 14-7A.  They're all from this interview.  If I could just move them in en masse.

THE COURT:  Now, Mr. MacMahon, did you have previous notice of this?

MR. MACMAHON:  I have the exhibit book, Your Honor. The whole tape is already in evidence.

THE COURT:  The whole what?

MR. MACMAHON:  The entire CD of Mr. Langan's interview is already in evidence, as are some outtakes that you saw yesterday, I think.

THE COURT:  All right.

MR. GIBBS:  Actually, Your Honor, I need to correct that.  They're not already in evidence.  We've entered individual clips into evidence and I think the defense has the same thing.  We have not moved the entire interview into evidence.

Again, everything at this stage is under seal anyway, but it's only the individual clips that we either have moved in or will move in.

THE COURT:  It's not going to be under seal if you play

them.

MR. GIBBS:  Well, I mean, yeah, it will certainly be public.  That's correct, Judge.

THE COURT:  Well, let's be clear about this.  Is the Government offering the full video of the interview by Mr. Langan of the defendant, Elsheikh?

MR. GIBBS:  Not at this time, Judge.

THE COURT:  What are you offering at this time?

MR. GIBBS:  So 14-1A is the clip that Mr. Langan was just describing.  It's about a minute of the interview with Mr. Elsheikh.

THE COURT:  All right.  And we'll do them one at a time.  Any objection to that, Mr. MacMahon?

MR. MACMAHON:  No, Your Honor.  But I --

THE COURT:  All right.  Play that one.  How long is it?

MR. GIBBS:  I would say one to two minutes, Your Honor.

THE COURT:  All right.  Now, wait just a moment.  The question that should have been asked to you, Mr. Langan, is: With respect to this and the others that he's going to play, have you seen these recently or before?

THE WITNESS:  Yes.  I have -- yeah, I have.  I believe so.

THE COURT:  And are they accurate depictions of your time with Elsheikh in 2019 or '18?

THE WITNESS:  Well, as the defense was saying, they do

speak for themselves.  I mean, it doesn't give you an overall picture.

THE COURT:  Yes.  I'm asking you:  As you see them, when you did review them, are they accurate depictions?

THE WITNESS:  Yeah, they are digital copies of --

THE COURT:  In other words --

THE WITNESS:  Exactly.

THE COURT:  -- nobody has fiddled with it or changed it?

THE WITNESS:  No editing, sir.  Right.

THE COURT:  All right.  Play it.  It's admitted.

(GOVERNMENT Exhibit 14A was moved into evidence.)

MR. GIBBS:  Thank you, Judge.

(Video played in open court.)

(Technical discussion off the record.)

THE COURT:  And does the camera move up like this?

Let me ask again, does the camera move up?  It should be to your left.

THE WITNESS:  Yeah, I've got the sound is coming from the laptop, but this camera, yes, I zoomed in because this is the raw footage, Your Honor.

THE COURT:  Because this is what?

THE WITNESS:  This is raw footage.  Not yet finished. This is completely uncut.

THE COURT:  Is he speaking English?

MR. GIBBS:  He is, Your Honor.

THE COURT:  Well, then I need to have the volume turned up.

MR. GIBBS:  We're working on it, Judge.

THE COURT:  It may be that this is a residual issue from the mass flooding that was experienced at the courthouse on Friday, Saturday, Sunday, and the courthouse was closed for three days because of massive flooding.  And that's why we had hearings in other courtrooms, because there was flooding in this courtroom.

(Video played in open court.)

MR. GIBBS:  That's the end, Judge, of that clip.

THE COURT:  All right.  Next question.

BY MR. GIBBS:

Q.  All right.  Mr. Langan, the next clip I want to play for you relates to the emails that were sent to the hostage families in this case.  Was that an area that you wanted to cover with both Kotey and Elsheikh when you interviewed them?

A.  Yes.

Q.  Why was that?

A.  Some of these had been made public.  I had read some of them in a magazine.  And it's part of establishing -- in the emails I'd read, sent to I think Diane Foley's family -- I'm getting a little feedback, I think, if you move back from the mic.  Sorry.

Q.  Okay.

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*

A.  I'd read the emails and they seemed to be, to my ear, clearly written by a British person.  So I was wanting to ask them --

MR. MACMAHON:  I'm going to object again to his characterization.  It's something he read in a magazine apparently, and the foundation in this case is an improper answer -- question, irrelevant and...

MR. GIBBS:  Judge, this is the reason he explored this topic with the defendant, so he's explaining that before I play the clip.

THE COURT:  I'll overrule the objection.  Go ahead. I've overruled the objection.

MR. GIBBS:  Thank you.

A.  So I wanted to -- because up until I met them, they denied being members of the Beatles.  In all their early interviews they denied being members of the Beatles.  And days or a week or two before I got there, in the first time I had ever seen an interview, they actually for the first time, Elsheikh and Kotey, on CNN said, well, yes, we were members of the Beatles, we're sorry to the families, but that was about it.

So I now knew they admitted to being members of this cell, this kidnap cell, or the Beatles by the hostages.  So I now want to go further because that was one statement.  So I'm making a one hour, two-hour film to be commissioned by *The Sunday Times*, so I wanted to ask them about were they there

at the abductions, did they meet the hostages.  And part of a very important, when you're doing a story on a kidnap and ransom, you ask, were you involved in the ransom process, collecting emails, proof of life questions and answers.

Q.  So let's stick with the emails for the time being.

MR. GIBBS:  Could we play 14-2A.

(Video played in open court.)

THE COURT:  You're offering this?

MR. GIBBS:  Yes, Your Honor.

THE COURT:  At the end, make sure we ask the witness whether that accurately reflects what happened during the interview, offer it, I'll admit it.  Do that after each segment.

MR. GIBBS:  I will, Your Honor.

THE COURT:  Proceed.

(Video played in open court.)

BY MR. GIBBS:

Q.  Mr. Langan, was that an accurate depiction of a portion of the interview you did with El Shafee Elsheikh in July of 2019?

A.  Yes.

MR. GIBBS:  If we could go to 14-2A.

THE COURT:  14-2 [sic] is admitted.  Proceed.

(GOVERNMENT EXHIBIT Number 14-2A was admitted into evidence.)

MR. GIBBS:  We'll go to the next number, Judge, 14-3A.

THE COURT:  All right.  You may play it.

(Video played in open court.)

THE COURT:  That's 14-3?

MR. GIBBS:  That's correct, Judge.

THE COURT:  Does that accurately reflect what happened, Mr. Langan?

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  It's admitted.

(GOVERNMENT EXHIBIT Number 14-3A was admitted into evidence.)

THE COURT:  Now, if you intend to offer this at trial, you better do transcripts so the jury can follow it.

MR. GIBBS:  Actually, Judge, we do have transcripts in the binder right behind these clips.  I believe it's 14-3A and I think the transcripts are 14-3.

THE COURT:  All right.  Go on, Mr. Gibbs.

BY MR. GIBBS:

Q.  Mr. Langan, the defendant brought up this issue of an Iraqi trial, called the kangaroo court, that was discussed.  Was that a topic that you and he discussed during the interview in July of 2019?

A.  Yes, right at the beginning, because I think it was two weeks prior to my arrival, it was in the news and on television that 10 or 12 French detainees, ISIS fighters, detainees, had been sent to Baghdad, and on the TV reports, after a very short trial they received a sentence, death by

hanging.

Q.  And what impact did that discussion have on the defendant's willingness to admit to written emails?

MR. MACMAHON:  Objection, Your Honor.  Your Honor, you can look at it.  He did not admit to writing any emails.  That's a question that assumes a fact that's not in evidence.  He says Mr. Emwazi wrote the emails.

MR. GIBBS:  That's the point, Judge.

THE COURT:  All right.  So let the testimony happen. If he didn't write the emails, that's going to come out, Mr. MacMahon.

BY MR. GIBBS:

Q.  And did the defendant ever admit to writing the emails?

A.  No.  He denied writing the emails.  To answer your question --

THE COURT:  So the point is, did showing this video have any effect on his willingness to admit that?  The answer is no, isn't it?

THE WITNESS:  Yes, Your Honor.  There was no video.  I was just recounting to him.  And he knew, the defendant was aware of this story as well.

But yes, that's my understanding, he had no -- having known about what happened, the fate of those prisoners, he didn't then tell me.  So the answer about the emails was, no, he wasn't involved in the writing.

THE COURT:  And the relevance, Mr. Gibbs, so that we're clear about that, is that you're showing that he was not coerced or influenced by that.  Is that right?

MR. GIBBS:  That's absolutely correct, Judge.

THE COURT:  Let's go on.  Move it along.

BY MR. GIBBS:

Q.  And did you also question Mr. Kotey about having written the emails?

A.  Yes.

MR. GIBBS:  So if we could play 14-4A.

MR. MACMAHON:  Your Honor, just object for the record. This is Mr. Kotey's statements for Rule 15 purposes, which has already been agreed.

MR. GIBBS:  And again, this is offered for the --

THE COURT:  Statements about what, Mr. MacMahon?

MR. MACMAHON:  Any of Mr. Kotey's statements after he's been arrested are not co-conspirator statements.  This has all been briefed to you and we've said that those are hearsay and can't be introduce against Mr. Elsheikh.  The Court can deal with that objection later, but I would have to make it now.

THE COURT:  All right.  Go on.

(Video played in open court.)

BY MR. GIBBS:

Q.  All right.  Mr. Langan, so that was the interview with Mr. Kotey.  Did you interview him the same day as Mr. Elsheikh?

232

A.   Yes, I did.  My first session with both was in one day.  We had a lunch break and they each had tea or coffee, so the same day I interviewed them.

Q.   And the clip we just saw which is 14-4A, did that accurately depict a portion of the interview you did with Alexanda Kotey in July of 2019?

A.   Yes, it did.

Q.   Now, how about -- you mentioned the emails.  How about the topic of the hostage negotiations?  Was that another topic you wished to explore with the defendants?

A.   Yes.  So to understand the events and the suspects' involvement, it was let me -- I want to know about the abduction point of the hostages, then the ransom process, sending emails, negotiations.  So that was -- yes, that was one of my questions.

MR. GIBBS:  If we could play 14-5A, please.

(Video played in open court.)

Q.   Mr. Langan, in that clip you had asked the defendant if Emwazi had instructed him to get the email addresses of the hostages.  Do you recall seeing that question on the video?

A.   Yes.

Q.   And at that point he volunteered the information about Kayla Mueller.  Because you hadn't asked about Kayla Mueller at that point, or at least in that question.  Correct?

A.   Yeah.  Correct.

Q.   And was that the case throughout the interview, that the

defendant would volunteer information?

A.  Well, often I had to prod their memory, ask lots of questions before they would say things.  Other times they would volunteer information, but it usually came about when I was asking.

And even then there were other times they would be saying no.  It depended on what I was talking about.  Sometimes they were more open and flowing, but other times I had to really kind of ask a few questions.  And in fact, with the emails, they just -- I left it on the point did they have any involvement in the writing.

But in the end, slowly, slowly, they talked about, yes, they went to get the email addresses and followed up with the proof of life.

MR. MACMAHON:  This is a narrative answer at this point.  This is a very vague answer and I would move to strike.  I'm unable to determine what it is about Mr. Elsheikh is being said.

MR. GIBBS:  Judge, I can ask specifically for Mr. Elsheikh.

THE COURT:  All right.  Do so.

Q.  Did Mr. Elsheikh ever admit to doing anything involving the negotiations beyond collecting emails?

A.  No.  What he admitted to was collecting the email addresses from hostages and then going back to them and getting their

proof of life answers.  And beyond that, he said he played no involvement.  He would hand it to Emwazi and he didn't know what Emwazi did.

MR. GIBBS:  Now if we could play 14-6A.

THE COURT:  I'm going to admit 5A [sic].  Was that an accurate depiction of your --

THE WITNESS:  Yes, Your Honor.

THE COURT:  -- interview, Mr. Langan?

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  It's admitted.

(GOVERNMENT EXHIBIT Number 14-5A was admitted into evidence.)

THE COURT:  You may play 14-6A.

(Video played in open court.)

BY MR. GIBBS:

Q.  Mr. Langan, is the clip we just saw, 14-6A, is that an accurate depiction of a portion of the interview you did with El Shafee Elsheikh in July 2019?

A.  Yes.  Yes, it is.

Q.  And that covered the topic of the emails.  I want to move to a different topic here at the moment.

How about the topic of how the hostages were killed, and the specific details regarding that?  Was that another topic you wished to cover with the defendants?

A.  Yes.  It was the key question for a journalist.  That's

where I hit a brick wall and he denied being involved, and it was Elsheikh who opened up more.  Specifically in Elsheikh's answer, I asked him --

Q.  Well, actually, Mr. Langan, I think this is one we can play and just have the clip, if that's okay.

A.  Right.  Good.

MR. GIBBS:  So if we could, I would like to play 14-7A.

THE COURT:  I'll admit 14-6A, because that was an accurate depiction, Mr. Langan?

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  Go ahead, play the next one.

MR. GIBBS:  Thank you, Judge.

(GOVERNMENT EXHIBIT Number 14-6A was admitted into evidence.)

(Video played in open court.)

THE COURT:  What exhibit was that?

MR. GIBBS:  Your Honor, that was 14-7A.

THE COURT:  All right.  Go on.

BY MR. GIBBS:

Q.  Mr. Langan, the clip that we just saw, 14-7A, was that an accurate depiction of a portion of the interview you conducted with the defendant?

A.  Yes, it was.

Q.  And in the video, there was actually -- you two were talking about two different videos.  Correct?

A.   Yes.

Q.   There was one where you were questioning him about a video where Emwazi let Elsheikh see him shoot someone.  Do you recall that?

A.   Yes, that was there.

Q.   What was that a reference to?

A.   They hadn't offered this, but after some questioning, I said:  Tell me about that time that you took Daniel Rye, the Danish hostage, into the desert.

And I was saying to Elsheikh:  That time you said to him, have you ever been to an execution?

And then they, Elsheikh and Kotey also - I'll just talk about Elsheikh - talked to me and described to me how he drove Daniel Rye Ottosen, and some of the other hostages into a desert and they were then in a pit, and Mohammed Emwazi -- well, actually, Elsheikh said to me he then also got a Syrian prisoner who was to be executed, and he then said to me:  He moved the car out of shot, meaning video shot.

And then he told me he watched Mohammed Emwazi shoot this Syrian prisoner in the head.  He then falls into the pit, and this was being filmed.  And that was what we were talking about, that execution, which is being filmed.

And Elsheikh's point there on this clip, oh, that wasn't published, means that was never aired.  That was sent to the mother of Daniel Rye Ottosen.

Q.  Right.  And so --

MR. MACMAHON:  Your Honor, I move -- all of this is superfluous information that the witness is giving.  We have got a video of the discussion he has, and he's talking about who is sending videos to people.  It's far beyond the question that was answered.  I move to strike.

MR. GIBBS:  Judge, we would oppose that.  The clip included a discussion of two different videos.  Mr. Langan just described one of those, the one that was never officially published.  Now I'm going to ask him about the second one.

THE COURT:  All right.  I understand what you were doing.

I think, Mr. MacMahon, it is relevant.  This defendant, Elsheikh, is charged with engaging in a conspiracy to take hostages resulting in death, and so this would bolster that contention by the Government, that he was part of a conspiracy to take hostages that resulted in death so I don't see that it's irrelevant.

Now, there may be a specific statement that Mr. Langan makes that results in an opinion he gives about something, because Mr. Langan is doing a video for purposes entirely different from obtaining evidence to be presented in court and he wants some color in these things and so he's saying things.

I'm not going to exclude it at this time; however, Mr. MacMahon, you may file -- with respect to this testimony and

this exhibit, you may file a motion to strike certain portions of it on whatever grounds you think are appropriate.

And then, Mr. Gibbs, you may file a response and I'll rule on it.  But in the interim, I'm going to hear all of it.

I think there are other reasons why it might be relevant.  It may be relevant to whether, when they make any admissions that are directly relevant to the murders that are at issue here, those were voluntary and willing, and whether they're reliable.

So I'm going to deny your motion to strike at this time, but I'll give you an opportunity, after it's all done --

And I think it might be useful, Mr. Gibbs, if you offered the entire interview and gave me a transcript of the entire interview.

Now, I know it's not always easy to do it because Mr. Langan sometimes talks at the same time Mr. Elsheikh does. And anybody who records testimony has a difficult time with that.  But I understand, Mr. Langan's goals are not the same as the goals of a prosecutor would be to obtain clear testimony.

So to recapitulate, you may continue, and Mr. MacMahon, you may file a motion to strike all or any portions of it, and the reasons and the case law you rely on.  And Mr. Gibbs, you may file a response.  I will rule on it at that time.

In the meantime, this witness, who may not be here for trial -- now you're going to have to find -- if I grant it in

part and deny it in part, you're going to have to find an editor who can edit the film, but I'm sure you can do that.  I hope you can find people who can do that adequately.

All right.  So you may go ahead, Mr. Gibbs.  You may complete your direct testimony of this witness.

And Mr. MacMahon, you may file a motion that seeks to strike all or any portion of it, giving me the arguments, the authorities that you rely on.

Mr. Gibbs, you may then respond on that, and I will enter an order maybe today or tomorrow telling you how long you'll have to do it.  But don't worry, it won't be Thanksgiving.

BY MR. GIBBS:

Q.  Mr. Langan, in that clip there was a discussion, Mr. Elsheikh brought up about what he described as an officially published IS video.  Did you understand that reference?

A.  Yes.

Q.  What was that in reference to?

A.  That was in reference to the videos aired, broadcast of the beheadings of James Foley and the other Western hostages.

Q.  And if you have the book there, if you could take a look at Government's Exhibit 14-8.  It should be towards the end in there.

A.  14-8.

THE COURT:  It's a photograph.

A.   8.   I'm a bit deaf, Your Honor.  But I'm only 57, but I've got hearing -- I can't -- 14A, is that what you're saying?

Q.   No, I'm sorry, 14, dash, the number 8.

A.   Oh, number 8.  Sorry.  Apologize.  Okay.  Yes.  Yes, I'm looking -- I've got that.

Q.   And do you recognize that photograph?

A.   Yes, I do.

Q.   What is that?

A.   That's the photo of my friend James Foley kneeling in the desert with -- on the video released by ISIS with Mohammed Emwazi before he beheaded him.

     MR. GIBBS:  And Your Honor, we would ask to move in 14-8 and publish.

     THE COURT:  All right.  You may do so.

     (GOVERNMENT EXHIBIT Number 14-8 was admitted into evidence.)

Q.   So Mr. Langan, 14-8, is that a still photo of the officially published ISIS video that El Shafee Elsheikh was talking with you in that video clip?

A.   Yeah.  Yes.

     MR. GIBBS:  We can take that down.

     THE COURT:  The video clip was 14-7.  Correct?

     MR. GIBBS:  It was.  Did I say 14-8?

     THE COURT:  No.

     MR. GIBBS:  Okay, yeah, it was 14-7.  That's correct,

Judge.

THE COURT:  Next question.

BY MR. GIBBS:

Q.  Mr. Langan, just to summarize, the interview of the defendant in mid-July of 2019, we've seen seven clips taken from the longer interview, but the longer interview, how long was it?

A.  That day, two hours long, approximately.  Two and a half, maybe, one -- you know, between one and a half-forty minutes, two something hours.

Q.  And the interview of El Shafee Elsheikh, was it basically one long take with you interviewing him, as we've seen in these video clips?

A.  Yes.

Q.  And you also did an interview of Alexanda Kotey that day as well.  Correct?

A.  Similar length, one and a half, one hour forty minutes, or so.

Q.  And all the clips you've seen today, we only have one of Kotey, but do they truly and accurately reflect that portion of the interview that you did on that day?

A.  Yes, they do.  Yeah.

Q.  Now, when you got the permission to do the interviews in 2019, you indicated you'd asked for three sessions.  Correct?

A.  Yes.

Q.  After that first day of doing the interviews, did you still

want to get back in front of the defendant and Alexanda Kotey at least a second time?

A.   Even more so.  Because this was my first interview session, and part of that is getting to know you, finding common ground. So in my eyes -- that may not be great for the job that Your Honor was saying, to collect evidence; it's good TV.  But I needed a second session to actually now try and ask some proper questions and good answers.  So yes, I was very much wanting the next session.

Q.   And did you in fact get a next session at least with Alexanda Kotey?

A.   So a week later, the following Sunday, I was supposed to meet both of them, but I met -- I had a session, yes, with Alexanda Kotey.

Q.   And in the course of the session with Alexanda Kotey, did the questioning get more heated in that second interview?

A.   Yes.  It became quite emotional.

Q.   And did it become quite emotional on your part?

A.   To be specific, I became quite emotional, and then the discussion became quite heated.

Q.   Why was that?

A.   I had been listening politely, I'd shaken hands and been very friendly, and I was -- Alexanda Kotey asked me:  Why are you taking this so personally?

          MR. MACMAHON:  Your Honor, objection to Alexanda Kotey.

This is now a week afterwards.

THE COURT:  What relevance does this have, Mr. Gibbs?

MR. GIBBS:  Your Honor, so this is the interview where they have the blowup at the end.

THE COURT:  I understand.  But why is that relevant?

MR. GIBBS:  Because he was not permitted to interview the co-defendant after that, which undercuts the notion that SDF was torturing these defendants, forcing them to be interviewed against their will, when we have an instance where because of a loss of temper between Kotey and the interviewer, they wouldn't let El Shafee Elsheikh be interviewed a second time.  Because that's what he had intended and hoped to do --

THE COURT:  Just ask him the question:  Were you permitted to interview him a second time?

It doesn't matter what reason the SDF had.  You're just trying to establish that the SDF and maybe the individuals could control whether they were interviewed, not Mr. Langan.

MR. GIBBS:  Right.  If I could, Judge, I would like to go into when the blowup happened, what happened with the SDF officials there at that time.

THE COURT:  Ask him that specific question.  You may --

Q.  Mr. Langan, can you describe --

THE COURT:  Just a moment.  You may ask him what he observed, not any opinions of his as to what they did, why they did what they did.  Is that clear?

MR. GIBBS:  It is, Judge.

THE COURT:  All right.  Proceed.

BY MR. GIBBS:

Q.  Mr. Langan, in the second interview a week later with Alexanda Kotey when the blowup occurred, can you describe what happened with the Kurdish officials there?

A.  Yes.  And it was a verbal blowup.  They had said, you know, previously I'm not supposed to hand someone, one of the suspects, an electronic device, obviously standing up and not getting close, they weren't happy with.

So when we started raising our voices and shouting at each other and swapping insults, Alexanda Kotey said:  I want to stop this interview, and turned to the guards and said:  I've had enough; I want to leave.

And then I stood up and got angry and said:  Oh, you've had enough, have you?

And that's when the two guards I observed, not armed -- the two men who were filming were like -- you know, and Kotey stood up, took off his mic, and he walked off.  And they walked with him.

And my fixer sort of stood by me and we were trading insults a little bit and then I apologized as well.  And he was escorted out by these two SDF guys who were in plain clothes who had been filming.

Q.  And did anybody come to see you from SDF after that?

A.   Yes.  The same man I directly requested the three sessions with - Siemens, I believe his name was - who I took to be not in media, to be part of the television foreign services part of the government, he came in because these two men filming were, like: Wow, this was really heated and Sean was shouting at him and he was shouting at Sean.

And they did say to me:  We were worried for your safety, because there was a glass ashtray, but we have to be careful, we've got a duty of care for our prisoners and it looks like you were shouting and abusing him.

So Mr. Siemens came in and said:  We're going to have to cancel the next session with Elsheikh because you're obviously too emotional.

And I apologized, and he said:  It's not good, doesn't look good for us if you're shouting at one of our prisoners.  So that's what I observed.  And then they canceled my next session and I had to apologize to the Kurdish regime.

Q.   And he told you on the spot the next interview --

MR. MACMAHON:  I'm sorry, Your Honor.  Just for the record, objection to the hearsay, Your Honor.

THE COURT:  I said you would have an opportunity to file a motion.  And yes, it's hearsay what he was told, but if it was told for the truth of the matter asserted rather than for state of mind or some other exception.  And I'm not going to make that ruling right now.

MR. MACMAHON:  I apologize, Your Honor.  If I had a continuing objection to this --

THE COURT:  No, you don't.  You have an opportunity at the end to make specific objections supported by references to the Federal Rules of Evidence and of the case law under it.  And Mr. Gibbs, you'll have to respond similarly.

But I -- Mr. Gibbs, I keep returning to this.  What does this have to do with the indictment against Mr. Elsheikh?  I take it it has to do because you intend to introduce portions of this in the case against Mr. Elsheikh.  Is that right?

MR. GIBBS:  It is, Judge.  So we filed a motion to pre-admit a number of video clips, including some of Mr. Langan's.  The defense filed a motion to suppress all the video clips based on involuntariness.  So this particular piece of evidence we believe goes to oppose the motion to suppress, demonstrating that if SDF was overbearing the defendant's will to force him to --

THE COURT:  Mr. Gibbs, how do you overcome a confrontation clause objection?  If you intend to introduce -- well, this was done at the time that Mr. Elsheikh and Mr. Kotey were still in custody.  Right?

MR. GIBBS:  Correct.

THE COURT:  So who knows whether the conspiracy was still under way?  The Government, I take it, will contend that there was still a conspiracy.  Is that right?

MR. GIBBS:  Judge, actually, the video clips we believe are admissions by party opponents so we think they come in on that basis.

THE COURT:  A party opponent?  But it's not -- he's no longer -- since he's pled guilty, it's not admitted as to him.

MR. GIBBS:  Yeah, I'm sorry, Judge, I was not talking about the Kotey statements.  We just intend to introduce --

THE COURT:  Oh, I see.  I was talking about the Kotey statements.  The statements that the defendant makes of course come in as admissions.

MR. GIBBS:  Right.  And with the Kotey statements, I think if at trial we have to present 3501 evidence to overcome the involuntariness arguments, I think the Kotey clips may become relevant to at least that inquiry.

THE COURT:  All right.  And as I've indicated, I'll make the initial gatekeeping determination, Mr. MacMahon, as to whether anything is excluded.  But if I determine that it's not, it then becomes a jury issue that you can introduce evidence, and the rest of the tape would be admitted for that purpose, to show that they were not being coerced to give these statements.

All right.  What else do you have?  How much longer do you have?

MR. GIBBS:  Judge, I have one question and I'm done with Mr. Langan.

THE COURT:  All right.

BY MR. GIBBS:

Q.  Mr. Langan, you testified a moment ago that the SDF official that came to see you right after this blowup occurred told you you could not interview El Shafee Elsheikh.  Correct?

A.  Yes.

Q.  And was that in fact true, you were never able to re-interview the defendant?

A.  No, I was told I crossed a line and became too emotional, and it was in my best interests and in their best interests not to let this continue.

So my session with Elsheikh was canceled and I applied but told, forget it.

Q.  And so the only footage that exists of you interviewing the defendant is from that first-day session that we saw clips from?

A.  Yes, correct.

MR. GIBBS:  Mr. Langan, I believe the defense may have some questions for you.  Thank you, sir.

MR. MACMAHON:  If it please the Court.

**CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

**BY MR. MACMAHON:**

Q.  Mr. Langan, you never talked to Mr. Elsheikh again the second day at all.  Right?

THE COURT:  Asked and answered.  He said he never spoke to him again.

Q.  So you don't know whether he refused to see you.  Correct?

A.   He was next door waiting to come in and it was the Kurds who refused.  So I never spoke to him after the end of my first interview the week before.

Q.   So you blew it?

A.   Yeah, 100 percent blew it.

Q.   You blew it.

A.   Yeah.

Q.   You did more than insult people.  I mean, you came up with some very colorful language, didn't you?

A.   Yes, I did.  Yeah.

Q.   Yes.  And we've seen that clip.  I'm not going to play it again today --

A.   Okay.

Q.   -- for you.

But you didn't hear anybody ask El Shafee Elsheikh whether he wanted to or didn't want to talk to you the second day, did you?

A.   I didn't hear that the first time either.

Q.   Right.  And you said earlier that you sent Mr. Elsheikh a letter.  Right?  I've looked at the whole two-hour video many times.  He doesn't discuss with you anywhere reading a letter that you sent him, does he?

A.   No.

Q.   So sitting here, you can't tell the judge that that letter that you say you wrote ever got to Mr. Elsheikh.  Right?

A.  No, I wasn't claiming that.  I can -- the BBC, if you were to request them, this would be this -- the email they would have sent.  You could ask them for that.  But yes.

Q.  All right.  But you're the one that's here, Mr. Langan.

A.  Sure.

Q.  You don't have any proof that the letter was ever received by Mr. Elsheikh?

A.  No.

Q.  Right.  And you never talked to him about the letter?

THE COURT:  Asked and answered.

Q.  Right?

THE COURT:  Asked and answered.

MR. MACMAHON:  I'm sorry.  You're correct, Your Honor.

A.  We talked about my film --

THE COURT:  When I say asked and answered, that means you've already answered it and I'm not going to take any more time with it.  You've answered it.

Next question.

Q.  So when you first saw Mr. Elsheikh, one of the first things you told him was that he had lost a lot of weight.  Isn't that correct?

A.  Yeah.  Did I say that?  Maybe, yes.

Q.  You maybe said he was emaciated, didn't you?

A.  Did I say that?  I'm asking that generally.  I don't recall using the word "emaciated."

Q.   Do you remember telling -- giving an interview to the Crown back in England in 2019 where you said Mister --

THE COURT:  Giving an interview to the Crown?

MR. MACMAHON:  The Crown police, Your Honor. (Indicating.)

THE COURT:  All right.  The Crown is different.

MR. MACMAHON:  It's late in the day -- I'm --

THE COURT:  What does this (indicating) mean, Mr. MacMahon?

MR. MACMAHON:  It's me, at myself, for asking a bad question.

THE COURT:  All right.  I'm glad you clarified that.

MR. MACMAHON:  Thank you, Your Honor.

THE COURT:  What's your question, Mr. MacMahon?

BY MR. MACMAHON:

Q.   Did you tell the police in London that Mr. Elsheikh looked emaciated when you first saw him?

A.   Oh.  So I don't know what exact words I used, but I commented to the police, if you're telling me, and I'm sure -- and I'll comment now, yes, my memory was having seen those early videos when they're joking and joshing, when I now saw him enter that room, which maybe a year after some of the interviews, I was -- I noticed visibly he looked somehow kind of diminished, less happy, less friendly.  It was both physical and psychological.  I don't recall using the word "emaciated."  I

thought I used the word "diminished."

Q.  Did you bring a man named Jim Walker with you to Syria?

A.  Yes.

Q.  Did you talk to Mr. Walker about his impression of Mr. Elsheikh when you first saw him?

A.  Did I ask -- are you asking my impression or James'?

Q.  Did you and Mr. Walker have a conversation in which Mr. Walker told you that Mr. Elsheikh looked like a broken man?

A.  Yes, we were -- I don't remember that phrase.  But both our impressions were, when you looked at those first videos, we're always comparing them to the early videos where they're joking and laughing with the journalists.

And this time, if you allow me to sort of give context to that conversation, we were both -- and I think it was me saying it but I'm sure Jim agreed, and I remember him saying: He looks like a broken man.

It looked like to us the game was up.  This was to longer a joke.  They were no longer joking about the Rolling Stones.

And I took that, because this was further down the line, and it obviously hit home and I would speak to Elsheikh about this, had they heard the news about the French prisoners. And it looked to me -- and that was in that context.  Jim Walker was saying the news of the French prisoners being sent has knocked the stuffing out of him metaphorically.  And he looks a

broken man compared to those early joking interviews.

Q.   And there came a time in the interview also where he tried to tell you something that had happened to him.  Correct?

A.   Actually, looking at it now, it's not clear but he was about to tell me about something happening, yeah.  And I cut him off because just in case he was going to say it happened to him.  But I look at that now -- is that the clip you're referring to?

Q.   And he brought up the word "Geneva."  He told you he wasn't in Geneva and he wasn't free to talk to you about these matters.  Right?

A.   Actually, I don't recollect at all the word "Geneva," so if you show me the clip.  And I fully agree I could have got that wrong, but actually I don't ever remember that conversation.

Q.   So you thought you were protecting Mr. Elsheikh from telling you what it was that he wanted to tell you about the conditions of the prison?

A.   No.  Sorry, we -- I don't remember the Geneva ever coming into it in that clip.  Do you want -- or should I just -- or does that not matter for you?

Q.   All right.  We'll get back around to that.

A.   But on this matter, yes, my concern for Elsheikh, the defendant, is if he's about to criticize the people who are holding him captive on camera, I just wanted to cut that dead, as I explained, for his sake, yeah.  Just in case, you know, what something could happen.

Q.   And one of the things that could have happened was your interview would have ended.  Right?

A.   My what?

Q.   One of the things you were worried about was that your interview would have ended.

A.   But why would that have ended the interview?

Q.   If he had said something about being abused by the authorities in the prison?

A.   Oh.  Well, no, I think because he was very openly talking about it in previous interviews, he'd accused the FBI of being a good bit aggressive.  So it looked to me they had been given at lot of latitude and freedom by the Kurdish, unusual amount of freedom to talk openly and criticize the FBI, British, American Governments.  So that was not my concern.  I can say that for sure.

Q.   So my question was about the people that were holding him in the prison.

A.   Yeah.

Q.   You didn't want the people in the prison to retaliate against him if he told you something that had happened inside the prison.  Correct?

A.   No.  Because as I was trying to explain, they seemed very relaxed and noninterventionist in the interviews in my -- they weren't interrupting.  And also, the two men filming didn't really speak English that well.  So I didn't ever feel anything

that we were saying would be stopped at that point by the people in the room.

Q.  So you mentioned this situation with the French prisoners being sent to Iraq --

A.  Yeah.

Q.  -- as being a topic of your interview with Mr. Elsheikh. Right?

A.  A topic?  It was preinterview.  As we sat down talking about the interview, I brought it up in that sense as, yes, a topic.

Q.  Right.  That was something you brought up at least five times during the course of this interview --

A.  Yeah.

Q.  -- with Mr. Elsheikh.  Right?

A.  I don't know how many times, but yes, I spoke about that and asked them did they know about it.  Because it was kind of big news, developing news in this story.  It had only broken, I think, weeks before I got there.

Q.  You told Mr. Elsheikh on several occasions that people who were being sent to Iraq where they were having a ten-minute trial and they were being sentenced to hang by the neck.  Isn't that right?  That's what you told him?

A.  No, I said -- I remember this specifically.  You're paraphrasing, you're giving the right impression, but just to be -- what I actually said was:  Did you hear about this news, have you heard about the French prisoners?

And Elsheikh said:  Yes, I have.  And he then said, but he didn't know what happened to them.

And I said:  I'll tell you what happened to them.  They got death by hanging after a ten-minute trial.

Q.   Right.  And that's because what you wanted him to do was to tell you everything because you promised him that it might help him go either to England or the United States and get a fairer trial.  Right?

A.   By -- I don't -- are you -- is that a statement or are you asking me a question?

Q.   That's a statement.  That's something that you told Mr. Elsheikh, that given what was happening to people that went to Iraq, that he would be better off if he got a fair trial, and the way to do that was to be honest with you and to tell him [sic] everything.  That's what you told him?

A.   If I may answer the question, within the context -- I'm not disagreeing with you at all.  I'm sorry.  I'm just saying, in the context previous to that little excerpt you picked up, we were talking about why he wanted to do the interview, why I was there - and it was, yes, the thing about the French prisoners - I said:  I'm here.  One of the reasons I wanted to talk to you and I hope you can meet me halfway by talking openly is for the mothers' sake, for Diane Foley, who has been campaigning for his right to a fair trial, Marsha Mueller, and then I mentioned:  And your mother, who's been fighting for your right.  And I hope

for their sakes you can meet me halfway and so we can end, bring this -- get them closure.

So very much it was, that brought him to closing that I'm here because I believe in your right to a fair trial.  And if you talk to me, I hope you meet me halfway.  So the implication is -- which I never actually spelled out, I know that for sure.  I'm sure you felt it's not there.  I never said it, but I would accept as implied that if you're on television now talking about your involvement in the crimes, that's going to help the families, the mothers get closure, and more likely to get a trial in the UK.  But I never specifically said it, but that was definitely my implication.

Q.  Right.  And his response was, to one of those questions was that if I give you a confession, will that speed up the process of going to the UK or the United States.  Right?

A.  I don't remember that.

Q.  And you had no interest in helping these families by doing this interview.  You went there to get --

THE COURT:  Your question is now compound.

MR. MACMAHON:  I'm sorry.

Q.  Mr. Langan, your intent when you went to Syria was to try to get Mr. Elsheikh to incriminate himself in the crimes that you were investigating.  Isn't that right?

A.  But why wouldn't that be in the interest of the family?  Why wouldn't that help the family?  Wouldn't that help them?

Q.  Sir, did you tell the Crown police that your intent of going to Syria was to get him to implicate himself in crimes?

A.  It's what journalists do.  If you've got suspects denying and they're in the public interest, this story of was seismic global news.  They beheaded journalists.  James Foley is a journalist.  So therefore when they're denying their involvement, it's what investigative journalists do.  You sit down, you try and get them to talk and encourage them to talk, and hopefully, yes, to incriminate themselves.

Q.  Right.  And that was one of your techniques was to tell him that you were there for his mother.  Correct?

A.  That what, sorry?

Q.  That you were there, you showed him pictures of his family and --

A.  Yeah.

Q.  -- got him upset.  Right?

A.  No, no, but with the mothers, I brought up Elsheikh's mother which I wasn't sure if he was aware that her campaign in the UK was to force Britain to keep to its values about the rule of law and not share evidence with the U.S. whilst there was the death penalty.

MR. MACMAHON:  Your Honor, can you instruct the witness to answer my questions yes or no if he can?

THE COURT:  I thought it was responsive, Mr. MacMahon.

MR. MACMAHON:  No, I asked him if he told the -- he

went there to get incriminating evidence --

THE COURT:  He's answered that.

MR. MACMAHON:  Right.  And --

THE WITNESS:  I went --

MR. MACMAHON:  I'm sorry.

THE COURT:  Just a moment.  When I speak, stop.  How much more do you have?

MR. MACMAHON:  Not a whole lot, Your Honor.  I keep getting these narrative --

THE COURT:  How much more do you have?

MR. MACMAHON:  I would say 15 minutes, Your Honor.

THE COURT:  I'm going to give you 15 minutes to think about how you can shorten even that.  How much do you have by way of redirect?

MR. GIBBS:  Redirect, Your Honor, probably about three questions.  Not really too long.

THE COURT:  All right.  Now, Mr. Langan, you may step down.  Now, during the recess, do not discuss your testimony with anybody.  We'll continue in 15 minutes.

THE WITNESS:  Thank you.

THE COURT:  Let me say generally, I'm not going to allow government attorneys or defense attorneys to get into disputes and angry exchanges with witnesses.  It's not going to happen.  If you can't do it in a quiet, civil manner, you're not going to be able to do it at all.  Is that clear, Mr. Gibbs?

MR. GIBBS:  It is, Judge.

THE COURT:  Mr. MacMahon?

MR. MACMAHON:  Yes, Your Honor.

THE COURT:  Court stands in recess.

(Recess taken at 5:31 p.m.)

THE COURT:  We are going to complete the cross-examination of this witness and then we are going to proceed if it's necessary.  Mr. Gibbs, are you the person offering a summary witness?

MR. GIBBS:  I am, Judge.

THE COURT:  Why do I need a summary witness on a motion to suppress?

MR. GIBBS:  Judge, Dan O'Toole, the FBI witness, will testify about statements that the defendant made in his declaration that was filed with the defense motion to suppress, and how a number of claims he makes in that declaration are directly contradicted by evidence in the case.

THE COURT:  How long do you think this testimony will take?

MR. GIBBS:  Probably about 35 minutes, Judge.

THE COURT:  All right.  My plan is to continue this evening until we finish.

MR. GIBBS:  That's fine.  That will be good.

THE COURT:  Let's go, Mr. MacMahon.  Finish your cross-examination.

MR. MACMAHON:  Yes, Your Honor.

BY MR. MACMAHON:

Q.  Mr. Langan, would you agree that you told Mr. Elsheikh that if he wanted to go to the United States instead of Baghdad, that he had to finish an interview with you and tell you more?

A.  I mean, is that in between when we're having a -- is that when we're having a break and we're discussing -- when we're not doing the interview?  Is that the moment you're referring to?

Q.  Yes.  You --

A.  Yeah.

Q.  -- but told him that, didn't you?

A.  No, I said we were chatting.  I offered to, did he want me to send a message to his mother.  And I said look -- we were talking about the outside world and I was like, my feeling is, rather like with the interview, if he admits to things on camera, it will put pressure on the U.S. and British government - at that point there was a stalemate - to bring him to the West to put on trial.

And I said to him in that vein:  I think you should be cooperating.  That's my -- if you're asking me, yes, I would say the more you talk, the more likely you'll be able to -- be of interest to them, I think I said.

Q.  All right.  But you weren't acting at that time as an advocate for Mr. Elsheikh to get him to the United States instead of Baghdad.  Right?

A.    No.  And I was very clear as well.  I said to him:  I'm not here to fight for your right to a fair trial but for the principle of the right to a fair trial.  And without any -- I would just like to say, yes, I did hope genuinely this would be helping the mothers.  I don't think it's incompatible and to make a television program.  They were all part.

But on that point with Elsheikh, it wasn't -- correct me if I'm wrong, I don't know if that's what the suggestion is.  I'm not there trying to get him to open up and using tricks and talking about what happened to the French prisoners.  Obviously I want to encourage him to talk.  But I've been very serious about the right to a fair trial because my friend who was murdered is a journalist.  So it's both personal, which is why I got emotional, but it's also a point of principle.

I didn't want, and I know Jim Foley and Kayla Mueller wouldn't want, these men shipped off to a kangaroo court.  And in fact, I put my TV program on hold so as not to prejudice this trial, and only allowed NBC to air brief clips, thinking it would help the process that Britain and America would come to an agreement, drop the death penalty.

I'm not taking credit for it, but when you say I'm not an advocate, I think one could say that the NBC airing the clip of them did play a part in America dropping the death penalty and bringing them here.

Q.    Mr. Langan, at that time, though, what you were trying to

get Mr. Elsheikh to do was to try to tell you more about what happened with the hostages.  You thought he had more information that he wasn't giving you?

THE COURT:  The question is now becoming compound --

MR. MACMAHON:  Yes.

THE COURT:  -- and it's becoming an argument.

MR. MACMAHON:  It wasn't meant to be, Your Honor.  I'm sorry.

THE WITNESS:  But no, I know I can be, and I apologize if my tone is that.

A.  But yes, I would agree --

THE COURT:  No, just a moment.  There's no question pending.

As a concession to the shortness of life, let's get this done.  Next question.

BY MR. MACMAHON:

Q.  At that time, what you were trying to do was to get Mr. Elsheikh to give you additional details about the hostage plot that he hadn't yet given you.  Correct?

A.  That's the talk of a journalist you've just described.  And yes, every journalist wants more talk, more information, more evidence, to get to the truth, yes.

Q.  And in the end, you went back to your hotel room and did a video where you say you failed.  You didn't get additional information out of Mr. Elsheikh, did you?

A.  Not that I didn't get additional.  I always thought I had failed, yes.  And actually, when I -- throughout mu -- you're referring to my pieces to camera, I'm recording my video diaries.

It's like a football game or a boxing match.  You're not quite consciously aware, in the middle of a conversation, how good it is.  So my immediate response at the end was I failed.  Somehow I didn't get them to tell me -- and what I was referring to, Marsha Mueller had given me some questions:  Where is my daughter's body buried?  Did you rape my daughter?  Did you kill James Foley?

And because I failed to get the answers to those direct questions, I felt I had failed because it was a burden of responsibility on my shoulders when a mother asks you, can you ask these men --

THE COURT:  All right, Mr. Langan.

THE WITNESS:  I'm sorry, I'm going on too much.  I apologize.

THE COURT:  Let's get it done.  Next question.

THE WITNESS:  I apologize.

Q.  And to all three of those questions, Mr. Elsheikh told you he didn't have any information?

A.  Yes.

THE COURT:  All three of what questions?

MR. MACMAHON:  The questions that he just related in

his --

THE WITNESS:  Yes.

MR. MACMAHON:  -- answer, Your Honor.

THE COURT:  Well, he can't answer that.  There may be legal things.  I mean, the fact that he admits that he was a Beatle, or at least there, implicates him in a conspiracy.

MR. MACMAHON:  I understand that, Your Honor.  The question was that...

Q.  You said that you thought he knew where a body was --

THE COURT:  The point I'm making to you, sir, is his opinion as to whether he failed or didn't fail is irrelevant and probably not admissible.  It's an opinion.

MR. MACMAHON:  Your Honor, I was trying to elicit from him that he didn't get those admissions out of Mr. Elsheikh.  That was the only question I asked him.

THE COURT:  And how is that admissible?  I mean, you've got the video of it, and it either has it in it or it doesn't.

BY MR. MACMAHON:

Q.  The last thing that Mr. Elsheikh told you, sir, was that he last saw all the Western prisoners and they were alive.  Isn't that correct?

A.  He -- not Western.  Because the Europeans -- they were all Western, but the Europeans had already been released.  We were talking specifically about the Americans and British hostages.  The last time he saw them, when I asked, he drove them to a

point and he handed the American and British hostages to Emwazi, who took them off and he never saw them again.

But he then said he obviously met his friend, Emwazi, after he had killed James Foley but before the others. But that was the point he said he'd last saw the American and British hostages. He drove them to a point where Emwazi drove them off with some other people.

Q. All right. And he never thereafter had nothing to do with the hostages at all. Correct?

THE COURT: Who had nothing to do?

MR. MACMAHON: Mr. Elsheikh, Your Honor. I'm sorry.

THE COURT: He doesn't know one way or the other.

MR. MACMAHON: No. Mr. Elsheikh told him that he thereafter had no more interaction with the hostages.

A. Well, I didn't ask specifically about the Europeans, but I'm assuming that's because at that point, when the executions started, the Europeans had all been released.

But yeah, that was -- he said that was the last he saw the Americans or British, when he drove them, and Emwazi and some other ISIS fighters put them in a vehicle, drove off, and he never saw them again at that point.

Q. Now, sir, just in closing, what is the status of the film you're still trying to make with this videotape?

A. I've been commissioned by Channel 4, a national broadcaster in Britain, last year to make a one-hour "Dispatches." It's a

program.  BBC offered me 20,000 pounds a minute.  I've put my own film on hold so as not to prejudice a trial.  And so I've been turning down work for two years and not exploiting my material, apart from the one-minute clip I let NBC use at that point when America and Britain were arguing over whether to share evidence.

So I've actually -- not that you've accused me of that, but this has been the worst thing ever for my TV career or the film because I'm the only journalist not reporting or making a film on this case because I'm now acting as a witness.

Q.   And you've been asking the U.S. Government for help in making your film, asking them to give you information, haven't you?

A.   What do you mean, help?  No, I don't --

Q.   Did you ask the U.S. Government to give you access to the video of the execution of a Syrian prisoner for use in your film?

A.   Oh, so as a filmmaker, rather like I asked the Kurds for access and I asked to speak to Elsheikh, I was allowed to speak to the defense, speak to the FBI.  Yes, I've been asking -- I wouldn't consider that help.  I don't need any help.  There's journalists here sitting in this dock writing upon this.  I would not put it as help; I would ask them access to enable me to make a documentary because I feel it's very important that the rule of law is the pillar, but the free press here is not --

that's often used by -- James Foley died because he believed in these principles.

So, yeah, they're not -- I can't say I've made their life easier. I'm forever making the government's life hard by pushing them, as a member of the free press, saying: Why can't I meet, interview someone? I want access to this.

And I think you're referring to the video which I believe is the video which they filmed of the execution of a Syrian prisoner in front of the European hostages. I was informed that would be -- as evidence, would be made public to the other media. And all I was asking for is to be allowed to be granted the same rights that the other media are, which was to have access to that.

Q. And it's still your hope, Mr. Langan, you'll profit from this film someday. Correct?

A. If you're talking about money, no. In fact, this is a film -- I have to answer that correctly because the prosecution think the same thing. If this was a film on the Kardashians, perhaps. It costs money to make. As you know, documentaries on a murder aren't ratings successes, necessarily.

But I hope that it's -- to answer your question, I went there to shed light, to get them to incriminate themselves, and now to not withhold evidence, but also to put something on TV. It's not something to be ashamed of. You're somehow -- yeah, I would stand here and say, of course I want this to be put on air

because I want to prevent other young British Muslims thinking this is all glamorous and fun that involves murder, rape, terrifying, and I'm not ashamed to say, after cooperating with this process, I would like to put that on air and have it broadcast.

MR. MACMAHON:  Your Honor, I move to strike the answer. I just asked him if he wanted to get his money back on the film --

THE COURT:  Well --

THE WITNESS:  I won't get my money back, if that's the direct --

THE COURT:  You can file the motion that I told you you can file and I will consider it.  But your attempt to attack his motives was predictable in its result.  You attacked his motives, and, you know, his motives, everyone has to make a living, including you.

MR. MACMAHON:  Your Honor, I wasn't attacking his motive, I was just reading an email he sent to the Government seeking to --

THE COURT:  Yes, you were attacking his motives. That's the bottom line.  And he certainly took it that way and attempted to defend himself.  Whether he did it or not, whether any of this is admissible -- the only thing I think the Government is seeking to offer of this witness is clips from his interview of Elsheikh.  Is that right?

MR. GIBBS:  That is correct, Judge.

THE COURT:  All right.  Well, I've heard the authenticity issues about that -- those clips, and I've admitted them.  Therefore, they can be shown at the trial, I think.  I don't see any authenticity problems.  I think there's still an argument about whether he was coerced into doing it.  Is that right, Mr. MacMahon?

MR. MACMAHON:  Judge, as part of the motion to suppress, Your Honor.  Just part of argument at this point, yes, Your Honor.

THE COURT:  Right.  But that's just argument.  But if I were to rule that it comes in, the Government -- the defendant could still argue that he was -- he did it involuntarily.  Now, they can look at the video, a jury can, and they can make their own determination on that.

I don't think anything that this witness said really is going to be relevant at trial, but we will see.  In the meantime, you may spin your wheels and file your motions, Mr. MacMahon.  And you may spin your wheels, Mr. Gibbs, in responding to it.  I won't spin any wheels in deciding it.  It's not that difficult.

You may step down, sir.  Thank you.  And you may be excused.

THE WITNESS:  Thank you, Your Honor.

MR. GIBBS:  Judge, I have just a couple of housekeeping

matters.  May Mr. Langan stay in the courtroom now that he's done testifying?

THE COURT:  Yes, he may.

MR. GIBBS:  We will turn off the camera.  Your Honor had asked about transcripts for the clips we saw.  I did not move those in previously.  I would like to move those in at this time.

THE COURT:  Yes, I thought you did and I assumed you did.  They're admitted.

MR. GIBBS:  Thank you, Judge.

THE COURT:  It's 14A or C, 1 through 7, as I recall.

MR. GIBBS:  Correct.  It's the 14 series, 1A through 7B, which would include all the clips and all the transcripts.

THE COURT:  Right.  Now, you're not moving all of the --

You may step down, sir.  Thank you.

You're not moving all of the interviews in.

MR. GIBBS:  Judge, on the entire interview, the Court had asked about that.  Obviously for purposes of the suppression hearing, given the fact that we've got a protective --

THE COURT:  So you may tell move it in at the time of trial.

MR. GIBBS:  Well, what I was going to say, for purposes of the suppression motions, we can move it in with the limitation that the protective order is still in place on all

this evidence.  Because obviously --

THE COURT:  Yes, it's still in place.  There's no doubt about that.  I haven't vacated the order.  But I haven't made any rulings about trial evidence.  I have admitted them for this.

But the point I'm making is, this witness has authenticated the video, so we don't need him to authenticate.  And I don't think there's any further testimony we need from this witness as to whether the defendant was in some way coerced.  Certainly not by him.

Some questions asked by the defendant would suggest otherwise, but I think at most what this witness said was he was hoping both for his own humanitarian reasons, as he put it, and for his own personal reasons, and for his business reasons, he was hoping this person would cooperate.

But he had no power to coerce anybody.

All right.  Now, who is your next witness?

MR. GIBBS:  Judge, the Government calls Special Agent Dan O'Toole to the stand.

THE COURT:  All right.  Get him quickly, please.  And you better cover what you have with this witness in the most succinct and direct way.

MR. GIBBS:  Understood, Judge.

(Oath administered by courtroom deputy clerk.)

THE COURT:  All right.  You may proceed, Mr. Gibbs.

(SPECIAL AGENT DANIEL O'TOOLE, having been duly sworn, testified

as follows:)

EXAMINATION BY COUNSEL FOR THE UNITED STATES

BY MR. GIBBS:

Q.   **Sir**, will you please state and spell your name for the

record.

A.   Daniel O'Toole, D-A-N-I-E-L; O'Toole O, apostrophe,

T-O-O-L-E.

Q.   You work for the government, sir, or for the FBI?

A.   Yes, sir.  For the Federal Bureau of Investigation.

Q.   How long have you been with the FBI?

A.   A little less than a decade.

Q.   And what types of cases do you work on?

A.   Counterterrorism investigations.

Q.   Has that been for your entire career?

A.   Yes.

Q.   Are you the co-case agent in the Elsheikh/Kotey

investigation?

A.   Yes, sir.

Q.   Mr. O'Toole, you should have a binder on the witness stand.

If you would turn to Government Exhibit 15-1.  What is 15-1?

A.   It's the declaration of El Shafee Elsheikh.

Q.   And what's the date on this document?

A.   This says 30 September 2021.

Q.   And have you had an opportunity to review this document?

A.   Yes, sir.

MR. GIBBS:  Judge, we'd move Government Exhibit 15-1 into evidence.

THE COURT:  All right.  It's admitted for purposes of this suppression hearing.  Not for the trial, of course.

MR. GIBBS:  Correct.  This is focused on the suppression motions, Your Honor.

THE COURT:  All right.  Go ahead.

(GOVERNMENT EXHIBIT Number 15-1 was admitted into evidence.)

Q.   In the course of that declaration - and we'll pull up some portions here in a bit - did the defendant discuss interviews he did, media interviews, that he did while in SDF custody?

A.   Yes, sir.

Q.   And did he talk specifically about interviews he did in 2018, after the FBI interviews in March?

A.   Yes, sir.

MR. GIBBS:  If we could blow up Paragraph 9, three lines from the bottom, starting with the word "Moreover."

Q.   Special Agent O'Toole, is this what the defendant said in his declaration?

A.   One moment.  I'm just reading.  Yes, sir.

Q.   And when it says:  "They also told me they did not care what I spoke about during the interviews," what is that a reference to?  Who is "they"?

A.  I have to reread that paragraph.

MR. GIBBS:  And if you can just widen that out, please.

A.  This is referring to the FBI.

Q.  I'm sorry?

THE COURT:  To the SDF?

THE WITNESS:  Sorry, the SDF.

THE COURT:  Is that what you said?

THE WITNESS:  I said from my understanding, this is about the FBI interview.  "They" would be referring to the FBI.

THE COURT:  "They," in that sentence?

THE WITNESS:  Sorry, Your Honor, let me reread this.

THE COURT:  That's all right.  Take your time.  You're reading something you didn't write.

For the information of persons in the courtroom, this is a reference to a declaration that is by the defendant, Kotey, and it's a public document.  It's in the clerk's office.  Am I correct?

MR. GIBBS:  It's a declaration by El Shafee Elsheikh.

THE COURT:  Yes.  And it's a public document, isn't it?

MR. GIBBS:  Judge, I don't know that it is because of the protective order in the case.  It was filed initially as an attachment to the defense motion to suppress.

THE COURT:  All right.  Let me ask Mr. MacMahon, is it under seal?

MR. MACMAHON:  I believe it is, Your Honor.

THE COURT: Well, it's no longer under seal. It's going to be referred to here in open court.

MR. GIBBS: That's correct, Judge.

THE COURT: All right. Go ahead.

A. I apologize. This is referring to the SDF. "They" was referring to the SDF.

THE COURT: All right. That's the answer, Mr. Gibbs. Proceed.

MR. GIBBS: Thank you.

BY MR. GIBBS:

Q. And did the Defendant El Shafee Elsheikh do a number of media interviews in 2018?

A. Yes, sir.

Q. And then moving forward to 2019, if we can go to page 8. Now, Special Agent O'Toole, on page 8 it indicates: "After the beating ceased, the head of the prison said, 'Consider this your first day of detention. Everything that happened before never happened. You have no rights. This is the best it is going to get. From this point on, it can only get worse unless you can do what you're told. From now on, you don't refuse to speak to anyone, and when you speak to anyone, you tell them exactly what you told the American DoD.'"

MR. GIBBS: Now, if we can go to page 9 and blow up that top portion.

THE COURT: So that it's clear, that's a quote by the

defendant, Elsheikh.  It's not a quote from the person who is said to have made the statement, it's Elsheikh's putting it in quotes.

MR. GIBBS:  That's exactly correct, Judge.  This is his declaration that he signed.  This is his quote.

THE COURT:  Right.  But his statement about what someone else said to him, putting it in quotes suggests that he had some way of getting it word for word, and that's not the case.

What's your question?

BY MR. GIBBS:

Q.  And turning to page 9, can you just read the portion that starts with the sentence, "The moment the interview was over," that's highlighted there.

A.  Yes.  "The moment the interview was over, I was taken back to my cell.  On the way back, the guards left me alone.  At this point I knew that I would not be physically beaten if I kept restating my false DoD confessions to the media outlets.  I felt like a broken and abused animal, doing whatever I could to be properly fed and not physically abused."

Q.  And in terms of what the defendant said in his declaration, by this point in 2019, he claimed that he had been told to "do nothing but repeat what you told DoD when you're interviewed," and here on page 9 he said, "I knew I would not be physically beaten if I kept restating my false DoD confessions."

Is that what's included in the declaration?

A.   That is what's included in the declaration, yes.

Q.   Now let's go to Government Exhibit 15-2.

THE COURT:   I trust that this examination is going to do something other than have this witness identify certain portions of the defendant's declaration.

MR. GIBBS:   It is, Judge.   What I intend to do with this witness is compare the statements we just heard, which is the defendant is going to repeat what he said to DoD, with what he actually said to DoD compared with what he said in the media interviews.

THE COURT:   All right.   Proceed.

Q.   What is Government Exhibit 15-2, Special Agent O'Toole?

A.   That is a CD with my initials on it.

Q.   And did you have an opportunity to review some CDs and initial them before the hearing?

A.   I did.

Q.   And does one of those CDs include an interview with CNN News in 2019?

A.   It does.

MR. GIBBS:   Your Honor, we ask to move in Government Exhibit 15-2 and play it for the Court.   And I believe -- I don't believe there's a transcript on this one.

(Video played in open court.)

Q.   Special Agent O'Toole, the interview clip we just looked at,

what media organization was that with?

A.  This was with CNN.

Q.  When was that?

A.  This is roughly summer of 2019.

THE COURT:  2000 when?

THE WITNESS:  '19.

THE COURT:  '19.  Next question.

Q.  And in the clip we just saw, the defendant made a statement about not having any communication or intelligence about the locations of where the hostages were.  Was that consistent with what he told DoD?

A.  It is not.

MR. GIBBS:  Your Honor, at this point I would like to put up Exhibit 2-3, which is already in evidence, and ask the witness about it.

THE COURT:  You may do so.

Q.  Special Agent O'Toole, this is already in evidence.  But do you recognize this document?

A.  Yes, I do.

Q.  What is this document?

A.  This is a Tactical Interrogation Report provided by the Department of Defense of the defendant.

MR. GIBBS:  Can we enlarge those first two paragraphs as much as we can.  Or I tell you what, can we just do first one and then the second one.  That may be easier.

THE COURT:  Go ahead.

MR. GIBBS:  Can you enlarge the paragraph below that.

THE COURT:  Why don't you do them one at a time?  Are you going to ask him any questions about the first one?

MR. GIBBS:  I was going to ask questions to cover all of it, Your Honor.

THE COURT:  Well, enlarge the first one again.  All right.

MR. GIBBS:  Your Honor, I can ask a question about that one.

THE COURT:  Go ahead.

BY MR. GIBBS:

Q.  Special Agent O'Toole, are you aware of any media interviews where the defendant stated what he told DoD; that is, that Muhammad Emwazi told him he personally beheaded and disposed of the remains of James Foley and Steven Sotloff?

A.  No, I'm not aware of any media interview that includes that information.

(Reporter clarification.)

A.  I'm not aware of any media interview that includes that information.

MR. GIBBS:  Now, if we can enlarge the second paragraph.

THE COURT:  All right.  Go ahead.

Q.  All right.  Special Agent O'Toole, are you aware of any

media interviews where the defendant stated what he told DoD; that is, that Emwazi told him that he executed both Foley and Sotloff near where Elsheikh and Emwazi used to practice shooting?

A.   No, I'm not aware of any media interview that includes that information.

Q.   And are you aware of any media interviews where the defendant stated that Emwazi told him what he did with the bodies after these executions?

A.   No, sir.

MR. GIBBS:   If we could go back to the declaration, Exhibit 15-1, and go back to Paragraph 14 of that exhibit.

Q.   Special Agent O'Toole, the enlarged portion of the defendant's declaration states, "Moreover, during the July or August 2019 *Washington Post* interview, the interviewer asked me why I looked so poorly in the last CNN interview.  I responded by stating, 'Let's just say I was not feeling so good.'"

Agent O'Toole, the *Washington Post* interview with the defendant was actually recently uploaded online.  Correct?

A.   That's correct.

Q.   Have you had an opportunity to review the entire *Washington Post* interview?

A.   I did.

Q.   Did you see the exchange that the defendant claims in his declaration?

A.   No, I did not.  I did not hear that exchange.

Q.   Other than CNN, in 2019 did the defendant also do media interviews with a journalist with ITV News?

A.   Yes.

Q.   And have you had the opportunity to review clips from the ITV News interview?

A.   Yes.

Q.   If you could look in the binder at Exhibit 15-4, if you could just quickly identify that and then we'll play it.

A.   Yes, I see a DVD with my initials written on it.

          MR. GIBBS:  Judge, we would ask to move 15-4 into evidence and to play it for Your Honor.

          THE COURT:  All right.  It's admitted for purposes of this hearing.  I take it your purpose in showing it is to contradict statements in the declaration of the defendant?

          MR. GIBBS:  That's correct, Judge.

          THE COURT:  All right.  You may do so and you may play it.

          (GOVERNMENT EXHIBIT Number 15-4 was admitted into evidence.)

          (Video played in open court.)

BY MR. GIBBS:

Q.   Special Agent O'Toole, who was David Haines?

A.   David Haines was a British national that was taken hostage by ISIS within the 2014-2013 time period.

Q.   And what ultimately happened to David Haines?

A.   He was beheaded by ISIS.

Q.   Now, in the interview we saw, the interviewer was pressing him quite hard about David Haines.  Can you take a look at Exhibit 15-5?

A.   I do.  It's a DVD with my initials written upon it.

MR. GIBBS:  Your Honor, we would ask to play a second clip, 15-5, for the Court.

THE COURT:  You may do so.  Again, tell me what the purpose of this is, to show what?

MR. GIBBS:  So I'll clean it up at the end.  But it's to show that the defendant was asked very specifically about a particular hostage.  He claimed to have no knowledge of this person, when in fact, in the DoD interviews, he gave some very specific information about this person.

THE COURT:  So when he claims he had no knowledge of it, is that in the declaration?

MR. GIBBS:  In the declaration -- I mean, well, yeah, in the declaration, what he's saying is any statement he gave was involuntary because it was coerced.  The interview we just watched -- or the clip we just watched, and the next one, is where he said he had no information about this individual.

But again, in the declaration, he said that he was told, "Repeat what you said to the DoD in the media interviews," and he said he did that.  He felt like a broken animal, so he

simply repeated what he said to the DoD in the media interviews; when, in fact, here he is in a media interview being asked a very specific question, and I'll tie it up with the DoD information after this next clip.

THE COURT:  Proceed.

(Video played in open court.)

BY MR. GIBBS:

Q.  Special Agent O'Toole, that second clip we saw, is that another ITV News interview where the defendant was pressed very forcefully about what, if anything, he knew about David Haines' murder?

A.  Yes, it is.

Q.  And in fact, did the defendant tell DoD details about David Haines' murder?

A.  He did.

Q.  And were details related to his murder included in Exhibit 5-1D, which is in evidence?

A.  Is that here?

Q.  No.

MR. GIBBS:  Judge, this is just to advise the Court, 5-1D is in evidence.  Jonathan Kath was the witness on Tuesday. That is still a classified exhibit, so I can't publish it at the moment.  But that does tie up with the two clips about David Haines, Your Honor.

THE COURT:  All right.  Proceed.

Q.  Now let's go back to the second page of Exhibit 5-2 that we looked at earlier.  That is in evidence.  When it comes up, Special Agent O'Toole, if you can just reorient us as to what this document is.

A.  5-2 is another Tactical Interrogation Report provided by the U.S. Department of Defense.  These are interrogation reports done of Shafee Elsheikh.

Q.  So does this document summarize some of the answers that the defendant gave in the DoD tactical interrogations?

A.  Yes.

MR. GIBBS:  And if you can enlarge the part with the heading, "What was the involvement of the Beatles in the death of Goto and Yukawa."

THE COURT:  What are your enlarging?  I don't see anything enlarged.

MR. GIBBS:  It will take a moment, Judge.  We're pulling it up now.

THE COURT:  Mr. Gibbs, just so I'm very clear about this, you're showing the Court this to contradict what Elsheikh said in his declaration.  Is that right?  And in addition, to show that he was a member of the hostage-taking conspiracy.

MR. GIBBS:  While I would agree with that, Judge, I think secondarily -- it certainly shows he was a member of the hostage-taking conspiracy.  Since this was taken from a DoD interview, we're not offering this as direct evidence.  But

you're exactly right, this evidence shows that what he told DoD was much more detailed and robust than what he said in the media interviews, despite the fact that in his declaration he said:  I was forced to do the media interviews and I did what SDF told me to do; I repeated my DoD statements in the media interviews. And this is to rebut that claim.

THE COURT:  All right.  Proceed.

Now, when you say you're not going to offer this to show membership in the hostage-taking conspiracy alleged in the indictment, we're not at the trial.  This is just a motion to suppress.  So I'm not interested in whether you offer it for that purpose or not.  You may decide to do it, you may decide not to do it, as you see fit.

Proceed.

BY MR. GIBBS:

Q.  Special Agent O'Toole, this summarizes information that the defendant gave to DoD?

A.  It does.

Q.  And it relates to two Japanese hostages.  Can you explain who Goto and Yukawa were?

A.  Haruna Yukawa and Kenji Goto were both held by ISIS as captives, attempted to be ransomed out in early 2015; ultimately were both beheaded.

Q.  And if you could take a look in the binder at --

MR. GIBBS:  We can take that down now, thank you.

287

Q.   -- Exhibit 15-9.

A.   (Witness complies.)

Q.   What is 15-9?

A.   It's a clip taken from an ISIS propaganda video showing Haruna Yukawa and Kenji Goto.

Q.   And are those the two gentlemen you were just speaking about?

A.   Those are the two individuals I referenced -- or the DoD document references.

MR. GIBBS:  Your Honor, we would move Government Exhibit 15-9 in and ask to publish.

THE COURT:  All right.  You may do so.

(GOVERNMENT EXHIBIT Number 15-9 was admitted into evidence.)

Q.   And where did this photograph -- or this still photo come from, Special Agent O'Toole?

A.   This was from an ISIS propaganda video that was published in January 2015.

Q.   January 2015?

A.   Correct.

Q.   And can you explain who the two gentlemen are in the orange shirts?

A.   Yes.  So on the right is Haruna Yukawa, and on the left is Kenji Goto.  Yukawa was beheaded first, and then soon thereafter there was another video provided of Kenji Goto's beheading.

Q.   And you said that the gentleman on the right was beheaded first.  Is that correct?

A.   That's correct.

Q.   Did ISIS publicize his beheading?

A.   They did.

Q.   How did they do that?

A.   Through their media apparatus, online.

Q.   And what did they show online?

A.   They showed -- how it was shown was Kenji Goto actually held a picture of Yukawa's severed head in another plea for a ransom demand.

Q.   And when was that that the ISIS video was released with Kenji Goto holding the photo of the severed head?

A.   That's, again, also January of 2015.

Q.   And then if you could quickly look at Exhibit 15-8, what is that?

A.   Yes, it's a depiction of Kenji Goto, also in a similar state as the previous photo, but Yukawa is not present.

          MR. GIBBS:  Judge, we would ask to publish Exhibit 15-8, the photo of Kenji Goto.

          THE COURT:  You may do so.

Q.   And what ultimately happened to Kenji Goto, Special Agent O'Toole?

A.   Kenji Goto was, too, beheaded.

Q.   When was that?  Or when was his death reported by ISIS?

A.   Again, in January 2015.

MR. GIBBS:  You can take that down.

Q.   Special Agent O'Toole, in the DoD exhibit we looked at a minute ago, Exhibit 5-2, that described the two Japanese hostages, it also talked about how Emwazi had tasked the defendant to reach out to representatives of the Norwegian government to initiate negotiations.  Do you recall that?

A.   That is correct.

Q.   And if you could take a look at Government Exhibit 15-11.

A.   (Witness complies.)

Q.   What is 15-11?

A.   This is sort of an advertisement that ISIS made, published in an ISIS publication called *Dabiq* in the latter half of 2015, of a Norwegian hostage - or prisoner, as it states here - for sale.  The name is listed as Ole-Johan Grimsgaard-Ofstad.

MR. GIBBS:  Judge, at this time we would ask to move in Government Exhibit 15-11 and publish it.

THE COURT:  All right.  You may do so.

(GOVERNMENT Exhibit Number 15-11 was moved into evidence.)

THE COURT:  Now, what does this contradict in his declaration?

MR. GIBBS:  Well, what it shows is that in fact what he said to DoD about having negotiated for a Norwegian hostage, there was in fact a Norwegian hostage held by ISIS, and in a

moment we'll play some clips where the defendant was asked specifically about -- or I'll ask the agent whether he, in any media interview, ever admitted to being involved in negotiations for Japanese, Norwegian, or anyone else.

THE COURT:  And he says?

MR. GIBBS:  And he -- there are no media interviews where the defendant repeated what he told DoD about the fate of the Japanese or Norwegian hostages.

THE COURT:  All right.  Does this contradict something in his declaration?

MR. GIBBS:  It does, Judge.  Because his declaration says:  I was forced, against my will, to repeat what I said to DoD in the media interviews, and I did that.

In the media interviews he was asked questions which would have elicited the fact that he knew -- or he was tasked by Emwazi to help negotiate with the Japanese government and the Norwegian government, and he never told that to any media organization, which contradicts the notion that his statements to the media were involuntary and coerced.  Because he had made a decision -- clearly he told DoD one thing, and he chose not to repeat that to the media, despite saying in his declaration that that's what he had done.

THE COURT:  All right.

MR. MACMAHON:  Very briefly, Your Honor.  I would like to object to the lack of foundation.  I think Mr. Gibbs just

said he's going to play a clip where someone asked Mr. Elsheikh a specific question that would match what he said to the DoD. But otherwise, it wouldn't be an inconsistent statement if he wasn't asked specifically about it.

MR. GIBBS:  Well, Your Honor, I believe earlier Mr. Langan, in some of the clips, he was asking specifically about any role Elsheikh had in the negotiations for the hostages, and Elsheikh pushed back very forcefully and said:  I got the emails, I gave them to Emwazi; that's the full extent of it.

And he was pressed on that on a couple of occasions, and he stuck to that story.

Well, in fact, Emwazi had tasked him to communicate with two foreign governments, to open lines of communication about these hostages.  So I think he was asked questions that would have elicited that, and he failed to say what he told DoD.

THE COURT:  All right.  Next question.

BY MR. GIBBS:

Q.  So this gentleman that we just looked at - you don't need to pull it back up - this was a Norwegian hostage held by ISIS?

A.  That's correct.

Q.  And what ultimately happened to him?

A.  In *Dabiq 12*, there's another sort of notification issued in the *Dabiq* publication, ISIS publication, that shows a body covered with blood that is said that the results of the

Norwegian hostage, indicating that he's died.

Q. And *Dabiq*, that's an ISIS publication, you said?

A. That's correct.

Q. And when was that publication issued?

A. It's the issue after *Dabiq 11*, so roughly the autumn of 2015.

Q. All right. And Special Agent O'Toole, are you aware of any media interviews where the defendant repeated what he told DoD about his role in negotiations with the Japanese government?

A. No.

Q. Are you aware of any media interviews where the defendant repeated what he said about his role in negotiations with the Norwegian government?

A. No.

Q. Finally, Special Agent O'Toole, I just have one last area to cover with you. When was the defendant moved from SDF custody into U.S. DoD custody?

A. He was moved from SDF custody to DoD custody on October 9, 2019.

Q. And was he subjected to a medical exam upon going into DoD custody?

A. Yes.

Q. And did you have an opportunity to -- well, first off, can you take a look at Exhibit 15-7.

A. (Witness complies.)

Q.   What is 15-7?

A.   15-7 is a TSF medical in-processing form.  Want me to explain it?

Q.   Yeah, please.

A.   So the in-processing form was a normal form used by the United States Department of Defense when they were in-processing detainees coming into their facility in Iraq.  Elsheikh was to in-process on 9 October 2019, as it states on the bottom.  He --

Q.   I think that's enough.

        MR. GIBBS:  Your Honor, if we could move Government Exhibit 15-7 into evidence.

        THE COURT:  All right.  It's admitted.  You may display it if you wish.

        MR. GIBBS:  Please.  And I want to ask the agent some questions about it.

        (GOVERNMENT EXHIBIT Number 15-7 was admitted into evidence.)

Q.   So Special Agent O'Toole, you've testified to what 15-7 is.  Did you also have an opportunity to interview the doctor who examined the defendant in October 2019?

A.   Yes.

Q.   And when did you speak to the doctor?

A.   It was approximately -- when did I?  That was the question, when?

Q.   Yes.

A.  Approximately two weeks ago.

Q.  And what did the doctor say when you spoke to him about how claims of abuse or mistreatment are handled within the DoD?

A.  I guess with severity and concern --

MR. MACMAHON:  Object to the hearsay, Your Honor.

THE COURT:  It is hearsay, but I'll hear it and I can evaluate its accuracy in a motion to suppress.

Proceed.

A.  The doctor advised that they were very sensitive to any allegations of abuse or torture.  He noted especially, since the beginning of the war on terror, every allegation had to be investigated and looked into thoroughly.

Q.  And did the doctor say that when he examined the defendant, that the defendant spoke to him and provided some information that was included in the form?

A.  Yes, that's correct.

MR. GIBBS:  Could we sort of blow up that right -- the column on the right-hand side.

Q.  So, for example, Special Agent O'Toole, it looks like in the column on the right-hand side, there's a typed notation that says, "Job:"  And can you read what it says next to that?

A.  It says "mechanic."

Q.  Did you ask the doctor about that?

A.  I did.

Q.  And what did he say?

A.   He said this was a response given by Elsheikh when he asked what his job was.

Q.   And so the defendant was able to speak to the doctor and provide him information about his medical history?

A.   Correct.

Q.   And in fact, up above there, do you see where it says "Food Allergies"?

A.   Yes, I see.

Q.   And what is listed there, or written in hand there?

A.   "Vegetarian" -- "No preference, vegetarian, will eat fish."

Q.   And that's information that would come from the defendant?

A.   Correct.  It's my understanding from talking to the doctor that all the responses here were direct responses to his questions from the defendant.

Q.   And then, did the doctor also do a physical exam of the defendant?

A.   He did.

Q.   And did he make some notations related to that physical exam?

A.   Yes.  There are a lot of acronyms that are medical acronyms, but he explained those as well.

Q.   And at sort of the bottom left of the form, there's diagrams of the human body.  Do you see that?

A.   Yes.

Q.   And the one on the left there, if we can get it back up, was

there a notation for the head of Mr. Elsheikh?

A.   Yes, there's a notation sort of scribbled on here.  The doctor explained that the writing he put for the mark on the defendant's head was a prostration mark.

THE COURT:  Was what?

THE WITNESS:  A prostration mark.

Q.   And what is a prostration mark, Special Agent O'Toole?

A.   Notably, from my experience from dealing with counterterrorism and dealing with the Middle East, a prostration mark, in sometimes individuals who pray five times a day or even more, who take a kneel and do the normal prayers every day, five times a day, they eventually, if they do it consistently, they have a prostration mark on their forehead.

As an example, Ayman al-Zawahiri has a prostration mark on his forehead.

Q.   And can it sometimes look like a bruise or some sort of skin blemish?

A.   It can.

Q.   But when the doctor did the examination, his conclusion was that was a prostration mark?

A.   That's right.

Q.   All right.  Now, in the interest of time, in the defendant's declaration - and this is from page 7, at the bottom, and then page 8, starting at the seventh line - I'll just read it into the record since it is in evidence.  The defendant stated in his

declaration: "Specifically they would hold my handcuffs behind my back and knock me to the floor, and once on the floor, they would yank me up from behind.  The pain was extreme, and to this day I still suffer pain when attempting to move my shoulders in specific positions."

At page 8 he said:  "One of the guards proceeded to lift my handcuffed arms behind my back.  I could only assume they were trying to dislocate my arms."

Now, in the examination that was done of the defendant, were his upper and lower extremities examined by the doctor?

A.   They were.  There's two categories on the left side of this form.  It lists lower and upper extremities, notated "EXT."

Q.   And what did the doctor indicate on the form regarding the upper and lower extremities?

A.   He wrote, "No edema, no tenderness, no gross deformations," and the strange notation here of, it looks like, F-L-R-O-M, full range of motion.

Q.   And the doctor, did he tell you that's what that notation meant, full range of motion?

A.   Yes.

Q.   So was there any indication in the medical report of the defendant having pain to this day in his shoulders?

A.   No.  And the doctor said if there were an allegation or a comment made by the defendant that there was difficulty in some movement such as that, he would notate it in the

"Injuries/Abuse" category of the form.

Q.  And in the declaration, just in the interest of time, at page 8, eight lines down, the defendant claimed that part of his mistreatment included being lifted in the air through the genitals.

Was there -- the diagram that's here, was the genital region one area that the doctor could have examined?

A.  Yes, it was.

Q.  And what did the doctor's report say about that region?

A.  I can't quite remember what the acronym stands for, but on the left side of the middle of the document there's an area just underneath "Lungs," the category of "Lungs," it's notated "GU," genital -- I couldn't exactly tell you what the "U" stands for. But the notation was "deferred," meaning that the defendant deferred to an inspection by the doctor for that region of the body.

THE COURT:  What do you mean by "deferred"?

THE WITNESS:  As in he deferred not to be inspected there.  The doctor added that he kept his underwear on.

THE COURT:  Next question.

Q.  And then at the end of Paragraph 12 of the defendant's declaration, he said:  "Because of the beating to my head, I developed a horrible ear infection in which blood and pus were coming from my ear.  For a long time after this prolonged beating, I was in constant pain and had difficulty hearing."

In the report that the doctor did when he examined the defendant in October of 2019, did he indicate any indications of problems with the defendant's ears?

A.   No.  In the category of -- on the left side of the page, again, just in the middle, just above the category of "Neck," there's a region that says "HEENT," head, eyes, ears, nose, throat, and he made notations here.  I'd have to refer to my notes for what they actually mean, but suffice it to say, when we talked to the doctor, if there were any kind of damage to the ear, he did not notice any from his examination.  And then he also communicated with Elsheikh throughout the interview, and he responded without difficulty.

Q.   And without raising any complaints of any physical ailments or injuries?

A.   Correct.  And as the doctor said, if there were any injury or abuse allegations, it would be notated in that second category near the top of the page, under "Injuries/Abuse."

Q.   Right.  And what is notated in the category "Injuries/Abuse"?

A.   "No concerns here."

Q.   That was when the defendant was initially in-processed into DoD custody.  Was that his only opportunity to get medical treatment or to seek medical treatment?

A.   No, the doctor advised that there were medics that checked on any detainee within the facility twice a day.  They took

notes and then the doctor would review those notes.  The defendant was eventually moved from this facility to another facility in the Department of Defense custody.  But at any time, even after the initial processing, he can make a claim.

Q.  And in your investigation, did you find the defendant making any claims that supported what he said in his declaration about his mistreatment?

A.  No.

MR. GIBBS:  That's all I have, Special Agent O'Toole. I believe Mr. MacMahon may have some questions.

MR. MACMAHON:  Just a few, Your Honor.

THE COURT:  All right.

**CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT**

**BY MR. MACMAHON:**

Q.  Special Agent O'Toole, the comment you talked about from the *Washington Post* article where Mr. Elsheikh said, "Let me say I wasn't feeling so good," that's actually in the Langan interview, isn't it?

A.  I would have to review the Langan interview to see.  The comment, based on the affidavit from Elsheikh, says it's *Washington Post*.

Q.  No, I understand that.

A.  It's not present in the *Washington Post* interview.

Q.  No, I understand that.  It could be a mistake.  It was actually in the Langan interview.  Correct?

A.  I don't know.

Q.  If you know.

MR. MACMAHON:  Judge, the only other thing, I don't have --

THE COURT:  If it was a mistake, it would have been the defendant's mistake.

MR. MACMAHON:  Yes, Your Honor, of course.

THE COURT:  All right.  Next question.

MR. MACMAHON:  Your Honor, I don't have any more questions for the witness.  There were some exhibits we were going to use because he's the custodian, and we've agreed with the Government just to put in.  And I can read those and the witness can be excused, unless Mr. Gibbs has another question for him.

MR. GIBBS:  No objection, Judge.  I just want to put that on the record.

THE COURT:  Stay there for a moment.  Let me hear about the exhibits, Mr. MacMahon.

MR. MACMAHON:  They're just exhibits that are -- they are videos from the Department of Defense rec centers that show conversations with things that Mr. Elsheikh is saying about his injuries.  When he was in custody, the Department of Defense would record when he was in certain rec areas.

THE COURT:  All right.  What are they?

MR. MACMAHON:  They're Exhibits 400 to 410.

THE COURT:  Are they documents or videos?

MR. GIBBS:  They're very short videos, Your Honor.  We don't need to see them today, but this is the witness I can get them in through, so...

THE COURT:  All right.  Well, let's ask the witness what you need to do to authenticate them.

BY MR. MACMAHON:

Q.  Special Agent O'Toole, are you familiar with the Department of Defense videos that have been produced in this case?

A.  Yes, sir, the socialization videos.

Q.  However you want to describe them, I'm sorry.

A.  Yes.

Q.  And have you looked at the exhibits in the defense binder?

A.  I have not.

MR. MACMAHON:  Your Honor, we have an agreement with the Government that these are videos that the Government produced, and there isn't an objection that they're authentic and...

MR. GIBBS:  Your Honor, Mr. MacMahon is correct.  These were provided by the Government as part of the discovery in this case.  I was actually provided with a disc.  I don't want to become a witness in the case, but over lunch time I did review them.  They're consistent with the discovery provided in this case.

THE COURT:  So in other words, these are video clips

that the Government provided to the defendant that the defendant now wants to use to substantiate his claims of being mistreated?

MR. MACMAHON:  Yes, Your Honor.

THE COURT:  All right.  And do you have any objection to the admissibility of these for purposes of this hearing, Mr. Gibbs?

MR. GIBBS:  I do not, Judge.  And the one thing I would add, we actually attached a clip from the socialization visits to one of our pleadings.  It was Attachment 17.  I believe it was one of our responses.  And that may well contradict some of what was said in these.  But yes, I have not objection --

THE COURT:  May contradict what?

MR. GIBBS:  Just some of the claims of the defendant regarding abuse by SDF.

THE COURT:  All right.  So I will admit Exhibits 400 through what Mr. MacMahon?

MR. MACMAHON:  410.

THE COURT:  To 410 for purposes of this hearing.

(DEFENDANT EXHIBIT Numbers 400-410 were admitted into evidence.)

THE COURT:  Now --

MR. MACMAHON:  I have -- I'm sorry, Your Honor.  I didn't meant to interrupt you.

THE COURT:  No, go ahead, sir.

MR. MACMAHON:  Exhibits 411, 412, 413, and 414 we've

also agreed with the Government have a foundation.  They're parts of the CNN videos that the Government didn't rely on in their -- we would move 411, '12, 413 and 414 as well.

MR. GIBBS:  No objection.

THE COURT:  They're admitted for purposes of this suppression hearing.  Anything further?

MR. MACMAHON:  One other exhibit, Number 123, which is a letter from Mr. Fitzpatrick about Kotey statements, which is stipulated as authentic only for purposes of this - nobody is trying to use it for the trial - but it deals with some of the comments that have been made, evidence that's come before you about what Mr. Kotey may have said.  And the Government has no objection to that coming in either.

THE COURT:  What exhibit is it?

MR. MACMAHON:  Defense 123.

THE COURT:  And what is this coming in for, Mr. MacMahon.

MR. MACMAHON:  First of all, I said Mr. Fitzpatrick's name wrong, which I've done before and I apologized to him when I called him Fitzgerald.

The exhibit in front of you is an exhibit that contains the disclosure from the Government as to Mr. Kotey claiming abuse and the Government finding it to be credible.

MR. GIBBS:  Judge, no, the Government did not find it to be credible.

MR. PAREKH:  No.

MR. MACMAHON:  No, I may have mis -- this isn't my witness here.  I'm trying to -- Ms. Ginsberg has this.

MR. FITZPATRICK:  Your Honor, I wrote the letter.  I can explain.

THE COURT:  All right.  Do so.

MR. MACMAHON:  And I didn't mean to misstate it, Your Honor.

THE COURT:  I'm not in the habit of admitting lawyers' letters in a motion to suppress or in a trial, but it's central. What is it?

MR. FITZPATRICK:  I apologize.  Your Honor is familiar with the Alexanda Kotey case.  He has pled guilty.  He has a modified cooperation agreement with the Government.  In the course of fulfilling that plea agreement, we interviewed Mr. Kotey.  We specifically asked him questions about conditions of confinement went he was within SDF custody.

To discharge our *Brady* obligations, we memorialized his statements in a letter and provided them to the defense solely to discharge our *Brady* obligations.  We say in the preface to the letter, in the first paragraph of the letter, that we have not had any opportunity to evaluate the statements.  By that we mean we have not vetted the statements for their accuracy or truthfulness.

It is true that that is what Mr. Kotey said, and in

order to discharge our discovery obligations, we provided them. But we have not evaluated those statements for their truthfulness.

THE COURT:  So the only correction here is that the Government doesn't agree with the statement.  You're just reporting the defendant's statement.  Is that what you're saying?

MR. FITZPATRICK:  Yes, we are reporting the defendant's statements that involve potentially *Brady* material to the defense.

THE COURT:  So what is it about this letter that should be admitted for purposes of this hearing?

MR. FITZPATRICK:  Judge, we have no objection to the Court receiving the letter.  I mean, I communicated that to Mr. MacMahon and Ms. Ginsberg.  We have no objection to the Court receiving that.  I also told them that we were going to ask the Court to place very little weight on the contents of the letter or the assertions in the letter because they have not been fully evaluated.  You can consider them; the Government's argument will be you should give them little weight.

THE COURT:  Well, these are statements by the defendant, are they not?

MR. FITZPATRICK:  These are statements by Mr. Kotey.

THE COURT:  Mr. Kotey, all right.

MR. FITZPATRICK:  Concerning the conditions of

confinement within SDF custody.

THE COURT:  All right.

MR. MACMAHON:  Your Honor, just one last thing and I think we'll be done for the night.

THE COURT:  Ms. Ginsberg, do you have something you want to say?

MS. GINSBERG:  I do, because I was the one who was involved.

THE COURT:  Do you want to say anything, Mr. MacMahon?

MR. MACMAHON:  If I can have one second, then I'll be able to sit down for the night, Your Honor.

In the declaration I think Mr. Gibbs just was paraphrasing on page 8, Mr. Elsheikh said that the guards kicked him in the genitals, and there were different words used by Mr. Gibbs.  I'm just clarifying that.

MR. GIBBS:  And that's an accurate clarification, Judge.  We have no problem with that.

MS. GINSBERG:  Judge, just with respect to this letter, Mr. Fitzpatrick is right, that they never vouched for the credibility or the reliability of the statements.  But they were disclosed, these were statements that were made by Mr. Kotey, and in lieu of having to call an agent or a prosecutor who was present for that interview, the letter was submitted.

The reference to the credible finding refers to what was Defendant's Exhibit 121, which is a report that Mr. Kotey

made of abuse when he was taken into DoD custody in Iraq, and he reported -- I can't tell the Court who it was addressed to because that part is redacted. But it appears to be an email reciting the complaints of abuse that Mr. Kotey made sometime after October of 2019 when he was in U.S. custody. And he claims five different types of abuse occurred five months prior, which would have been the time that he was detained at Derik.

And the Government official who took this report made a finding in this report or in this email that Mr. Kotey's allegations were credible.

THE COURT: What exhibit is that?

MS. GINSBERG: It's Defendant's Exhibit 121. And if that hasn't been introduced, I would move the admission of that. And that was produced by the Government in discovery.

THE COURT: All right.

(DEFENDANT Exhibit Number 121 was moved into evidence.)

MS. GINSBERG: Thank you, Your Honor. I hope that clarifies.

THE COURT: Anything further today in the motion to suppress?

MR. GIBBS: I believe Mr. Parekh has one thing, Judge.

MR. PAREKH: Your Honor, briefly, before our last break you had asked me about the March 27th, 2018, Mirandized interview that the Government will be seeking to introduce in its case-in-chief at trial should Your Honor rule that that --

the statements from that interview are admissible.  This is the Mirandized interview conducted by Special Agent Chiappone and Special Agent Nutter.

And Your Honor had gone through the eight counts in the indictment and had asked, other than the material support counts what other counts would the statements from that interview go to, and I've given Your Honor a summary.  I just wanted to add just two important points here, Your Honor, in light of Your Honor's question.

The statements that are in Government Exhibit 12-8, which Your Honor admitted for the motions hearing, there are a number of statements in there that do go to the other counts this the indictment.  And I think that will become clear at trial.  But just to give Your Honor two quick examples, the defendant admitted to Special Agents Chiappone and Nutter that he was part of the British Army Cadets in the United Kingdom when he discussed his pre-travel to Syria.  We believe we'll have evidence at trial indicating from the hostages where the hostages will be able to recount stories of their masked jailers and one of the masked jailers, who we would like to proffer is El Shafee Elsheikh, indicated that -- with a British accent that he was a member of the British Army Cadets or something similar to that effect.

Another important example Your Honor will see in this report, in Government Exhibit 12-8, it's Bates Number US4245,

talks about the fact that Elsheikh does not have faith in the United States judicial system because Aafia Siddiqui received an 80-year sentence.  That is highly, highly relevant and probative of the hostage-taking scheme that we've alleged because we have evidence in the form of the ransom emails that Your Honor has heard evidence, a little bit of evidence about during this hearing, where Aafia Siddiqui was mentioned as a potential prisoner swap in exchange for hostages that were being held in connection with this conspiracy.

So these statements are highly probative and relevant to the scheme that we've alleged in the indictment, and we would connect the dots for the jury to witness testimony and other evidence throughout the trial.  So I just wanted to give some more color to Your Honor's question.

THE COURT:  All right.  Thank you.

MR. DEUBLER:  Your Honor, may I be briefly heard on Mr. Parekh's point?

THE COURT:  Do you have anybody else sitting over there who wants to be heard?  Maybe a cousin or a distant relative?  Go ahead, but do it quickly.

MR. DEUBLER:  Very, very quickly, Your Honor.  It was just for clarification of the record.  Mr. Parekh talks about somehow tying the reference to Siddiqui to my client.  Fine.  But Alexanda Kotey -- there's plenty of evidence that also ties that comment to Alexanda Kotey.

And regarding the British Cadet comment, there's also evidence in the discovery that Alexanda Kotey was a British Cadet.

So I just put that on the record to kind of even the field.  Thank you, Your Honor.

THE COURT:  You have a long way to go to even the field, both of you.

What else do you have, Mr. Parekh, in response to that?  Anything?

MR. PAREKH:  No, Your Honor.

THE COURT:  All right.  Good answer.

Now, I have before me a motion to suppress.  I think it's complete.  It's been fully briefed.  I've now heard testimony in this hearing.  I don't think there is any -- in the course of the hearing, I said:  Well, Mr. MacMahon, you can file a motion to strike certain portions of Mr. Langan's testimony, but I don't think that has any relevance to the motion to suppress.  If it comes to trial, then you can file that motion.

Do you understand what I'm saying, Mr. MacMahon?

MR. MACMAHON:  Yes, Your Honor.  Thank you.

THE COURT:  But I don't see any obstacle to my now proceeding to decide the motion to suppress that has been presented.  Do you, Mr. Parekh?

MR. PAREKH:  We do not, Your Honor.

THE COURT:  Mr. MacMahon or...

MR. MACMAHON:  I mean, the hearing is complete, Your Honor.  If the Court wants to --

THE COURT:  No, I'm saying everything is complete.  I don't need any more briefing.

MR. MACMAHON:  No, I don't think we need any more briefing, if that's the question, Your Honor.

THE COURT:  Good.  I think it's ripe and now ready for me to decide.  That's what I wanted to know, Mr. MacMahon.  Is it?

MR. MACMAHON:  Yeah, we don't need to file any more briefs, Your Honor.  You have more than enough briefs on these issues.

THE COURT:  Amen.  All right.  I will do so.  And once I do that, this matter is set for trial in January.  So I need to resolve this fairly promptly so that parties can make their determinations on how they want to present their cases.

MS. GINSBERG:  Judge, I hate to stand up but I feel like I have to.

THE COURT:  I'm going to be very, very permissive, but in the future I don't want people popping up.  Because if you had ten lawyers, I would have to listen to ten of you pop up.  Last time, Ms. Ginsberg.

MS. GINSBERG:  Yes.  Judge, just for the Court 's information, we have just been told that we are going to receive approximately another terabyte, a significantly large discovery

production sometime after Thanksgiving.  And I'm just telling the Court, I don't know where that will leave us.  We received one just before this hearing which was also very large which we have not been able to review.

THE COURT:  I'm glad you brought that to my attention.  Refresh my recollection.  Now you have one, two, three, four, five lawyers working for this defendant.  Am I right?  Two law firms, or three law firms?

MS. GINSBERG:  We have four lawyers, Your Honor.

THE COURT:  Oh, there have been more.

MS. GINSBERG:  Ms. Carmichael is on maternity leave, so we don't have the benefit of her assistance.

THE COURT:  Do you have the benefit of anyone else in your firm?

MS. GINSBERG:  Not that's working on this case.

THE COURT:  Mr. MacMahon?

MR. MACMAHON:  No, Your Honor.

THE COURT:  Four lawyers.  And the Government has about four.  Is that right, Mr. Parekh?

MR. PAREKH:  We have four trial lawyers and Mr. Grano-Mickelsen is on our trial team as well.

THE COURT:  All right.

MS. GINSBERG:  Judge, I'm not asking that the Court continue the trial.  I just don't know what this will bring.  I'm just bringing it to the Court's attention.

THE COURT:  I appreciate that.  But if you do intend to seek more time, you need to do it promptly.

MS. GINSBERG:  Yes, sir.

THE COURT:  And I have no idea what a terabyte is.  I'm a twentieth century person.  I don't use a computer and I don't -- well, I know what those things mean.  But tell me, Mr. Parekh, in terms of volume of paper, how much is it you're producing?

MR. PAREKH:  If I could just have a moment to confer, Your Honor.

THE COURT:  Yes.

MR. GIBBS:  I think the agent may be able to assist us with this one.

THE COURT:  You're referring now to Agent O'Toole?

MR. GIBBS:  Correct, Judge.

THE COURT:  All right.  What's the answer, Mr. Parekh?

MR. PAREKH:  Your Honor, we don't have a precise number for Your Honor.  We're doing our best to answer Your Honor's question.  And the reason for that is --

THE COURT:  Yes, I know, some of it is video, some of it is text or something like that?

MR. PAREKH:  Some of it is FBI lab information that we're not actually using in our trial.  Some of it are witness statements.  So if Your Honor doesn't mind, we'll communicate that promptly to the defense and, if Your Honor wishes, to the

Court as well.  But we're trying to get --

THE COURT:  No, I don't need it.  But I need to know very soon whether this case is going to remain on the trial schedule as it is at present.  Planning is very important.  And I would add to that, my wife insists on that, too.

Anything further to be done in this matter this evening on behalf of the government?

MR. PAREKH:  Yes, Your Honor.  I believe the defense did not have an objection to this, but the Rule 15 deposition videos should remain under seal.  Obviously, there's still trial pending, we have the SDF witnesses whose identities we would not like to get out on camera, so if Your Honor will permit us to have those remain under seal as well as the exhibits for purposes of this motion hearing because we still have a trial, obviously, to conduct in this matter.

THE COURT:  What are you concerned about, jury contamination?

MR. PAREKH:  Some of the witness statements -- or some of the exhibits, rather, are classified.  Other exhibits that the defense is concerned about I believe is because they don't want the evidence to come out pretrial because they claim jury issues.  I don't think we have that concern, but we have no problem having them be under seal until the trial begins to avoid that issue.

THE COURT:  Well, this hearing was open to the public

except for the first three days.  And indeed, it was also open to the public through telephone lines, I believe.

Is that right, Tanya?

COURTROOM CLERK:  Yes, Judge.

THE COURT:  And some of them, there were people attending this hearing from the United Kingdom.  So it's hard to see anything that happened in that portion that should be anything other than public.  Is that right?

MR. PAREKH:  That's right, Your Honor.  Only the first day was actually not open to the public.  That was the classified day.

THE COURT:  Yes.

MR. PAREKH:  And the defense knows that.  They were well aware of that.  I think we certainly have no issue with the exhibits except for the Rule 15 depositions.  I don't think there are any other exhibits that we have a concern with.  But I believe the defense may want to be heard on that.

THE COURT:  Let's do it this way.  I'm going to issue an order that makes clear what exhibits are under seal.  But you are going to draft the order and get together with Mr. MacMahon and give it to me.  If you agree that something should remain under seal, then tell me and tell me why you think it should be under seal, and then I'll enter an order accordingly.

Until then, there isn't going to be anything that's going to be filed.  There won't be a transcript because it won't

be ready, and if anyone gets a transcript, it's going to be me.

All right.  Anything else to be accomplished today?  I think the only thing -- the protective order is in effect.  Of course, nothing in the first two days or day --

MR. PAREKH:  The first day, Your Honor.

THE COURT:  The first day was closed, and that is under seal, classified.

MR. PAREKH:  Correct.

THE COURT:  The testimony of the SDF persons, is that public?

MR. PAREKH:  That is public, just not the videos.

THE COURT:  All right.  Well, nothing is going to be available as a practical matter to the public for the next day or so, or next week.  You and Mr. MacMahon or Ms. Ginsberg need to get together and send me an agreed order, but the order has to recite what the reasons are for placing it under seal because this should be a public proceeding and the public is entitled to it.  I think the press left, I guess.  I don't see Mr. Langan here anymore.

MR. GIBBS:  I think he did leave, Judge.

THE COURT:  Yes.  So he was hungry for information but not that hungry.

MS. GINSBERG:  Judge, there is one -- we had objected -- we didn't file an objection but we raised an objection with the Government when they filed one of their

pleadings in which statements from the DoD interviews were referenced.  There was an exhibit comparing some of the DoD statements with the declaration that was originally filed under seal.

It's our position that because those were intelligence interviews that are not admissible in the Government's case-in-chief, that making a public record --

THE COURT:  We don't know that and I don't think it matters whether they're DoD documents, and whether -- you discuss this with Mr. Parekh, and if you-all can agree that that remains under seal, otherwise, I'm going to put it in the public record.

MS. GINSBERG:  I understand.  But I think the Government agrees that they are not going to use those and there's a real danger of contaminating the jury pool.

THE COURT:  Well, you can make that point and you can tell me why you think that's necessary and I'll look at it.

This is, I take it, Ms. Ginsberg, where there are contradictions between your client's statements in his declaration and other facts?

MS. GINSBERG:  Well, as the Government reads them, yes, that's correct, Your Honor.  We don't necessarily agree that he was asked about certain things.

THE COURT:  Of course not.  I'm sure that, as every defense attorney, your client is an honest man.  And we'll see

what the jury thinks.

MS. GINSBERG:  Yes, sir.

THE COURT:  And, of course, I'll make a determination as well in connection with the motion to suppress.

MS. GINSBERG:  Yes, I understand, Your Honor.

THE COURT:  All right.  Anything further one more time, Mr. Parekh?

MR. PAREKH:  No, Your Honor.  In addition to what you stated, it's the booking statements motion as well.

THE COURT:  It's the what?

MR. PAREKH:  There's a booking statements motion where we're seeking to elicit in our case-in-chief the defendant's false statements when he was meeting with DoD.  And Your Honor heard testimony about that on Day One.

THE COURT:  Has that been fully briefed?

MR. PAREKH:  That's been fully briefed as well, Your Honor.

THE COURT:  I'll decide that.

MR. PAREKH:  Thank you.

MR. MACMAHON:  Nothing for the defense, Your Honor.

THE COURT:  Good statement, Mr. MacMahon.

MR. MACMAHON:  I try.

THE COURT:  In that you succeed.  Court stands in recess until 8:30 tomorrow morning.

(Off the record at 7:16 p.m.)

**CERTIFICATE OF OFFICIAL COURT REPORTER**


        I, Rebecca Stonestreet, certify that the foregoing is a

correct transcript from the record of proceedings in the

above-entitled matter.




___//Rebecca Stonestreet//___                    ___12/6/21__

SIGNATURE OF COURT REPORTER                      DATE


*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*